# Exhibit 15

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2023**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE TRANSITION PERIOD FROM                TO**

**Commission File Number 001-38663**

# Gritstone bio, Inc.

**(Exact name of Registrant as specified in its Charter)**

| | |
|---|---|
| **Delaware** | **47-4859534** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **5959 Horton Street, Suite 300** | |
| **Emeryville, CA** | **94608** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**(510) 871-6100**

**Registrant's telephone number, including area code**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.0001 par value per share | GRTS | The Nasdaq Stock Market LLC |

**Securities Registered Pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. YES ☐ NO ☒

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. YES ☐ NO ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. YES ☒ NO ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). YES ☒ NO ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the Registrant has filed a report on and attestation to its management assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). YES ☐ NO ☒

The aggregate market value of the common stock of the registrant held by non-affiliates as of June 30, 2023 (the last business day of the registrant's most recently completed second fiscal quarter) was approximately $173.7 million, based on the closing price of the registrant's common stock, as reported by the Nasdaq Stock Market LLC on June 30, 2023 of $1.95 per share. Shares of the registrant's common stock held by each executive officer, director, and holder of 5% or more of the outstanding common stock have been excluded in that such persons may deemed to be affiliates of the registrant. This calculation does not reflect a determination that certain persons are affiliates of the registrant for any other purpose. Further information concerning the security holdings of the registrant's executive officers, directors and principal stockholders is included or incorporated by reference in Part III, Item 12 of this Annual Report on Form 10-K.

The number of shares of Registrant's Common Stock outstanding as of March 1, 2024 was 98,065,594.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's definitive Proxy Statement relating to the 2024 Annual Meeting of Shareholders are incorporated by reference into Part III of this Annual Report on Form 10-K where so indicated herein. Such definitive Proxy Statement will be filed with the Securities and Exchange Commission within 120 days after the fiscal year to which this report relates. Except with respect to information specifically incorporated by reference in this Annual Report on Form 10-K, the Proxy Statement shall not be deemed to be filed as part hereof.

# PART I

## Note Regarding Forward-Looking Statements

This Annual Report on Form 10-K, including "Business" in Part I Item I and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II Item 7, contains "forward-looking statements" within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended (Exchange Act). All statements included in this Annual Report on Form 10-K other than statements of historical fact are statements that could be deemed forward-looking statements. In some cases, you can identify forward-looking statements by terminology such as "aim," "anticipate," "assume," "believe," "contemplate," "continue," "could," "due," "estimate," "expect," "goal," "intend," "may," "objective," "plan," "predict," "potential," "positioned," "seek," "should," "target," "will," "would" and other similar expressions that are predictions of or indicate future events and future trends, or the negative of these terms or other comparable terminology. These forward-looking statements include, but are not limited to, statements about:

- the sufficiency of our capital resources and timing of our cash runway, as well as our actual needs for additional financing and our ability to obtain additional capital on terms that are attractive to us, if at all;

- our clinical and regulatory development plans for our product candidates;

- our expectations regarding the potential market size and size of the potential patient populations for our product candidates, in particular those within the GRANITE®, SLATE® and CORAL programs, and any future product candidates with limited patient populations, if approved for commercial use;

- our expectations regarding the data to be derived in our ongoing and planned clinical trials including, in particular, our expectations for the size and design of our planned clinical trials, timing of commencement and initiation of our trials and the timing of the availability of data from such trials;

- our expectations regarding our Gritstone EDGE™ artificial intelligence and vaccine platforms, including our ability to utilize (i) our Gritstone EDGE™ platform to predict the tumor-specific neoantigens that will be presented on a patient's tumor cells and identify highly conserved T cell epitopes for durable protection for infectious diseases and (ii) our vaccine platform to deliver selected antigens to the patient's immune system to drive the destruction of tumors or virally-infected cells;

- the timing of commencement of our future nonclinical studies, clinical trials and research and development programs;

- our ability to discover, develop and advance product candidates into, and successfully complete, clinical trials;

- our plans and strategy regarding maintaining existing and entering into new collaborations and/or partnerships;

- the timing or likelihood of regulatory filings and approvals for our product candidates;

- the pricing and reimbursement of our product candidates, if approved;

- our expectations with respect to the commercialization, marketing and manufacturing of our product candidates;

- the implementation of our business model and strategic plans for our business, product candidates and technology platforms, including additional indications for which we may pursue;

- the scope of protection we are able to establish and maintain for intellectual property rights covering our product candidates, including the projected terms of patent protection;

- our expectations regarding the impact of the COVID-19 pandemic on our operations and our ability to manage such impact;

- the accuracy of our estimates of our expenses, future revenue and capital requirements;

- our future financial performance;

- developments and projections relating to our competitors and our industry, including the success of competing therapies that are or may become available; and

- our ability to attract and retain key management and technical personnel.

These statements relate to future events or to our future financial performance and involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. Factors that may cause actual results to differ materially from current expectations include, among other things, those listed under "*Item 1A. Risk Factors*" and elsewhere in this Annual Report on Form 10-K. Any forward-looking statement in this Annual Report on Form 10-K reflects our current views with

respect to future events as of the date of this Annual Report on Form 10-K and is subject to these and other risks, uncertainties and assumptions relating to our operations, results of operations, industry and future growth. Given these uncertainties, you should not place undue reliance on these forward-looking statements. Except as required by law, we assume no obligation to update or revise these forward-looking statements for any reason, even if new information becomes available in the future.

This Annual Report on Form 10-K also contains estimates, projections and other information concerning our industry, our business and the markets for our product candidates, including data regarding the estimated patient population and market size for our product candidates, as well as data regarding market research, estimates and forecasts prepared by our management. Information that is based on estimates, forecasts, projections or similar methodologies is inherently subject to uncertainties, and actual events or circumstances may differ materially from events and circumstances reflected in this information. Unless otherwise expressly stated, we obtained this industry, business, market and other data from reports, research surveys, studies and similar data prepared by third parties, industry, medical and general publications, government data and similar sources. In some cases, we do not expressly refer to the sources from which this data are derived. In that regard, when we refer to one or more sources of this type of data in any paragraph, you should assume that other data of this type appearing in the same paragraph are derived from the same sources, unless otherwise expressly stated or the context otherwise requires.

In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based upon information available to us as of the date of this Annual Report on Form 10-K, and while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all relevant information. These statements are inherently uncertain and investors are cautioned not to unduly rely upon these statements.

**Note Regarding Company References**

Unless the context otherwise requires, the terms "Gritstone," "the Company," "we," "us," and "our" in this Annual Report on Form 10-K refer to Gritstone bio, Inc. and its subsidiary.

2

Melinda Gates Foundation, the Coalition for Epidemic Preparedness Innovation ("CEPI") and the National Institute of Allergy and Infectious Diseases ("NIAID").

In addition to advancing a potential next-generation vaccine against COVID-19, our CORAL program is intended to serve as proof of concept for applying our infectious disease approach (driving both B cell and T cell responses using samRNA) for the prevention and treatment of various infectious diseases.

*HIV Vaccine in Collaboration with Gilead Sciences, Inc.*

In January 2021, we entered into a collaboration, option and license agreement with Gilead to research and develop a vaccine-based immunotherapy for HIV. Together, we aim to develop an HIV-specific therapeutic vaccine using our proprietary prime-boost vaccine platform, comprised of samRNA and adenoviral vectors, with antigens developed by Gilead. Under the terms of the agreement, Gilead invested $60.0 million, consisting of a $30.0 million upfront cash payment and a $30.0 million equity investment at the closing. Gilead is responsible for conducting a Phase 1 clinical trial for the HIV-specific therapeutic vaccine and holds an exclusive option under the collaboration to obtain an exclusive license to develop and commercialize the HIV-specific therapeutic vaccine beyond the Phase 1 clinical trial. We are also eligible to receive up to an additional $725.0 million if the option is exercised and if certain clinical, regulatory and commercial milestones are achieved, as well as mid-single-digit to low double-digit tiered royalties on net sales upon commercialization. The HIV program is currently in Phase 1.

### Preclinical Research

Beyond GRANITE, SLATE, CORAL and the HIV collaboration with Gilead, we continue to apply our broad set of capabilities in oncology and infectious diseases through promising preclinical work and partnerships. These projects include development of an optimal immunogen in the context of human papillomavirus (HPV) that is supported by the Gates Foundation. We are also researching the development of an influenza (flu) vaccine and a new combination respiratory vaccine candidate against multiple respiratory viruses.

### New Developments

On February 12, 2024, we announced that we are preparing to launch the Phase 2b trial of our next-generation COVID-19 vaccine supported by BARDA in the Fall of 2024 rather than first quarter of 2024. This is to allow use of GMP-grade raw materials in our samRNA vaccine, which is expected to increase the regulatory utility of the trial. This decision was made following communications with the FDA.

On February 29, 2024, we announced an approximately 40% reduction of our workforce. The move followed the recently announced delay of the proposed Phase 2b CORAL Study, which resulted in Gritstone not receiving external funding it previously anticipated beginning in 1Q 2024, associated with the initiation of the study. The reduction primarily impacted our employees within vaccine manufacturing and clinical infectious disease operations.

### License and Collaborations

### NCI Clinical Trial Collaboration

In January 2023, we entered into a clinical trial agreement with the National Cancer Institute ("NCI") to evaluate an autologous T cell therapy expressing a T cell receptor targeting mutated KRAS in combination with Gritstone's KRAS-directed vaccine candidate, SLATE-KRAS in a Phase 1 study. An IND to run the Phase 1 study was cleared by the U.S. Food and Drug Administration (FDA) in October 2023. This collaboration remains ongoing.

### *HIV Vaccine in Collaboration with Gilead Sciences, Inc.*

In January 2021, we entered into a collaboration, option and license agreement with Gilead to research and develop a vaccine-based immunotherapy for HIV. Together, we aim to develop an HIV-specific therapeutic vaccine using our proprietary prime-boost vaccine platform, comprised of samRNA and adenoviral vectors, with antigens developed by Gilead. Under the terms of the agreement, Gilead invested $60.0 million, consisting of a $30.0 million upfront cash payment and a $30.0 million equity investment at the closing. Gilead is responsible for conducting a Phase 1 study for the HIV-specific therapeutic vaccine and holds an exclusive option under the collaboration to obtain an exclusive license to develop and commercialize the HIV-specific therapeutic vaccine beyond Phase 1. We are also eligible to receive up to an additional $725.0 million if the option is exercised and if certain clinical, regulatory and commercial

*Clinical Regulatory*

In our SLATE Pre-IND communication with OTAT the FDA previewed Clinical Protocol NCT03953235, GO-005 and confirmed that the overall design appeared reasonable, but requested we add language to clarify our proposed dose escalation and stopping rules. The FDA had additional questions on our proposed Next Generation Sequencing method to screen patients for their HLA type and communicated that this novel method may be viewed as a companion diagnostic.

*Regulatory Chemistry, Manufacturing & Controls*

Much of the manufacturing process contained in SLATE was similar to that used in the GRANITE IND, therefore, the FDA's pre-IND feedback focused primarily on the quality of the reagents, drug product characterization and release, and ongoing stability requests. The FDA inquired on the status of certain research-grade reagents and reminded us of the need to progress to GMP grade materials in the manufacture drug product by the time of BLA approval and commercial licensure. In order to retain consistency in the manufactured drug product across SLATE batches, we were asked to amend the specification of certain release assays' criteria and continue the development of quantitative potency assays for the ChAd and samRNA products prior to approval, and we were asked to summarize our QC plan to prevent, detect, and correct deficiencies that may compromise product integrity or function, or that may lead to the possible transmission of adventitious infectious agents. Additionally, the FDA provided feedback on the proposed method for qualifying Gritstone's proposed accelerated adventitious agent release assay.

*SLATE Regulatory Milestones*

The FDA allowed our IND for SLATE to proceed in June 2019.

**CORAL Development Program**

A pre-IND interaction with the FDA was conducted to review the proposed clinical investigation of ChAd vectors encoding the SARS-CoV-2 and CD8+ T-cell epitope spike antigen sequences in normal healthy subjects. The FDA concluded that the overall manufacturing and release testing for the CORAL vaccines candidates, which is similar to the GRANITE/SLATE process, appeared acceptable and requested detail on the transfection process, grade of materials, and release tests be submitted in the IND. We also received feedback that pre-clinical pharmacokinetic, and toxicology studies conducted in support of the GRANITE IND could be used to support the safety information needed to initiate the SARS-CoV-2 clinical study, and that additional animal immune response pharmacodynamic data would be submitted within the IND. The FDA previewed the proposed clinical protocol, confirmed that the overall design appeared reasonable and requested we include language to clarify dose escalation, stopping rules and a sentinel arm. The FDA requested that we exclude those subjects who are being treated with COVID-19 investigational agents or who have a high risk of potential exposure to SARS-CoV-2.

*CORAL Regulatory Milestones*

In March 2021, the FDA acknowledged our biologics master file which provides CMC and non-clinical sections support of NIH's IND to study CORAL program candidates in previously vaccinated healthy volunteers.

In August 2021, the MHRA provided a notice of acceptance for our CTA to initiate a clinical study of certain CORAL program candidates to boost vaccinate healthy volunteers >60 years in the UK.

In December 2021, the MHRA provided a notice of acceptance for our CTA to initiate a clinical study of certain CORAL program candidates in previously vaccinated B-cell deficient subjects in the UK.

South Africa's SAHPRA provided a notice of acceptance for our CTA to initiate a clinical study to test certain CORAL program candidates in COVID-19 naïve, convalescent, and HIV subjects in South Africa.

In July 2022, Gritstone held a Scientific Advice meeting with the MHRA to discuss the importance of cellular immunity for the development of a COVID vaccine. The MHRA agreed that in principle, T cells could be important for protection against viral infection. The MHRA also acknowledged that T cell responses to non-spike epitopes may create an advantage for protection against new variants and potentially increase durability. The MHRA also agreed that T cell data may be included in the summary of product characteristics.

In November 2023, we submitted an IND application to the FDA for our Phase 2b CORAL Study designed to evaluate our next-generation CORAL vaccine candidate against COVID-19. In December 2023, we were notified by the FDA that our Phase 2b CORAL Study had been placed on clinical hold. In January 2024, we received the formal clinical hold letter from the FDA, identifying certain

37

CMC and clinical deficiencies. The FDA informed us that, among other changes, we will be required to use GMP-grade materials in the manufacture of the vaccine as well as implement minor changes in the clinical trial protocol. We are working on preparing a complete response to the FDA's letter in an effort to remove the clinical hold from our IND application. This includes re-manufacturing our CORAL vaccine candidate to be used in the Phase 2b CORAL Study with GMP-grade materials.

## Financial Information About Segments

We manage our operations as a single reportable segment for the purposes of assessing performance and making operating decisions. See "*Note 2. Summary of Significant Accounting Policies*" in the notes to the consolidated financial statements included elsewhere in this Annual Report on Form 10-K.

## Employees

As a mission-driven organization, we value and foster a culture of collaboration, discovery and passion, which is reflected in our hiring and retention strategies. We employ talented individuals who have the skills and expertise to meet the challenges of our mission, and we recognize that our employees are key to our success. Our human capital objectives include hiring goals set to provide us with necessary expertise, integrating new employees, and retaining, incentivizing and developing our existing employees.

As of December 31, 2023, we had 231 full-time employees, including a total of 54 employees with M.D. or Ph.D. degrees. Within our workforce, 98 employees are engaged in research and development, 78 in manufacturing and quality, and 55 are engaged in business development, finance, legal, human resources, facilities, information technology and general management and administration. None of our employees are represented by labor unions or covered by collective bargaining agreements. We consider our relationship with our employees to be good.

## Corporate Information

We were founded in August 2015 as a Delaware corporation. In May 2021, we changed our name from Gritstone Oncology, Inc. to Gritstone bio, Inc. Our principal executive offices are located at 5959 Horton Street, Suite 300, Emeryville, California 94608, and our telephone number is (510) 871-6100. Our website address is www.gritstonebio.com. The information on, or that can be accessed through, our website is not part of this Annual Report on Form 10-K and is not incorporated by reference herein. We have included our website address as an inactive textual reference only. We also use our website as a means of disclosing material non-public information and for complying with our disclosure obligations under Regulation FD.

We file electronically with the Securities and Exchange Commission (SEC) our annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K pursuant to Section 13(a) or 15(d) of the Exchange Act. We make available on our website at www.gritstonebio.com, free of charge, copies of these reports, as soon as reasonably practicable after we electronically file such material with, or furnish it to, the SEC. The SEC maintains a website that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC. The address of that website is www.sec.gov. The information in or accessible through the SEC and our website or social media sites does not constitute part of this Annual Report on Form 10-K or any other report or document we file with the SEC, and any references to our website and social media sites are intended to be inactive textual references only.

We use Gritstone bio, Inc.®, the Gritstone bio logo, and other marks as trademarks, including, in particular, EDGE™, in the United States and other countries. This Annual Report on Form 10-K contains references to our trademarks and service marks and to those belonging to other entities. Solely for convenience, trademarks and trade names referred to in this Annual Report on Form 10-K, including logos, artwork and other visual displays, may appear without the ® or ™ symbols, but such references are not intended to indicate in any way that we will not assert, to the fullest extent under applicable law, our rights or the rights of the applicable licensor to these trademarks and trade names. We do not intend our use or display of other entities' trade names, trademarks or service marks to imply a relationship with, or endorsement or sponsorship of us by any other entity.

## Item 1A. Risk Factors.

*Investing in our common stock involves a high degree of risk. You should carefully consider the risks described below, as well as the other information in this Annual Report on Form 10-K, including our consolidated financial statements and the related notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations," and the information contained in our other public filings before deciding whether to invest in our common stock. The occurrence of any of the events or developments described below could have a material adverse effect on our business, results of operations, financial condition, prospects and stock*

our application and on what terms.  The RRPV Request for Project Proposals included the potential to begin a Phase 2b study by March 31, 2024, or at BARDA's discretion by October 1, 2024, to align with the Fall 2024 COVID-19 strain change.

Our ability to receive any of the initially identified $423.0 million in additional funding provided for under the BARDA Contract is dependent on BARDA electing to continue to fund additional two gated stages or the RRPV Consortium accepting our application, which would occur only at BARDA's direction and its sole discretion. The base period for performance under the BARDA Contract is currently scheduled to run from September 2023 to March 31, 2024, though BARDA may grant a no-cost extension to the base period to allow for regulatory negotiations to continue. The option periods for the two additional gated stages under the BARDA Contract were scheduled to run from January 2024 to March 2026 and from July 2024 to July 2026. These periods of performance may be adjusted if Gritstone's RRPV application is accepted.

As a standard government contract, BARDA is entitled to terminate the BARDA Contract for convenience at any time, in whole or in part, and is not required to provide continued funding beyond reimbursement of amounts currently incurred and obligated by us as a result of contract performance. In addition, activities covered under the base period may ultimately cost more than is covered by the BARDA Contract and may require a longer performance period to complete than is remaining under the terms of the BARDA Contract. BARDA is not required to provide funding above the approximately $10.0 million currently obligated for the base period of the BARDA Contract, nor is BARDA required to extend the base period of performance or elect to pursue any of the gated stages. As noted in Note 7 to the consolidated financial statements, we received $9.0 million of the $10.0 million obligated by December 31, 2023. If activities covered under the base period cost us more than the approximately $10.0 million currently obligated for the base period under the BARDA Contract, and we are unable to secure additional funding from BARDA to complete performance of the base period activities, we would have to bear the cost to complete the activities. Further, if we are unable to complete the base period activities during the base period due to circumstances that may be either within or outside of our control, including, among others, any potential delays in sourcing an approved comparator vaccine, and BARDA is unwilling to allow for additional time, then BARDA may decide to terminate the BARDA Contract or deny the application to the RRPV Consortium.

Moreover, the continuation of the BARDA Contract or receipt of a new award administered by the RRPV Consortium for the effort intended for the BARDA Contract option periods would primarily depend on our ability to initiate a Phase 2b study within BARDA's timeline and on our compliance with certain operating procedures and protocols, assuming federal funds remain available.

Further, as an organization, we are relatively new to government contracting and the related regulatory compliance obligations, and are continuing to develop and implement our internal compliance processes. BARDA may suspend or terminate the BARDA Contract, opt not to exercise the remaining option periods, or deny the application to the RRPV Consortium should we fail to achieve key milestones or fail to comply with the operating procedures and processes approved by BARDA and its audit agency. There can be no assurance that we will be able to achieve these milestones or continue to comply with these procedures and protocols, and there can also be no assurance that the BARDA Contract will not be terminated, that the BARDA Contract will be extended through the exercise of the gating periods, that any such extensions would be on terms favorable to us, or that we will otherwise obtain the funding that we anticipate to obtain under the BARDA Contract or an award from the RRPV Consortium. The availability and focus for any BARDA funding will likely be finite and may require us to compete with other technologies, both similar and disparate. If the BARDA Contract is terminated or suspended, if there is any reduction or delay in funding under the BARDA Contract, or if BARDA determines not to elect to pursue any of the gated stages under the BARDA Contract or select Gritstone for a new award administered by the RRPV Consortium, our revenues and cash flows would be significantly and negatively impacted and we may be forced to seek alternative sources of funding, which may not be available on non-dilutive terms, terms favorable to us or at all. If alternative sources of funding are not available, we may be forced to suspend or terminate development activities for our next-generation self-amplifying mRNA vaccine candidate containing Spike plus other viral targets to protect against COVID-19, which could materially harm our business.

***It may take considerable time and expense to resolve the clinical hold that has been placed by the FDA on our Phase 2b CORAL trial we proposed in our IND for our CORAL COVID-19 vaccine product candidate and no assurance can be given that the FDA will remove the clinical hold, in which case our business and financial prospects may be materially adversely affected.***

In December 2023, we were notified by the FDA that our Phase 2b CORAL Study had been placed on clinical hold. In January 2024, we received the formal clinical hold letter from the FDA, identifying certain CMC and clinical deficiencies. The FDA informed us that, among other changes, we will be required to use GMP-grade materials in the manufacture of the vaccine as well as implement minor changes in the clinical study protocol. We are working on preparing a complete response to the FDA's letter in an effort to remove the clinical hold from our IND application.  This includes re-manufacturing our CORAL vaccine candidate to be used in the Phase 2b CORAL Study with GMP-grade materials.

If the FDA does not accept the responses we plan to provide, it may take a further considerable period of time, the length of which is not certain at this time, and additional expense for us to fully address the FDA's concerns. It is possible that we will be unable

to fully address the FDA's concerns and, as a result, that the clinical hold may never be lifted and we may never be able to initiate our Phase 2b CORAL Study in the United States, which could have a material adverse effect on our business, financial condition, results of operations and prospects.

***Our tumor-specific cancer immunotherapy approach is based on novel ideas and technologies that are unproven and may not result in marketable products, which exposes us to unforeseen risks and makes it difficult for us to predict the time and cost of product development and potential for regulatory approval.***

Regarding our tumor-specific cancer immunotherapies, our foundational science and product development approach are based on our ability to predict the presence of a patient's TSNA and develop a TSNA-directed therapy that will elicit a meaningful T cell response. We believe that this approach may offer an improved therapeutic effect by driving an intense, focused T cell attack selectively upon a patient's tumor. However, this approach to treating cancer is novel and the scientific research that forms the basis of our efforts to predict the presence of TSNA and to develop TSNA-directed cancer immunotherapy candidates is both preliminary and limited. The results of our preclinical animal studies may not translate into humans. For example, our prediction model may fail to accurately predict the presence of TSNA, resulting in little or no tumor-targeted T cell response, or our therapy may fail to elicit a significant or durable enough T cell response to effectively destroy a tumor. As such, we cannot assure you, even if we are able to develop individualized cancer immunotherapy candidates capable of recognizing TSNA and eliciting a T cell response, that such therapy would safely and effectively treat cancers. We may spend substantial funds attempting to develop this approach and never succeed in developing a marketable therapeutic.

No regulatory authority has granted approval for a cancer immunotherapy based on a heterologous prime-boost approach, which may increase the complexity, uncertainty and length of the regulatory approval process for our product candidates. We may never receive approval to market and commercialize any product candidate. Even if we obtain regulatory approval, the approval may be for targets, disease indications, lines of therapy or patient populations that are not as broad as we intended or desired or may require labeling that includes significant use or distribution restrictions or safety warnings. We may be required to perform additional or unanticipated clinical trials to obtain approval or be subject to post-marketing testing requirements to maintain regulatory approval. If our personalized immunotherapy candidates prove to be ineffective, unsafe or commercially unviable, our entire technology platform and pipeline would have little, if any, value, which would have a material adverse effect on our business, financial condition, results of operations and prospects.

The regulatory approval process and clinical trial requirements for novel product candidates can be more expensive and take longer than for other, better known or more extensively studied product candidates, and we cannot predict how long it will take or how much it will cost to complete clinical developments and obtain regulatory approvals for a cell therapy product candidate in the United States or how long it will take to commercialize a product candidate, if and when approved. Regulatory requirements governing cell therapy products have changed frequently and may continue to change in the future. For example, the FDA established the Office of Tissues and Advanced Therapies (OTAT) within its Center for Biologics Evaluation and Research, or CBER, to consolidate the review of cell therapies and related products, and the Cellular, Tissue and Gene Therapies Advisory Committee to advise CBER on its review. OTAT was subsequently reorganized to become the Office of Therapeutic Products (OTP) and transitioned into a super office structure. New offices created within the super office structure align disciplines and product types, allowing our workforce to address the exponential growth in cell and gene therapies. This updated structure will enable OTP to provide oversight and coordination across programs, ensure flexibility for current and future growth in staff, distribute workload more evenly, support industry needs and commitments, enhance expertise in highly specialized disciplines.  These and other regulatory review agencies, committees and advisory groups and the requirements and guidelines they promulgate, may lengthen the regulatory review process, require us to perform additional preclinical studies or clinical trials, increase our development costs, lead to changes in regulatory positions and interpretations, delay or prevent approval and commercialization of these treatment candidates or lead to significant post-approval limitations or restrictions. Additionally, under the NIH Guidelines, supervision of human gene transfer trials includes evaluation and assessment by an IBC, a local institutional committee that reviews and oversees research utilizing recombinant or synthetic nucleic acid molecules at that institution. The IBC assesses the safety of the research and identifies any potential risk to public health or the environment, and such review may result in some delay before initiation of a clinical trial. While the NIH Guidelines are not mandatory unless the research in question is being conducted at or sponsored by institutions receiving NIH funding of recombinant or synthetic nucleic acid molecule research, many companies and other institutions not otherwise subject to the NIH Guidelines voluntarily follow them.

Even if our product candidates obtain required regulatory approvals, such approvals may later be withdrawn as a result of changes in regulations or the interpretation of regulations by applicable regulatory agencies. Additionally, adverse developments in clinical trials conducted by others of cell therapy products or products created using similar technology, or adverse public perception of the field of cell therapies editing, may cause the FDA and other regulatory bodies to revise the requirements for approval of any product candidates we may develop or limit the use of products utilizing technologies such as ours, either of which could materially harm our business. As we advance our product candidates, we will be required to consult with various regulatory authorities, and we must comply with applicable laws, rules and regulations, which may change from time to time, including during the course of development of our

49

**Gritstone bio, Inc.**
**Notes to Consolidated Financial Statements**

**December 31, 2023**

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized**.**

GRITSTONE BIO, INC.

Date: March 5, 2024

By:   /s/ Andrew Allen
Andrew Allen, M.D., Ph.D.
President and Chief Executive Officer
(Principal Executive Officer)

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints each of Andrew Allen and Vassiliki Economides his or her true and lawful attorney-in-fact and agent, with full power of substitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the U.S. Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming that all said attorneys-in-fact and agents, or their, his or her substitutes or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this Report has been signed below by the following persons on behalf of the Registrant in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ Andrew Allen<br>Andrew Allen, M.D., Ph.D. | President, Chief Executive Officer and Director<br>(Principal Executive Officer) | March 5, 2024 |
| /s/ Vassiliki "Celia" Economides<br>Vassiliki "Celia" Economides | Chief Financial Officer<br>(Principal Financial Officer) | March 5, 2024 |
| /s/ James Cho<br>James Cho | Chief Accounting Officer<br>(Principal Accounting Officer) | March 5, 2024 |
| /s/ Elaine Jones<br>Elaine Jones, Ph.D. | Chairperson of our Board of Directors | March 5, 2024 |
| /s/ Clare Fisher<br>Clare Fisher | Director | March 5, 2024 |
| /s/ Steve Krognes<br>Steve Krognes | Director | March 5, 2024 |
| /s/ Naiyer A. Rizvi<br>Naiyer A. Rizvi, M.D. | Director | March 5, 2024 |
| /s/ Lawrence Corey<br>Lawrence Corey, M.D. | Director | March 5, 2024 |
| /s/ Shefali Agarwal<br>Shefali Agarwal, M.D., M.P.H. | Director | March 5, 2024 |

153