POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Lead Plaintiff Richard*
*Rodriguez and Lead Counsel for the*
*Class*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE GRITSTONE BIO, INC. SECURITIES LITIGATION<br><br>THIS DOCUMENT RELATES TO: ALL ACTIONS | Case No.: 3:24-cv-03640-CRB<br><br>**PLAINTIFFS' OPPSOTION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT**<br><br><u>CLASS ACTION</u><br><br>Judge:  Hon. Charles R. Breyer |

## **TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ....................................................................................1

II.   STATEMENT OF FACTS ........................................................................................3

    A.    Defendants Lie About Gritstone's cGMP Manufacturing Capabilities. ...................3

    B.    Gritstone's Success Hinges On Its BARDA-CORAL Phase II Trial. .....................3

    C.    Defendants Mislead Investors About the BARDA-CORAL Phase II Trial. ...........4

    D.    The Truth Beings To Emerge, and Gritstone Goes Bankrupt..................................5

III.  ARGUMENT ..........................................................................................................6

    A.    The AC Pleads Actionable False and Misleading Statements and Omissions. ........6

        1.    Defendants Mislead Investors About Gritstone's cGMP Manufacturing Capabilities. ......................................................................................6

        2.    Defendants Mislead Investors About Gritstone's BARDA-Funded Trial for CORAL's Phase II Vaccine Program.......................................................9

            a.    Statements Touting the BARDA Collaboration Were Misleading.................................................................................9

            b.    Statements Touting CORAL Phase II's Timeline Were Misleading...............................................................................10

            c.    Statements Touting Gritstone's Cash Runway Were Misleading...............................................................................15

    B.    The AC Pleads A Strong Inference of Defendants' Scienter................................16

        1.    Defendants Were in Possession of Contemporaneous, Contradictory Information. ....................................................................................16

        2.    Success of the CORAL Phase II Rollout Was Critical To The    Company's Survival. ...........................................................................................21

        3.    Defendants' Motive Supports Scienter. .......................................................22

    C.    Plaintiffs Adequately Allege Claims Against Defendant CFO Economides..........23

IV.   CONCLUSION......................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                               **Page(s)**

*Abdo v. Fitzsimmons*,
  2018 WL 11220494 (N.D. Cal. May 22, 2018) ..................................................................24

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002) ..............................................................................................23

*Axonic Cap. LLC v. Gateway One Lending & Fin.*,
  2019 WL 4138024 (C.D. Cal. May 22, 2019) ..................................................................16

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) .................................................................................6, 9, 19

*Borteanu v. Nikola Corp.*,
  2023 WL 11017679 (D. Ariz. Dec. 8, 2023) ....................................................................24

*Cisneros v. Allianz Life*,
  2019 WL 9656383 (N.D. Cal. Dec. 2, 2019) ....................................................................25

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
  880 F.Supp.2d 1045 (N.D. Cal. 2012) ..............................................................................14

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
  527 F.Supp.3d 1151 (N.D. Cal. 2021) ..............................................................................23

*Cullen v. RYVYL Inc.*,
  2024 WL 898206 (S.D. Cal. Mar. 1, 2024) ......................................................................21

*E. Öhman J:or Fonder AB v. NVIDIA Corp.*,
  81 F.4th 918 (9th Cir. 2023) ..........................................................................6, 10, 17, 18

*Flynn v. Sientra, Inc.*,
  2016 WL 3360676 (C.D. Cal. June 9, 2016) ....................................................14, 15, 21, 22

*Gammel v. Hewlett-Packard Co.*,
  2013 WL 1947525 (C.D. Cal. May 8, 2013) ..............................................................22, 23

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) ............................................................................................18

*Gov't of Guam Ret. Fund v. Invacare Corp.*,
  2014 WL 4064256 (N.D. Ohio Aug. 18, 2014)................................................................20

*Hampton v. Aqua Metals, Inc.*,
2020 WL 6710096 (N.D. Cal. Nov. 16, 2020) ...................................................................24

*Hatamian v. Advanced Micro Devices*,
87 F.Supp.3d 1149 (N.D. Cal. 2015) ...................................................................................8

*Hefler v. Wells Fargo & Co.*,
2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) ...................................................................24

*Hershewe v. JOYY Inc.*,
2022 WL 1123208 (C.D. Cal. Mar. 9, 2022)......................................................................11

*Immanuel Lake v. Zogenix, Inc.*,
2020 WL 3820424 (N.D. Cal. Jan. 27, 2020) .....................................................................13

*In re Accuray, Inc. Sec. Litig.*,
757 F.Supp.2d 936 (N.D. Cal. 2010) ..................................................................................18

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ................................................................................................14

*In re Amgen Inc. Sec. Litig.*,
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)................................................................16, 22

*In re Ariad Pharms., Inc. Sec. Litig.*,
842 F.3d 744 (1st Cir. 2016)...............................................................................................12

*In re Axsome Theraps., Inc. Sec. Litig.*,
2025 WL 965265 (S.D.N.Y. Mar. 31, 2025) .........................................8, 9, 10, 12, 13, 14, 17

*In re BofI Holding, Inc. Sec. Litig.*,
2016 WL 5390533 (S.D. Cal. Sept. 27, 2016) ....................................................................17

*In re Cabletron Sys., Inc.*,
311 F.3d 11 (1st Cir. 2002)..................................................................................................23

*In re Cannavest Corp. Sec. Litig.*,
307 F.Supp.3d 222 (S.D.N.Y. 2018)....................................................................................25

*In re Convergent Techs. Sec. Litig.*,
948 F.2d 507 (9th Cir. 1991) ..............................................................................................14

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) ............................................................................................14

*In re Delcath Sys., Inc. Sec. Litig.*,
36 F.Supp.3d 320 (S.D.N.Y. 2014)......................................................................................17

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

*In re Emergent BioSolutions Inc. Sec. Litig.*,
2023 WL 5671608 (D. Md. Sept. 1, 2023) ...............................................................7, 12, 17, 20

*In re Facebook, Inc. Sec. Litig.*,
87 F.4th 934 (9th Cir. 2023) .......................................................................................14

*In re Fannie Mae 2008 Sec. Litig.*,
891 F.Supp.2d 458 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 16 (2d Cir. 2013) .........................24

*In re Genius Brand Int'l, Inc. Sec. Litig.*,
97 F.4th 1171 (9th Cir. 2024) ......................................................................................25

*In re Immune Response Sec. Litig.*,
375 F.Supp.2d 983 (S.D. Cal. 2005)..............................................................................16

*In re Innocoll Holdings Pub. Ltd. Sec. Litig.*,
2020 WL 1479128 (E.D. Pa. Mar. 25, 2020)....................................................................23

*In re Insys Theraps., Inc. Sec. Litig.*,
2018 WL 2943746 (S.D.N.Y. June 12, 2018) ...................................................................23

*In re LDK Solar Sec. Litig.*,
2008 WL 4369987 (N.D. Cal. Sept. 24, 2008) ..................................................................24

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
982 F.Supp.2d 277 (S.D.N.Y. 2013)...............................................................................15

*In re Network Assocs., Inc., Sec. Litig.*,
2000 WL 33376577 (N.D. Cal. Sept. 5, 2000) ..................................................................18

*In re Nuvelo, Inc., Sec. Litig.*,
2008 WL 5114325 (N.D. Cal. Dec. 4, 2008).....................................................................14

*In re Nuvelo, Inc., Sec. Litig.*,
668 F.Supp.2d 1217 (N.D. Cal. 2009) .............................................................................21

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) ........................................................................................16

*In re Paypal Holdings, Inc. S'holder Derivative Litig.*,
No. 17-CV-00162-RS, 2018 WL 466527 (N.D. Cal. Jan. 18, 2018).........................................7

*In re Pivotal Sec. Litig.*,
2020 WL 4193384 (N.D. Cal. July 21, 2020).....................................................................14

*In re PTC Theraps. Inc. Sec. Litig.*,
2017 WL 3705801 (D.N.J. Aug. 28, 2017) .......................................................................19

*In re Rigel Pharms., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) .........................................................................13

*In re Rocket Fuel, Inc. Sec. Litig.*,
  2015 WL 9311921 (N.D. Cal. Dec. 23, 2015) ...............................................24

*In re Sepracor, Inc. Sec. Litig.*,
  308 F.Supp.2d 20 (D. Mass. 2004) ................................................................23

*In re Splunk Inc. Sec. Litig.*,
  592 F.Supp.3d 919 (N.D. Cal. 2022) .......................................................16, 23

*In re SunPower Corp. Sec. Litig.*,
  2025 WL 719967 (N.D. Cal. Mar. 6, 2025) ..................................................15

*In re Thornburg Mortg., Inc. Sec. Litig.*,
  695 F.Supp.2d 1165 (D.N.M. 2010) ..............................................................23

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ..........................................................................13

*Irvine v. ImClone Sys., Inc.*,
  2003 WL 21297285 (S.D.N.Y. June 4, 2003) ...............................................11

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011). ECF No. 58 .............................................................13, 23

*Jiaxing Super Lighting Elec. Appliance Co. v. Bruggeman*,
  2023 WL 4628974 (N.D. Cal. July 18, 2023)................................................11

*Kendall v. Odonate Theraps., Inc.*,
  2021 WL 3406271 (S.D. Cal. Aug. 4, 2021) ............................................10, 12

*Khoja v. Orexigen Theraps., Inc.*,
  899 F.3d 988 (9th Cir. 2018) ............................................................................6

*Kui Zhu v Taronis Techs. Inc.*,
  2020 WL 1703680 (D. Ariz. Apr. 8, 2020) ...................................................25

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ........................................................................18

*Mandalevy v. BofI Holding, Inc.*,
  2021 WL 794275 (S.D. Cal. Mar. 2, 2021) .....................................................7

*Mauss v. Nuvavsive, Inc.*,
  2015 WL 10857519 (S.D. Cal. Aug. 28, 2015) .............................................14

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

v

*Meyer* v. *Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014)...........................................................................7

*Mulderrig v. Amyris, Inc.*,
   492 F.Supp.3d 999 (N.D. Cal. 2020) .........................................................16

*Mulligan v. Impax Lab'ys, Inc.*,
   36 F.Supp.3d 942 (N.D. Cal. 2014) ...............................................7, 17, 22

*Murphy v. Precision Castparts Corp.*,
   2017 WL 3084274 (D. Or. June 27, 2017) ................................................13

*Nguyen v. Radient Pharms. Corp.*
   2011 WL 5041959 (C.D. Cal. Oct. 20, 2011)............................................23

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding,*
   320 F.3d 920 (9th Cir. 2003) .....................................................................22

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ...................................................................11

*Ocular Therapeutix, Inc. Sec. Litig.*,
   2019 WL 1950399 (D. Mass. Apr. 30, 2019) .............................................7

*Odeh v. Immunomedics, Inc.*,
   2020 WL 4381924 (D.N.J. July 31, 2020)............................................10, 11

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
   780 F. App'x 480 (9th Cir. 2019) ..............................................................18

*Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*,
   2020 WL 3268531 (S.D.N.Y. June 17, 2020) ...........................................20

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) .....................................................................21

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   2012 WL 1868874 (N.D. Cal. May 22, 2012) ...........................................18

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
   679 F.3d 972 (8th Cir. 2012) .......................................................................7

*Rihn v. Acadia Pharms. Inc.*,
   2016 WL 5076147 (S.D. Cal. Sept. 19, 2016)............................9, 11, 12, 13, 19, 22

*Robb v. Fitbit, Inc.*,
   2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ..............................................18

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

vi

*S. Ferry LP, No. 2 v. Killinger,*
542 F.3d 776 (9th Cir. 2008) ...................................................................................19, 21

*Salzman v. ImmunityBio, Inc.,*
753 F.Supp.3d 1050 (S.D. Cal. 2024).............................................11, 13, 18, 22, 23

*Schueneman v. Arena Pharms., Inc.,*
840 F.3d 698 (9th Cir. 2016) ..............................................................................16, 17

*Sinnathurai v. Novavax, Inc.,*
645 F.Supp.3d 495 (D. Md. 2022) ...........................................................................12

*Skiadas v. Acer Theraps. Inc.,*
2020 WL 3268495 (S.D.N.Y. June 16, 2020) .........................................................23

*Special Situations Fund III QP, L.P. v. Brar,*
2015 WL 1393539 (N.D. Cal. Mar. 26, 2015)..........................................................24

*Thomas v. Magnachip Semiconductor Corp.,*
167 F.Supp.3d 1029 (N.D. Cal. 2016) ......................................................................21

*Todd v. STAAR Surgical Co.,*
2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) (*STAAR II*) ....................9, 12, 13, 17, 20, 21, 22

*WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.,*
655 F.3d 1039 (9th Cir. 2011) ..................................................................................18

*Xu v. Gridsum Holding Inc.,*
624 F.Supp.3d 352 (S.D.N.Y. 2022).........................................................................24

*Yanek v. Staar Surgical Co.,*
388 F.Supp.2d 1110 (C.D. Cal. 2005) (*STAAR I*)......................................12, 17, 20

*Yuan v. Facebook, Inc.,*
2021 WL 4503105 (N.D. Cal. Sept. 30, 2021) .........................................................11

*Zhou v. Faraday Future Intelligent Elec. Inc.,*
2022 WL 13800633 (C.D. Cal. Oct. 20, 2022).........................................................24

*Zucco Partners, LLC v. Digimarc Corp.,*
552 F.3d 981 (9th Cir. 2009) ....................................................................................18

**Statutes**

Private Securities Litigation Reform Act of 1995 .................................................. *passim*

## I.    PRELIMINARY STATEMENT

Gritstone bio, Inc. ("Gritstone" or the "Company") is a clinical-stage biotechnology company founded by Defendant Allen in 2015 with no commercial-stage products for sale, and with the vast majority of its clinical trials funded via external collaborators, such as through nonprofits and government grants.  But its claim to fame (and to commercial prosperity) rested with its "next generation" vaccine technology and with the Company's robust "Current Good Manufacturing Practices" ("cGMP")-compliant manufacturing capabilities that Defendants repeatedly touted could bring these vaccines to the market.  After a cash crisis threatened the Company's ability to operate as a going concern for another year, the government extended a critical lifeline: a lucrative contract with the Biomedical Advanced Research and Development Authority ("BARDA") (a division of the U.S. Department of Health and Human Services) to provide $430 million to fund the next trial for Company's vaccine for COVID-19 (known as the "CORAL" program) to start in Q1 2024.  This money would buoy the Company's cash runway well into 2024, solving the Company's liquidity crash.

At the risk of stating the obvious, there could not be a topic more important to Gritstone investors than the successful BARDA-funded CORAL rollout, including any major cGMP issues that stood in its way.  Indeed, FDA regulations requires that such trials use cGMP-compliant manufacturing processes, and the BARDA contract expressly called for those same standards to govern the CORAL trial.  Throughout the class period, Defendants repeatedly reassured that Gritstone (and any third-party contractors it used to manufacture its vaccines) were cGMP compliant.  And while they cautioned in the abstract that it was always theoretically possible that manufacturing issues could delay any trials, they gave no reason to believe that such issues were plaguing the CORAL trial.  As pled in the AC, no investor was under the impression that manufacturing posed any risk to the BARDA-funded CORAL trial.

In truth, Defendants had lied about Gritstone's cGMP capabilities.  As former employees revealed, contrary to is public statements, Gritstone did *not* have cGMP-compliant manufacturing processes.  Rather, unknown to investors, ongoing and pervasive cGMP issues pervaded the CORAL trial throughout 2023—until the truth began to emerge in February 2024, when Defendants announced that the CORAL trial would be delayed due to these cGMP problems.  Soon after, Defendants revealed that the FDA had placed the CORAL trial on a clinical hold because of

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

1

these deficiencies. As a result of these setbacks, the Company went belly-up, and it announced it was filing for bankruptcy.

In their Motions, Defendants simply ignore or attempt to discredit the well-plead allegations confirming the falsity of their statements assuring the Company was cGMP compliant. They also engage in the fiction that Defendants did not know about the cGMP issues until the FDA issued its formal clinical hold—a contention squarely at odds with the AC's allegations confirming this knowledge as early as March 2023. Similarly, Defendants' attempt to argue that the cGMP risks discussed in the Company's SEC filings did not materialize until it received the clinical hold confuses the risk with its consequences. The Ninth Circuit recently rejected this same argument, as have other cases arising in the context of drug manufacturing. Defendants also (wrongly) try to cabin statements about the BARDA contract as simply "accurate"—an argument contrary to the well-known maxim that these statements nonetheless can misled by omission. Consistent with similar cases decided in this Circuit over the past twenty years, once Defendants *choose* to speak favorably about cGMP compliance or the progress of clinical trials, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information. Defendants failed to do so.

Likewise, Defendants (wrongly) contend that they can only act with scienter if they knew that the cGMP issues would result in a clinical hold. That is a transparent ploy to raise the pleading standard for scienter far beyond that required by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), as other cases have recognized, and masks the coherent theme: Defendants misrepresented the *true risk* of the ongoing cGMP issues and its impact on the CORAL trial. It has long been the law that a party acts with scienter when they have knowledge of the facts that make their public statements misleading, and Defendants had such knowledge. Their baseless attempts to discredit the confidential witnesses (each a "CW"), downplay the significance of the severe cGMP issues as "routine business setbacks" in no way alters this conclusion.

For all the foregoing reasons, and those discussed below, the Motions should be denied.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

2

## II.    STATEMENT OF FACTS

### A.    Defendants Lie About Gritstone's cGMP Manufacturing Capabilities.

Defendants promoted Gritstone's CORAL vaccine program as a novel approach to secure longer-lasting immunity to COVID-19.  AC¶24.  In 2023, Gritstone had completed CORAL's Phase I and was initiating Phase II.  AC¶¶2-3.  Under FDA regulations, unlike Phase I, all Phase II vaccine manufacturing must comply with "Current Good Manufacturing Practices" ("cGMP"), a set of a regulations and policies that seek to ensure that pharmaceuticals meet quality standards so that they will be safe and effective when used as intended.  AC¶¶3, 27.  cGMP compliance is required for Phase II trials because—unlike the small exploratory Phase I trials that test the vaccine primarily for safety—Phase II involves a "substantially greater" number of people, and the trial tests the drug for both safety and effectiveness.  AC¶29.

Defendants assured investors that one of the core tenants of Gritstone's "unique approach" was robust in-house manufacturing that was cGMP compliant.  AC¶¶23, 31.  In the Company's annual report, it boasted that the Company "manufactur[es] our products at our own fully-integrated good manufacturing practice (GMP) biomanufacturing facilities."  AC¶33.  While the Company "perform[s] the majority of the manufacturing," it sometimes "use[s] a hybrid approach to manufacturing … whereby certain elements of our product candidates are manufactured … at [qualified third-party contract manufacturing organizations] CMOs," but the Company assured investors that "all [are] designed in compliance with cGMP."  AC¶34.

But behind the scenes, former employees confirm that neither Gritstone nor its CMOs had the manufacturing capabilities to be cGMP complaint.  AC¶¶7, 43-55, 123.  Rather, Gritstone was scrambling to procure the necessary cGMP capabilities.  *Id.*  In March 2023, when one former CW joined the Company, for instance, there was a "long list" of materials the Company needed to become cGMP compliant, and the Company had already formed a "task force" with the express goal of procuring those cGMP-grade materials to replace the non-GMP-grade: "There was a huge task force for it," CW said. "That was a huge project to put together."  AC¶¶46.

### B.    Gritstone's Success Hinges On Its BARDA-CORAL Phase II Trial.

As a relatively new start-up pharmaceutical venture, Gritstone has no commercial-stage products, so it has "not generated any revenue from product sales, and" did "not expect to generate any revenue from product sales for the foreseeable future." AC¶35.  Rather, the "vast majority of"

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

3

its vaccine programs are "being funded via external collaborators," such as through nonprofits and government grants, and all recognized gains would flow from those agreements funding its vaccine programs. *Id.* Without those external funds, Gritstone was quickly heading to insolvency. AC¶¶36-37. Indeed, Gritstone's August 2023 10-Q contained a "going concern" warning that "[t]he Company's cash, cash equivalents and marketable securities are not sufficient to fund the Company's planned operations for a period of 12 months." AC¶37.

But soon after, however, a government-funded contract award appeared to solve the Company's cash crisis. On September 27, 2023, Gritstone announced that it entered into a contract with the BARDA where the Company "[f]ollowing successful completion of the base period" in Q1 2024, "will receive funding of up to an estimated $433 million to conduct a 10,000 participant randomized [CORAL] Phase 2" trial to launch in Q1 2024. AC¶80. With this influx of BARDA cash, "the Company's cash runway will be extended into the fourth quarter of 2024." *Id.* Conforming to FDA regulations for trials in Phase II, the BARDA contract also expressly required the use of cGMP compliant manufacturing for the CORAL Phase II trial. AC¶41.

C.     **Defendants Mislead Investors About the BARDA-CORAL Phase II Trial.**

Unknown to the market, however, Gritstone did not have the necessary cGMP capabilities to comply with the BARDA contract or the timeline to launch in Q1 2024. AC¶¶43-55. As one CW (a Director of Quality Assurance on the cGMP task force) conveyed, all throughout 2023, Gritstone was struggling (and failing) to secure the "long list" of needed cGMP capabilities, and, by the end of 2023—while the Company had found some sources of cGMP-grade materials to replace the non-GMP materials—Gritstone was still missing "critical" cGMP materials needed for the Phase II CORAL study. AC¶¶46-48. Another CW (a Senior Director of Process Development) related how "there are a hundred-plus raw materials used in the upstream process for Gritstone's COVID-19 vaccine" (AC¶¶53-54) while another CW (the Senior Vice President of Clinical Development for Infectious Diseases) recalled how the vaccine "team shrunk as employees on his team began to quit due to what [CW2] described as a toxic work environment" over the strenuous "work demands" for the lacking CORAL vaccine program (AC¶¶51-52).

Yet during the same timeframe, from the BARDA announcement through the end of 2023, Defendants continued to proclaim that "[p]reparations for the [CORAL Phase II] study are underway, and we expect to initiate the study in the first quarter of 2024." AC¶89. As the CWs

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

conveyed, however, given the pervasive lack of many cGMP capabilities, the Company could not meet that timeline. AC¶¶43-55. As pharmaceutical expert Todd Clark elucidated, that failure would be particularly apparent given the "massive" "scale up" in "specialized" manufacturing resources needed for the 10,000 subject-enrollment in Phase II (as opposed to Phase I's enrollment of just 463, "or less than 5% of the number that would be included in the BARDA trial"). AC¶¶57-58. Such a "supply challenge" like that described by CWs could not be resolved by Q1 2024. *Id.*

**D.      The Truth Beings To Emerge, and Gritstone Goes Bankrupt.**

Finally, on February 12, 2024, Defendants announced that the Company had to postpone the CORAL-BARDA Phase II trial "until the fall of 2024 rather than the first quarter of 2024" due to the lack of cGMP manufacturing capabilities. AC¶94. Two weeks later, on February 29, 2024, Defendants revealed that Gritstone was forced to fire 40% of its workforce "following the recently announced delay of the proposed CORAL Phase 2b study, which resulted in Gritstone not receiving [the BARDA] external funding it previously anticipated beginning in 1Q 2024, associated with the initiation of the study." AC¶106. On this news, Gritstone's stock price fell $0.78 per share, or 27.86%, to close at $2.02 per share on March 1, 2024. AC¶107.

On March 5, 2024, Defendants filed the Company's 2023 annual report, which revealed that the FDA had placed a "clinical hold" on the CORAL program in January 2024, and that the Defendants were "working on preparing a complete response … to remove the clinical hold," which "includes re-manufacturing our CORAL vaccine candidate to be used in the Phase 2b CORAL Study with GMP-grade materials." AC¶113. On April 1, 2024, Defendants announced that the Company "has commenced an underwritten public offering of shares of its common stock" to shore up the Company's liquidity crisis, a pronouncement that sent the stock falling $1.15 per share, or 48.94%, to close at $1.20 per share on April 2, 2024. AC¶115.

On October 10, 2024, Gritstone declared Chapter 11 bankruptcy seeking "to preserve value and support its ongoing strategic alternatives process." Gritstone also announced further layoffs and that it would be delisted from NASDAQ trading effective October 22, 2024. AC¶116.

## III.    ARGUMENT

### A.    The AC Pleads Actionable False and Misleading Statements and Omissions.

A statement is false if it is "contradict[ed]" by existing facts. *E. Öhman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 928 (9th Cir. 2023).  By its terms, however, Rule 10b-5 also requires the disclosure of any fact necessary to make the statements "not misleading." 17 C.F.R. § 240.10b-5(b). A statement is misleading "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).  Thus, even if the statement is literally accurate, an actionable statement "may be misleading if it omits material information" and "[d]isclosure is required only when necessary 'to make statements made, in the light of the circumstances under which they were made, not misleading.'" *Khoja v. Orexigen Theraps., Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018). "'[C]ompanies can control what they have to disclose under these provisions by controlling what they say to the market.'" *Id*. "But once defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Id*. (quoting *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016)).

### 1.    Defendants Mislead Investors About Gritstone's cGMP Manufacturing Capabilities.

Throughout the class period, Defendants assured investors that Gritstone's "in-house" manufacturing capabilities included compliance with cGMP.  Under the header, "In-house GMP Manufacturing," the March 9, 2023 annual report relates that "We manufacture our products at our own fully-integrated good manufacturing practice (GMP) biomanufacturing facilities," and, while Gritstone itself "perform[s] the majority of the manufacturing," any outsourced work likewise is done "in compliance with cGMP."  AC¶¶31-34, 72, 78, 90.

Defendants' claim that "Plaintiffs plead no facts showing the challenged statements to be false when made" (ECF No. 55 ("MTD") at 16) ignores the allegations confirming their falsity. At the time Defendants issued the March 2023 annual report at the start of the class period, CW1 revealed the Company *already* had been struggling to get its manufacturing process cGMP compliant.  AC¶¶44-45. Indeed, when CW1 joined in Gritstone in March 2023, the Company already had put together a "long list" of raw materials needed to make the vaccine that were non-

GMP-grade and that needed replacement and had already formed a "huge task force" to procure those cGMP-grade raw materials. AC¶46.[1] Defendants also ignore how Defendants endorsed and reiterated these manufacturing-compliance assurances in each 10-Q quarterly report *following* the March 10-K. AC¶¶72, 78, 92. But as CW1 relates, by the end of 2023, Gritstone still was missing "critical" cGMP capabilities. AC¶48.

Courts consistently find such statements that give the impression a company was "compliant" with cGMP were misleading in light of "recurring and pervasive problems" with cGMP in the manufacturing process. *See, e.g.*, *Mulligan v. Impax Lab'ys, Inc.*, 36 F.Supp.3d 942, 958, 960-61 (N.D. Cal. 2014); *In re Emergent BioSolutions Inc. Sec. Litig.*, 2023 WL 5671608, at *15 (D. Md. Sept. 1, 2023) ("Emergent's statements touting Bayview's manufacturing capabilities misleadingly omitted the facility's persistent, serious issues."); *Meyer* v. *Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) ("failure to disclose then-ongoing and serious pollution violations" could "render[] misleading the comforting statements … about compliance measures"). "Having chosen to represent it was in material compliance with FDA regulations and cGMP, [Defendants] w[ere] obligated to make a full disclosure of any material facts." *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 983 n.8 (8th Cir. 2012).[2]

---

[1] Defendants' claim that those statements are "untethered to any product candidate" is unavailing. If anything, the fact that these statements are unqualified means they cover all drugs in Gritstone's portfolio. *Cf. Mandalevy v. BofI Holding, Inc.*, 2021 WL 794275, at *5 (S.D. Cal. Mar. 2, 2021) ("[T]he paragraph of the press release in which the statement appears does not limit the statement to criminal DOJ investigations and was broad enough to [cover] any . . . government probes."). *Ocular Therapeutix, Inc. Sec. Litig.*, 2019 WL 1950399, at *6 (D. Mass. Apr. 30, 2019) (MTD at 14) is readily distinguishable. There, the disclosure stated the company made its drugs "using cGMP," which "is essentially a statement of the standards that the Company is guided by in designing and operating its manufacturing processes," whereas here, Defendants made specific disclosures that Gritstone had, in fact, "manufactur[ed] our products at our own fully-integrated good manufacturing practice (GMP) biomanufacturing facilities." And in *Ocular*, the "plaintiffs d[id] not allege any contemporaneous facts … to demonstrate that the Company in fact did not 'us[e] current good manufacturing practices,'" while here, accounts of CWs intimately familiar with Gritstone's manufacturing confirm it lacked cGMP capabilities.

Nor are they "too general" or "amorphous" to be actionable. *Contra* MTD at 14-15. None of the statements in Defendants' authorities were objective and verifiable (like a statement assuring investors about cGMP manufacturing capabilities) but instead involved vague puffery that "reasonable investors do not consider them important in making investment decisions." *E.g.*, MTD 14-15, citing *In re Oak Tech. Sec. Litig.*, 1997 WL 448168, at *7 (N.D. Cal. Aug. 1, 1997) (statements regarding "synergies"); *In re Paypal Holdings, Inc. S'holder Derivative Litig.*, 2018 WL 466527, at *4 (N.D. Cal. Jan. 18, 2018) ("strong governance standards").

[2] Even crediting Defendants' argument that any statements pre-BARDA are not actionable (MTD at 11), the September 2023 BARDA announcement would trigger a duty to disclose the

Tellingly, Defendants do not dispute these are material; nor could they. As a Company with no approved products for sale—and one that relies on third-party contracts (AC¶35)—affirming that it was cGMP compliant and ready to hit the ground running on any collaboration was crucial to the Company's success. Thus, in the context of this case, having cGMP compliant manufacturing capabilities "carries a specific meaning." *Hatamian v. Advanced Micro Devices*, 87 F.Supp.3d 1149, 1161 (N.D. Cal. 2015). By stating that Gritstone was "compliant," Defendants conveyed that there was nothing material left to do for those trials to move forward.[3]

The recent decision *Axsome Therapeutics* is instructive. There, a pharmaceutical company likewise made representations about its "manufacturing capabilities" to support a new drug application, but in reality, as a confidential witness confirmed, key "suppl[ies]" needed to create the drug "w[ere] inadequate due to a vendor's manufacturing issues." *In re Axsome Theraps., Inc. Sec. Litig.*, 2025 WL 965265, at *5 (S.D.N.Y. Mar. 31, 2025). The court concluded the statements lauding the manufacturing capabilities "were misleading because they created an impression that the Company was not facing supply issues, when, in reality, the SAC alleges that Axsome was unable to produce sufficient [supply] for at least a year." *Id.* The same is true of Defendants' statements (falsely) assuring the market of Gritstone's robust cGMP manufacturing processes.

Although not relevant to show falsity, the AC also pleads facts showing "actual or materialized risk" due to these pervasive "GMP issues." *Contra* MTD at 16. Indeed, the loss felt by Plaintiffs here occurred expressly because of the "announced delay of the proposed CORAL Phase 2b study" (AC¶106) due to the need to "incorporate GMP-grade materials" (AC¶¶109, 111) and thus the need to "re-manufactur[e] our CORAL vaccine candidate to be used in the Phase 2b CORAL Study with GMP-grade materials" (AC¶¶113-14). In a sworn declaration, Defendant Economides blamed the Company's bankruptcy on "delays due to regulatory and manufacturing challenges [for the CORAL Phase II] which impacted the Company's financial outlook." Declaration of Vassiliki Economides ¶44, *In re Gritstone Bio, Inc.*, No. 24-12305 (Bankr. D. Del.

---

pervasive cGMP issues. Yet Defendants do not and cannot dispute that they never did so in any of the post-BARDA SEC filings until the truth was partially revealed in February 2024.

[3] Defendants purported words of "caution[]" about Gritstone's reliance on CMOs (MTD at 15) do not dispel this unmistakable impression given it assured the market those CMOs also were "cGMP" compliant. AC¶¶34, 72, 78, 92.

Oct. 11, 2024), ECF No. 17 ("Economides Bankr. Decl."). Those manufacturing failures thus undoubtedly caused this risk and the resultant losses.

### 2. Defendants Mislead Investors About Gritstone's BARDA-Funded Trial for CORAL's Phase II Vaccine Program.

Defendants repeatedly lauded the BARDA-funded rollout of CORAL Phase II, proclaiming that under the BARDA contract, "[f]ollowing successful completion of the base period" in Q1 2024, the Company "will receive funding of up to an estimated $433 million to conduct a 10,000 participant randomized [CORAL] Phase 2b comparative study." AC¶¶80, 86, 89. Defendants also repeatedly promoted that "[w]e … look forward to initiating the Phase 2b study … in the first quarter of 2024," AC¶82, and described the BARDA contract as providing a critical influx of cash such that "the Company's cash runway will be extended into the fourth quarter of 2024," AC¶80. But while lauding this agreement and its implications, Defendants hid from the market that the Company lacked the cGMP capabilities to comply with it.

### a. Statements Touting the BARDA Collaboration Were Misleading.

Defendants' main contention is that the statements about the BARDA contract were "accurate." MTD at 16. But courts have held that even "literally true" statements about manufacturing compliance are misleading where the company fails to disclose cGMP issues. *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *10 (C.D. Cal. Apr. 12, 2016) (*STAAR II*); *Axsome Theraps.*, 2025 WL 965265, at *8 (rejecting argument that statements about manufacturing capabilities were inactionable as "accurate" given "Defendants failed to disclose that Axsome's vendor was experiencing equipment problems that were causing an insufficient supply … when describing the Company's manufacturing capabilities").

Defendants ignore the maxim that once they *chose* to discuss the BARDA contract and its rollout, they had a duty "to do so in a manner that wouldn't mislead." *Berson*, 527 F.3d at 987. By lauding that "[f]ollowing successful completion of the base period" in Q1 2024, Gritstone "will receive funding of up to an estimated $433 million to conduct a 10,000 participant randomized [CORAL] Phase 2b comparative study," Defendants gave the impression that no known material setbacks would upend this collaboration. AC¶¶80, 86, 89. But in reality, the Company did *not* have the cGMP compliance necessary to comply the BARDA contract or FDA regulations. AC¶¶43-55. Thus, Defendants' statements lauding the BARDA collaboration without this critical

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

9

context gave investors an "impression of the state of affairs that differed materially" from reality on the ground—they therefore are actionable. *Rihn v. Acadia Pharms. Inc.*, 2016 WL 5076147, at *6 (S.D. Cal. Sept. 19, 2016) (statements about drug application process misleading "without mentioning" lack of "meaningful assessment of the manufacturing and quality assurance systems"); *Odeh v. Immunomedics, Inc.*, 2020 WL 4381924, at *6 (D.N.J. July 31, 2020) (positive statements about drug-approval process, including that "manufacturing validation runs[] were yielding positive results," were actionable in light of data integrity breach that "could seriously jeopardize" FDA approval); *Kendall v. Odonate Theraps., Inc.*, 2021 WL 3406271, at *5 (S.D. Cal. Aug. 4, 2021) (omitted information rendered statements misleading because "the undisclosed reality was materially different").

In *Axsome Therapeutics*, for instance, the court found that statements touting a "planned" new drug application launch for the next year were misleading where "they omitted the fact that, at the same time, Axsome could not obtain sufficient [supply] to conduct the necessary stability studies for almost a year, which would result in an inadequate [new drug application] filing, which in turn would 'almost certainly result[ ] in the FDA delaying or rejecting approval'" of that application. 2025 WL 965265, at *5. The same logic precludes Defendants from hyping the BARDA collaboration for CORAL Phase II while "omit[ing] the fact that, at the same time, [Gritstone] could not obtain sufficient" cGMP materials "to conduct the necessary … studies." *Id.*

b. Statements Touting CORAL Phase II's Timeline Were Misleading.

Throughout the class period, Defendants also made specific representations about the timing of the CORAL Phase II trial to start in Q1 2024. AC¶82. When announcing the BARDA collaboration, Defendant Allen stated, "We are excited about this opportunity to work alongside BARDA and look forward to initiating the Phase 2b study … in the first quarter of 2024." AC¶82. In October and November 2023 press releases, he reiterated that "preparations for the study [were] underway," and that Gritstone would "initiate the study in the first quarter of 2024." AC¶¶84, 86. But, as CWs and pharmaceutical expert Mr. Clark made clear, there was no chance for the Company to start by that Q1 2024 deadline given the known and pervasive inability to comply with cGMP, particularly problematic due to the massive scale-up needed for a Phase II trial.

AC¶¶43-61.[4]  It thus was misleading for Defendants to portray that the CORAL Phase II would meet this deadline while omitting this negative information that was likely to delay or to terminate the BARDA collaboration.  *Irvine v. ImClone Sys., Inc.*, 2003 WL 21297285, at *1 (S.D.N.Y. June 4, 2003) (company "reasonably expected approval by the FDA in early 2002" was actionable where defendants knew "it was not reasonably foreseeable that the FDA would approve Erbitux on that time line"); *Immunomedics*, 2020 WL 4381924, at *6 (positive statements about FDA review actionable based on awareness of data breach that "could seriously jeopardize" approval). As the AC alleges, just the opposite was true.

The court in *Acadia Pharmaceuticals*, for instance, addressed the case where "adequate manufacturing and quality assurance systems w[ere] a significant undertaking and w[ere] a critical component of the [new drug application] NDA approval process," and Defendants had proclaimed that a certain drug application was "on track" to meet an upcoming deadline.  2016 WL 5076147, at *6.  Defendants, however, omitted that "Acadia did not perform a mock inspection of these [manufacturing] systems," and "[a]ccordingly, when Defendants represented that the NDA was 'on track' to be submitted by March 31, 2015, without mentioning that no meaningful assessment

[4] Defendants argue that the Court should disregard Mr. Clark's opinions as "unreliable" given "Mr. Clark lacks personal knowledge about the Company or its efforts to procure raw materials." MTD at 20.  But the Ninth Circuit recently rejected such an "onerous and undue pre-discovery burden on plaintiffs in securities fraud cases," holding that courts should credit the expert's opinion so long as it includes with particularity all facts on which the expert's belief is based. *NVIDIA*, 81 F.4th at 942.  Here, Mr. Clark (a highly qualified consultant with decades of education and experience in FDA regulatory compliance) identifies with particularity all sources, assumptions, and facts on which he relied, including the accounts of CWs, Gritstone's filings, his own experience and expertise, industry regulations, and publicly available information about the CORAL program.  AC¶¶56-63.  The AC explains the basis for Mr. Clark's opinions, corroborated by two CWs that Gritstone lacked cGMP capabilities throughout 2023 and needed over a hundred cGMP components to make the vaccine, AC¶49, 54, and thus Mr. Clark' conclusions about the inability to meet the Q1 2024 deadline are "non-conclusory assertions" "properly considered in determining whether plaintiff has plausibly made" a claim.  *See Jiaxing Super Lighting Elec. Appliance Co. v. Bruggeman*, 2023 WL 4628974, at *4 (N.D. Cal. July 18, 2023); *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir. 2004).  Defendants' authorities (MTD at 21) do not change this.  In *Salzman v. ImmunityBio, Inc.*, 753 F.Supp.3d 1050, 1066 (S.D. Cal. 2024), the court only declined to consider Mr. Clark's input regarding "statements [that] do not advise of GMP difficulties but rather are premised entirely on the potential approval" of a drug application. Here, Mr. Clark's opinions about the timeline for the CORAL trial are based on CW accounts of the lack of cGMP compliance.  And in *Hershewe v. JOYY Inc.*, 2022 WL 1123208 (C.D. Cal. Mar. 9, 2022), the court declined to entertain an expert's analysis where he opined on facts "not at issue in this case," which is not true here.  Finally, in *Yuan v. Facebook, Inc.*, 2021 WL 4503105 (N.D. Cal. Sept. 30, 2021), the plaintiffs "conced[ed] that … [the expert's statements] consists [only] of [legal] opinions" whereas as, Mr. Clark invokes facts about FDA regulations and clinical trials.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

of the manufacturing and quality assurance systems had been conducted, Defendants created an impression of a state of affairs that differed in a material way from the one that actually existed." *Id*. While "Defendants led the public to believe that all appropriate steps had been taken to make sure that the NDA was ready for review by the deadline and that barring unforeseen circumstances, the NDA would be submitted by that date," "[i]n actuality, Defendants lacked information regarding whether the necessary infrastructure for commercial-scale operations was in place," rendering "Defendants' assurances that the NDA remained 'on track' for submission by March 31, 2015 … materially misleading." *Id*.

The same reasoning applies here. "Defendants led the public to believe that all appropriate steps had been taken to make sure that" the CORAL Phase II trial would be "ready … by the deadline and that barring unforeseen circumstances, the" trial would begin "by that date," when in reality, the Company was and had been scrambling for a year to procure the necessary cGMP materials to comply with FDA regulation and the terms of the BARDA contract. *Acadia Pharms.*, 2016 WL 5076147, at *6. Failure to disclose this reality gave a misleading "impression that [the study] was proceeding as expected, with no significant setbacks." *Odonate Theraps.*, 2021 WL 3406271, at *5 (statements, including that they were "to complete enrollment of [a Phase 3 study] in the second half of 2019," gave a misleading "impression that [the study] was proceeding as expected, with no significant setbacks"); *Sinnathurai v. Novavax, Inc.*, 645 F.Supp.3d 495, 519-20 (D. Md. 2022) (statements of manufacturing status that "left out another important factor in the delay" actionable where company "faced significant manufacturing concerns and … delays"); *Axsome Theraps.*, 2025 WL 965265, at *5 (statement that "2021 was a year of continued progress which has put the Company in a position to potentially launch" drug was "misleading because they created an impression that the Company was not facing supply issues, when, in reality, the SAC alleges that Axsome was unable to produce sufficient [drug component] for at least a year").

By touting this timeline—while omitting the truth about the poor state of the cGMP capabilities—those statements "necessarily implied that there would be no serious impediments to timely" Phase II beginning and, as such, it would be misleading to omit "facts suggesting a possible delay," including serious cGMP failures at the manufacturing site. *Yanek v. Staar Surgical Co.*, 388 F.Supp.2d 1110, 1130 (C.D. Cal. 2005) (*STAAR I*); *Emergent*, 2023 WL 5671608, at *13-14, *19 (pre-commercial statements touting ability to support "large scale manufacturing" misled investors given issues that would impact "how risky it would be" for firm to achieve that goal).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

12

"While management may have held out hope of achieving this result, the expression of that hope without disclosure of recent troubling developments created an impermissible risk of misleading investors." *In re Ariad Pharms., Inc. Sec. Litig.*, 842 F.3d 744, 753 (1st Cir. 2016).

Defendants cannot characterize this failure as a matter of "fraud by hindsight" because the FDA did not issue a formal "clinical hold" on the CORAL Phase II trial until December 2023. MTD at 17-18.  "[T]his argument ignores the allegation that Defendants were well aware of manufacturing deficiencies through other means" well before that formal hold.  *Salzman v. ImmunityBio, Inc.*, 753 F.Supp.3d 1050, 1064 (S.D. Cal. 2024).  As the AC alleges, at the start of the class period nearly a year earlier in March 2023, Gritstone *already* was suffering from cGMP failures to launch CORAL Phase II.  AC¶¶43-61.  Thus, the formal clinical hold only further confirmed the deficiencies pervading the manufacturing process.  AC¶¶62-63; *STAAR II*, 2016 WL 6699284, at *12 (a formal warning from the FDA is not "necessary to impute knowledge of [cGMP] violations" at a manufacturing facility).[5]

Nor does the PSLRA safe harbor shield these statements.  MTD at 12.  *First*, they are not forward-looking, but are statements of present fact that describe the current status of the CORAL Phase II process.  *See Acadia Pharms.*, 2016 WL 5076147, at *6 (holding defendants "'on track' assurances were representations about the *current* state of affairs" of "the [drug application] process"); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016) (holding "present representations" may be "embedded within statements that Vivendi deems forward-looking"); *Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *12-13 (D. Or. June 27, 2017) ("[Defendants'] assertion … there is no change to the [2016 EPS] framework … is a representation of [Defendants'] current market status, *i.e.*, hitting benchmarks along the way to achieving the 2016 goal."), *R. & R. adopted*, 2017 WL 3084274 (D. Or. Aug. 22, 2017).

---

[5] Plaintiffs do not allege that Defendants had a duty to disclose each FDA disclosure (MTD at 18-19), but that once they touted the Company's cGMP manufacturing capabilities and the timeline for the BARDA-funded CORAL trial, they had a duty to convey that information fully and accurately. This is not "fraud by hindsight," and Defendants' authorities (MTD 17-18) are not to the contrary.  In *Immanuel Lake v. Zogenix, Inc.*, 2020 WL 3820424, at *9 (N.D. Cal. Jan. 27, 2020), the court found the statements would have been misleading by omission if the complaint alleged facts showing "defendants … were already in possession of information that directly contradicted their public statements when made," which is alleged here.  The same analysis distinguishes *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 882 (9th Cir. 2012); there, "the complaint d[id] not allege that Defendants falsely represented their actual partnership plans and expectations," but here, the AC alleges Defendants falsely represented the manufacturing capabilities and progress for the CORAL Phase II trial.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

*Second*, even if certain of these statements are forward looking, the safe harbor does not apply because the "'[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.'" *Axsome Theraps.*, 2025 WL 965265, at *6.  Defendants claim that the statements about the "projected date to initiate the Phase 2b Study" are accompanied by meaningful cautionary language, citing warnings about the "*potential* [for] delays in our ongoing clinical trials" and the *potential* failure to procure materials (including from third-party suppliers) that "*could* delay … development."  MTD at 12-13 (emphases added).  The *Axsome* court recently rejected the very same argument; there, defendants tried to invoke language that "If the manufacturers upon whom we rely fail to produce our product candidates in the volumes that we require on a timely basis ... we may face delays in the development," given "the SAC sufficiently alleges that, when those statements were made, 'manufacturers upon whom Defendants relied' were already facing supply issues that were delaying 'the development and commercialization' of" the drug.  *Id.* at *6.[6]  The AC alleges the same.[7]

---

[6] Defendants' authorities (MTD at 14) are not to the contrary. Unlike in *In re Pivotal Sec. Litig.*, 2020 WL 4193384 (N.D. Cal. July 21, 2020), where "the risk disclosures 'addressed the very subjects Plaintiffs challenge," here the risk disclosures do not address the lack of cGMP capabilities or the impact on the CORAL trial.  *In re Cutera Sec. Litig.*, 610 F.3d 1103 (9th Cir. 2010) is even farther off the mark; there, the court found "there is no material difference between what Cutera disclosed in January [when Defendants allegedly knew about the failure of a junior sales force] and what it disclosed in later reports and conference calls." Here, there *is* a material difference between claiming Gritstone's manufacturing is cGMP compliant and that the CORAL trial was proceeding as normal, when in reality, the Company had been scrambling (and failing) to ramp up its cGMP capabilities.  And the alleged omissions about such material compliance are a far cry from the general "misstatements about the 'path to regulatory approval' and potential for 'transformative' commercial success" found inactionable in *In re Nuvelo, Inc., Sec. Litig.*, 2008 WL 5114325, at *15 (N.D. Cal. Dec. 4, 2008). In *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F.Supp.2d 1045, 1063 (N.D. Cal. 2012), the court found "Plaintiffs have not adequately pled that Defendants had actual knowledge that their forward-looking projections were false or misleading when made" based primarily on the Defendants' roles, whereas here, the AC contains far more facts showcasing knowledge, including accounts of CWs.

[7] Defendants also included misleading disclosures in the "MD&A" and "Risk Factors" section of Gritstone's SEC filings.  AC¶¶67, 72, 78, 90, 92, 105.  One such disclosure conveyed that "[a]ll internal and third-party contract manufacturing is performed under cGMP or similar guidelines."  AC¶¶67, 72, 78, 92, 111.  Defendants merely point to "disclosed risks that *could* jeopardize the [CORAL Phase II BARDA] timeline" or "*could* delay the development and potential commercialization of our product candidates."  MTD at 13 (emphases added).  But, as explained above, those risks already had come to pass.  The disclosure is not alleged to be objectionable because it failed to disclose the risk itself but because it "represented the risk . . . as purely hypothetical."  *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 949 (9th Cir. 2023).  In this regard, merely warning that manufacturing issues *could* occur does not relieve Defendants from the duty to disclose that they were, in fact, occurring.  *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703-04 (9th Cir. 2021) (collecting cases); *Facebook*, 87 F.4th at 949 (speaking about

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

14

c.   Statements Touting Gritstone's Cash Runway Were Misleading.

In addition to publicizing the CORAL Phase II timeline, Defendants repeatedly characterized the BARDA contract as providing a critical influx of cash such that "the Company's cash runway will be extended into the fourth quarter of 2024." AC¶80. For the same reasons above, that was misleading given the pervasive and ongoing failure to procure the needed cGMP compliant manufacturing procedures. AC¶81. These statements gave investors a highly misleading impression of the level of risk associated with the CORAL Phase II rollout and the likelihood of realizing the $430 million influx of needed BARDA cash; those statements thus are actionable. *In re SunPower Corp. Sec. Litig.*, 2025 WL 719967, at *8 (N.D. Cal. Mar. 6, 2025) (statements about future liquidity are actionable where undisclosed material facts undermine that assurance); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F.Supp.2d 277, 299 (S.D.N.Y. 2013) (same). And for the same reasons, the PSLRA safe harbor (MTD at 12) does not shield these statements. *SunPower*, 2025 WL 719967, at *8 (refusing to apply safe harbor where cautionary language warned of purely hypothetical risk of cash crisis); *MF Glob.*, 982 F.Supp.2d at 299 (same). Rather, "'[b]y superficially warning of possible risks while failing to disclose critical facts,' [Defendants] … were allegedly like 'someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'" *SunPower*, 2025 WL 719967, at *8.

risks in the abstract mislead when they are already present). Indeed, "[t]o warn that the untoward may occur when the event is contingent is prudent" but to state "it is only possible for the unfavorable events to happen when they have already occurred is deceit." *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 515 (9th Cir. 1991); *see also Mauss v. Nuvavsive, Inc.*, 2015 WL 10857519, at *15 (S.D. Cal. Aug. 28, 2015). As such, Defendants contend that the "risk" here did not materialize until the FDA issued the clinical hold in January 2024. MTD at 17. This argument confuses the risk with its consequences. Defendants in *Flynn v. Sientra, Inc.*, 2016 WL 3360676 (C.D. Cal. June 9, 2016) raised this *same* argument: "That Sientra had not yet felt the loss resulting from [its CMO]'s regulatory shortcomings when it allegedly made these statements does not make the statements any less misleading." *Id.* at *12. That precludes Defendants' attempt to evade liability.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
15

**B.      The AC Pleads A Strong Inference of Defendants' Scienter.**

Scienter is "a mental state that not only covers 'intent to deceive, manipulate, or defraud, but also deliberate recklessness.'" *Arena Pharms.*, 840 F.3d at 705. "Supreme Court precedent permits a series of less precise allegations to be read together to meet the PSLRA requirement" such that "[e]ven vague or ambiguous allegations are … properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter." *Axonic Cap. LLC v. Gateway One Lending & Fin.*, 2019 WL 4138024, at *10 (C.D. Cal. May 22, 2019). That inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences'"; in other words, any "tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014). Here, a holistic review of the AC's well-pled facts demonstrates a "strong inference" of Defendants' scienter.

**1.  Defendants Were in Possession of Contemporaneous, Contradictory Information.**

Deliberate recklessness refers to "an extreme departure from the standards of ordinary care" which "presents a danger of misleading buyers or sellers that is either known … or is so obvious that the actor must have been aware." *Arena Pharms*, 840 F.3d at 705. Thus, pleading that "defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *In re Immune Response Sec. Litig.*, 375 F.Supp.2d 983, 1022 (S.D. Cal. 2005); *see also, e.g.*, *In re Splunk Inc. Sec. Litig.*, 592 F.Supp.3d 919, 948 (N.D. Cal. 2022) (scienter pled by alleging that "Defendants were aware of the adverse facts that cut against [the] positive information conveyed in the challenged statements" that made them "misleading"); *Mulderrig v. Amyris, Inc.*, 492 F.Supp.3d 999, 1026 (N.D. Cal. 2020). A reckless disregard can be proven "'if [a defendant] had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort.'" *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010).

As they do throughout their Motion, Defendants' arguments proceed from the flawed premise that they can only act with scienter if they "knew," when each statement was made, that the manufacturing failures doomed "the Phase 2b Study … [to] launch by Q1 2024 or that the FDA would later issue a clinical hold on the study." MTD at 22. This not only misconstrues Plaintiffs' claims; it is contrary to law. Such exacting facts are not necessary to establish that Defendants'

positive statements about cGMP compliance and the CORAL Phase II timeline were misleading. To borrow words from *STAAR I*, 388 F.Supp.2d at 1130, which addressed this same argument, "Defendants attempt to raise the standard for scienter far beyond what is required by the PSLRA …. [T]he PSLRA does not require that Plaintiffs show that Defendants were capable of predicting the future." Were it otherwise, "then it would be virtually impossible to establish scienter at the pleading stage" in cases where deeply flawed manufacturing issues undercut defendants' upbeat public commentary. *STAAR II*, 2016 WL 6699284, at *14. That is not the law. Rather, what matters is "the failure to disclose 'issues' and 'concerns'" raised by FDA undermining defendants' positive statements "not who was ultimately right about the underlying [issue]." *Arena Pharms.*, 840 F.3d at 709; *Emergent*, 2023 WL 5671608, at *21 (plaintiff's theory is not that manufacturing facility was "doomed to fail" but that "ongoing, serious" flaws made defendants' public assessments riskier than they led investors to believe). Properly viewed, without Defendants' spin, Plaintiffs' scienter allegations plead facts that Defendants were directly aware of the numerous and recurring cGMP issues at Gritstone, or further support such an inference.

***CW Allegations Show Defendant Allen's Knowledge***. CWs intimately involved with the Company's lack of cGMP compliance confirm Defendant Allen knew about the lack of cGMP compliant materials as early as at the start of the class period in March 2023. *E.g.*, AC¶49 (CW1: personal conversations and meetings with COO who "convey[ed] the information [about lack of cGMP materials] to the CEO …. One hundred percent this [was] be[ing] conveyed to the CEO" consistently in real time); AC¶54 (CW3: "He [CEO Allen] was aware of the entire communication. Nothing goes without his knowledge."). An individual defendant making decisions concerning the topic at issue supports scienter. *In re Delcath Sys., Inc. Sec. Litig.*, 36 F.Supp.3d 320, 335 (S.D.N.Y. 2014) (ruling complaint pleaded scienter based on allegation that "all decisions came from" the CEO).[8] The CW, moreover, extolled the longstanding efforts to remediate the cGMP

---

[8] Unable to deny that their knowledge of these facts is well-pled, Defendants attempt to discredit the CWs who supply them. MTD at 22-23. But CW allegations will be credited at the pleading stage if they are described with sufficient detail to "support the probability that a person in the position occupied by the source would possess the information alleged." *NVIDIA*, 81 F.4th at 938. This can involve many considerations, but as this Court has held it is typically satisfied by describing each CW's "job descriptions and responsibilities" and providing their "job title and the title of the person to whom they reported." *In re BofI Holding, Inc. Sec. Litig.*, 2016 WL 5390533, at *10 (S.D. Cal. Sept. 27, 2016); *Impax Lab'ys*, 36 F.Supp.3d at 962 ("[N]umbering the confidential witnesses and describing [their] job descriptions and responsibilities constitutes a 'large degree of specificity'"). The AC does just that. It is also irrelevant that certain CWs are not alleged to have any interaction with Defendants. *Axsome Theraps.*, 2025 WL 965265, at *9

issues (conveyed to Defendant Allen) and such efforts themselves to resolve these deficiencies is indicative of scienter. *ImmunityBio*, 753 F.Supp.3d at 1067 ("They considered them to be serious, as evidenced by their attempts to resolve the issues, but nevertheless declined to disclose any information to investors."). That "[t]he company actively labored to fix these issues, but continued to convey to the public that it was not experiencing GMP difficulties, that it had in fact established GMP manufacturing capacity at scale … supports an inference of intentional deceit." *Id.*

Defendants fault the CW allegations for failing to offer particularized facts about Defendant Allen's "state of mind." MTD at 22. Scienter is, of course, a subjective element. But as the PSLRA itself indicates, plaintiffs may satisfy that element by pleading facts from which "to *infer* that mental state." *WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1051 (9th Cir. 2011) (emphasis added). Indeed, because it is "rare that a wrongdoer will admit to the required state of mind," scienter "can be proven and pled through [such] circumstantial evidence." *See In re Network Assocs., Inc., Sec. Litig.*, 2000 WL 33376577, at *8 (N.D. Cal. Sept. 5, 2000) ("PSLRA calls for a 'strong inference,' not an outright confession … at the pleading stage.").

***Defendant Allen Spoke Directly About the BARDA-CORAL Phase II Trial***. Where a company executive holds themselves out as knowledgeable about a product of "critical

---

("CW 1's information need not be based on direct contact with the Individual Defendants to be reliable."). The Ninth Circuit has credited indirect accounts that are probative of what Defendants knew, particularly when the complaint describes "how [the CWs] obtained their knowledge." *NVIDIA*, 81 F.4th at 940; *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 772 (9th Cir. 2023) (similar). CW1, who worked on the task force designed to get Gritstone in cGMP compliance, learned about ongoing cGMP issues CW1's own work, meetings and discussions, including discussions with CW1's supervisor, COO Jones, who conveyed this information to Allen. *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 485 (9th Cir. 2019) (CW stated his superior provided reports to defendants undermining their statements); *Robb v. Fitbit, Inc.*, 2017 WL 219673, at *5 (N.D. Cal. Jan. 19, 2017) (CW prepared a report that was presented to defendants by his superior). Each of these observations is "specific in time, context, and details," and corroborated by other CWs. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016). That suffices. Defendants' authorities (MTD 22) do not compel a different result. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 997 (9th Cir. 2009) involved CWs reporting "triple hearsay, accompanied by no details describing which projects or what employees were affected"; *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 2012 WL 1868874, at *20 (N.D. Cal. May 22, 2012) had "witnesses … not employed at [the company] during the entire Class Period (or not at all during the Class Period … and thus their statements are entitled to little weight"; and in *In re Accuray, Inc. Sec. Litig.*, 757 F.Supp.2d 936, 944 (N.D. Cal. 2010), the primary CW on which "[p]laintiffs rel[ied] heavily" "d[id] not offer any facts regarding specific contracts" that were the subject of the alleged fraud nor did they "allege that they were involved in determining which deals would be included in the backlog or had any communication with Defendants regarding the use of term agreements." The CWs here were intimately involved in the cGMP manufacturing process.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

importance" to a company, it is reasonable to assume that the executive either knew or was reckless in not knowing negative information regarding it. *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) (scienter plead where AC "relied on specific and particular accusations about the role played by the defendants in managing the company, including specific allegations that defendants actually did monitor the data that were the subject of the allegedly false statements"); *Acadia Pharms*., 2016 WL 5076147, at *9 ("[s]tatements made by Defendants … indicate that they had knowledge regarding" manufacturing "issues" where defendants "made statements regarding preparations [company] needed to complete to support the [drug approval process] … and … commented on the [drug approval process] remaining 'on track'"). Throughout the class period, on investor earnings calls and press releases, Defendant Allen repeatedly lauded the BARDA collaboration and the rollout of the CORAL Phase II trial timeline and funding.[9] These assurances from the Company's CEO of CORAL's progress reflect his deep understanding of the Company's operations and support a strong inference of scienter. *See, e.g.*, *In re PTC Theraps. Inc. Sec. Litig.*, 2017 WL 3705801, at *17 (D.N.J. Aug. 28, 2017). Similarly, Defendant Allen's education, experience, and role supports scienter. Allen was Gritstone's Co-Founder, President, and CEO, and had decades of leadership roles in the research and development of drugs at other pharmaceutical companies. AC¶125; *Berson*, 527 F.3d at 988. With this technical, relevant background, Defendant Allen would have known about the FDA's requirement that all Phase II studies be conducted using cGMP materials and would have known that Gritstone's failure to procure those materials would not be negotiable for a government-funded contract like BARDA.[10]

***Defendant Economides Admitted Knowledge in A Sworn Declaration***. In her sworn declaration for the Company's bankruptcy proceedings, Defendant Economides admitted that "[a]s a result of my roles as CFO and EVP, I am familiar with the Debtor's [Gritstone's] businesses, financial affairs, and day-to-day operations." Economides Bankr. Decl. ¶6. Another sworn declaration identifies both Defendant Allen and Economides as two of six employees "vital to the

---

[9] *E.g.*, AC¶82 (press release: "We are excited about this opportunity to work alongside BARDA and look forward to initiating the Phase 2b study … in the first quarter of 2024"); AC¶84 (same: "Preparations for the BARDA-funded, 10,000 subject Phase 2b, head-to-head study are underway, having entered the base period, and we look forward to initiating the study in the first quarter of 2024"): AC¶96 (press release regarding CORAL Phase II delay); AC¶70 (investor call discussing CORAL program); AC¶76 (press release discussing CORAL program).

[10] Given such specific scienter allegations against Defendant Allen, the Court should reject the allegations of impermissible "group pleading" out of hand. MTD at 21-22.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

on-going stability, continuity, and strength of the company" as members of "[t]he Senior Leadership Employees … responsible for executing the [Company's] operating and strategic plans," such that the Company "believes that … [they] cannot be easily replaced without significant operational setbacks and material efficiency losses." Declaration of Seven J. Fleming ¶7, *In re Gritstone Bio, Inc.*, No. 24-12305 (Bankr. D. Del. Oct. 23, 2024), ECF No. 59-3; Supplemental Declaration. of Seven J. Fleming ¶8, *In re Gritstone Bio, Inc.*, No. 24-12305 (Bankr. D. Del. Nov. 8, 2024), ECF No. 130 (listing Allen and Economides two of six as key employees). In addition, the AC alleges how Defendant Economides has decades of experience holding senior financial management positions at other public companies developing immunotherapy treatments. AC¶125. These admissions of familiarity and this technical, relevant background supports an inference that Defendant Economides knew of the pervasive issues with the Company's cGMP manufacturing and the likely impact on the CORAL Phase II trial and the Company's finances.

***Defendants Communicated with the FDA About the CORAL Trial***. Defendants expressly conferred with the FDA regarding the CORAL Phase II study design, protocols, and materials. In its filings with the SEC, Defendants acknowledged these "Interactions with the Regulatory Health Authorities," where in a pre-IND "interaction with the FDA was conducted to review the proposed clinical investigation" for CORAL, where "[t]he FDA concluded that the overall manufacturing and release testing for the CORAL vaccines candidates … appeared acceptable and requested detail on the transfection process, grade of materials, and release tests be submitted in the IND." AC¶¶66, 119. That the FDA requested more information about the "grade of materials" to be used it the CORAL study supports the inference that Defendants were aware of the FDA's mandates for cGMP materials in Phase II studies, and that the current lack of cGMP grade material at Gritstone would roadblock any viable Phase II study launch. As cases hold, such "knowledge of [the] potential problems with its compliance with FDA CGMP" and, by extension, "that these problems could delay or jeopardize" the CORAL trial supports a strong inference of scienter.[11]

---

[11] *STAAR I*, 388 F.Supp.2d at 1130; *Emergent*, 2023 WL 5671608, at *23 (party was "aware" of information detailing "contamination and quality control issues" supports "strong inference of scienter"); *Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*, 2020 WL 3268531, at *18-19 (S.D.N.Y. June 17, 2020) (allegation that defendant "knew" about content of deficient manufacturing observations from subsequent communications pleads scienter); *Gov't of Guam Ret. Fund v. Invacare Corp.*, 2014 WL 4064256, at *5-6 (N.D. Ohio Aug. 18, 2014) (allegations that "Defendants were made aware" of "numerous, pervasive and repeated violations" in manufacturing pled scienter).

That the foregoing events all took place *before* the FDA's "clinical hold letter" (MTD at 17) is irrelevant as a matter of law and fact. Legally, that formal action is not "necessary to impute knowledge of [cGMP] violations" at a manufacturing facility. *STAAR II*, 2016 WL 6699284, at *12; *Sientra*, 2016 WL 3360676, at *14 (that company "made the challenged statements before [CMO] was forced to cease its manufacturing operations is likewise not fatal" to scienter where internal investigation confirmed contamination). Factually, Defendants' rhetoric is misplaced because they do not deny that these recurring issues constituted cGMP violations, as pled in the AC. *Caraco Pharm. Laby's, Ltd.*, 2010 WL 4184465, at *2, *6 (E.D. Mich. Oct. 21, 2010) (CWs describing "severe" manufacturing problems pre-dating 483 observations supported inference of scienter). Plead together, it was deliberately reckless for Defendants to keep these facts from investors given that they knew such information would "materially risk" the CORAL Phase II trial. *In re Nuvelo, Inc., Sec. Litig.*, 668 F.Supp.2d 1217, 1230 (N.D. Cal. 2009).

***Defendants Certified the Accuracy of Gritstone's Filings***. Defendants Allen and Economides both signed multiple SEC filings endorsing the contents assuring investors (falsely) about the Company's cGMP compliance and (after the BARDA contract was announced) that the CORAL rollout was proceeding as normal, with no material setbacks. AC¶¶69, 75, 79, 93. These support scienter. *See, e.g.*, *Thomas v. Magnachip Semiconductor Corp.*, 167 F.Supp.3d 1029, 1043 (N.D. Cal. 2016); *Cullen v. RYVYL Inc.*, 2024 WL 898206, at *6 (S.D. Cal. Mar. 1, 2024). The AC pleads that being quoted in or signing SEC filings gave rise to a duty to speak truthfully, which Defendants violated (AC¶147). Courts may "impute scienter to individual defendants . . . where . . . a company's public statements are so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607-08 (9th Cir. 2014). That is the case here.

## 2. Success of the CORAL Phase II Rollout Was Critical To The Company's Survival.

Even absent any allegations of knowledge or access to the information (which is alleged here) a strong inference of scienter is pled "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry*, 542 F.3d at 785-86. As pled, Gritstone was a clinical-stage company on the brink of insolvency with no prospects for commercial revenue other than from successful collaborations like BARDA (AC¶35) and Defendants knew the CORAL rollout (and the ability to

realize the $430 million in BARDA funds) depended on the implementation of a cGMP-compliant process (AC¶¶40-41).  As many cases have held, it would be "absurd"—indeed, virtually inconceivable—to think that the CEO or CFO of such a company were unaware of recurring cGMP failures that could (and ultimately did) tank the program on which its finances depended.[12]

"The scope and significance of the events underlying a disclosure can also support an inference of scienter," and "[i]n light of the importance of the implementation of the manufacturing and quality control systems to the [CORAL Phase II] process, the significant amount of work that actually remained to be done on those fronts, … it was highly likely that Defendants were aware that their 'on track' assurances lacked a factual basis." *Acadia Pharms*., 2016 WL 5076147, at *9. Indeed, as Defendants disclosed in Gritstone's November 2023 10-Q, "if BARDA were to decline … [or] delay … funding … this could have a significant, negative impact on our revenues and cash flows." AC¶121.  This warning came to pass:  Indeed, following the failure to comply with the BARDA timelines, Gritstone spiraled into a cash deficit leading to bankruptcy. *Id.*  Thus, that Gritstone was so dependent on this funding for its continued operations demonstrates that Defendants were aware of the Contract's cGMP requirements and the Company's lack of compliance with them. "[U]nder these circumstances it is reasonable to infer that [Gritstone's] leadership 'would be involved closely in ensuring compliance with FDA regulations, especially where any violations could postpone'" the CORAL rollout. *ImmunityBio*, 753 F.Supp.3d at 1067.

### 3. Defendants' Motive Supports Scienter.

Although "motive is not required to adequately plead scienter," it adds to the allegations. *Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, at *21 (C.D. Cal. May 8, 2013).[13]

---

[12] *STAAR II*, 2016 WL 6699284, at *13 (reasonable to infer executives of small pharmaceutical company were "involved closely in ensuring compliance with FDA regulations, especially where any violations could postpone the approval" of key product); *ImmunityBio*, 753 F.Supp.3d at 1067 (same); *Impax Lab'ys*, 36 F.Supp.3d at 970 (absurd "to think that the CEO and CFO of a pharmaceutical company would be unaware of the alleged substandard, non-compliant conditions … the very heart of a company whose main business is manufacturing pharmaceuticals for public consumption"); *Acadia Pharms.*, 2016 WL 5076147, at *9 (similar when "product candidate[] was critical to the success of the company" and "manufacturing and quality assurance" was "important" to approval); *Sientra*, 2016 WL 3360676 (strong inference that the CEO and CFO of medical company were aware of quality control issues plaguing sole manufacturer of silicone breast implants in light of the importance of manufacturing and quality control to the success of Sientra); *Amgen*, 2014 WL 12585809, at *11.

[13] Insider trading is not necessary to plead scienter. *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding*, 320 F.3d 920, 944 (9th Cir. 2003).  In *ImmunityBio*, the CEO was not alleged to have insider trades and made a "personal investment of an additional $300 million

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Allegations beyond "the usual concern by executives to improve financial results" founded on a company's future being dependent on a certain product support scienter. *In re Cabletron Sys., Inc.*, 311 F.3d 11, 39 (1st Cir. 2002); *Gammel*, 2013 WL 1947525, at *21 (executive could "recklessly misrepresent the inability to deliver on those promises"); *Splunk*, 592 F.Supp.3d at 949 & n.9 ("incentive" to deceive investors to boost career). That includes allegations where, as here, a drug company was "burning cash at a high rate and was dependent on [a specific drug] as the most promising drug in its pipeline." *In re Sepracor, Inc. Sec. Litig.*, 308 F.Supp.2d 20, 31 (D. Mass. 2004); *Nguyen v. Radient Pharms. Corp.* 2011 WL 5041959, at *8 (C.D. Cal. Oct. 20, 2011) (motive where "ability to continue operating was dependent upon raising additional capital"). As discussed, Gritstone's survival was dependent on the cash from the CORAL Phase II rollout, and its failure resulted in devastating workforce cuts, leading the Company in bankruptcy. AC¶121. Like here, where "executiv[es] ha[ve] a stronger incentive to bet the farm in a reckless gamble because the alternative is certain failure … supports … scienter." *Skiadas v. Acer Theraps. Inc.*, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020). *In re Innocoll Holdings Pub. Ltd. Sec. Litig.*, 2020 WL 1479128, at *10 (E.D. Pa. Mar. 25, 2020) (fear of losing job because company was on verge of insolvency); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83–84 (1st Cir. 2002); *see also In re Insys Theraps., Inc. Sec. Litig.*, 2018 WL 2943746, at *6 (S.D.N.Y. June 12, 2018) (executives motivated to misstate financials "to maintain the appearance of continued success" and "cover up the economic impact of" problems). In addition, prolonging the "survival" of an enterprise the Defendants manage can supply a proper motive. *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F.Supp.2d 1165, 1194-95 (D.N.M. 2010); *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 527 F.Supp.3d 1151, 1185 (N.D. Cal. 2021) (motive to buy time for strategy to succeed). Thus, this is a case where the "executives' careers and the very survival of the company were on the line" that strongly supports an inference of scienter. *Cabletron*, 311 F.3d at 39.

## C.    Plaintiffs Adequately Allege Claims Against Defendant CFO Economides.

Defendant Economides claims "Plaintiffs have not properly alleged that" she made any of these false and misleading statements under *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564

---

into the [company]" that "certainly suggests some level of faith in the company's ultimate success," "but … [did not] resolve[] Defendants' attempts to mislead investors as to the state of their manufacturing compliance." *ImmunityBio*, 753 F.Supp.3d at 1068.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

23

U.S. 135 (2011).  ECF No. 58 at 6.  But "[i]n the post-*Janus* world, an executive may be held accountable where the executive had ultimate authority over the company's statement; signed the company's statement; ratified and approved the company's statement; or where the statement is attributed to the executive." *In re Fannie Mae 2008 Sec. Litig.*, 891 F.Supp.2d 458, 473 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 16 (2d Cir. 2013).  The AC adequately alleges Economides meets this standard.  Economides is unquestionably a "maker" of the alleged false statements within Gritstone's SEC filings that Economides signed.  AC¶¶69, 75, 79, 93.[14]  Post-*Janus*, courts still routinely find signatories of SEC filings are the makers of such documents and the statements therein.  *Special Situations Fund III QP, L.P. v. Brar*, 2015 WL 1393539, at *3 (N.D. Cal. Mar. 26, 2015) ("the signer … is its 'maker,' because signing a filing implies 'ultimate control' over its contents"); *Abdo v. Fitzsimmons*, 2018 WL 11220494, at *10 (N.D. Cal. May 22, 2018) (same); *In re LDK Solar Sec. Litig.*, 2008 WL 4369987, at *8 (N.D. Cal. Sept. 24, 2008) (same).[15]

Likewise, the AC pleads Economides' "ultimate authority" over the misstatements about the CORAL program.  In particular, the AC notes how Economides "possessed the power and authority to control the contents of Gritstone's SEC filings, press releases, and other market communications," AC¶21, and was "provided with copies of Gritstone's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected," *Id*.  Courts have repeatedly found such allegations are sufficient alone to establish an executive as a "maker" of a company's statement. *See, e.g.*, *Zhou v. Faraday Future Intelligent Elec. Inc.*, 2022 WL 13800633, at *11 (C.D. Cal. Oct. 20, 2022) (endorsing same language); *In re Rocket Fuel, Inc. Sec. Litig.*, 2015 WL 9311921, at *10 (N.D. Cal. Dec. 23, 2015) (same). Economides "ultimate authority" is also evinced by "various indicia of control" "implicit from surrounding circumstances." *Xu v.*

---

[14] The claim that "Plaintiffs have failed to plead specific facts showing that Ms. Economides signed the challenged filings" (ECF No. 58 at 6) is bellied by Defendant Economides' *admission* to signing several SEC filings (ECF No. 58 at 7 n.6).

[15] Defendant Economides' authorities are not to the contrary.  ECF No. 58 at 8. In *Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *9 (N.D. Cal. Feb. 27, 2018) and *Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096, at *17 (N.D. Cal. Nov. 16, 2020) "there is no allegation that [defendant] … signed any of the SEC filings or press releases, nor are there any allegations that he was responsible for or had ultimate authority over their content," which is not the case here.  And in *Borteanu v. Nikola Corp.*, 2023 WL 11017679, at *5 (D. Ariz. Dec. 8, 2023), the court acknowledged that "'maker liability' will … attach to Defendants for the SEC filings or press releases which they personally signed."

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

24

*Gridsum Holding Inc.*, 624 F.Supp.3d 352, 359 (S.D.N.Y. 2022) ("'[U]ltimate authority' . . . can be found if implicit in surrounding circumstances, or, in other words, evidenced by various indicia of control."). Defendant's claim that "the alleged facts do not show that Ms. Economides—rather than any other executive, officer, director, or entity—had ultimate control over those statements" (ECF No. 58 at 8-9), ignores that as CFO, AC¶19, Defendant Economides would have primary authority over statements about Gritstone's cash runway, as the SEC filings signed by her convey. *E.g.*, AC¶94 ("These results were prepared by management and were based on the most current information available to management."). And her admissions in her bankruptcy declaration that "[a]s a result of my roles as CFO and EVP, I am familiar with the Debtor's [Gritstone's] businesses, financial affairs, and day-to-day operations" confirms it. Economides Bankr. Decl. ¶6; *see In re Cannavest Corp. Sec. Litig.*, 307 F.Supp.3d 222, 241 (S.D.N.Y. 2018) ("those with direct involvement in the everyday business . . . made the statements at issue").[16]

## IV.    CONCLUSION

Defendants' motions should be denied. Alternatively, Plaintiffs request leave to amend to cure any deficiencies. *Cisneros v. Allianz Life*, 2019 WL 9656383, at *4 (N.D. Cal. Dec. 2, 2019).

Dated: April 8, 2025

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)

---

[16] Defendants challenge the loss causation dates after the February 12, 2024 disclosure that the CORAL Phase II study "would be delayed" due to cGMP failures (MTD at 25), but each of those later losses are also causally related to Defendants' omissions about the pervasive cGMP issues: (1) the February 29 disclosure revealed the need for a "40% reduction of [the Company's] workforce" "following the recently announced delay of the proposed CORAL Phase 2b study, which resulted in Gritstone not receiving external funding it previously anticipated beginning in 1Q 2024, associated with the initiation of the study," AC¶106; (2) the March 5 disclosure revealed that the Company "received … [a] formal clinical hold letter from the FDA" due to cGMP deficiencies, AC¶¶112-13; and (3) the April 1 disclosure announced that the Company "commenced an underwritten public offering of shares of its common stock" to shore up the Company's liquidity crisis caused by the delay of the CORAL Phase II trial, AC¶115. A corrective disclosure "can reveal fraud 'in one fell swoop' or through a series of partial disclosures." *In re Genius Brand Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1184 (9th Cir. 2024); *Kui Zhu v Taronis Techs. Inc.*, 2020 WL 1703680, at *6 (D. Ariz. Apr. 8, 2020) ("[T]heory of a 'slow leak' revelation is nuanced, but this Circuit has recognized that there are an infinite number of ways to allege loss causation."). That is what occurred here.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

25

1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II (*pro hac vice*)
Samantha Daniels (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com
sdaniels@pomlaw.com

*Counsel for Lead Plaintiff Richard
Rodriguez and Lead Counsel for the
Class*

THE SCHALL FIRM
Brian Schall
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff
Richard Rodriguez*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
26