CATHERINE D. KEVANE (CSB No. 215501)
ckevane@fenwick.com
MARIE C. BAFUS (CSB No. 258417)
mbafus@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Telephone:     415.875.2300
Facsimile:     415.281.1350

KATHRYN HAUH (CSB No. 347786)
khauh@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone:     650.988.8500
Facsimile.     650.938.5200

Y. MONICA CHAN (admitted *pro hac vice*)
mchan@fenwick.com
FENWICK & WEST LLP
401 Union Street, 5th Floor
Seattle, WA  98101
Telephone:     206.389.4510
Facsimile:     650.938.5200

Attorneys for Defendant ANDREW R. ALLEN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE GRITSTONE BIO, INC. SECURITIES LITIGATION | Case No.: 3:24-cv-03640-CRB |
| | <u>CLASS ACTION</u> |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | **DEFENDANT ANDREW R. ALLEN'S NOTICE OF MOTION AND MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |
| | Date:        February 6, 2026 |
| | Time:        10:00 a.m. |
| | Dept:        Courtroom 6—17th Floor |
| | Judge:       Hon. Charles R. Breyer |

FENWICK & WEST LLP
ATTORNEYS AT LAW

## TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ........................................................... 1

ISSUES TO BE DECIDED ................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................... 1

I.      INTRODUCTION ....................................................................................................... 1

II.     STATEMENT OF FACTS .......................................................................................... 3

    A.      Gritstone ........................................................................................................ 3

    B.      Events During the Class Period ...................................................................... 3

        1.      Gritstone Announces Full Year 2022 Results on March 9, 2023 .............. 3

        2.      The Company Announces Q1 and Q2 2023 Results .................................. 5

        3.      The Company Enters the BARDA Contract .............................................. 5

        4.      The Company Announces Q3 2023 Results on November 8, 2023 ........... 6

        5.      The Company Delays the Phase 2b Study to the Fall of 2024 ................... 6

        6.      Gritstone Announces Full Year 2023 Results and a Corporate Update ........................................................................................................ 7

    C.      Procedural Posture ......................................................................................... 7

III.    APPLICABLE PLEADING STANDARDS ................................................................ 7

IV.     PLAINTIFFS STILL DO NOT PLEAD ANY MATERIAL MISSTATEMENTS ........... 8

    A.      The Pre-BARDA Contract Statements Remain Inactionable ................................. 9

    B.      The CORAL Phase 2b Study Statements Were Not False or Misleading ............ 11

        1.      Statements Regarding the Anticipated Financial Impact of the BARDA Contract and the Expected Phase 2b Study Timeline Are Protected by the PSLRA Safe Harbor ........................................................ 11

        2.      Plaintiffs Allege No Requirement to Use Fully GMP-Grade Raw Materials Across Phase 2 Trials, Let Alone the CORAL Phase 2b Study ........................................................................................................ 13

        3.      Vague CW Accounts Fail to Establish Falsity with Specificity ............... 16

    C.      The Court Has Already Rejected Plaintiffs' Purported Expert ........................... 18

V.      PLAINTIFFS DO NOT PLEAD A STRONG INFERENCE OF SCIENTER ............... 18

    A.      The CW Accounts Still Raise No Inference of Scienter ..................................... 19

FENWICK & WEST LLP
ATTORNEYS AT LAW

B.     The Absence of Insider Stock Sales Undermines Any Inference of Scienter ....... 21

C.     None of Plaintiffs' Remaining Allegations Establish Scienter ............................ 21

VI.    PLAINTIFFS STILL FAIL TO PLEAD LOSS CAUSATION ........................................ 23

VII.   PLAINTIFFS STILL FAIL TO PLEAD CONTROL PERSON LIABILITY ................. 24

VIII.  CONCLUSION .......................................................................................................... 24

FENWICK & WEST LLP
ATTORNEYS AT LAW

DEFENDANT ANDREW R. ALLEN'S MOTION TO
DISMISS THE SECOND AMENDED COMPLAINT       ii       Case No.: 3:24-cv-03640-CRB

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Brodsky v. Yahoo! Inc.*,
630 F. Supp. 2d 1104 (N.D. Cal. 2009) ...............................................................................16

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002)...........................................................................................8, 11

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) ..............................................................................13

*Dresner v. Silverback Therapeutics, Inc.*,
2023 WL 2913755 (W.D. Wash. Apr. 12, 2023)............................................................12, 20

*Dura Pharms. Inc. v. Broudo*,
544 U.S. 336 (1995).............................................................................................................23

*Espy v. J2 Glob., Inc.*,
99 F.4th 527 (9th Cir. 2024)................................................................................................22

*Hampton v. Aqua Metals, Inc.*,
2020 WL 6710096 (N.D. Cal. Nov. 16, 2020).....................................................................16

*In re AnaptysBio, Inc. Sec. Litig.*,
2021 WL 4267413 (S.D. Cal. Sept. 20, 2021) .....................................................................22

*In re Finisar Corp. Deriv. Litig.*,
2012 WL 2873844 (N.D. Cal. July 12, 2012).......................................................................23

*In re Hansen Nat. Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007)................................................................................11

*In re Nuvelo, Inc. Sec. Litig.*,
2008 WL 5114325 (N.D. Cal. Dec. 4, 2008) .......................................................................13

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014)...............................................................................................9

*In re Pivotal Sec. Litig.*,
2020 WL 4193384 (N.D. Cal. July 21, 2020).......................................................................13

*In re Pixar Sec. Litig.*,
450 F. Supp. 2d 1096 (N.D. Cal. 2006) ...............................................................................21

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012)...........................................................................................8, 18

*Joyce v. Amazon.com, Inc.*,
2023 WL 8370101 (W.D. Wash. Dec. 4, 2023)....................................................................22

FENWICK & WEST LLP
ATTORNEYS AT LAW

*Lake v. Zogenix, Inc.*,
2020 WL 3820424 (N.D. Cal. Jan. 24, 2020) ................................................................18

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016).......................................................................................20

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014)..........................................................................................23

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ..........................................................................................................8

*Mazzaferro v. Aruba Networks*,
2015 WL 456534 (N.D. Cal. Feb. 2, 2015), *aff'd sub nom. Par. Inv. Partners. L.P. v.
Aruba Networks, Inc.*, 681 F. App'x 618 (9th Cir. 2017) ............................................17

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008).....................................................................................7, 21

*Mineworkers' Pension Scheme v. First Solar, Inc.*,
881 F.3d 750 (9th Cir. 2018).........................................................................................23

*Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*,
2018 WL 3126393 (N.D. Cal. June 26, 2018) ...........................................................17, 21

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
780 F. App'x 480 (9th Cir. 2019) ...............................................................................19, 20

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014)...........................................................................................7

*Pardi v. Tricida, Inc.*,
2024 WL 1056013 (N.D. Cal. Mar. 11, 2024) ...............................................................17

*Park v. GoPro, Inc.*,
2019 WL 1231175 (N.D. Cal. Mar. 15, 2019) .................................................................8

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
2012 WL 1868874 (N.D. Cal. May 22, 2012), *aff'd*, 759 F.3d 1051 (9th Cir. 2014)..............19

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014).....................................................................................12, 21

*Prodanova v. H.C. Wainwright & Co.*,
993 F.3d 1097 (9th Cir. 2021).....................................................................................21, 22

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
845 F.3d 1268 (9th Cir. 2017)...................................................................................8, 10, 14

*Rok v. Identiv, Inc.*,
2017 WL 35496 (N.D. Cal. Jan. 4, 2017), *aff'd*, 716 F. App'x 663 (9th Cir. 2018) ...............23

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001)....................................................................................9, 11, 19

FENWICK & WEST LLP
ATTORNEYS AT LAW

*Tellabs. Applestein v. Medivation, Inc.*,
561 F. App'x 598 (9th Cir. 2014) .................................................................................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ..............................................................................................8, 18

*Webb v. SolarCity Corp.*,
884 F.3d 844 (9th Cir. 2018)........................................................................8, 18, 21, 22

*Wochos v. Tesla, Inc.*,
2019 WL 1332395 (N.D. Cal. Mar. 25, 2019), *aff'd*, 985 F.3d 1180 (9th Cir. 2021) .............12

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009)...............................................................................19, 24

**STATUTES**

15 U.S.C.
§ 78u-4(b)......................................................................................................................8
§ 78u-5(i)......................................................................................................................12
§ 78u-5(c)..............................................................................................................11, 12

21 U.S.C. § 351(a) ...........................................................................................................14

Federal Food, Drug, and Cosmetic Act § 501(a)(2)(B) .......................................................14

**OTHER AUTHORITIES**

21 C.F.R.
§ 10.115(d) ...................................................................................................................14
§ 210.3(b) ...............................................................................................................14, 15
§ 211.80(b) ...................................................................................................................14
§ 211.82(b) ...................................................................................................................14
§ 211.84(d) ...................................................................................................................14
§ 312.23(a) ...................................................................................................................17

*Contract Manufacturing Arrangements for Drugs: Quality Agreements Guidance for Industry* (Nov. 2016), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/contract-manufacturing-arrangements-drugs-quality-agreements-guidance-industry .......................................................................................14

*INDs for Phase 2 and Phase 3 Studies: Chemistry, Manufacturing, and Controls Information* (May 2003), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/inds-phase-2-and-phase-3-studies-chemistry-manufacturing-and-controls-information.............................................................17

FENWICK & WEST LLP
ATTORNEYS AT LAW

**NOTICE OF MOTION AND MOTION TO DISMISS**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on February 6, 2026, at 10:00 a.m., or as soon as available, in the courtroom of the Honorable Charles R. Breyer, 450 Golden Gate Avenue, San Francisco, CA, 94102, Defendant Dr. Andrew R. Allen will move to dismiss Plaintiffs' Second Amended Complaint ("SAC"). Dr. Allen moves under Fed. R. Civ. P. 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") for failure to state a claim under Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934. This motion is based on the Memorandum of Points and Authorities, the Request for Judicial Notice, the Declaration of Marie Bafus and exhibits ("Ex."), arguments of counsel, and other matters properly before the Court.

**ISSUES TO BE DECIDED**

1.       Should the Section 10(b) claim be dismissed where the SAC fails to plead facts (a) raising a strong inference of scienter, (b) showing a material actionable statement, and (c) necessary to plead loss causation?

2.       Should the Section 20(a) control person claim be dismissed where the SAC fails to plead a primary violation of Section 10(b)?

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.       INTRODUCTION**

The SAC does not come close to curing the defects that required dismissal of its predecessor, the Amended Complaint ("AC"). Plaintiffs repeat many of the ineffectual allegations from their earlier pleading and—despite the stringent pleading requirements imposed by the PSLRA and Rule 9(b)—add no facts to show that Defendant Andrew R. Allen acted with scienter or to otherwise repair their pleading defects. The basic facts remain the same. Gritstone Bio, Inc. ("Gritstone" or the "Company") was a biotechnology company focused on developing next-generation vaccines using self-amplifying mRNA. Gritstone entered a contract with the Biomedical Advanced Research and Development Authority ("BARDA") on September 27, 2023 ("BARDA Contract"), which provided up to $433 million to evaluate the Company's COVID-19 vaccine program called CORAL in a Phase 2b clinical trial ("Phase 2b Study"). On that day,

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

Gritstone also announced that it expected to initiate the Phase 2b Study in Q1 2024. But, in January 2024, the Food and Drug Administration ("FDA") placed the study on a clinical hold to allow for the full use of current-good-manufacturing-practices ("GMP" or "cGMP")-grade raw materials in the vaccines for the study.

Working backwards from the FDA's clinical hold, Plaintiffs contend that two categories of statements made between March 9, 2023 and February 12, 2024 are actionable: (1) statements that predate the BARDA Contract statements; and (2) statements made in September, October, and November 2023 and February 2024 regarding the BARDA Contract, specifically (a) statements regarding the expected financial value of the contract and (b) statements regarding the anticipated timeline for launching the Phase 2b Study.

In rejecting Plaintiffs' theory, the Court concluded that Plaintiffs "fail[ed] to adequately allege that Gritstone or Defendants knew that [the grade of materials] would cause problems for the BARDA contract until the FDA issued its clinical hold letter in January 2024." Dkt. 69, Order Granting Motion to Dismiss ("Order") at 12-13. The Court concluded that the challenged statements, other than certain narrow statements relating to third-party contract manufacturing, were "either puffery," "forward-looking and therefore [] not materially misleading under the securities laws," or "not false or misleading when viewed in their proper context." *Id.* at 9 n.1, 11-12. The Court also rejected the opinions of Plaintiffs' purported expert, Todd Clark, as an "after-the-fact assessment [that] is impermissible fraud by hindsight" because "it does not establish that Gritstone's statements were 'misleading at the time they were made.'" *Id.* at 13 (citation omitted). The Court also concluded that the assertions by a confidential witness ("CW")—CW1, the only CW who even purported to offer any information as to Dr. Allen's statement of mind—"lack[ed] the detail necessary to establish that Allen knew or should have known about those issues at the time that Gritstone made the misleading statements as to cGMP." *Id.* at 16. In short, the Court found that Plaintiffs' allegations did "not tell a cohesive story of a corporate executive attempting to hide key failings from his investors"; instead, the more likely alternative explanation is that Dr. "Allen, as Gritstone's CEO, was focused on bigger-picture aspects of the CORAL trials—especially since, as explained above, there was no reason for Allen or anyone at Gritstone to know

that the cGMP status of source products used in the CORAL vaccine would be a dealbreaker." *Id.* at 16-17.

Plaintiffs filed the SAC on August 21, 2025, asserting Section 10(b) and Section 20(a) claims against Dr. Allen for the same alleged misstatements based on largely the same allegations. The SAC introduces three additional CWs (CWs4-6), expands on Dr. Allen's background and expertise, and misconstrues a federal statute and various FDA regulations and guidelines. None of the new allegations, however, fix the fatal deficiencies previously identified by the Court. The Court should dismiss again—this time with prejudice.

## II.      STATEMENT OF FACTS

### A.      Gritstone

Gritstone was founded in 2015 with a focus on combining immunological insights with proprietary technologies to develop next-generation vaccines against cancer and infectious disease. ¶ 24.[1]  While Gritstone had multiple product candidates in development and testing, it had "no commercial-stage products." ¶ 4.  The Company's product candidates included oncology programs and infectious disease programs (e.g., CORAL). Ex. 1 at 7-13.  CORAL was initiated in 2021 as a "proof-of-concept" COVID-19 vaccine program. *Id.* at 12; Ex. 7 at 1.

### B.      Events During the Class Period

#### 1.      Gritstone Announces Full Year 2022 Results on March 9, 2023

The alleged class period begins on March 9, 2023, when the Company filed its annual report for the full year 2022 on Form 10-K.

***Manufacturing of Product Candidates.*** The 2022 10-K explained that the Company "use[s] a hybrid approach" whereby product candidates may be manufactured internally at the Company's facility or "on an outsourced basis" by third-party contract manufacturing organizations ("CMOs"). Ex. 1 at 16.  The Company also disclosed that it "currently lack[s] the internal resources and the capability to manufacture certain elements of our product candidates on a late-clinical or commercial scale." *Id.* at 52.  The Company further noted that it "do[es] not control the

---

[1] Unless otherwise noted, references to "¶ _" and "¶¶ _" are to paragraphs in the SAC.

FENWICK & WEST LLP
ATTORNEYS AT LAW

manufacturing process at our CMOs and [is] completely dependent on them for compliance with current regulatory requirements," and that the Company has "limited control over the ability of our CMOs to maintain adequate quality control, quality assurance and qualified personnel." *Id.* The Company further explained that "[a]dditional scale-up activities involving CMOs will be needed as the CORAL program progresses." ¶ 132.

***Third-Party Suppliers of Raw Materials.*** The 2022 10-K disclosed that the Company "rel[ied] on qualified third parties to supply some components of our product candidates," and "the loss of our third-party suppliers, or our or their failure to comply with applicable regulatory requirements or to supply sufficient quantities at acceptable quality levels or prices, or at all, would materially adversely affect our business." *Id.* at 37. The Company explained that "[w]e rely on third-party suppliers for certain materials required for the production of our individualized immunotherapy candidate." *Id.* at 53. The Company warned of the myriad risks associated with sourcing materials for the product candidates, including:

- "We cannot be certain that our suppliers will continue to provide us with the quantities of these raw materials that we require or satisfy our anticipated specifications and quality requirements," *id.*;

- "Any performance failure on the part of our suppliers could delay the development and potential commercialization of our product candidates, including limiting supplies necessary for clinical trials and regulatory approvals, which would have a material adverse effect on our business," *id.*; and

- The Company and its "CMOs may experience . . . raw material sourcing difficulties due to resource constraints, as a result of labor disputes or unstable political environments, or due to the impact of a public health crisis such as the COVID-19 pandemic." *Id.* at 52.

***Development and Regulatory Approval of Product Candidates.*** The 2022 10-K also summarized the status of the Company's product candidates, including CORAL. ¶ 27; Ex. 1 at 12-13. At that time, the CORAL program was still in "multiple ongoing Phase 1 trials," and the Phase 2b Study had not yet materialized. Ex. 1 at 12. The Company warned investors about risks and uncertainties associated with the development, testing, and approval of its product candidates, such as CORAL. *Id.* at 19, 46. For example, the Company cautioned that the FDA may issue findings regarding compliance with "regulatory requirements, including cGMP," and may "require the implementation of costly corrective actions;" a clinical trial could be "suspended or terminated

FENWICK & WEST LLP
ATTORNEYS AT LAW

. . . by the FDA;" and "the quality of our product candidates or other materials necessary to conduct preclinical studies or clinical trials" may be "insufficient or inadequate." *Id.* at 42-43, 46-47.

### 2.     The Company Announces Q1 and Q2 2023 Results

On May 11, 2023, the Company announced its Q1 2023 results. ¶ 75. Gritstone's Q1 2023 10-Q warned that the Company's "future capital requirements depend on many factors," including "the scope, progress, results and costs of developing our product candidates, and of conducting preclinical studies and clinical trials," including CORAL. Ex. 2. at 37-38. The Company reminded investors that Gritstone "currently depends on third-party suppliers for key materials and services used in its research and development manufacturing process and is subject to certain risks related to the loss of these third-party suppliers or their inability to supply the Company with adequate materials and services." *Id.* at 7. During the earnings call, Dr. Allen stated that "[w]e expect to share additional data from our [CORAL] program this fall." Ex. 3 at 4.

On August 9, 2023, Gritstone announced its Q2 2023 results. ¶ 76. Gritstone's Q2 2023 10-Q included "a new 'going concern' warning" (*id.*), disclosing that "[t]he Company's cash, cash equivalents and marketable securities are not sufficient to fund the Company's planned operations for a period of 12 months from the date the financial statements are issued." Ex. 4 at 6, 39.

### 3.     The Company Enters the BARDA Contract

On September 27, 2023, the Company announced that it had entered into the BARDA Contract on that day. Ex. 5 at 1; Ex. 6. According to its terms, the "BARDA Contract could result in payments to the Company of up to approximately $433 million" to conduct the CORAL Phase 2b study. Ex. 5 at 1. The "base period for the BARDA Contract includes government funding of up to approximately $10 million for performance of certain milestones such as preparation of protocol synopsis and submission of an investigational new drug application." *Id.* After the successful completion of the base period, the BARDA Contract "provides for approximately $423 million of additional BARDA funding for two stages gated at BARDA's discretion." *Id.* The contract gave "the government the right to terminate the contract at any time for its convenience." *Id.* at 1. The BARDA Contract notably does not address the grade of the raw materials to be used in the vaccines for the Phase 2b Study. Ex. 6 at 31. The Company estimated that the anticipated

FENWICK & WEST LLP
ATTORNEYS AT LAW

fees and reimbursements under the BARDA Contract would extend the Company's cash runway into Q4 2024. *Id.* The Company's press release reiterated the uncertainties inherent in "the regulatory approval processes" and "the challenges associated with manufacturing drug products," directing investors to prior risk disclosures. Ex. 7.

On October 11, 2023, the Company announced promising results from three ongoing Phase 1 studies for the CORAL program. Ex. 8.

### 4. The Company Announces Q3 2023 Results on November 8, 2023

The Company announced its Q3 2023 financial results on November 8, 2023. ¶ 152; *see also* Exs. 9 and 10. In its Q3 2023 10-Q and earnings press release, the Company extensively disclosed the risks associated with the BARDA Contract, including:

- "[I]f BARDA were to decline to pursue any of the gated stages, eliminate, reduce, delay, or object to extensions for funding available to us under the BARDA Contract, this could have a significant, negative impact on our revenues and cash flows." Ex. 9 at 46.

- "[T]he continuation of the BARDA Contract primarily depends on our ability to meet development milestones previously agreed to with BARDA and on our compliance with certain operating procedures and protocols" but the Company is "relatively new to government contracting and the related regulatory compliance obligations, and [is] continuing to develop and implement our internal compliance processes." *Id.* at 47.

- "***There can be no assurance that we will be able to achieve [key] milestones or continue to comply with these procedures and protocols, and there can also be no assurance that the BARDA Contract will not be terminated***, . . . or that we will otherwise obtain the funding that we anticipate to obtain under the BARDA Contract." *Id.*[2]

### 5. The Company Delays the Phase 2b Study to the Fall of 2024

Following the submission of the Investigational New Drug application ("IND") to the FDA in November 2023, the receipt of the formal clinical hold letter in January 2024, and communications with the FDA and BARDA, Gritstone announced on February 12, 2024 its decision to postpone the Phase 2b Study until the fall of 2024. As disclosed, "[t]he FDA informed the Company that, with respect to the Phase 2b Trial, the Company would be required to use fully GMP-grade materials, as well as implement certain other minor changes." Ex. 12. The Company also stated that it was making "necessary preparations to begin the Phase 2b study later this year

---

[2] Unless otherwise noted, all emphasis herein is added.

FENWICK & WEST LLP
ATTORNEYS AT LAW

using fully GMP-grade materials." Ex. 11. The Company's other programs were not affected by this development. *See* Exs. 11, 12.

On February 29, 2024, the Company announced an around 40% reduction in force. Ex. 13.

### 6. Gritstone Announces Full Year 2023 Results and a Corporate Update

On March 5, 2024, the Company filed its 2023 annual report on Form 10-K. Ex. 14. The Company stated that it was "working on preparing a complete response to the FDA's [January 2024 clinical hold letter] in an effort to remove the clinical hold from our IND application." *Id.* at 37-38; *see also* Ex. 15. It also advised that this "may take considerable time and expense" and "no assurance can be given that the FDA will remove the clinical hold." Ex. 14 at 48.

The alleged class period ends on April 2, 2024, a day after the Company announced "an underwritten public offering of shares of its common stock." ¶¶ 9, 181. The announcement did not mention the CORAL program or the BARDA Contract. *See* Ex. 16.

On October 10, 2024, the Company declared Chapter 11 bankruptcy. ¶ 182.

### C. Procedural Posture

On June 17, 2024, an initial securities class action was filed against the Company, Dr. Allen (the Company's CEO), and Vassiliki Economides (the Company's CFO). ECF No. 1. The initial complaint alleged a class period of March 9, 2023 through February 29, 2024, the alleged date on which the "truth" was revealed. *Id.* ¶¶ 1, 6. On December 9, 2024, Plaintiffs filed the AC, voluntarily dismissing the Company and expanding the class period to April 2, 2024. Dr. Allen and Ms. Economides moved to dismiss the AC. On July 24, 2025, the Court granted defendants' motions, dismissing the claims without prejudice as to Dr. Allen and with prejudice as to Ms. Economides. Plaintiffs filed the SAC on August 21, 2025.

## III. APPLICABLE PLEADING STANDARDS

Under Section 10(b), a plaintiff must plead "(1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603 (9th Cir. 2014). A Section 10(b) claim is subject to the "formidable" pleading requirements of the PSLRA and Rule 9(b). *Metzler Inv. GMBH v.*

FENWICK & WEST LLP
ATTORNEYS AT LAW

*Corinthian Colls., Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008). Plaintiff must offer specific, contemporaneous facts showing falsity and scienter, not mere "fraud by hindsight." *Park v. GoPro, Inc.*, 2019 WL 1231175, at *9 (N.D. Cal. Mar. 15, 2019). The securities laws "do not create an affirmative duty to disclose any and all material information," *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011), and do not prohibit statements that are merely "incomplete," *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012). To be actionable, any omission must affirmatively create "an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). A plaintiff also must plead facts to establish a "strong inference" that each alleged misstatement was made with scienter, an intent to defraud or deliberate recklessness so egregious as to be tantamount to actual intent. 15 U.S.C. § 78u-4(b)(2)(A); *Webb v. SolarCity Corp.*, 884 F.3d 844, 850-51 (9th Cir. 2018). The inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

## IV. PLAINTIFFS STILL DO NOT PLEAD ANY MATERIAL MISSTATEMENTS

The Order explained in detail why the AC failed to allege that the challenged statements were materially false or misleading when made. Order at 8-13. Notwithstanding that guidance, the SAC still does not "allege a [misstatement] with particularity and explain why it is misleading." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1274 (9th Cir. 2017).

Plaintiffs continue to challenge the same statements (made on March 9, 2023, May 11, 2023, August 9, 2023, September 27, 2023, October 11, 2023, November 8, 2023, and February 23, 2024), with substantially the same allegations. Plaintiffs still rely on an impermissible "fraud by hindsight" theory—that Gritstone was always required to use fully GMP-grade materials for the Phase 2b Study because the FDA later placed the study on a clinical hold to allow for the use of such materials. But as the Court found, although Plaintiffs "allege that Gritstone knew that some of its source materials were not compliant with good manufacturing practices, they fail to adequately allege that Gritstone or Defendants knew that would cause problems for the BARDA

FENWICK & WEST LLP
ATTORNEYS AT LAW

contract until the FDA issued its clinical hold letter in January 2024." Order at 12-13.

The SAC does nothing to cure the fundamental flaws in Plaintiffs' underlying theory. Nor do the SAC's new allegations provide the **particularized, contemporaneous facts** necessary to establish that the challenged statements were materially false or misleading **when made**. *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001).[3]

### A. The Pre-BARDA Contract Statements Remain Inactionable

The Court has considered and rejected Plaintiffs' falsity theory as to the challenged March 9, May 11, and August 9, 2023 statements regarding the Company's use of third-party CMOs to manufacture its product candidates, the CORAL Phase 1 studies, and the Company's "future cash requirements." *See* ¶¶ 129-32, 135, 137-38, 141. Nothing in the SAC changes that result.

The Court already concluded that there were no misstatements "with respect to the use of third-party contractors." Order at 11. Although the Company stated that it had "successfully internalized all biomanufacturing steps to drive down both cost and production," the Company also disclosed that it "currently lack[s] the internal resources and the capability to manufacture certain elements of our product candidates," that it would "rely on qualified third parties to supply some components of our product candidates," and that "[a]dditional scale-up activities involving CMOs will be needed as the CORAL program progresses." ¶ 132; *see also, e.g.*, Ex. 1 at 16, 37, 52. In light of this, the Court found that statements regarding the use of third-party contractors were simply "not false or misleading when viewed in their proper context." Order at 11. The SAC does not (and cannot) plead around that context.

The Court found other pre-BARDA Contract statements—*e.g.*, Gritstone's statement that it "expect[ed] to share additional data from [the] CORAL program this fall"—to be "either puffery or forward-looking and therefore [] not materially misleading under the securities laws." Order at 9 n.1.[4] The SAC adds no new allegations related to these statements, and they fail for the same

---

[3] Any claim based on item 303 of Regulation S-K (*see* ¶¶ 164-70) fails as before because "Item 303 does not create a duty to disclose for purposes of Section 10(b) and Rule 10b-5." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014). There is no violation of items 303 or 105 because the SAC does not plead any false or misleading statement with specificity.

[4] Although the Court did not specifically address the challenged statement regarding Gritstone's "future capital requirements" (¶ 138), it would also fall under the category of inactionable "forward-

FENWICK & WEST LLP
ATTORNEYS AT LAW

reasons as set forth in the Order. *See* Dkt. 70-1 (Redline between AC and SAC) at 54-59.

Indeed, the *only* challenged statements that survived dismissal was the March 9, 2023 statement that "[a]ll internal and third-party contract manufacturing is performed under cGMP or similar guidelines" and the associated risk disclosures.[5] Order at 11. The Court found that for pleading purposes, Plaintiffs adequately alleged falsity because "Gritstone's contractors did not comply with good manufacturing practices." *Id.* But even so, the SAC fails to allege materiality, which requires "a substantial likelihood that it would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" to investors. *Retail Wholesale*, 845 F.3d at 1274 (quotation and citation omitted). Here, these statements were immaterial in light of "the 'total mix' of information" already available to investors, including repeated warnings that CMOs might not manufacture material that "conforms to our specifications and the strict regulatory requirements of the FDA," and that third-party suppliers might not provide Gritstone with "quantities of these raw materials that we require or satisfy our anticipated specifications and quality requirements." Ex. 1 at 52-53. There is no allegation that Gritstone's CMOs failed to comply with "similar guidelines" (in fact, the SAC entirely ignores this part of the statement), that all or most CMOs failed to comply with cGMP, or that their non-compliance had any impact whatsoever on Gritstone. To the contrary, the SAC indicates that there was *no* impact. At the time, the CORAL program was still in Phase 1 trials—which "did not need to meet the FDA's cGMP requirements" (¶ 31)—and neither the BARDA Contract nor Phase 2 would come

looking" statements. And the March 9, 2023 statements—that "[t]he FDA concluded that the overall manufacturing and release testing for the CORAL vaccines candidates . . . appeared acceptable" and that it "previewed the proposed clinical protocol, confirmed that the overall design appeared reasonable" (¶ 131)—were indisputably accurate: the CORAL program was then in Phase 1, which Plaintiffs concede "did not need to meet the FDA's cGMP requirements." ¶ 31. There were no "necessary cGMP materials" at the time, as Plaintiffs contend. ¶ 133.

[5] Plaintiffs conflate "third-party contract manufacturing organizations (CMOs)" with "third-party suppliers for key materials used in our manufacturing processes." *Compare* Ex. 1 at 52, *with id.* at 53. These third parties play different roles in the drug manufacturing process: CMOs manufacture all or part of a drug product at their manufacturing facilities, whereas third-party suppliers provide the Company and/or its CMOs with the components or the raw materials that go into the drug. *See id.* at 52-53. Plaintiffs' theory centers on suppliers from whom the Company procured raw materials for CORAL, *see, e.g.*, ¶¶ 104, 112, but the Company never represented that all raw materials supplied by its third-party suppliers would meet cGMP or any other standard. The Company expressly said the opposite. *See, e.g.*, Ex. 1 at 53 ("We cannot be certain that our suppliers will . . . satisfy our anticipated specifications and quality requirements.").

FENWICK & WEST LLP
ATTORNEYS AT LAW

into view until several months later (¶ 77). There is no allegation that any of Gritstone's other product candidates were affected.[6] In other words, the challenged statement did not create "an impression of a state of affairs" as to the CORAL program, or any other program, "that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006.

**B.     The CORAL Phase 2b Study Statements Were Not False or Misleading**

The Court also dismissed statements regarding "the financial value of the BARDA contract" and "the expected timeline for beginning Phase 2b trials under the BARDA contract"[7] because Plaintiffs failed to plead specific facts showing that "when the statements were made, it was clear that the[] cGMP requirements" applied to the raw materials for the Phase 2b Study. Order at 12-13. Instead, Plaintiffs relied on an "after-the-fact assessment" by their purported expert, Todd Clark, which the Court found to be nothing more than "impermissible fraud by hindsight." *Id.*

The SAC fares no better. As an initial matter, many of the challenged statements are forward-looking and protected by the PSLRA's safe harbor. Even if they were not, Plaintiffs fail to cure the deficiencies outlined in the Order, and instead fall back on mischaracterizations of a federal statute and FDA regulations and guidance, as well as vague CW allegations—none of which suffice to plead that statements regarding the CORAL Phase 2b study were materially false when made. *Ronconi*, 253 F.3d at 432. The Court should once again dismiss Plaintiffs' theory.[8]

**1.     Statements Regarding the Anticipated Financial Impact of the BARDA Contract and the Expected Phase 2b Study Timeline Are Protected by the PSLRA Safe Harbor**

The PSLRA has a two-pronged safe harbor for forward-looking statements. 15 U.S.C. § 78u-5(c)(1)(A). Under the first, statements are inactionable if identified as forward-looking and "accompanied by meaningful cautionary" language, irrespective of the speaker's state of mind. *Id.*;

---

[6] Nor do Plaintiffs allege that the challenged statement had any financial import, rendering the statement "immaterial as a matter of law." *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1161 (C.D. Cal. 2007).

[7] ¶¶ 143, 145-46, 148, 150, 152-54, 158, 160.

[8] Plaintiffs also continue to challenge statements that simply "described the BARDA contract" (¶¶ 143, 145, 150, 152-53), but a review of the BARDA Contract confirms that these statements accurately reflect the contract terms (*see* Ex. 6). As explained below, they are also not misleading by omission.

FENWICK & WEST LLP
ATTORNEYS AT LAW

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014). Under the second, even absent identification and cautionary language, a forward-looking statement is not actionable unless specific facts show it was knowingly false at the time. 15 U.S.C. § 78u-5(c)(1)(B). The safe harbor applies to all forward-looking statements, whether about anticipated financial results, the objectives of management, or predictions of future performance, and extends to "the assumptions underlying or relating to" such statements. 15 U.S.C. § 78u-5(i)(1)(D); Order at 8.

*The statements are forward-looking.*  Here, Plaintiffs challenge quintessentially forward-looking statements, made on September 27, 2023, October 11, 2023, November 8, 2023, and February 12, 2024, regarding the anticipated financial impact of the BARDA Contract and the expected timeline to launch the Phase 2b Study. *See, e.g.*, ¶ 146 ("We . . . look forward to initiating the Phase 2b study (CORAL-BARDA) in the first quarter of 2024."); ¶ 143 ("The Company estimates that . . . cash runway will be extended into the fourth quarter of 2024"). Courts routinely find similar statements to be forward-looking. *See, e.g.*, *Dresner v. Silverback Therapeutics, Inc.*, 2023 WL 2913755, at *11 (W.D. Wash. Apr. 12, 2023) (statement that a study "is anticipated in the first quarter of 2022" is "forward-looking [] as to future development plans"); *Wochos v. Tesla, Inc.*, 2019 WL 1332395, at *4 (N.D. Cal. Mar. 25, 2019) ("on track" assertions "fall solidly within the category of forward-looking statements regarding plans and objectives for future operations") (Breyer, J.), *aff'd*,  985 F.3d 1180, 1192 (9th Cir. 2021).

*Gritstone's cautionary language was meaningful and specific.*  In each of the challenged Forms 8-K, press releases, and Forms 10-Q, Gritstone identified the challenged statements as forward-looking and directed investors to detailed disclosures of "the risks and uncertainties that could cause actual results to differ from those expressed in these forward-looking statements." *See, e.g.*, Exs. 5, 7, 8, 11.  Among other things, investors were told that:

- Any "future capital requirements" are subject to many factors, including "***potential delays in our ongoing clinical trials***." Ex. 1 at 38;

- The manufacturing of the Company's product candidates, such as CORAL, are "complex, time-consuming, highly-regulated and subject to multiple risks." Ex. 1 at 46.

- The Company "***cannot be certain that our suppliers will continue to provide us with the quantities of these raw materials that we require*** or satisfy our anticipated specifications and quality requirements," and failure to procure materials "could ***delay the development***

FENWICK & WEST LLP
ATTORNEYS AT LAW

*and potential commercialization of our product candidates, including limiting supplies necessary for clinical trials and regulatory approvals*." *Id.* at 53.

The November 8, 2023 Form 10-Q[9]—the Company's first quarterly report after it was awarded the BARDA Contract in September 2023—extensively disclosed risks that could jeopardize the timeline and funding under the BARDA Contract, including that "BARDA may suspend or terminate the BARDA Contract should we fail to achieve key milestones or fail to comply with the operating procedures and processes approved by BARDA and its audit agency," and "[t]here can be no assurance that we will be able to achieve these milestones or continue to comply with these procedures and protocols, and there can also be no assurance that the BARDA Contract will not be terminated." Ex. 9 at 46-47.  Because the risk disclosures "addressed the very subjects Plaintiffs challenge," the challenged forward-looking statements fall squarely within the safe harbor. *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *16 (N.D. Cal. July 21, 2020); *see also In re Nuvelo, Inc. Sec. Litig.*, 2008 WL 5114325, at *16 (N.D. Cal. Dec. 4, 2008) ("specification of the particular factor that ultimately renders the forward-looking statement incorrect" not required).

***There was no actual knowledge of a false or misleading statement.***  Even absent meaningful cautionary language (which Gritstone repeatedly provided), the SAC contains no specific contemporaneous facts to show that Dr. Allen had ***actual knowledge*** that the financial projections or estimated launch date were false when made or otherwise not achievable. *See City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1063 (N.D. Cal. 2012); *infra* § V.  Accordingly, both prongs of the PSLRA safe harbor bar Plaintiffs' claim.

### 2. Plaintiffs Allege No Requirement to Use Fully GMP-Grade Raw Materials Across Phase 2 Trials, Let Alone the CORAL Phase 2b Study

In an effort to avoid dismissal, Plaintiffs pad the SAC with mischaracterizations of a federal statute, and FDA regulations and guidance regarding drug manufacturing and cGMP.  ¶¶ 32-69.  Contrary to Plaintiffs' allegations, none of these authorities establish any requirement to use GMP-grade raw materials across all Phase 2 clinical trials.

---

[9] The SAC also fails to adequately plead that the risk of delay in the Phase 2b Study (as disclosed in the November 8, 2023 Form 10-Q) had already come to pass.

FENWICK & WEST LLP
ATTORNEYS AT LAW

The SAC first points to Section 501(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act, which provides that a drug is deemed adulterated if "***the methods used in***, ***or the facilities or controls used for***, ***its manufacture, processing, packing, or holding*** do not conform to or are not operated or administered in conformity with current good manufacturing practice."  21 U.S.C. § 351(a)(2)(B).  In other words, the statute addresses the methods, facilities, or controls by which a drug itself is manufactured, processed, packed, or held.  But the statute does not require drug components (*i.e.*, raw materials) to satisfy any particular quality or grade.

The SAC also relies on cGMP-related regulations promulgated by the FDA, such as 21 C.F.R. §§ 210 and 211.  ¶ 39.  21 C.F.R. § 210.3(b)(3) defines "component" to mean "any ingredient intended for use in the manufacture of a drug product, including those that may not appear in such drug product," *i.e.*, the raw materials that would be used for the CORAL vaccine. 21 C.F.R. § 211 addresses how the drug manufacturer should ***store, handle, sample, test, approve, or reject components***, for instance, ensuring that components are "handled and stored in a manner to prevent contamination" and are "stored under quarantine until they have been tested or examined, whichever is appropriate, and released."  21 C.F.R. §§ 211.80(b), 211.82(b).  But the regulation does not require the drug manufacturer to use *only* GMP-grade components; instead, it simply provides that the drug manufacturer shall test "[e]ach component . . . for conformity with all appropriate written specifications for purity, strength, and quality."  21 C.F.R. § 211.84(d)(2).

Plaintiffs also cite certain nonbinding guidance documents from the FDA,[10] which are even farther afield.  The November 2016 guidance, *Contract Manufacturing Arrangements for Drugs: Quality Agreements Guidance for Industry*, covers only "commercial manufacturing" but "does not explicitly apply to the manufacture of investigational, developmental, or clinical trial materials," such as the CORAL Phase 2b Study.[11]  And on its face, the portion of the guidance that Plaintiffs

[10] "[G]uidance documents do not establish legally enforceable rights or responsibilities.  They do not legally bind the public or FDA. . . . You may choose to use an approach other than the one set forth in a guidance document.  However, your alternative approach must comply with the relevant statutes and regulations.  FDA is willing to discuss an alternative approach with you to ensure that it complies with the relevant statutes and regulations."  21 C.F.R. § 10.115(d)(1)-(2).

[11] *Contract Manufacturing Arrangements for Drugs: Quality Agreements Guidance for Industry* (Nov. 2016), at 1-2, available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/contract-manufacturing-arrangements-drugs-quality-agreements-guidance-industry.

FENWICK & WEST LLP
ATTORNEYS AT LAW

rely on addresses situations where owners "commonly use contract facilities to perform some ***drug manufacturing activities***," such that "the owner's quality unit is legally responsible for approving or rejecting ***drug products*** manufactured by the contract facility." ¶ 54. But here, Plaintiffs' theory centers on the ***procurement of components***, not the ***manufacturing of drug products***. *See* 21 C.F.R. § 210.3(b)(3)-(4) (differentiating between "component" and "drug product"). Thus, the November 2016 guidance is irrelevant. Plaintiffs also cite to the FDA's website, which explains that cGMP obligations include "establishing strong quality management systems, obtaining ***appropriate quality*** raw materials." ¶ 35 (emphasis altered). The FDA does not say what quality or grade of raw materials is appropriate (much less that the raw materials must be GMP grade).

As to the Phase 2b Study, the BARDA Contract states that "the Government reserves the right to conduct site visits and inspections related to this Contract on an as needed basis during normal business hours," and the "areas included under the site visit could include, but are not limited to: security, regulatory and quality systems, manufacturing processes and cGMP/GLP/GCP compliance related to activities funded under this Contract." *See, e.g.*, Ex. 6 at 13, 17, 37. The BARDA Contract also states that "Good Manufacturing Practice Regulations (GMP) will be the standard to be applied for clinical manufacturing, processing, packaging, storage, and delivery of ***this product***"—*i.e.*, the CORAL vaccine itself. *Id.* at 38. But just like the statute, regulations, and guidance cited by Plaintiffs, the BARDA Contract nowhere addresses what grade of components or raw materials the Company should use in the CORAL vaccines for the Phase 2b Study—let alone require the use of fully GMP-grade raw materials. Nor is there any dispute that the Company did not receive the FDA's clinical hold letter—which contains the "written explanation of the basis for the hold" and required, for the first time, the use of fully GMP-grade raw materials—until January 2024, months after the challenged statements. ¶ 128. Plaintiffs cannot point to a single fact that would have made this requirement clear to the Company earlier than January 2024. Order at 12-13.

To illustrate the point, a restaurant would expect to comply with food-safety rules regarding its kitchen's cleanliness, how ingredients are stored, and the food preparation process. But that requirement does not speak to the quality of the ingredients themselves, much less require that the

FENWICK & WEST LLP
ATTORNEYS AT LAW

restaurant must use *only* Grade-A eggs or organic rice in its preparations. Like the food-safety rules that would apply to a restaurant, neither Plaintiffs' cited authorities nor the BARDA Contract require Gritstone to use any specific grade of raw materials for the Phase 2b Study vaccines. Plaintiffs have failed to allege any specific, contemporaneous facts to suggest otherwise.

### 3. Vague CW Accounts Fail to Establish Falsity with Specificity

Plaintiffs also rely on CW allegations, but none adequately establishes falsity. As before, some CWs claim that the Company was looking for GMP-grade raw materials for the Phase 2b Study throughout 2023, and CW1 conveys that the Company in fact "found some sources of GMP-grade materials" by the end of 2023. *See, e.g.*, ¶¶ 98, 111. These allegations only confirm the truth of the challenged statement that "[p]reparations for the BARDA-funded, 10,000 subject Phase 2b, head-to-head study are underway." ¶ 148.

The SAC adds new assertions from various CWs about their expectations and impressions. CW1 and CW4 believe there is a "standard practice" or "expectation" to use GMP-grade raw materials for Phase 2 trials generally. ¶¶ 87, 89. But CW2 was a Senior Vice President of Clinical Development for Infectious Diseases **who left the Company by August 2023**, *i.e.*, before the BARDA Contract for the Phase 2b Study and before most of the challenged statements. Thus, CW2 lacks credible knowledge regarding the Phase 2b Study and fails to supply any basis for CW2's subjective "expectations" that "there would be GMP-grade material for CORAL Phase 2." ¶ 91; *see Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096, at *14 (N.D. Cal. Nov. 16, 2020) (disregarding CW statements where the CW did not work at the company during the relevant period). CW5 believes from conversations with coworkers that "BARDA expected the Company to use only GMP-grade materials to manufacture the vaccine for use in the trial." ¶ 95. CW1, CW4, and CW5's accounts are not specific, factual, or contemporaneous and stand in stark contrast to the BARDA Contract, which says *nothing* about the required grade of raw materials. *See* Ex. 6. Moreover, their assertions are so temporally vague that they may simply reflect what the CWs believed *after* the Company received the FDA's clinical hold letter in January 2024. *See Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1114 (N.D. Cal. 2009) (rejecting CW statements "lack[ing] factual particularity" because the court was unable to determine "the temporal relationship between

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

CW[]'s statements and [the challenged] statements"). In any event, the Court should disregard statements regarding the CWs' personal "opinions" and expectation, absent specific facts showing that the FDA or the Company held the same view. *Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*, 2018 WL 3126393, at *5 (N.D. Cal. June 26, 2018) (disregarding CW opinions based on hindsight); *Mazzaferro v. Aruba Networks*, 2015 WL 456534, at *2 (N.D. Cal. Feb. 2, 2015) (unsupported opinions of a CW "cannot substitute for specific factual allegations"), *aff'd sub nom. Par. Inv. Partners. L.P. v. Aruba Networks, Inc.*, 681 F. App'x 618 (9th Cir. 2017).

CW3 claims that "well before the FDA's formal clinical hold, Gritstone 'was aware that the FDA *might* take issue with the use of non-GMP-grade raw materials,'" so "the Company prepared an analysis to the FDA that looked at the *potential* risks of using non-GMP materials in the trial as part of its justification to overcome the FDA's *expected* opposition." ¶ 96. These allegations undercut Plaintiffs' falsity theory that the Company must comply with some bright-line requirement to use all GMP-grade raw materials for the Phase 2b Study. At most, CW3's account shows that the Company was engaged in an ongoing dialogue with the FDA regarding the CORAL trials given the FDA's substantial discretion over the drug development process, including chemistry, manufacturing, and control ("CMC") considerations.[12] As courts have observed, dialogue with the FDA "about the sufficiency of various aspects of the clinical trials" is "an integral part of the drug approval process," and "inherent in the nature of [such] a dialogue are differing views." *Pardi v. Tricida, Inc.*, 2024 WL 1056013, at *8 (N.D. Cal. Mar. 11, 2024) (quoting *Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016)) (citation modified). Here, CW3 does not allege that the FDA ever

---

[12] 21 C.F.R. § 312.23(a)(7) provides that the amount of CMC information required for investigational drugs "will vary with the phase of the investigation, the proposed duration of the investigation, the dosage form, and the amount of information otherwise available," as well as "the scope of the proposed clinical investigation." The FDA also encourages sponsors to participate in dialogue regarding CMC development, noting that "[a]s clinical development of the drug product proceeds, sponsors can discuss with the Agency the type of CMC information that would be submitted to support the use of the drug in all investigational phases. The Agency encourages sponsors to meet with the CMC review team, if appropriate, before the initiation of or during phase 3 clinical trials to discuss issues and protocols that might affect the approvability of the NDA." *INDs for Phase 2 and Phase 3 Studies: Chemistry, Manufacturing, and Controls Information* (May 2003), at 3, available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/inds-phase-2-and-phase-3-studies-chemistry-manufacturing-and-controls-information.

expressed any concerns about or gave any indication that it disagreed with Gritstone's analysis before the January 2024 clinical hold. Nor do Plaintiffs plausibly plead any other contemporaneous fact that would have given the Company reason to believe that the FDA would require the Phase 2b Study to use fully GMP-grade raw materials.

At bottom, Plaintiffs cannot "merely parrot any deficiency identified by the FDA rejection letter" and then challenge "the company's decision to omit whatever, *in hindsight*, the FDA said was missing" in its rejection letter. *Lake v. Zogenix, Inc.*, 2020 WL 3820424, at *9 (N.D. Cal. Jan. 24, 2020); *see also Rigel Pharms*, 697 F.3d at 882.[13]

### C.   The Court Has Already Rejected Plaintiffs' Purported Expert

Plaintiffs continue to rely on their purported expert, Mr. Clark, to fill their pleading gaps. But the Court has already rejected Mr. Clark's opinions regarding cGMP as nothing more than "impermissible fraud by hindsight" because they do "not establish that Gritstone's statements were misleading at the time they were made." Order at 13. Mr. Clark's opinions in the SAC are nearly identical to those in the AC. *See* Dkt. 70-1 (Redline between AC and SAC) at 50-54, 85. The Court should reject Mr. Clark's opinions, which fail for the same reasons as before. *See* Dkt. 55 (Motion to Dismiss the AC) at 19-21; Dkt. 62 (Reply ISO Motion to Dismiss the AC) at 9-11.

## V.   PLAINTIFFS DO NOT PLEAD A STRONG INFERENCE OF SCIENTER

Plaintiffs must plead specific, contemporaneous facts establishing a strong inference of scienter. *See Tellabs*, 551 U.S. at 323. The facts must be "compelling," "persuasive," and "powerful." *Id.* They must reflect an intent to defraud or deliberate recklessness so egregious and obvious that it is tantamount to actual intent. *Webb*, 884 F.3d at 851. Applying these standards, individually or holistically, Plaintiffs' allegations still do not come close to pleading fraud.

---

[13] Plaintiffs still challenge the February 12, 2024 statements that the Phase 2b Study would be delayed to "the Fall of 2024 . . . to allow use of fully GMP-grade raw materials." ¶ 158; Ex. 11. These statements were allegedly false because Gritstone knew it could not meet the updated timeline. ¶ 159. But Plaintiffs offer no contemporaneous facts suggesting that fall 2024 was infeasible to achieve. To the contrary, CW3 contends that, at the end of 2023, Gritstone determined it would take 9-12 months "for its contractors 'to be ready to supply all GMP-grade materials'" and for Gritstone to submit an amended IND (¶ 115), thus placing the launch of the Phase 2b Study squarely in fall 2024.

FENWICK & WEST LLP
ATTORNEYS AT LAW

### A.    The CW Accounts Still Raise No Inference of Scienter

As before, conclusory CW assertions do not establish what Dr. Allen knew or was deliberately reckless in not knowing.  Order at 16; *Ronconi*, 253 F.3d at 432.  For a CW to establish scienter, Plaintiffs must allege with particularity that the CW was "in a position to be personally knowledgeable of the information alleged" **and** the CW must offer statements "indicative of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995-96 (9th Cir. 2009).  As the Court explained, where the CW lacks direct, personal contact with the defendant, the "indirect confidential witness must have personal knowledge to verify the reported hearsay statements—for instance, by observing meetings between the hearsay declarant and the defendant," "by participating in developing reports that went to the defendants," or "by identifying specific interactions with 'time, context, and details.'"  Order at 16 (citing *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 n.5 (9th Cir. 2019); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016); *Robb v. Fitbit Inc.*, 2017 WL 219673, at *5 (N.D. Cal. Jan. 19, 2017)).

Here, the CW accounts fall far short of satisfying this standard.  None of the CWs had any direct contact with Dr. Allen regarding cGMP generally, let alone regarding the Company's alleged inability to procure GMP-grade raw materials for the Phase 2b Study.  *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 2012 WL 1868874, at *20 (N.D. Cal. May 22, 2012) (rejecting accounts of CWs who did not directly communicate with defendants), *aff'd*, 759 F.3d 1051 (9th Cir. 2014).  Nor do any of the CWs have personal knowledge to verify their speculation or purported hearsay about what Dr. Allen knew and when.  *See* Order at 16; *LifeLock*, 780 F. App'x at 484 n.5.

*CW1.*  The Court previously rejected CW1's allegations because CW1's "vague and indirect witness account," which was based on hearsay, "lack[ed] the detail necessary to establish that Allen knew or should have known about [the cGMP] issues at the time" of the challenged statements.  Order at 16.  The SAC does not cure those deficiencies.  Although Plaintiffs now assert that Dr. "Allen was apprised of these cGMP failures in real time" (¶ 186), CW1's statements do not support that allegation.  CW1 still describes no direct interaction with Dr. Allen, and instead continues to rely on hearsay information from CW1's interactions with the COO, Mr. Jones.  Mr. Jones allegedly participated in task force meetings and knew "which GMP-grade raw materials were procured and

FENWICK & WEST LLP
ATTORNEYS AT LAW

which of the raw materials had not yet been procured at GMP-grade." ¶ 187. CW1 also cryptically references meeting with Mr. Jones "for the express purpose of providing a report to COO Jones that he said he would then directly convey to CEO Allen." ¶ 188. These vague assertions offer no specifics about (i) the "time, context, and details" of any conversations between Mr. Jones and Dr. Allen, *Lloyd*, 811 F.3d at 1208; (ii) the content of the supposed "report" to Dr. Allen, if any, and whether it had anything to do with the procurement of GMP-grade raw materials for the Phase 2b Study; or (iii) what Mr. Jones actually conveyed to Dr. Allen (if anything), and at what level of specificity. Because CW1's hearsay account is not "sufficiently reliable, plausible, or coherent," *Id.* (citation omitted), CW1 was not "in a position to be personally knowledgeable" about any interactions between Mr. Jones and Dr. Allen, *LifeLock*, 780 F. App'x at 484 n.5. In fact, CW1's only statement with any specificity—that Mr. Jones allegedly "informed CEO Andrew Allen about the status of the [cGMP] task force's work, including details about the inability to acquire GMP-grade raw materials **by early 2024**"—suggests that Dr. Allen learned of the GMP requirement around the same time as the January 2024 clinical hold letter. ¶ 186. If anything, CW1 reinforces that Dr. Allen lacked the requisite state of mind at the time of the challenged statements.

**CW2.** None of CW2's prior assertions in the AC were indicative of scienter, and CW2's new assertions in the SAC still fall far short. CW2 merely observes that Dr. Allen and Mr. Jones "spoke frequently about what was happening at the Company" and "were close." ¶ 191. But CW2 provides no specifics about what Dr. Allen and Mr. Jones discussed, including if or when they ever discussed the procurement of GMP-grade raw materials. Without such specifics, CW2's general observation about Dr. Allen and Mr. Jones' relationship does not raise an inference of scienter. *See Dresner*, 2023 WL 2913755, at *14 (rejecting CW account that offers "no specific details about what was discussed during the meetings that would demonstrate" scienter).

**CWs3-6.** None of these CWs reported to Dr. Allen; they lack personal knowledge that would allow them to speak to his state of mind, and instead speculate about what he might have known:

- CW3's assertions purporting to show scienter are substantially identical to those the AC and fail as before. When asked about Dr. Allen's "involvement and knowledge of communications with the FDA regarding using of GMP-grade versus non-GMP-grade raw

materials," CW3 asserts without factual support that Dr. "[Allen] was aware of the entire communication. Nothing goes without his knowledge." ¶ 117. CW3 also vaguely claims that "the leadership at Gritstone," "people at the Company," and "Gritstone" generally knew that "the FDA *might* take issue with the use of non-GMP-grade raw materials." ¶ 96.

- The SAC adds CW4, who opines that "[w]hen they [top management] are manufacturing it, I'm sure they knew the process, they knew the regulations as well." ¶ 199. But CW4 conspicuously does not say who "they" refer to (and "top management" appears to be *Plaintiffs*' phrase, not CW4's), what "process" means, or which "regulations" are at issue.

- The SAC adds CW5, who does not even mention Dr. Allen. Instead, CW5 only puts forth CW5's own understanding that "BARDA expected the Company to use only GMP-grade materials to manufacture the vaccine for use in the trial." ¶ 95.

- The SAC adds CW6, an Associate Director of Procurement, who admittedly was not responsible for locating contractors for the Phase 2b Study. CW6 only had a glimpse into that process when the responsible teams "sometimes asked for suggestions from CW6 about c-GMP compliant vendors to use." ¶ 100. CW6 was not positioned to say anything about the Phase 2b Study—let lone Dr. Allen's state of mind. Indeed, CW6 says nothing about Dr. Allen, alleging only what "the SVP of Quality, Luis Cabassa-Latoni" allegedly knew. ¶ 99.

Even setting aside that these assertions are neither sufficiently specific nor indicative of scienter, the CWs' "unsubstantiated" "impression" and "opinions" cannot establish what Dr. Allen "knew or should have known." *Intuitive*, 759 F.3d at 1063; *Solazyme*, 2018 WL 3126393, at *5.

Because the SAC identifies no CW with personal knowledge of fraud by Dr. Allen, the CW accounts raise no inference of scienter.

**B.    The Absence of Insider Stock Sales Undermines Any Inference of Scienter**

"[T]he absence of insider trading by a defendant is highly relevant and undermines any inference of scienter," *In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1107 (N.D. Cal. 2006), because it "suggest[s] that there was no insider information from which to benefit," *Metzler*, 540 F.3d at 1067; *see also Webb*, 884 F.3d at 856. The SAC does not allege that Dr. Allen engaged in *any* stock sales during the class period. This fact, coupled with the lack of any plausible motive for Dr. Allen to artificially inflate the Company's stock price, undercuts any inference of scienter. *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1108 (9th Cir. 2021) ("lack of a plausible motive certainly makes it much less likely that a plaintiff can show a strong inference of scienter.").

**C.    None of Plaintiffs' Remaining Allegations Establish Scienter**

***Dr. Allen's Background and Expertise.*** Disregarding the Court's ruling—that "allegations about Allen's role at the company do not establish scienter, nor do [] allegations about Allen's

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

general experience in the field" (Order at 16)—Plaintiffs *double down* on their theory that Dr. Allen's professional background somehow raises an inference of scienter. *See* ¶¶ 20-22, 195-200. CW2 and CW4 now speculate—based solely on Dr. Allen's experience in the pharmaceutical industry—that he "would have," "should have," or had "likely" understood the "expectations and standards" and "standard practice" of using GMP-grade raw materials for Phase 2. ¶¶ 197-99. But these assertions are "entirely speculative" and "do[] not rise to the required strong inference" under *Tellabs*. *Applestein v. Medivation, Inc.*, 561 F. App'x 598, 601 (9th Cir. 2014). In any event, "evidence of standard industry practices . . . standing alone remains insufficient" to establish scienter. *Prodanova*, 993 F.3d at 1110. At bottom, Dr. Allen's "status and expertise alone do not clear the high bar of alleging scienter," especially considering that "most CEOs of a biotechnology company" share similar backgrounds. *In re AnaptysBio, Inc. Sec. Litig.*, 2021 WL 4267413, at *10 (S.D. Cal. Sept. 20, 2021) (collecting cases).

***The Challenged Statements Themselves.*** Plaintiffs now argue that Dr. Allen's public statements about the Company's general manufacturing capabilities and the Phase 2b Study's timeline "reflect his deep understanding of the Company's operations and support a strong inference of scienter." ¶¶ 201-07. But if "the mere decision to speak on a topic were indicative of scienter, there would be no distinction between the element of scienter and the requirement to plead a false statement." *Joyce v. Amazon.com, Inc.*, 2023 WL 8370101, at *13 (W.D. Wash. Dec. 4, 2023). Plaintiffs' argument would reduce the scienter requirement to a nullity.

***Plaintiffs' Style as a CEO.*** The SAC newly alleges that Dr. Allen was "pretty on top of things," "tapped in," and "hands-on" as a CEO, which supports an inference of scienter. ¶¶ 193-94. But the Ninth Circuit routinely rejects similar allegations as insufficient to raise an inference of scienter. *See, e.g.*, *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 539 (9th Cir. 2024) (allegations that executives "signed off on every acquisition, received detailed reports, or were 'obsessed with numbers,' do not compel a strong inference that they had knowledge of the alleged omitted information about particular underperforming acquisitions . . . [and] cover[ed] them up"); *Webb*, 884 F.3d at 857 (allegations that executives had a "hands-on style" not indicative of scienter).

***Holistic Considerations.*** The theory that Dr. Allen intentionally or recklessly misled

investors about the prospects for and funding from the Phase 2b Study is factually unsupported, nor does it make any sense. Dr. Allen is not alleged to have profited in any way, and Plaintiffs plead no plausible motive for fraud. As the Court observed, the more likely alternative explanation is that Dr. Allen, "as Gritstone's CEO, was focused on bigger-picture aspects of the CORAL trials—especially since, as explained above, there was no reason for Allen or anyone at Gritstone to know that the cGMP status of source products used in the CORAL vaccine would be a dealbreaker." Order at 17. Taken holistically, the competing inference of good faith is far more compelling.[14]

## VI. PLAINTIFFS STILL FAIL TO PLEAD LOSS CAUSATION

Plaintiffs must plead loss causation with particularity. *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014). Myriad factors unrelated to fraud—such as the fruition of a known risk or other adverse business developments—can cause stock-price decline. *See Dura Pharms. Inc. v. Broudo*, 544 U.S. 336, 342-43 (1995). Accordingly, Plaintiffs must trace a loss back to "the very facts about which the defendant lied," *Mineworkers' Pension Scheme v. First Solar, Inc.*, 881 F.3d 750, 753 (9th Cir. 2018), and plead specific facts indicating that the revelation of a "fraud," *i.e.*, new information correcting a prior misstatement, caused a stock price decline, *Dura Pharms.*, 544 U.S. at 342-43. Here, under Plaintiffs' own theory, the "truth" was fully revealed on February 12, 2024, when the Company announced that the FDA would require "fully GMP-grade materials" and that the study was delayed to "the Fall of 2024." ¶ 160; Exs. 12-13. Because none of the subsequent announcements on February 29, 2024, March 5, 2024, and April 1, 2024 revealed any new information indicative of "fraud," Plaintiffs fail to plead that they are corrective. *Rok v. Identiv, Inc.*, 2017 WL 35496, at *18 (N.D. Cal. Jan. 4, 2017) ("[C]orrective disclosures must present facts

---

[14] The SAC continues to assert scienter allegations that the Court previously rejected. As before, "Gritstone's interactions with the FDA before March 2023 do not establish scienter with respect to Allen specifically—or even with respect to Gritstone as a whole. The FDA's request for 'detail on the . . . grade of materials' along with other information, [] does not create a strong inference of scienter, as not every request for additional information necessarily implies a critical deficiency (or any deficiency at all)." Order at 16. And, to the extent Plaintiffs still seek to impute allegations regarding Gritstone generally to Dr. Allen individually (*see* SAC at 6 n.1), that too fails. As the Court previously explained, "[i]t is [] necessary to distinguish Gritstone, which is not a named Defendant in this action, from Allen and Economides." Order at 14. Plaintiffs must "plead scienter on an individualized, defendant-by-defendant basis." *In re Finisar Corp. Deriv. Litig.*, 2012 WL 2873844, *9 (N.D. Cal. July 12, 2012).

FENWICK & WEST LLP
ATTORNEYS AT LAW

to the market that are new.") (Breyer, J.), *aff'd*, 716 F. App'x 663 (9th Cir. 2018).

## VII.   PLAINTIFFS STILL FAIL TO PLEAD CONTROL PERSON LIABILITY

Because there is no predicate Section 10(b) claim, the Section 20(a) claim also fails. *Zucco*, 552 F.3d at 990.

## VIII.   CONCLUSION

The SAC is Plaintiffs' third pleading effort, prepared with the benefit of more than a year of analysis and investigation, the assistance of highly experienced counsel, and an Order detailing the deficiencies in the AC.  Yet Plaintiffs still cannot begin to plead that any of the challenged statements were false or made with scienter.  Given Plaintiffs' inability "to correct these deficiencies in [their] Amended Complaint," and the fact that it is now "clear that the plaintiffs . . . made their best case and have been found wanting," there is no reason to permit them to file yet another complaint. *Zucco*, 552 F.3d at 1007.  The SAC should be dismissed with prejudice.

Dated:   October 17, 2025

FENWICK & WEST LLP

By: */s/ Catherine D. Kevane*
    Catherine D. Kevane (CSB No. 215501)

Attorneys for *Defendant Andrew R. Allen*

FENWICK & WEST LLP
ATTORNEYS AT LAW