# Exhibit 1

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2022**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE TRANSITION PERIOD FROM                TO**

**Commission File Number 001-38663**

# Gritstone bio, Inc.

**(Exact name of Registrant as specified in its Charter)**

| | |
|---|---|
| **Delaware** | **47-4859534** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **5959 Horton Street, Suite 300** | |
| **Emeryville, CA** | **94608** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**(510) 871-6100**

**Registrant's telephone number, including area code**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.0001 par value per share | GRTS | The Nasdaq Global Select Market |

**Securities Registered Pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. YES ☐ NO ☒

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. YES ☐ NO ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. YES ☒ NO ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). YES ☒ NO ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| Emerging growth company | ☒ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☒

Indicate by check mark whether the Registrant has filed a report on and attestation to its management assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). YES ☐ NO ☒

The aggregate market value of the common stock held by non-affiliates of the registrant as of June 30, 2022 (the last business day of the registrant's most recently completed second fiscal quarter) was approximately $171.7 million, based on the closing price of the registrant's common stock, as reported by the Nasdaq Global Select Market on June 30, 2022 of $2.42 per share. Shares of the registrant's common stock held by each executive officer, director, and holder of 5% or more of the outstanding common stock have been excluded in that such persons may deemed to be affiliates. This calculation does not reflect a determination that certain persons are affiliates of the registrant for any other purpose.

The number of shares of Registrant's Common Stock outstanding as of March 7, 2023 was 87,661,978.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Registrant's Definitive Proxy Statement relating to the Annual Meeting of Shareholders, scheduled to be held on June 16, 2023, are incorporated by reference into Part III of this Annual Report on Form 10-K where indicated. Such Definitive Proxy Statement will be filed with the Securities and Exchange Commission within 120 days after the fiscal year to which this report relates.

**PART I**

**Note Regarding Forward-Looking Statements**

This Annual Report on Form 10-K, including "Business" in Part I Item I and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II Item 7, contains "forward-looking statements" within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended (Exchange Act). All statements other than statements of historical fact are statements that could be deemed forward-looking statements. In some cases, you can identify forward-looking statements by terminology such as "aim," "anticipate," "assume," "believe," "contemplate," "continue," "could," "due," "estimate," "expect," "goal," "intend," "may," "objective," "plan," "predict," "potential," "positioned," "seek," "should," "target," "will," "would" and other similar expressions that are predictions of or indicate future events and future trends, or the negative of these terms or other comparable terminology. These forward-looking statements include, but are not limited to, statements about:

- the sufficiency of our capital resources and timing of our cash runway, as well as our actual needs for additional financing and our ability to obtain additional capital;

- our clinical and regulatory development plans for our product candidates;

- our expectations regarding the potential market size and size of the potential patient populations for our product candidates, in particular those within the GRANITE®, SLATE® and CORAL programs, and any future product candidates with limited patient populations, if approved for commercial use;

- our expectations regarding the data to be derived in our ongoing and planned clinical trials including, in particular, our expectations for the size and design of our planned clinical trials, timing of commencement and initiation of our trials and the timing of the availability of data from such trials;

- our expectations regarding our Gritstone EDGE™ artificial intelligence and vaccine platforms, including our ability to utilize (i) our Gritstone EDGE™ platform to predict the tumor-specific neoantigens that will be presented on a patient's tumor cells and identify highly conserved T cell epitopes for durable protection for infectious diseases and (ii) our vaccine platform to deliver selected antigens to the patient's immune system to drive the destruction of tumors or virally-infected cells;

- the timing of commencement of our future nonclinical studies, clinical trials and research and development programs;

- our ability to discover, develop and advance product candidates into, and successfully complete, clinical trials;

- our plans and strategy regarding maintaining existing and entering into new collaborations and/or partnerships;

- the timing or likelihood of regulatory filings and approvals for our product candidates;

- our expectations with respect to the commercialization, marketing and manufacturing of our product candidates;

- the pricing and reimbursement of our product candidates, if approved;

- the implementation of our business model and strategic plans for our business, product candidates and technology platforms, including additional indications for which we may pursue;

- the scope of protection we are able to establish and maintain for intellectual property rights covering our product candidates, including the projected terms of patent protection;

- our expectations regarding the impact of the COVID-19 pandemic or the end of the COVID-19 pandemic on our operations;

- the accuracy of our estimates of our expenses, future revenue and capital requirements;

- our future financial performance; and

- developments and projections relating to our competitors and our industry, including competing therapies.

These statements relate to future events or to our future financial performance and involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. Factors that may cause actual results to differ materially from current expectations include, among other things, those listed under "*Item 1A. Risk Factors*" and elsewhere in this Annual Report on Form 10-K. Any forward-looking statement in this Annual Report on Form 10-K reflects our current views with respect to future events and is subject to these and other risks, uncertainties and assumptions relating to our operations, results of operations, industry and future growth. Given these uncertainties, you should not place undue reliance on these forward-looking

1

<mark>statements.</mark> Except as required by law, we assume no obligation to update or revise these forward-looking statements for any reason, even if new information becomes available in the future.

This Annual Report on Form 10-K also contains estimates, projections and other information concerning our industry, our business and the markets for our product candidates, including data regarding the estimated patient population and market size for our product candidates, as well as data regarding market research, estimates and forecasts prepared by our management. Information that is based on estimates, forecasts, projections or similar methodologies is inherently subject to uncertainties, and actual events or circumstances may differ materially from events and circumstances reflected in this information. Unless otherwise expressly stated, we obtained this industry, business, market and other data from reports, research surveys, studies and similar data prepared by third parties, industry, medical and general publications, government data and similar sources. In some cases, we do not expressly refer to the sources from which this data are derived. In that regard, when we refer to one or more sources of this type of data in any paragraph, you should assume that other data of this type appearing in the same paragraph are derived from the same sources, unless otherwise expressly stated or the context otherwise requires.

In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based upon information available to us as of the date of this Annual Report on Form 10-K, and while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all relevant information. These statements are inherently uncertain and investors are cautioned not to unduly rely upon these statements.

**Note Regarding Company References**

Unless the context otherwise requires, the terms "Gritstone," "the Company," "we," "us," and "our" in this Annual Report on Form 10-K refer to Gritstone bio, Inc. and its subsidiary.

2

**Item 1. Business.**

**Overview and Strategy**

We are a clinical-stage biotechnology company focused on combining immunological insights with proprietary technologies and capabilities to develop next-generation vaccines. Specifically, we discover, develop, manufacture and deliver vaccine-based immunotherapy candidates against cancer and infectious disease. Our goal is to unlock more potent and durable immunity by harnessing vaccine innovation. We aim to achieve that goal by leveraging our in-house capabilities and technologies to address the shortcomings of currently available vaccines and immunotherapies.

The immune system sits at the nexus of many diseases and we believe that immune response modulation is core to several transformational product classes. Recent advances have pointed to T cells as being central to the success of cancer immunotherapy and critical in the elimination of virally infected cells. We believe that our scientific approach of focusing on generating antigen-specific T cells, particularly the challenging but critical cytotoxic CD8+ T cell subclass has the potential to drive transformational therapeutic and prophylactic benefits.

In oncology, we develop personalized vaccines that aim to destroy tumors through CD8+ (killer) T cell recognition of tumor cells by virtue of their surface display of neoantigens, peptides that are presented on cancer cells when certain mutations occur in tumor DNA. We have two clinical-stage oncology programs, both for common solid cancers. The first, GRANITE, focuses on development of individualized vaccines based on each patient's tumor DNA/RNA sequence (i.e., each vaccine is developed for each individual patient). The second, SLATE, focuses on development of "off-the-shelf" vaccines for sets of patients that share common tumor antigens including neoantigens. The scientific approaches to GRANITE and SLATE are similar, and we believe the technologies we developed to execute against them, i.e., to identify neoantigens accurately and deploy powerful killer T cell-stimulating vectors to deliver them, are capable of driving more potent and durable immune responses. In infectious disease, we develop both therapeutic and prophylactic vaccines targeting both T cells and B cells. We believe we are leading the field of development and application of self-amplifying mRNA (samRNA), a rapidly-emerging platform technology. Our unique approach to immunogen design, whereby our vaccines deliver, as appropriate, whole proteins to drive neutralizing antibodies (nAbs) and/or protein fragments to drive T cell responses, has the potential to both neutralize incoming pathogens (through nAbs) and kill infected cells through CD8+ T cell recognition of foreign, pathogen-derived peptides displayed on the surface of infected cells.

**Our Key Technologies and Capabilities**

**Epitope Discovery: Gritstone EDGE™ (Epitope Discovery for GEnomes) Antigen Discovery and T cell Target Identification Platform**

Antigen presentation to T cells is hard to predict since multiple biological steps must be comprehended within any prediction system, and antigenic peptide fragments are displayed on the cell surface by highly variable human leukocyte antigen (HLA) molecules that vary subject-to-subject. Our proprietary epitope discovery platform, EDGE™, has demonstrated the ability to offer accurate identification of T cell antigens that can be recognized by the immune system on tumor or virally-infected cells.

In the case of tumor cells, mutations in tumor DNA provide a large set of altered candidate protein fragments that the immune system can recognize. In cancer, we use EDGE™ to identify and select those mutations that are most likely to serve as tumor-specific neoantigens (TSNA), i.e., those neoantigens on the tumor that will best serve as targets for killer T cells.

Developing cancer immunotherapies that include tumor-specific neoantigens is challenging because tumors typically have hundreds of mutations, but only a small percentage of such mutations result in tumor-specific neoantigens (TSNA). Using EDGE™, we are able to sequence data from a patient's routine core needle tumor biopsy in an effort to predict which mutations will generate TSNAs most likely to be presented on the tumor cell surface by the patient's particular human leukocyte antigens (HLA).

We believe that EDGE™ leads the field in TSNA identification and previously available technologies are not able to predict the presence of TSNA with sufficient accuracy to design an effective therapy. We have observed a 9-to10-fold improvement in prediction performance with our EDGE™ platform compared to traditional approaches and published these data in Nature Biotechnology in December 2018. We continue to improve on EDGE and intend to continue optimizing its use for our cancer and infectious disease applications.

In infectious disease, we use EDGE™ to analyze the DNA/RNA sequence of a pathogen with the goal of predicting which gene fragments will likely function as T cell antigens on the surface of virally-infected cells. EDGE™ allows us to design the components of our vaccine candidates to include the specific target antigens for administration to humans (immunogens), with the aim of generating

3

strong immune responses to those antigens to achieve a desired biological effect. Such immune responses can be prophylactic (e.g., protecting against viral infections) or therapeutic (e.g., treating virally infected individuals with the aim to eradicate the virus).

The first US patent covering the EDGE™ technology was issued to us in 2018. We are working to identify novel classes of tumor antigens and continually improve the performance of EDGE™.

**Next-generation Proprietary Vectors (ChAd and samRNA)**

Following the identification of suitable targets with the help of EDGE™, we encode such targets within our vaccine vectors to deliver the payload and stimulate the immune system. We have developed two proprietary vectors that we deploy with the aim of eliciting the desired immune response; chimpanzee adenovirus (ChAd) and self-amplifying mRNA (samRNA). ChAd is well-recognized as a leading vector for induction of CD8+ (killer) T cells. samRNA is a next-generation RNA platform technology that has the potential to offer benefits over mRNA relevant to oncology and infectious disease. We selected ChAd and samRNA because we believe they are the best vectors for inducing and boosting CD8+ T cells in our personalized cancer vaccine programs. We believe our proprietary ChAd and samRNA vectors lead the field.

In oncology, we deploy both vectors via a heterologous prime-boost (vaccination with one vector followed by the other, in this case ChAd then samRNA). In infectious disease, we deploy one or both vectors based on the desired therapeutic or prophylactic immune response. The independent and "mix and match" application of our vectors is one of Gritstone's core competencies.

*Chimpanzee Adenovirus 68 (ChAd)*

ChAd vectors have been utilized in clinical studies in infectious disease and oncology over the past 20 years. They have been demonstrated to be well tolerated and effective at generating rapid and substantial CD8+ and CD4+ T cell responses. Additionally, ChAd vectors can induce B cell immune responses, i.e., elicit nAbs. We have developed a proprietary ChAd vector employing an E4 deletion to improve viral production efficiency in manufacturing.

*self-amplifying mRNA (samRNA)*

Gritstone was the first to introduce samRNA encapsulated in lipid nanoparticles (LNP) into clinical trials in 2018. We believe  that samRNA has the ability to boost pre-existing T cell responses and the potential to drive differentiated immune responses (potent and durable) in infectious disease.

Our samRNA vector is based on a synthetic RNA molecule derived from a wild-type Venezuelan Equine Encephalitis Virus (VEEV) replicon with the goal of extending the duration and magnitude of immunogen expression to drive potent and durable immune responses. Our samRNA is delivered in a LNP formulation. We are deploying this vector across our clinical stage programs. Like traditional mRNA vaccines, samRNA vaccines use the host cell's transcription system to produce target antigens to stimulate adaptive immunity. Unlike traditional mRNA, the RNA replicates once inside the cell, theoretically leading to high and durable antigen expression.

4

Potential benefits of samRNA may include extended duration and magnitude of antigen expression, strong and durable induction or boosting of neutralizing antibody and T cell immunity (CD8+ and CD4+), dose sparing, and a refrigerator-stable product.

**Figure 1.   Self-amplifying mRNA (samRNA) replicates within transduced cells, potentially driving stronger and more durable immune responses compared to traditional mRNA vaccines**



*Tsf = T cell (Ts) released factor
*293A cells

**In-house GMP Manufacturing**

We manufacture our products at our own fully-integrated good manufacturing practice (GMP) biomanufacturing facilities. Our ability to control the manufacturing of high-quality vaccine products, and scale production, if early data are positive, is critical for efficient clinical development and commercialization. We have invested significant resources in our Cambridge, Massachusetts sequencing lab and our Pleasanton, California biomanufacturing facility to address these needs and position ourselves to control the critical steps in the production of our immunotherapy candidates.

**Immunogen Design**

Immunogen design is a key element in vaccine development, and a foundational aspect of design is understanding how vaccines might work for each individual application. Understanding how to elicit specific beneficial T cell responses is crucial to the development of effective therapeutic cancer vaccines. Successful vaccine strategies for infectious disease pathogens require wholly different approaches for the elicitation of antibodies to the pathogen surface antigen.

Our unique approach to immunogen design, whereby our vaccines can deliver both surface antigens to drive neutralizing antibodies (nAbs) and protein fragments to drive T cell responses, enables us to optimize our vaccine candidates to engage both arms of the immune system for both antibody and T cell production. Due in part to our chimeric design capabilities, our vaccines have the potential to both neutralize incoming pathogens (through nAbs) and kill infected cells through CD8+ T cell recognition of foreign, pathogen-derived peptides displayed on the surface of infected cells.

**Translational Immunology**

Through our work, we gain invaluable insights that go from "bench-to-manufacturing-to-bedside" and back at Gritstone. We have processes in place to translate these insights across our internal functions and systems to optimize our vaccine innovation efforts, incorporate them into our research and development work, advance our programs and optimize our product candidates throughout the development cycle.

A notable example of our translational work is within SLATE, our program focused on developing an "off the shelf" neoantigen immunotherapy for oncology, where we utilized outcomes from our first candidate (SLATE v1) to develop an optimized, second

5

candidate (SLATE-KRAS), which has since exhibited immunogenic superiority over SLATE v1 in both model systems and in humans. Our continuous learnings regarding fundamental mechanisms of innate and adaptive immunity, including the interplay between CD4+ and CD8+ T cell development, and the evolution of antibody responses following vaccination, are a key element in our effort to develop potent and durable vaccines.

**Our Strategy**

We believe that our team of industry leaders, each possessing specific expertise across our core disciplines of cancer genomics, immunology and vaccinology, clinical development, regulatory, and biomanufacturing, can successfully deliver groundbreaking vaccine-based immunotherapies for cancer and infectious disease by executing on the following strategic priorities:

- *Continue leveraging our proprietary Gritstone EDGE™ platform and maximize its utility across modalities.* We use EDGE™ to predict, with high accuracy, tumor targets for our oncology programs. This is critical for our GRANITE program, where each patient's targets are individualized. We continue to improve EDGE by expanding its ability to identify novel classes of tumor antigens (such as gene fusions and alternative splicing) across our programs. We also use EDGE to predict viral epitopes for inclusion in our vaccine candidates against viral targets.

- *Continue deploying and optimizing our next-generation vectors to drive potent and durable immune responses suited to the clinical context.* Chimpanzee Adenovirus 68 (ChAd) and self-amplifying mRNA (samRNA) are our two vectors of choice based on their unique and synergistic properties. In multiple studies across our oncology and infectious disease platforms, we have exhibited the ability to deploy them individually and in combination to drive potent and durable immune responses based on the clinical context. We continue to improve and optimize these proprietary vectors for their use across our programs.

- *Continue building, automating, and optimizing our in-house biomanufacturing capabilities to increase scalability and capacity.* We believe the speed, quality, reliability, and scalability of our manufacturing capabilities is a core competitive advantage to our clinical development and potential commercial success. We have successfully internalized all biomanufacturing steps to drive down both cost and production time, as well as establish full control over intellectual property and product quality. We have internalized the majority of our quality control testing elements as well, though we outsource where prudent and feasible. We believe that operating our own manufacturing facility provides us with enhanced control of material supply for both clinical trials and the commercial market, will enable the more rapid implementation of process changes, and will allow for better long-term manufacturing cost control. We have the capability to manufacture every element involved in clinical development of our oncology vaccine-based immunotherapies.

- *Continue advancing the GRANITE program through randomized, controlled trials with the goal of evaluating earlier lines of treatment and additional tumor types.* Phase 1/2 clinical data to date have demonstrated initial positive safety results, induction of substantial neoantigen-specific CD8+ T cell responses and molecular responses for our individualized vaccine program. We are pleased with results observed with GRANITE to date in hard-to-treat, late-line CRC patients, and are optimistic we could see similar or better results from neoantigen immunotherapy in earlier lines of treatment where immune responses have the potential to be stronger and tumor genomic complexity is lower. GRANITE is now in a randomized Phase 2/3 clinical trial (GRANITE-CRC-1L) as a first-line maintenance treatment for microsatellite stable colorectal cancer (MSS-CRC). Within this study, we are also evaluating the potential of ctDNA as a new biomarker by which cancer progression could be measured. We believe the potential regulatory approval of our individualized vaccine candidate represents a potentially transformative development within cancer care.

- *Continue advancing and optimizing our SLATE program to include other antigen classes to both broaden applicable patient population and drive multiple antigens per patient.* SLATE is our "off-the-shelf" TSNA-directed immunotherapy program for solid tumor cancers. SLATE vaccines are produced and delivered to clinical sites proactively, and can be administered rapidly upon patient selection (achieved by standard commercial screening for driver mutations). Phase 1/2 studies within SLATE have provided proof-of-concept for the approach and enabled optimization of the cassette based on results to date. We now believe the SLATE is now ready for "plug and play" application across solid tumor indications and shared tumor neoantigen classes. Our long-term vision is to continue optimizing this immunotherapy candidate to include other antigen classes to both broaden addressable patient population and also drive multiple antigens per patient.

- *Conduct research and development on additional pathogens/infectious diseases.* Our research pipeline focuses on the development of novel therapeutic and prophylactic vaccines across oncology and infectious diseases. Preclinical projects include a therapeutic HPV vaccine with support from the Bill and Melinda Gates Foundation, an influenza (flu) vaccine utilizing the samRNA vaccine platform and our capability of generating chimeric vaccine cassettes to drive broad and potent neutralizing antibodies and CD8+ T cells against these viruses, and a new combination respiratory vaccine candidate against multiple respiratory viruses.

6

**Pipeline**

Our unique capabilities have enabled us to advance potentially differentiated clinical assets across multiple therapeutic areas. The table below summarizes key information about our pipeline.

**Figure 2.   Our Pipeline**

\* Randomized trial in newly-diagnosed metastatic patients

**Oncology Programs**

Immuno-oncology (I-O) represents one of the most significant advances in the history of cancer treatment and has saved and extended the lives of an incalculable number of people since the discovery of the T cell receptor in 1982. However, despite the fields' advances, the benefits of today's immunotherapies, namely checkpoint inhibitors (CPIs), are limited only to those patients whose immune systems have recognized their tumor. Within CPI therapy, solid tumor patients, whose tumors have been infiltrated by CD8+ T cells (commonly referred to as "hot" tumors), typically respond to therapy, while the majority of patients, whose tumors lack immune infiltration (commonly referred to as "cold" tumors), typically develop disease progression and death. The primary challenge to the field today, and our approach to oncology, is to extend the positive outcomes seen in "hot" tumors to "cold" tumors by activating (aka "priming") de-novo aka naïve T cells, thus enabling the immune system to recognize the tumor and form an army of neoantigen-specific CD8+ T cells to enable tumor destruction.

Immunologically "cold" tumors represent many of the deadliest and 'hardest-to-treat' cancers we know today, and unleashing the immune system (notably CD8+ T cells) against them could represent the next transformational advance in I-O.

**Figure 3. Gritstone's Approach: Induce CD8+ T cells Against "Cold" Solid Tumors Using Antigen Selection + Prime-boost Approach**



Neoantigens are a novel class of targets for cancer immunotherapy and have been validated in cancer patients as potentially the most critical T cell targets. Neoantigens comprise short, tumor-specific, mutated peptide sequences presented on cancer cells, referred to as tumor-specific neoantigens (TSNA).

When a solid tumor patient responds to CPI therapy, there is abundant evidence they do so because T cells that recognize tumor-specific neoantigen (TSNA) are activated, enabling them to traffic to and engage the tumor. In GRANITE, we sequence the patients' tumor in-house and then use EDGE™ to identify those mutations most likely to serve as TSNA. In SLATE, identifying patients' driver mutations (and thus whether they are eligible for the "off the shelf" vaccine) can be done locally using commercially available sequencing.

*The Prime-Boost Approach: Our Construct and Antigen Delivery System for GRANITE and SLATE*

Having identified the proper neoantigens to incorporate the vaccine, the next step is to deliver the payload such that it primes naïve CD8+ T cells (activating and expanding them) and sustains their activity over time. To achieve this, we deploy a "heterologous prime-boost" immunization whereby we use ChAd to prime naïve T cells and samRNA to augment/sustain or "boost" the immune response (Figure 3 above). There is abundant literature demonstrating that the heterologous prime boost approach (whereby you "prime" with one vector and then "boost" with a different vector, both delivering the same antigens) can elicit greater and longer-lasting levels of immunity compared to the immune response obtained by single vaccination or by inoculations with the same vector.

Human infectious disease vaccine experience has taught us that the adenoviral vector is the vector of choice for priming a substantial T cell response consisting of cytotoxic CD8+ T cells (and, to a lesser degree, CD4+ T-helper cells). samRNA was selected as a likely vector of choice for boosting pre-existing T cells.

We believe that continued strong immune pressure upon the tumor is likely necessary to prevent immune escape by the tumor and drive a durable clinical response.

Our personalized vaccine candidates consist of (1) a prime vector and (2) a boost vector, both of which contain (3) a neoantigen cassette:

1. *Prime Vector (ChAd).* Our prime vector is a chimpanzee adenovirus (ChAd). We believe an adenoviral vector is one of the most potent antigen-delivery platforms to prime naïve T cells. There is extensive clinical experience demonstrating that

8

ChAd vectors are generally well tolerated and consistently generate rapid and substantial CD4+ and CD8+ T cell responses. Findings from our studies are consistent with these general observations.

2.  *Boost Vector (samRNA).* Our boost vector is a self-amplifying mRNA (samRNA). Once in the cell, the injected source RNA replicates, amplifying the number of copies within the cells and leading to production of large amounts of the delivered target antigens. The presence of large quantities of antigen in an immune-stimulating environment drive profound antigen-specific T cell responses (adaptive immune responses). Additionally, samRNA has demonstrated the ability to be administered multiple times as a boost (aka safe and efficacious when 'repeat boosting'). Additional potential benefits of samRNA include extended antigen expression, nAb and T cell induction, and dose sparing potential.

3.  *Neoantigen Cassette.* Within each of the two vectors used for the prime and boost immunizations, we include a cassette that contains neoantigens. For GRANITE, we have designed the cassette to contain 20 TSNA, based on several considerations, including TSNA prediction performance, breadth of the tumor-specific immune response and potential immune competition and manufacturing factors. The cassette is designed and made uniquely for each patient based upon their tumor sequence data and EDGE™-based TSNA predictions.  For SLATE, the cassette is fixed for all patients, and contains common driver mutations (e.g. KRAS), which are known to be processed and presented by certain HLA molecules such as neoantigens that are shared between some patients. Most SLATE patients' tumors will only present a single neoantigen contained within the shared cassette. In contrast, although all of the mutations in a GRANITE cassette are contained within the patient's own tumor and can activate T cell responses post immunizations, it is expected that some of the delivered mutations, while present in the tumor genome, will not be processed and presented as a tumor cell surface neoantigenic HLA-peptide complex. We expect this to be acceptable, since these sequences are not wild-type (found in normal cells) and, therefore, only an irrelevant mutated peptide-specific immune response is expected to be elicited.

**Figure 4.   Comparison of Heterologous Prime-Boost with Homologous Prime-Boost and Prime Alone**



*Methods for evaluating efficacy, including circulating tumor DNA (ctDNA)*

The standard method of evaluating early efficacy outcomes in advanced cancer therapy (radiology) is increasingly imprecise in immuno-oncology since it relies upon radiologic assessment of tumor size, with the assumption that tumor shrinkage is necessary for clinical benefit to ensue (RECIST criteria). We aim to drive T cells into lesions, wherein they proliferate and could temporarily increase tumor lesion size (radiologic pseudoprogression), rendering traditional radiologic tools uninformative and, possibly, misleading.

We believe that circulating tumor DNA (ctDNA) response data, together with overall survival figures, are the most appropriate and accurate methods to predict and measure outcomes from novel therapeutics such as ours, in patients with advanced, metastatic cancer. Data from Phase 1/2 studies of both GRANITE and SLATE have demonstrated an association between molecular response and overall survival, together with evidence of radiologic pseudoprogression at early timepoints.

*GRANITE individualized neoantigen-based vaccine program*

GRANITE is our individualized neoantigen-based vaccine program for solid cancers. Development of our GRANITE vaccines begins with receipt of a routine tumor biopsy from the patient. Next, we sequence the tumor sample in-house to identify tumor mutations and apply our proprietary EDGE™ platform to identify which mutations form TSNA most likely to be presented on the patient's tumor.

9

Using these TSNA, we design and manufacture a vaccine that contains the relevant neoantigens for that specific patient, which is administered by simple intramuscular injection alongside a patients' normal course of treatment. Our individualized immunotherapy candidates are designed to fit easily into a community oncology setting, where most oncology patients are treated. GRANITE was granted Fast Track designation by the Food and Drug Administration (FDA) for the treatment of microsatellite stable colorectal cancer (MSS-CRC).

Results from our ongoing Phase 1/2 study evaluating GRANITE combination with checkpoint inhibitors in 3rd line microsatellite-stable colorectal cancer (MSS-CRC) and other advanced solid tumors have demonstrated positive results. Among all cohorts, the vaccine regimen was shown to be generally well-tolerated with no dose limiting toxicities and demonstrated consistent and potent CD8+ neoantigen-specific T cell induction. Additionally, an association between molecular responses (as measured by reduction in circulating tumor DNA, ctDNA) and improved clinical outcomes (including overall survival) was observed in MSS-CRC subjects.

As of August 31, 2022, the median overall survival (mOS) among molecular responders in this cohort was 22 months (median not yet reached) and demonstrated a molecular response rate of 55% molecular (6/11 evaluable patients; molecular response defined as ≥30% reduction in ctDNA from baseline). This compares to mOS of 7.8 months in evaluable MSS-CRC patients who did not exhibit a molecular response in the study, and a general 6-7 months against standard of care (Trifluridine/tipiracil combo and Regorafenib monotherapy). Interim results from the Phase 1/2 study of GRANITE were published in Nature Medicine in August 2022.

Upon assessing initial results of the GRANITE Phase 1/2 study, we discussed potential registrational paths with the FDA and subsequently initiated a randomized, controlled Phase 2/3 trial in newly diagnosed metastatic CRC patients that has registrational intent (NCT05141721). The study, which is evaluating GRANITE as a maintenance treatment in patients with first-line MSS-CRC who have completed FOLFOX (or FOLFOXFIRI)-bevacizumab induction therapy, was announced in late 2021 and the first patient was enrolled in January 2022. Preliminary results from the study are expected in 4Q2023.

**Figure 5.    Clinical Activity in Previously Treated MSS-CRC Based on Partial and Complete Molecular Responses and Associated Prolonged Progression-Free Survival**

*Best ctDNA molecular response (% ctDNA change from baseline)*

SD=stable disease; PD=progressive disease
** ctDNA samples not available; Molecular response is defined as >= 30% decrease in ctDNA from baseline at any post-baseline; ctDNA assessment based on Gritstone-developed, tumor-informed assay.

10

**Figure 6. ctDNA Reduction was Associated with Prolonged Overall Survival in Phase 1/2 trial assessing GRANITE; Median Overall Survival in Molecular Responders Exceeds 22 Months**



[1]  13 MSS-CRC patients treated; 2 did not have samples for analysis of ctDNA changes relative to baseline and included in without MR group; 6 of 11 were molecular responders; Molecular responders defined as patients with ≥30% reduction in ctDNA
[2]  Mayer et al., The New England Journal of Medicine 372, 1909-1919 (2015)
[3]  Grothey et al., The Lancet 381, 303-312 (2013)
**Notes:** GRTS vaccine candidates have not been studied head-to-head with those listed. Data cut-off: Aug 31, 2022; Molecular response is defined as >= 30% decrease in ctDNA from baseline at any post-baseline; ctDNA assessment based on Gritstone-developed, tumor-informed assay.

*SLATE "off-the-shelf" neoantigen-based immunotherapy vaccine*

Our "off-the-shelf" TSNA-directed immunotherapy program, SLATE, utilizes the same heterologous prime-boost approach as GRANITE but contains TSNA that are shared across a subset of cancer patients (rather than TSNA customized for that patient). The key differentiator and advantage of SLATE as compared to GRANITE is speed. SLATE vaccines are produced and delivered to clinical sites proactively and can be administered rapidly upon patient selection (achieved by standard commercial screening for driver mutations). We believe vaccines capable of targeting neoantigens from common tumor driver mutations, such as SLATE, have a clear potential clinical utility and commercialization advantages that are complementary to individualized vaccines.

An initial version of SLATE (SLATE v1) was studied in a Phase 1/2 study in patients with metastatic solid tumors (n = 26). SLATE v1 demonstrated induction of CD8+ T cells against multiple KRAS driver mutations and greatest activity was observed in a subset of NSCLC patients with KRASmut G12C mutations. With these initial data, we developed a second SLATE candidate that exclusively includes epitopes from mutated KRAS (SLATE-KRAS) and evaluated it under the same study protocol. In results shared during ESMO 2022, SLATE-KRAS exhibited immunogenic superiority over v1 in human HLA-transgenic mice and cancer patients, and demonstrated similar molecular response and overall survival trends as those seen in Phase 1/2 study of GRANITE. In 38 patients with advanced solid tumors evaluating both SLATE v1 (n =26) and SLATE-KRAS (n=12), the candidates demonstrated a 39% molecular response rate (MRR) in evaluable patients with MSS-CRC and NSCL and among the 18 patients with NSCLC, a molecular response was correlated with extended median OS (mOS of 9.6 months in molecular responders vs. 4.5 months in non-responders).

We believe the results to date demonstrate our ability to both accurately define shared neoantigen targets and engineer the SLATE cassette and vaccine to optimize immune response based on those specific mutations. Having optimized and validated the SLATE cassette, we now believe the SLATE platform is ready for "plug and play" application across solid tumor indications and shared tumor neoantigen classes. In advancing SLATE, we aim to combine the potential benefits of the full spectrum of tumor antigens with the practicality of the "off-the-shelf" approach.

11

**Figure 7.  Off-The-Shelf Immunotherapy Platform, SLATE Ready for Application Across Solid Tumor Indications and Shared Tumor Neoantigen Classes**



\* CTAs – cancer testis antigens; HERVs – human endogenous retroviruses; neoORFs – noncanonical open reading frames

**Infectious Disease Programs**

We currently have two clinical-stage infectious disease programs, a collaboration with Gilead Sciences, Inc. (Gilead) to develop a therapeutic vaccine for human immunodeficiency virus (HIV) and CORAL, a second-generation SARS-CoV-2 program. The HIV program represents the first therapeutic application of our platform against an infectious disease. CORAL serves as proof-of-concept for our ability to develop potent, durable self-amplifying mRNA (samRNA) vaccines for prophylactic application.

*HIV Vaccine in Collaboration with Gilead Sciences, Inc.*

In January 2021, we entered into a collaboration, option and license agreement with Gilead to research and develop a vaccine-based immunotherapy for HIV. Together, we aim to develop an HIV-specific therapeutic vaccine using our proprietary prime-boost vaccine platform, comprised of samRNA and adenoviral vectors, with antigens developed by Gilead. Under the terms of the agreement, Gilead invested $60.0 million, consisting of a $30.0 million upfront cash payment and a $30.0 million equity investment at the closing. Gilead is responsible for conducting a Phase 1 study for the HIV-specific therapeutic vaccine and holds an exclusive option under the collaboration to obtain an exclusive license to develop and commercialize the HIV-specific therapeutic vaccine beyond Phase 1. We are also eligible to receive up to an additional $725.0 million if the option is exercised and if certain clinical, regulatory and commercial milestones are achieved, as well as mid-single-digit to low double-digit tiered royalties on net sales upon commercialization. The HIV program is currently in Phase 1.

*CORAL – Second Generation COVID-19 Vaccine Program*

The CORAL program was initiated in 2021 in response to emerging limitations of first-generation COVID-19 vaccines, and today, serves as proof-of-concept for our ability to drive more potent and durable responses than those of current vaccines in prophylactic applications. As seen in COVID-19 and other infectious diseases, immune responses can vary, viruses mutate, and neutralizing antibodies wane, necessitating re-dosing (boosters). An approach capable of inducing a potent, broad immune response could have utility across a variety of viral and infectious diseases,

In multiple ongoing Phase 1 trials, we have generated early data demonstrating the potential ability of our vaccines to elicit potent and durable neutralizing antibody responses, and potent cytotoxic cellular responses against Spike and other conserved targets regions of the virus. These results have also provided early signals of the potential advantages of self-amplifying mRNA over first-generation mRNA.

Across the three active Phase 1 trials (CORAL-BOOST, CORAL-CEPI and CORAL-NIH), there are multiple constructs being evaluated with various antigenic cassettes designed to target Wild Type, Beta and Omicron variants. The trials are evaluating our approach in different populations including elderly adults, immunocompromised individuals, those naïve to the virus, and previously

12

vaccinated individuals using different vaccine regimens. In all, these trials are designed to answer core questions regarding self-amplifying mRNA dose regimen, and the patient populations that could be applicable to other infectious diseases.

We believe that our CORAL vaccine candidates have the potential to improve both B cell and T cell responses to Spike and other viral proteins. By creating a cassette that targets several viral antigens including Spike protein and additional TCE from the SARS-CoV-2 virus, some of which are highly conserved between viral strains (such as SARS and SARS-CoV-2), we believe our vaccine candidates may have pan-coronavirus potential to protect against future coronavirus pandemics. While mutations in the Spike protein may reduce protection by antibodies (since the antibody target changes its shape), broad T cell immunity and long-term memory to different viral proteins may provide a second layer of clinical protection. The CORAL program is supported by the Bill & Melinda Gates Foundation, the Coalition for Epidemic Preparedness Innovation (CEPI) and the National Institute of Allergy and Infectious Diseases (NIAID).

**Preclinical Research**

Beyond GRANITE, SLATE, CORAL and the HIV collaboration with Gilead, we continue to apply our broad set of capabilities in oncology and infectious diseases through promising preclinical work and partnerships. These projects include development of an optimal immunogen in the context of human papillomavirus (HPV) that is supported by the Gates Foundation. We are also researching the development of an influenza (flu) vaccine and a new combination respiratory vaccine candidate against multiple respiratory viruses.

**New Developments**

**Randomized, Phase 2 Trial in SLATE**

In January 2023, we announced plans to initiate a randomized, Phase 2 study evaluating KRAS-directed SLATE in patients with newly diagnosed metastatic cancer. We expect to initiate this randomized study, which is separate from the ongoing Phase 1/2 study in SLATE, in the second half of 2023.

**NCI Clinical Trial Collaboration**

In February 2023, we entered into a clinical trial agreement with the National Cancer Institute (NCI) to evaluate an autologous T cell therapy expressing a T cell receptor targeting mutated KRAS in combination with Gritstone's KRAS-directed vaccine candidate, SLATE-KRAS in a Phase 1 study.

**License and Collaborations**

*HIV Vaccine in Collaboration with Gilead Sciences, Inc.*

In January 2021, we entered into a collaboration, option and license agreement with Gilead to research and develop a vaccine-based immunotherapy for HIV. Together, we aim to develop an HIV-specific therapeutic vaccine using our proprietary prime-boost vaccine platform, comprised of samRNA and adenoviral vectors, with antigens developed by Gilead. Under the terms of the agreement, Gilead invested $60.0 million, consisting of a $30.0 million upfront cash payment and a $30.0 million equity investment at the closing. Gilead will be responsible for conducting a Phase 1 study for the HIV-specific therapeutic vaccine and holds an exclusive option under the collaboration to obtain an exclusive license to develop and commercialize the HIV-specific therapeutic vaccine beyond Phase 1. We are also eligible to receive up to an additional $725.0 million if the option is exercised and if certain clinical, regulatory and commercial milestones are achieved, as well as mid-single-digit to low double-digit tiered royalties on net sales upon commercialization. Gritstone and Gilead received IND clearance for this program in December 2021, and the program is currently in Phase 1.

*Strategic Collaboration with 2seventy bio*

In August 2018, we entered into a research collaboration and license agreement with bluebird bio, Inc. (bluebird), to utilize our EDGE™ platform to identify and validate tumor-specific targets and provide TCRs directed to 10 selected targets for use in bluebird's cell therapy platform. In November 2021, bluebird assigned the research collaboration and license agreement to its affiliate, 2seventy bio, Inc. (2seventy), in connection with an internal restructuring and subsequent spin-out of 2seventy (such research collaboration and license agreement, as assigned, 2seventy Agreement). In connection with the 2seventy Agreement, we received a non-refundable up-front cash payment of $20.0 million and an additional $10.0 million in equity investment in our Series C convertible preferred stock. We are also eligible to receive up to an aggregate of $1.2 billion in development, regulatory and commercial milestones associated with 2seventy's resulting cell therapy products, as well as tiered, single-digit royalties on sales of the TCR immunotherapy products that

13

undertaken by us under the CEPI Funding Agreement must be terminated, (iii) we become unable to discharge its obligations under the CEPI Funding Agreement, (iv) we fail to meet certain criteria set forth in the CEPI Funding Agreement, or (v) we commit fraud or a financial irregularity, as such terms are defined in the CEPI Funding Agreement. Certain termination rights for CEPI are subject to cure periods.

For additional information on all our license and collaboration arrangements, see "*Collaboration and License Agreements*" in Note 7 to our consolidated financial statements.

**Manufacturing**

Manufacturing is a vital component of our individualized immunotherapy platform, and we are devoting significant resources to manufacturing and process development in an effort to maintain the potential safety and efficacy of our product candidates, as well as to reduce our per-unit manufacturing costs and time to market. The production of our individualized immunotherapy candidates requires two distinct elements for each patient: tumor biopsy analysis to determine candidate neoantigens, followed by manufacture of vectors containing an individualized cassette encoding the selected neoantigens. SLATE and CORAL contains a fixed cassette with TSNA or SARS-CoV-2 vaccine constructs that is shared across cancer patients/subjects rather than a cassette unique to an individual patient, which is designed to provide an off-the-shelf alternative to our individualized manufactured product candidate, GRANITE. The manufacture of these vectors involves complex processes, including per-patient plasmid production, mammalian cell production of virus and RNA synthesis and lipid encapsulation. SLATE and CORAL manufacturing, as a fixed, "off-the-shelf" product candidate, are not time-sensitive and while manufacturing scale differs, both are relatively straightforward operationally. GRANITE, on the other hand, is an "N of 1" product candidate and is manufactured in real-time for each patient, which involves a greater logistical burden.

Our goal is to carefully manage our fixed-cost structure, maximize optionality, and drive long-term cost of goods as low as possible. We have used a hybrid approach to manufacturing and release of our individualized immunotherapy candidates whereby certain elements of our product candidates are manufactured and tested on an outsourced basis at CMOs, and other elements of our product candidates are manufactured and released internally at the 42,600 square foot manufacturing facility we established in 2017 in Pleasanton, California, all designed in compliance with cGMP.

Our manufacturing process begins with receipt of a patient's routine biopsy and blood sample at our Cambridge, Massachusetts facility, where TSNA identification is performed using the EDGE™ platform. The TSNA sequences generated by our platform are sent electronically to our Pleasanton, California manufacturing facility to generate the patient-specific TSNA cassette, which is then cloned into each of the ChAd and samRNA vectors and amplified. Following amplification, the ChAd vector containing the cassette is further manufactured into the final drug product and vialed onsite. In parallel at the Pleasanton facility, the samRNA vector is manufactured into RNA, formulated into LNP, and vialed onsite. Currently, the entire manufacturing process, from biopsy receipt at our facilities to the release and shipment of the individualized immunotherapy candidate to the clinical site for patient administration, often takes approximately 16-20 weeks in principle. Our goal is for this production and release timeline (and associated cost) to diminish over time due to process scaling, potential improvements in production and testing technologies, internal process expertise, internalization of potential reductions in regulatory testing requirements based on clinical experience.

To achieve this, our process development group is focused on several key initiatives. The first is investigating novel approaches to manufacturing our products, including process optimization and quality by design of each intermediate, drug substance and drug product. Additionally, we are systematically characterizing our manufacturing processes, including product intermediates and manufacturing unit operations. This characterization effort is designed to enable us to implement process changes over the entire product lifecycle and to quickly react to evolving process technologies that can lead to reductions in per-unit manufacturing costs and shorter process cycle times. In addition, we plan to establish automated, closed-platform manufacturing processes. Our goal is for these processes to enable us to conduct manufacturing in a lower-classified, lower cost manufacturing environment for multiple steps of our drug product manufacturing.

For our CORAL program, manufacturing of early-stage clinical lots was initiated on our Pleasanton, California manufacturing facility towards the end of 2020 and we have continued to produce next generation, variant-specific clinical lots through 2021 within this facility. Product candidates include both samRNA and adenoviral vectors to deliver SARS-CoV-2 viral antigens. Additional scale-up activities involving CMOs will be needed as the CORAL program progresses leading to large demand for the product candidates.

Our manufacturing strategy is currently structured to support our U.S., E.U., South African, and Australian development plans. We believe this manufacturing strategy developed for global distribution will enable use in other geographies. Specific supply strategies for other geographies will be developed as part of our clinical and commercial plans for such other geographies.

16

products. It is uncertain whether the issuance of any third-party patent would require us to alter our development or commercial strategies, alter our processes, obtain licenses or cease certain activities. The expiration of patents or patent applications licensed from third parties or our breach of any license agreements or failure to obtain a license to proprietary rights that we may require to develop or commercialize our future technology may have a material adverse impact on us. If third parties prepare and file patent applications in the United States that also claim technology to which we have rights, we may have to participate in interference proceedings in the USPTO to determine priority of invention.

We further own trade secrets relating to our technology, and we maintain the confidentiality of proprietary information to protect aspects of our business that are not amenable to, or that we do not consider appropriate for, patent protection. We seek to protect our trade secrets and know-how by entering into confidentiality agreements with third parties, consultants and employees who have access to such trade secrets and know-how. These agreements provide that all confidential information concerning our business or financial affairs developed or made known to the individual during the course of the individual's relationship with us are to be kept confidential and not disclosed to third parties except in specific circumstances. In addition, we enter into employment agreements that require employees to assign to us any inventions, trade secrets or know-how that they develop while employed by us. Although we take steps to protect our proprietary information and trade secrets, including through agreements with our employees and consultants, these agreements may be breached, or third parties may independently develop substantially equivalent proprietary information and techniques or otherwise gain access to our trade secrets or disclose our technology. Thus, we may not be able to meaningfully protect our trade secrets. To the extent that our employees, consultants, scientific advisors or other contractors use intellectual property owned by others in their work for us, disputes may arise as to the rights in related or resulting know how and inventions.

For a more comprehensive discussion of the risks related to our intellectual property, please see the section titled "Risk Factors—Risks Related to Intellectual Property."

## Government Regulation

The FDA and other regulatory authorities at federal, state, and local levels, as well as in foreign countries, extensively regulate, among other things, the research, development, testing, manufacture, quality control, import, export, safety, effectiveness, labeling, packaging, storage, distribution, record keeping, approval, advertising, promotion, marketing, post-approval monitoring, and post-approval reporting of biologics such as those we are developing. We, along with third-party contractors, will be required to navigate the various preclinical, clinical and commercial approval requirements of the governing regulatory agencies of the countries in which we wish to conduct studies or seek approval or licensure of our product candidates.

In the United States, the FDA regulates biologic products under both the Federal Food, Drug and Cosmetic Act (FDCA) and the Public Health Service Act and their respective implementing regulations. Our product candidates are subject to regulation by the FDA as biological products. Biological products require the submission of a biologics license application (BLA) and licensure, which constitutes approval, by the FDA before being marketed in the United States. None of our product candidates has been approved by the FDA for marketing in the United States, and we currently have no BLAs pending. Failure to comply with applicable FDA or other requirements at any time during product development, clinical testing, the approval process or after approval may result in administrative or judicial sanctions. These sanctions could include the FDA's refusal to approve pending applications, suspension or revocation of approved applications, warning letters, product recalls, product seizures, total or partial suspensions of manufacturing or distribution, injunctions, fines, civil penalties or criminal prosecution.

The process required by the FDA before biologic product candidates may be marketed in the United States generally involves the following:

- completion of preclinical laboratory tests and animal studies performed in accordance with the FDA's good laboratory practice, or GLP, regulations;

- submission to the FDA of an IND which must become effective before clinical trials may begin;

- approval by an independent Institutional Review Board (IRB) or ethics committee at each clinical site before the trial is commenced;

- performance of adequate and well-controlled human clinical trials in accordance with the IND, protocol, and FDA's good clinical practice (GCP) regulations to establish the safety, purity and potency of the proposed biologic product candidate for its intended purpose;

- preparation of and submission to the FDA of a BLA after completion of all pivotal clinical trials;

- satisfactory completion of an FDA Advisory Committee review, if applicable;

19

- a determination by the FDA within 60 days of its receipt of a BLA to file the application for review;

- satisfactory completion of an FDA pre-approval inspection of the manufacturing facility or facilities at which the proposed product is produced to assess compliance with cGMP and to assure that the facilities, methods and controls are adequate to preserve the biological product's continued safety, purity and potency, and of selected clinical investigation sites,

- FDA review and approval of the BLA to permit commercial marketing of the product for particular indications for use in the United States.

*Preclinical and Clinical Development*

Prior to beginning the first clinical trial with a product candidate, we must submit an IND to the FDA. An IND is a request for authorization from the FDA to administer an investigational new drug product to humans. The central focus of an IND submission is on the general investigational plan and the protocol(s) for clinical studies. The IND also includes results of animal and in vitro studies assessing the toxicology, pharmacokinetics, pharmacology, and pharmacodynamic characteristics of the product; chemistry, manufacturing, and controls information; and any available human data or literature to support the use of the investigational product. An IND must become effective before human clinical trials may begin. The IND automatically becomes effective 30 days after receipt by the FDA, unless the FDA, within the 30-day time period, raises safety concerns or questions about the proposed clinical trial. In such a case, the IND may be placed on clinical hold and the IND sponsor and the FDA must resolve any outstanding concerns or questions before the clinical trial can begin. Submission of an IND therefore may or may not result in FDA authorization to begin a clinical trial.

In addition to the submission of an IND to the FDA before initiation of a clinical trial in the United States, under the National institutes of Health (NIH) Guidelines for Research Involving Recombinant or Synthetic Nucleic Acid Molecules (NIH Guidelines) supervision of human gene transfer trials includes evaluation and assessment by an institutional biosafety committee (IBC) a local institutional committee that reviews and oversees research utilizing recombinant or synthetic nucleic acid molecules at that institution. The IBC assesses the safety of the research and identifies any potential risk to public health or the environment, and such review may result in some delay before initiation of a clinical trial. While the NIH Guidelines are not mandatory unless the research in question is being conducted at or sponsored by institutions receiving NIH funding of recombinant or synthetic nucleic acid molecule research, many companies and other institutions not otherwise subject to the NIH Guidelines voluntarily follow them.

Clinical trials involve the administration of the investigational product to human subjects under the supervision of qualified investigators in accordance with GCPs, which include the requirement that all research subjects provide their informed consent for their participation in any clinical study. Clinical trials are conducted under protocols detailing, among other things, the objectives of the study, the parameters to be used in monitoring safety and the effectiveness criteria to be evaluated. Generally, a separate submission to the IND must be made for each successive clinical trial conducted during product development and for any subsequent protocol amendments. While the IND is active, progress reports summarizing the results of the clinical trials and nonclinical studies performed since the last progress report, among other information, must be submitted at least annually to the FDA, and written IND safety reports must be submitted to the FDA and investigators for serious and unexpected suspected adverse events, findings from other studies suggesting a significant risk to humans exposed to the same or similar drugs, findings from animal or in vitro testing suggesting a significant risk to humans, and any clinically important increased incidence of a serious suspected adverse reaction compared to that listed in the protocol or investigator brochure

For purposes of BLA approval, human clinical trials are typically conducted in three (3) sequential phases that may overlap or be combined.

- Phase 1—The investigational product is initially introduced into healthy human subjects or patients with the target disease or condition. These studies are designed to test the safety, dosage tolerance, absorption, metabolism and distribution of the investigational product in humans, the side effects associated with increasing doses, and, if possible, to gain early evidence on effectiveness.

- Phase 2—The investigational product is administered to a limited patient population with a specified disease or condition to evaluate the preliminary efficacy, optimal dosages and dosing schedule and to identify possible adverse side effects and safety risks. Multiple Phase 2 clinical trials may be conducted to obtain information prior to beginning larger and more expensive Phase 3 clinical trials.

- Phase 3—The investigational product is administered to an expanded patient population to further evaluate dosage, to provide statistically significant evidence of clinical efficacy and to further test for safety, generally at multiple geographically dispersed clinical trial sites. These clinical trials are intended to establish the overall risk/benefit ratio of the investigational product and to provide an adequate basis for product approval.

20

*Regulatory Chemistry, Manufacturing & Controls*

Much of the manufacturing process contained in SLATE was similar to that used in the GRANITE IND, therefore, the FDA's pre-IND feedback focused primarily on the quality of the reagents, drug product characterization and release, and ongoing stability requests. The FDA inquired on the status of certain research-grade reagents and reminded us of the need to progress to GMP grade materials in the manufacture drug product by the time of BLA approval and commercial licensure. In order to retain consistency in the manufactured drug product across SLATE batches, we were asked to amend the specification of certain release assays' criteria and continue the development of quantitative potency assays for the ChAd and samRNA products prior to approval, and we were asked to summarize our QC plan to prevent, detect, and correct deficiencies that may compromise product integrity or function, or that may lead to the possible transmission of adventitious infectious agents. Additionally, the FDA provided feedback on the proposed method for qualifying Gritstone's proposed accelerated adventitious agent release assay.

*SLATE Regulatory Milestones*

The FDA allowed our IND for SLATE to proceed in June 2019.

**CORAL Development Program**

A pre-IND interaction with the FDA was conducted to review the proposed clinical investigation of ChAd vectors encoding the SARS-CoV-2 and CD8+ T-cell epitope spike antigen sequences in normal healthy subjects. The FDA concluded that the overall manufacturing and release testing for the CORAL vaccines candidates, which is similar to the GRANITE/SLATE process, appeared acceptable and requested detail on the transfection process, grade of materials, and release tests be submitted in the IND. We also received feedback that pre-clinical pharmacokinetic, and toxicology studies conducted in support of the GRANITE IND could be used to support the safety information needed to initiate the SARS-CoV-2 clinical study, and that additional animal immune response pharmacodynamic data would be submitted within the IND. The FDA previewed the proposed clinical protocol, confirmed that the overall design appeared reasonable and requested we include language to clarify dose escalation, stopping rules and a sentinel arm. The FDA requested that we exclude those subjects who are being treated with COVID-19 investigational agents or who have a high risk of potential exposure to SARS-CoV-2.

*CORAL Regulatory Milestones*

In March 2021, the FDA acknowledged our biologics master file which provides CMC and non-clinical sections support of NIH's IND to study CORAL program candidates in previously vaccinated healthy volunteers.

In August 2021, the MHRA provided a notice of acceptance for our CTA to initiate a clinical study of certain CORAL program candidates to boost vaccinate healthy volunteers >60 years in the UK.

In December 2021, the MHRA provided a notice of acceptance for our CTA to initiate a clinical study of certain CORAL program candidates in previously vaccinated B-cell deficient subjects in the UK.

South Africa's SAHPRA provided a notice of acceptance for our CTA to initiate a clinical study to test certain CORAL program candidates in COVID-19 naïve, convalescent, and HIV subjects in South Africa.

In July 2022, Gritstone held a Scientific Advice meeting with the MHRA to discuss the importance of cellular immunity for the development of a COVID vaccine. The MHRA agreed that in principle, T cells could be important for protection against viral infection. The MHRA also acknowledged that T cell responses to non-spike epitopes may create an advantage for protection against new variants and potentially increase durability. The MHRA also agreed that T cell data may be included in the summary of product characteristics.

**Financial Information About Segments**

We manage our operations as a single reportable segment for the purposes of assessing performance and making operating decisions. See "*Note 2. Summary of Significant Accounting Policies*" in the notes to the consolidated financial statements included elsewhere in this Annual Report on Form 10-K.

35

**Employees**

As a mission-driven organization, we value and foster a culture of collaboration, discovery and passion, which is reflected in our hiring and retention strategies. We employ talented individuals who have the skills and expertise to meet the challenges of our mission, and we recognize that our employees are key to our success. Our human capital objectives include hiring goals set to provide us with necessary expertise, integrating new employees, and retaining, incentivizing and developing our existing employees.

As of December 31, 2022, we had 233 full-time employees, including a total of 54 employees with M.D. or Ph.D. degrees. Within our workforce, 100 employees are engaged in research and development, 85 in manufacturing and quality, and 48 are engaged in business development, finance, legal, human resources, facilities, information technology and general management and administration. None of our employees are represented by labor unions or covered by collective bargaining agreements. We consider our relationship with our employees to be good.

**Corporate Information**

We were founded in August 2015 as a Delaware corporation. In May 2021, we changed our name from Gritstone Oncology, Inc. to Gritstone bio, Inc. Our principal executive offices are located at 5959 Horton Street, Suite 300, Emeryville, California 94608, and our telephone number is (510) 871-6100. Our website address is www.gritstonebio.com. The information on, or that can be accessed through, our website is not part of this report and is not incorporated by reference herein. We have included our website address as an inactive textual reference only. We also use our website as a means of disclosing material non-public information and for complying with our disclosure obligations under Regulation FD.

We file electronically with the SEC our annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K pursuant to Section 13(a) or 15(d) of the Exchange Act. We make available on our website at www.gritstonebio.com, free of charge, copies of these reports, as soon as reasonably practicable after we electronically file such material with, or furnish it to, the SEC. The public may read or copy any materials we file with the SEC at the SEC's Public Reference Room at 100 F Street NE, Washington, D.C. 20549. The public may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC maintains a website that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC. The address of that website is www.sec.gov. The information in or accessible through the SEC and our website or social media sites does not constitute part of this Annual Report on Form 10-K or any other report or document we file with the SEC, and any references to our website and social media sites are intended to be inactive textual references only.

We use Gritstone bio, Inc.®, the Gritstone bio logo, and other marks as trademarks in the United States and other countries. This Annual Report on Form 10-K contains references to our trademarks and service marks and to those belonging to other entities. Solely for convenience, trademarks and trade names referred to in this Annual Report on Form 10-K, including logos, artwork and other visual displays, may appear without the ® or ™ symbols, but such references are not intended to indicate in any way that we will not assert, to the fullest extent under applicable law, our rights or the rights of the applicable licensor to these trademarks and trade names. We do not intend our use or display of other entities' trade names, trademarks or service marks to imply a relationship with, or endorsement or sponsorship of us by any other entity.

**Item 1A. Risk Factors.**

*Investing in our common stock involves a high degree of risk. You should carefully consider the risks described below, as well as the other information in this Annual Report, including our financial statements and the related notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations," before deciding whether to invest in our common stock. The occurrence of any of the events or developments described below could have a material adverse effect on our business, results of operations, financial condition, prospects and stock price. In such an event, the market price of our common stock could decline, and you may lose all or part of your investment. Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also impair our business operations.*

**Summary of Principal Risks Associated with Our Business**

- We are a biotechnology company with a limited operating history and no products approved for commercial sale. We have incurred significant losses since our inception, and we anticipate that we will continue to incur significant losses for the foreseeable future, which, together with our limited operating history, makes it difficult to assess our future viability;

- Clinical development involves a lengthy and expensive process with an uncertain outcome, and delays can occur for a variety of reasons outside of our control, including external factors that may affect our clinical trial enrollment;

36

- We will require substantial additional financing to achieve our goals, and a failure to obtain such necessary capital when needed on acceptable terms, or at all, could force us to delay, limit, reduce or terminate our product development programs, commercialization efforts or other operations;

- Our immunotherapy approach is based on novel ideas and technologies that are unproven and may not result in marketable products, which exposes us to unforeseen risks and makes it difficult for us to predict the time and cost of product development and potential for regulatory approval;

- Our business remains highly dependent on the successful development, regulatory approval and commercialization of our individualized immunotherapy product candidate and GRANITE, our "off-the-shelf" immunotherapy product candidate, SLATE, which are in clinical trials;

- We may be unable to obtain regulatory approval for our product candidates under applicable regulatory requirements. The denial or delay of any such approval would delay commercialization of our product candidates and adversely impact our potential to generate revenue, our business and our results of operations;

- We rely, and intend to rely, on third parties in the conduct of our preclinical studies and clinical trials. If these third parties do not successfully carry out their contractual duties, fail to comply with applicable regulatory requirements, or fail to meet expected deadlines, we may be unable to obtain regulatory approval for our immunotherapy product candidates;

- We currently perform the majority of the manufacturing of our product candidates internally and rely on qualified third parties to supply some components of our product candidates. Our inability to manufacture sufficient quantities of GRANITE, SLATE or any other current or future product candidates, or the loss of our third-party suppliers, or our or their failure to comply with applicable regulatory requirements or to supply sufficient quantities at acceptable quality levels or prices, or at all, would materially adversely affect our business;

- We face significant competition in an environment of rapid technological and scientific change, and our failure to effectively compete may prevent us from achieving significant market penetration. Most of our competitors have significantly greater resources than we do, and we may not be able to successfully compete;

- Our success depends on our ability to protect our intellectual property and our proprietary technologies and to avoid infringing the rights of others; and

- Our stock price is volatile, and you may not be able to resell shares of our common stock at or above the price you paid.

**Risks Related to Our Limited Operating History, Financial Condition and Capital Requirements**

***We are a biotechnology company with a limited operating history and no products approved for commercial sale. We have incurred significant losses since our inception, and we anticipate that we will continue to incur significant losses for the foreseeable future, which, together with our limited operating history, makes it difficult to assess our future viability.***

Product development in the biotechnology industry is a highly speculative undertaking and involves a substantial degree of risk. We are a clinical-stage biotechnology company with a limited operating history upon which you can evaluate our business and prospects. We have no products approved for commercial sale, have not yet generated any revenue from product sales and have incurred losses in each year since our inception in August 2015. Investment in biopharmaceutical product development is highly speculative because it entails substantial upfront capital expenditures and significant risk that any potential product candidate will fail to demonstrate adequate efficacy or an acceptable safety profile, gain regulatory approval and become commercially viable. In addition, as a business with a limited operating history, we may encounter unforeseen expenses, difficulties, ,complications, delays and other known and unknown factors and risks frequently experienced by early-stage biopharmaceutical companies in rapidly evolving fields.

We have had significant operating losses since our inception (for additional information, see "Liquidity" in Note 1 to our consolidated financial statements). Substantially all of our losses have resulted from expenses incurred in connection with our research and development programs and from general and administrative costs associated with our operations. Our programs will require substantial additional development time and resources before we (or our collaboration partners) would be able to apply for or receive regulatory approvals and begin generating revenue from product sales. In addition, we incur substantial costs associated with operating as a public company. We also do not yet have a sales organization or commercial infrastructure and, accordingly, if our product candidates are approved, we will incur significant expenses to develop a sales organization or commercial infrastructure in advance of generating any commercial product sales. We expect to continue to incur losses for the foreseeable future, and we anticipate these losses

37

will increase as we continue to develop our current and any future immunotherapy product candidates, conduct clinical trials and pursue research and development activities. Even if we achieve profitability at some point in the future, we may not be able to sustain profitability in subsequent periods. Our prior losses, combined with expected future losses, have had and will continue to have an adverse effect on our stockholders' equity and working capital.

***We will require substantial additional financing to achieve our goals, and a failure to obtain such necessary capital when needed on acceptable terms, or at all, could force us to delay, limit, reduce or terminate our product development programs, commercialization efforts or other operations.***

Since our inception, we have invested a significant portion of our efforts and financial resources in research and development activities for tumor-specific cancer immunotherapies and infectious disease programs in addition to establishing our in-house manufacturing capabilities. Our preclinical studies, clinical trials and additional research and development activities will require substantial funds to complete. We believe that we will continue to expend substantial resources for the foreseeable future in connection with the development of our current and any other future immunotherapy product candidates we may choose to pursue, as well as the continued development of our manufacturing capabilities and other corporate uses. Specifically, in the near term, we expect to incur substantial expenses as we advance GRANITE and SLATE through clinical development, seek regulatory approval, prepare for and, if approved, proceed to commercialization, continue our research and development efforts and invest in our manufacturing facility. These expenditures will include costs associated with conducting preclinical studies and clinical trials, obtaining regulatory approvals, and manufacturing and supply, as well as marketing and selling any products approved for sale. In addition, other unanticipated costs may arise. Because the outcome of any of our preclinical studies or clinical trials is highly uncertain, we cannot reasonably estimate the actual amounts necessary to successfully complete the development and commercialization of GRANITE, SLATE or any other current or future immunotherapy product candidates.

We believe that our existing cash, cash equivalents and marketable securities will be sufficient to fund our planned operations for at least twelve (12) months. However, our operating plans and other demands on our capital resources may change as a result of many factors currently unknown to us, and we may need to seek additional funds sooner than planned, through public or private equity or debt financings or other sources, such as strategic collaborations. If we raise additional funds through licensing or collaboration arrangements with third parties, we may have to relinquish valuable rights to our product candidates or grant licenses on terms that are not favorable to us. In addition, we may seek additional capital due to favorable market conditions or strategic considerations even if we believe we have sufficient funds for our current or future operating plans. Attempting to secure additional financing may divert our management from our day-to-day activities, which may adversely affect our ability to develop our product candidates. In addition, we cannot guarantee that future financing will be available in sufficient amounts or on terms acceptable to us, if at all.

Our future capital requirements depend on many factors, including:

- the scope, progress, results and costs of developing each of our product candidates, including conducting preclinical studies and clinical trials, either on our own or in collaboration with others;

- potential delays in our ongoing clinical trials, including for reasons beyond our control;

- the timing of, and the costs involved in, obtaining regulatory approvals for our product candidates;

- the number and characteristics of any additional product candidates we develop or acquire;

- the timing and amount of any milestone, royalty or other payments we are required to make pursuant to any current or future collaboration or license agreement;

- the cost of manufacturing any of our products we successfully commercialize, including the cost of scaling up our internal manufacturing operations;

- the cost of building a sales force in anticipation of product commercialization;

- the cost of commercialization activities, including legal, compliance, marketing, sales and distribution costs;

- our ability to maintain existing, and establish new, strategic collaborations, licensing or other arrangements and the financial terms of any such arrangement, including the timing and amount of any future milestone, royalty or other payments due under any such arrangement;

- any product liability or other lawsuits related to our products;

- the expenses needed to attract, hire and retain skilled personnel;

- the costs associated with being a public company;

- the costs involved in preparing, filing, prosecuting, maintaining, defending and enforcing our intellectual property portfolio; and

- the timing, receipt and amount of sales of our future approved products, if any.

Additional funds may not be available when we need them, on terms that are acceptable to us, or at all. If adequate funds are not available to us on a timely basis, we may be required to:

- delay, limit, reduce or terminate preclinical studies, clinical trials or other research and development activities or eliminate one or more of our development programs altogether; or

- delay, limit, reduce or terminate our efforts to establish manufacturing and sales and marketing capabilities or other activities that may be necessary to commercialize our immunotherapy product candidates, or reduce our flexibility in developing or maintaining our sales and marketing strategy.

We also could be required to seek funds through arrangements with collaborators or others that may require us to relinquish rights or jointly own some aspects of our technologies or product candidates that we would otherwise pursue on our own. We may not realize revenue from sales of products or royalties from licensed products in the foreseeable future, and no such revenue will be realized unless and until a product candidate is clinically tested, approved for commercialization and successfully marketed. To date, we have primarily financed our operations through the sale of equity securities. We will be required to seek additional funding in the future and currently intend to do so through collaborations, public or private equity offerings or debt financings, credit or loan facilities or a combination of one or more of these funding sources. Our ability to raise additional funds will depend on financial, economic and other factors, many of which are beyond our control. Additional funds may not be available to us on acceptable terms or at all. If we raise additional funds by issuing equity securities, our stockholders will suffer dilution and the terms of any financing may adversely affect the rights of our stockholders. In addition, as a condition to providing additional funds to us, future investors may demand, and may be granted, rights superior to those of existing stockholders. Debt financing, if available, is likely to involve restrictive covenants, repayment obligations, or other similar restrictions that may affect our business and limit our flexibility in conducting future business activities, and, in the event of insolvency, debt holders would be repaid before holders of our equity securities received any distribution of our corporate assets.

***Our operating results may fluctuate significantly, which makes our future operating results difficult to predict and could cause our operating results to fall below expectations.***

Our quarterly and annual operating results may fluctuate significantly, which makes it difficult for us to predict our future operating results. These fluctuations may occur due to a variety of factors, many of which are beyond our control and may be difficult to predict, including:

- the timing and cost of, and level of investment in, research, development and commercialization activities, which may change from time to time;

- the timing of receipt of approvals from regulatory authorities in the United States and internationally;

- the timing and status of enrollment for our clinical trials;

- the cost of manufacturing, as well as building out our supply chain, which may vary depending on the quantity of production, the cost of continuing to establish and scale up our internal manufacturing capabilities, and the terms of any agreements we enter into with third-party suppliers;

- the timing and amount of any milestone, royalty or other payments due under any current or future collaboration or license agreement;

39

- coverage and reimbursement policies with respect to our immunotherapy product candidates, if approved, and potential future drugs that compete with our products;

- expenditures that we may incur to acquire, develop or commercialize additional products and technologies;

- the level of demand for our immunotherapy products, if approved, which may vary significantly over time;

- the timing and success or failure of preclinical studies and clinical trials for our product candidates or competing product candidates, or any other change in the competitive landscape of our industry, including consolidation among our competitors or partners; and

- future accounting pronouncements or changes in our accounting policies.

The cumulative effects of these factors could result in large fluctuations and unpredictability in our quarterly and annual operating results. As a result, comparing our operating results on a period-to-period basis may not be meaningful. Investors should not rely on our past results as an indication of our future performance.

This variability and unpredictability could also result in our failing to meet the expectations of industry or financial analysts or investors for any period. If our revenue or operating results fall below the expectations of analysts or investors or below any forecasts we may provide to the market, or if the forecasts we provide to the market are below the expectations of analysts or investors, the price of our common stock could decline substantially. Such a stock price decline could occur even when we have met any  revenue or earnings guidance we previously provided.

**Risks Related to Our Business**

*Our business is highly dependent on the successful development, regulatory approval and commercialization of our product candidates, primarily our individualized immunotherapy product candidate, GRANITE, and our "off-the-shelf" immunotherapy product candidate, SLATE, which are in clinical trials.*

We currently have no products approved for sale and may never be able to develop marketable products. All three of our clinical programs are in either Phase 1 or Phase 2 clinical trials. As such, we face significant clinical risk with our programs and our tumor and viral-specific immunotherapy approach generally. The success of our business, including our ability to finance our operations and generate any revenue in the future, will primarily depend on the successful development, regulatory approval and commercialization of GRANITE and SLATE, as well as other product candidates derived from our immunotherapy approach, which may never occur. To date, our product candidates have only been tested in a small number of humans, and, given our early stage of development, it may be many years, if at all, before we have demonstrated the safety and efficacy, especially of an individualized immunotherapy treatment, sufficient to warrant approval for commercialization. In the future, we may also become dependent on other product candidates that we may develop or acquire.

We have not previously submitted a BLA to the FDA or made a similar filing seeking regulatory approval to comparable foreign authorities, for any product candidate, and we cannot be certain that our product candidates will be successful in clinical trials or receive regulatory approval. Further, any product candidates may not receive regulatory approval even if they are successful in clinical trials. If we do not receive regulatory approvals for our product candidates, we may not be able to continue our operations. Even if we successfully obtain regulatory approvals to market a product candidate, our revenue will be dependent, in part, upon a number of factors outside of our control, including, in particular, the size of the markets in the territories for which we gain regulatory approval and have commercial rights. If the markets or patient subsets that we are targeting are not as significant as we estimate, we may not generate significant revenues from sales of such products, if approved.

We plan to seek regulatory approval to commercialize our product candidates both in the United States and in selected foreign countries. While the scope of regulatory approval generally is similar in other countries, to obtain separate regulatory approval in other countries we must comply with numerous and varying regulatory requirements of such countries regarding quality, safety and efficacy. Other countries also have their own regulations governing, among other things, clinical trials and commercial sales, as well as pricing and distribution of our product candidates, and we may be required to expend significant resources to obtain regulatory approval and to comply with ongoing regulations in these jurisdictions.

The clinical and commercial success of our current and any future product candidates will depend on several factors, including the following:

- our ability to raise any additional required capital on acceptable terms, or at all;

- timely completion of our preclinical studies and clinical trials, which may be significantly slower, or cost more, than we currently anticipate and will depend substantially upon the performance of third-party contractors;

- our ability to timely execute our ongoing clinical trials and enroll a sufficient number of patients on a timely basis to evaluate the potential of our product candidates in clinical development;

- whether we are required by the FDA or similar foreign regulatory agencies to conduct additional clinical trials or other studies beyond those planned to support approval of our product candidates;

- our ability to complete an IND, or similar foreign applications, enabling studies, and successfully submit an IND or similar foreign applications for future product candidates;

- acceptance of our proposed indications and primary endpoint assessments relating to the proposed indications of our product candidates by the FDA and similar foreign regulatory authorities;

- our ability to consistently manufacture our product candidates on a timely basis;

- our ability, and the ability of any third parties with whom we contract, to remain in good standing with regulatory agencies and develop, validate and maintain commercially viable manufacturing processes that are compliant with cGMPs or similar foreign requirements;

- our ability to demonstrate to the satisfaction of the FDA and similar foreign regulatory authorities the quality, safety, efficacy and acceptable risk-benefit profile of our product candidates;

- the prevalence, duration and severity of potential side effects or other safety issues experienced with our product candidates or future approved products, if any;

- the timely receipt of necessary marketing approvals from the FDA and similar foreign regulatory authorities;

- achieving and maintaining, and, where applicable, ensuring that our third-party contractors achieve and maintain, compliance with our contractual obligations and with all regulatory requirements applicable to our current or any future product candidates or approved products, if any;

- the willingness of physicians, operators of hospitals and clinics and patients to utilize or adopt our individualized cancer immunotherapy approach;

- our ability to successfully develop a commercial strategy and thereafter commercialize GRANITE, SLATE, CORAL or any future product candidates (including our partnered HIV therapeutic vaccine) in the United States and internationally, if approved for marketing, sale and distribution in such countries and territories, whether alone or in collaboration with others;

- the availability of coverage and adequate reimbursement from managed care plans, private insurers, government payors (such as Medicare and Medicaid) and other third-party payors for any of our product candidates that may be approved;

- the convenience of our treatment or dosing regimen;

- acceptance by physicians, payors and patients of the benefits, safety and efficacy of our product candidates or any future product candidates, if approved, including relative to alternative and competing treatments;

- patient demand for our current or future product candidates, if approved;

- our ability to establish and enforce intellectual property rights in and to our product candidates; and

- our ability to avoid third-party patent interference, intellectual property challenges or intellectual property infringement claims.

These factors, many of which are beyond our control, could cause us to experience significant delays or an inability to obtain regulatory approvals or commercialize our current or future product candidates. Even if regulatory approvals are obtained, we may never

41

be able to successfully commercialize any product candidates. Accordingly, we cannot provide assurances that we will be able to generate sufficient revenue through the sale of our product candidates or any future product candidates to continue our business or achieve profitability.

***Clinical development involves a lengthy and expensive process with an uncertain outcome, and delays can occur for a variety of reasons outside of our control.***

Clinical development is expensive and can take many years to complete, and its outcome is inherently uncertain. Failure can occur at any time during the clinical trial process. We may experience delays in enrolling or completing our clinical trials. Additionally, we cannot be certain that studies or trials for our product candidates will begin on time, not require redesign, enroll an adequate number of subjects on time or be completed on schedule, if at all. Clinical trials can be delayed or terminated for a variety of reasons, including delays or failures related to:

- inability to generate sufficient preclinical, toxicology, or other *in vivo* or *in vitro* data to support the initiation or continuation of clinical trials;

- the FDA or comparable foreign regulatory authorities disagreeing as to the design or implementation of our clinical trials;

- delays in obtaining regulatory authorization to commence a trial;

- reaching agreement on acceptable terms with prospective contract research organizations (CROs) and clinical trial sites, the terms of which can be subject to extensive negotiation and may vary significantly among different CROs and trial sites;

- obtaining IRB, ethics committee and, where required, IBC approval at each trial site;

- recruiting an adequate number of suitable patients to participate in a trial, which can be impacted by external factors beyond our control, including, due to the COVID-19 or other pandemics;

- having subjects complete a trial or return for post-treatment follow-up;

- clinical sites deviating from trial protocol or dropping out of a trial;

- addressing subject safety concerns that arise during the course of a trial;

- adding a sufficient number of clinical trial sites;

- supplying sufficient quantities of product candidates or other materials for use in preclinical studies or clinical trials; or

- accessing checkpoint inhibitors for use in combination with our product candidates in preclinical studies or clinical trials, including checkpoint inhibitors that have not been approved by the FDA for such use.

As demonstrated during the COVID-19 pandemic, a public health crisis (or other situation having lasting and widespread societal impact) can result in challenges and delays in initiating, enrolling, conducting or completing our planned and ongoing clinical trials, as well as delays in the commencement of our preclinical studies.

We may experience numerous adverse or unforeseen events during, or as a result of, preclinical studies and clinical trials that could delay or prevent us from receiving marketing approval or commercializing our product candidates, including:

- we may receive feedback from regulatory authorities that requires us to modify the design of our clinical trials;

- we may be affected by safety concerns that have a class effect; for example, if a competitor reports negative results with respect to a product candidate similar to those we are developing, such setbacks could negatively impact our own product development;

- clinical trials of our product candidates may produce negative or inconclusive results, and we may decide, or regulators may require us, to conduct additional clinical trials or abandon our development programs, including our individualized cancer immunotherapy program;

42

- the number of patients required for clinical trials of our product candidates may be larger than we anticipate, enrollment in these clinical trials may be slower than we anticipate, or participants may drop out of these clinical trials at a higher rate than we anticipate;

- we or our third-party contractors may fail to comply with regulatory requirements, fail to maintain adequate quality controls, or be unable to produce sufficient product supply to conduct and complete preclinical studies or clinical trials of our product candidates in a timely manner, or at all;

- we or our investigators might have to suspend or terminate clinical trials of our product candidates for various reasons, including noncompliance with regulatory requirements, a finding that our product candidates have undesirable side effects or other unexpected characteristics, or a finding that the participants are being exposed to unacceptable health risks;

- the cost of clinical trials of our product candidates may be greater than we anticipate;

- the quality of our product candidates or other materials necessary to conduct preclinical studies or clinical trials of our product candidates may be insufficient or inadequate;

- regulators may revise the requirements for approving our product candidates, or such requirements may not be as we anticipate; and

- future collaborators may conduct clinical trials in ways they view as advantageous to them but that are suboptimal for us.

If we are required to conduct additional clinical trials or other testing of our product candidates beyond those that we currently contemplate, if we are unable to successfully complete clinical trials of our product candidates or other testing, if the results of these trials or tests are not positive or are only moderately positive, or if there are safety concerns, we may:

- incur unplanned costs;

- be delayed in obtaining marketing approval for our product candidates or not obtain marketing approval at all;

- obtain marketing approval in some countries and not in others;

- obtain marketing approval for indications or patient populations that are not as broad as intended or desired;

- obtain marketing approval with labeling that includes significant use or distribution restrictions or safety warnings, including boxed warnings;

- be subject to additional post-marketing testing requirements, which could be expensive and time consuming; or

- have the treatment removed from the market after obtaining marketing approval.

We could also encounter delays if a clinical trial is suspended or terminated by us, by the IRBs or ethics committees of the institutions in which such trials are being conducted, by the Data Safety Monitoring Board (DSMB), or by the FDA or other regulatory authorities. Such authorities may suspend or terminate a clinical trial due to a number of factors, including failure to conduct the clinical trial in accordance with regulatory requirements or our clinical protocols, inspection of the clinical trial operations or trial site by the FDA or other regulatory authorities resulting in the imposition of a clinical hold, unforeseen safety issues or adverse side effects, failure to demonstrate a benefit from using a product candidate, changes in governmental regulations or administrative actions or lack of adequate funding to continue the clinical trial.

Further, conducting clinical trials in foreign countries, as we have done in our collaborations related to CORAL and may do for certain of our other product candidates, presents additional risks that may delay completion of our clinical trials. These risks include the failure of enrolled patients in foreign countries to adhere to clinical protocol as a result of differences in healthcare services or cultural customs, managing additional administrative burdens associated with foreign regulatory schemes, as well as political and economic risks relevant to such foreign countries.

Principal investigators for our clinical trials may serve as scientific advisors or consultants to us from time to time and may receive cash or equity compensation in connection with such services. If these relationships and any related compensation result in perceived or actual conflicts of interest, we fail to ensure such relationships and compensation are accurately disclosed, or a regulatory

43

authority concludes that the financial relationship may have affected the interpretation of the trial, the integrity of the data generated at the applicable clinical trial site may be questioned and the utility of the clinical trial itself may be jeopardized, which could result in the delay or rejection of the marketing application we submit. Any such delay or rejection could prevent or delay us from commercializing our current or future product candidates.

If any of our preclinical studies or clinical trials of our product candidates are delayed or terminated, the commercial prospects of our product candidates may be harmed, and our ability to generate revenues from any of these product candidates could be delayed or not realized at all. In addition, any delays in completing our clinical trials may increase our costs, slow down our product candidate development and approval process and jeopardize our ability to commence product sales and generate revenues. Any of these occurrences may significantly harm our business, financial condition and prospects. In addition, many of the factors that cause, or lead to, a delay in the commencement or completion of clinical trials may also ultimately lead to the denial of regulatory approval of our product candidates. If our product candidates or our immunotherapy prediction platform generally prove to be ineffective, unsafe or commercially unviable, our entire platform and approach would have little, if any, value, which would have a material adverse effect on our business, financial condition, results of operations and prospects.

In addition, the FDA's and other regulatory authorities' policies with respect to clinical trials may change and additional government regulations may be enacted. For instance, the regulatory landscape related to clinical trials in the European Union recently evolved. The CTR, which was adopted in April 2014 and repeals the EU Clinical Trials Directive, became applicable on January 31, 2022. While the Clinical Trials Directive required a separate CTA to be submitted in each member state to both the competent national health authority and an independent ethics committee, the CTR introduces a centralized process and only requires the submission of a single application to all member states concerned. The CTR allows sponsors to make a single submission to both the competent authority and an ethics committee in each member state, leading to a single decision per member state. The assessment procedure of the CTA has been harmonized as well, including a joint assessment by all member states concerned, and a separate assessment by each member state with respect to specific requirements related to its own territory, including ethics rules. Each member state's decision is communicated to the sponsor via the centralized EU portal. Once the CTA is approved, clinical study development may proceed. The CTR foresees a three-year transition period. The extent to which ongoing and new clinical trials will be governed by the CTR varies. For clinical trials whose CTA was made under the Clinical Trials Directive before January 31, 2022, the Clinical Trials Directive will continue to apply on a transitional basis for three years. Additionally, sponsors were still able to choose to submit a CTA under either the Clinical Trials Directive or the CTR until January 31, 2023 and, if authorized, those will be governed by the Clinical Trials Directive until January 31, 2025. By that date, all ongoing trials will become subject to the provisions of the CTR. Compliance with the CTR requirements by us and our third-party service providers, such as CROs, may impact our developments plans.

It is currently unclear to what extent the United Kingdom, as a free-standing regulatory regime outside of the European Union, will seek to amend its regulations so that they diverge from the regulatory regime in the European Union. The UK regulatory framework in relation to clinical trials is derived from the EU Clinical Trials Directive (as implemented into UK law, through secondary legislation) in place prior to the date of application of the CTR. On January 17, 2022, the MHRA launched an eight-week consultation on reframing the UK legislation for clinical trials. The consultation closed on March 14, 2022 (although a response has not yet been published) and aims to streamline clinical trials approvals, enable innovation, enhance clinical trials transparency, enable greater risk proportionality, and promote patient and public involvement in clinical trials. The outcome of the consultation will be closely watched and will determine whether the United Kingdom chooses to align with the new EU CTR or diverge from it to maintain regulatory flexibility. A decision by the United Kingdom not to closely align its regulations with the CTR may have an effect on the cost of conducting clinical trials in the United Kingdom as opposed to other countries and/or make it harder to seek a marketing authorization in the European Union for our product candidates on the basis of clinical trials conducted in the United Kingdom.

If we are slow or unable to adapt to changes in existing requirements or the adoption of new requirements or policies governing clinical trials, our development plans may also be impacted.

***Our tumor-specific cancer immunotherapy approach is based on novel ideas and technologies that are unproven and may not result in marketable products, which exposes us to unforeseen risks and makes it difficult for us to predict the time and cost of product development and potential for regulatory approval.***

Regarding our tumor-specific cancer immunotherapies, our foundational science and product development approach are based on our ability to predict the presence of a patient's TSNA and develop a TSNA-directed therapy that will elicit a meaningful T cell response. We believe that this approach may offer an improved therapeutic effect by driving an intense, focused T cell attack selectively upon a patient's tumor. However, this approach to treating cancer is novel and the scientific research that forms the basis of our efforts to predict the presence of TSNA and to develop TSNA-directed cancer immunotherapy candidates is both preliminary and limited. The results of our preclinical animal studies may not translate into humans. For example, our prediction model may fail to accurately predict the presence of TSNA, resulting in little or no tumor-targeted T cell response, or our therapy may fail to elicit a significant or durable enough T cell response to effectively destroy a tumor. As such, we cannot assure you, even if we are able to develop individualized

44

cancer immunotherapy candidates capable of recognizing TSNA and eliciting a T cell response, that such therapy would safely and effectively treat cancers. We may spend substantial funds attempting to develop this approach and never succeed in developing a marketable therapeutic.

No regulatory authority has granted approval for a cancer immunotherapy based on a heterologous prime-boost approach, which may increase the complexity, uncertainty and length of the regulatory approval process for our product candidates. We may never receive approval to market and commercialize any product candidate. Even if we obtain regulatory approval, the approval may be for targets, disease indications, lines of therapy or patient populations that are not as broad as we intended or desired or may require labeling that includes significant use or distribution restrictions or safety warnings. We may be required to perform additional or unanticipated clinical trials to obtain approval or be subject to post-marketing testing requirements to maintain regulatory approval. If our personalized immunotherapy candidates prove to be ineffective, unsafe or commercially unviable, our entire technology platform and pipeline would have little, if any, value, which would have a material adverse effect on our business, financial condition, results of operations and prospects.

The regulatory approval process and clinical trial requirements for novel product candidates can be more expensive and take longer than for other, better known or more extensively studied product candidates, and we cannot predict how long it will take or how much it will cost to complete clinical developments and obtain regulatory approvals for a cell therapy product candidate in the United States or how long it will take to commercialize a product candidate, if and when approved. Regulatory requirements governing cell therapy products have changed frequently and may continue to change in the future. For example, the FDA established the Office of Tissues and Advanced Therapies within its Center for Biologics Evaluation and Research, or CBER, to consolidate the review of cell therapies and related products, and the Cellular, Tissue and Gene Therapies Advisory Committee to advise CBER on its review. These and other regulatory review agencies, committees and advisory groups and the requirements and guidelines they promulgate, may lengthen the regulatory review process, require us to perform additional preclinical studies or clinical trials, increase our development costs, lead to changes in regulatory positions and interpretations, delay or prevent approval and commercialization of these treatment candidates or lead to significant post-approval limitations or restrictions. Additionally, under the NIH Guidelines, supervision of human gene transfer trials includes evaluation and assessment by an IBC, a local institutional committee that reviews and oversees research utilizing recombinant or synthetic nucleic acid molecules at that institution. The IBC assesses the safety of the research and identifies any potential risk to public health or the environment, and such review may result in some delay before initiation of a clinical trial. While the NIH Guidelines are not mandatory unless the research in question is being conducted at or sponsored by institutions receiving NIH funding of recombinant or synthetic nucleic acid molecule research, many companies and other institutions not otherwise subject to the NIH Guidelines voluntarily follow them.

Even if our product candidates obtain required regulatory approvals, such approvals may later be withdrawn as a result of changes in regulations or the interpretation of regulations by applicable regulatory agencies. Additionally, adverse developments in clinical trials conducted by others of cell therapy products or products created using similar technology, or adverse public perception of the field of cell therapies editing, may cause the FDA and other regulatory bodies to revise the requirements for approval of any product candidates we may develop or limit the use of products utilizing technologies such as ours, either of which could materially harm our business. As we advance our product candidates, we will be required to consult with various regulatory authorities, and we must comply with applicable laws, rules and regulations, which may change from time to time, including during the course of development of our product candidates. If we fail to do so, we may be required to delay or discontinue the clinical development of certain of our product candidates. These additional processes may result in a review and approval process that is longer than we otherwise would have expected. Even if we comply with applicable laws, rules, and regulations, and even if we maintain close coordination with the applicable regulatory authorities with oversight over our product candidates, our development programs may fail to succeed. Delay or failure to obtain, or unexpected costs in obtaining, the regulatory approval necessary to bring a potential product to market would materially adversely affect our business, financial condition, results of operations and prospects.

*Results of earlier studies and trials of our product candidates may not be predictive of future trial results.*

Clinical testing is expensive and can take many years to complete, and its outcome is inherently uncertain. Failure or delay can occur at any time during the clinical trial process. Success in preclinical studies and early clinical trials does not ensure that later clinical trials will be successful. A number of companies in the biotechnology and pharmaceutical industries have suffered significant setbacks in clinical trials, even after positive results in earlier preclinical studies or clinical trials. These setbacks have been caused by, among other things, preclinical findings made while clinical trials were underway and safety or efficacy observations made in clinical trials, including previously unreported adverse events. Notwithstanding any promising results we may have observed in earlier studies and trials, we cannot be certain that we will not face similar setbacks. Even if our clinical trials are completed, the results may not be sufficient to obtain regulatory approval for our product candidates. In addition, the results of our preclinical animal studies, including our non-human primate studies, may not be predictive of the results of outcomes in human clinical trials. For example, our tumor-specific cancer immunotherapy candidates and any future product candidates may demonstrate different chemical, biological and pharmacological properties in patients than they do in laboratory studies or may interact with human biological systems in unforeseen

45

or harmful ways. Product candidates in later stages of clinical trials may fail to show the desired pharmacological properties of safety and efficacy traits despite having progressed through preclinical studies and initial clinical trials. Even if we are able to initiate and complete clinical trials, the results may not be sufficient to obtain regulatory approval for our product candidates.

*Our product candidates are biologics with complex and time-consuming manufacturing processes, and we may encounter difficulties in production, particularly with respect to process development or scaling-out of our manufacturing capabilities. If we or any of our third-party manufacturers encounter such difficulties, our ability to provide supply of our product candidates for clinical trials or our products for patients, if approved, could be delayed or stopped, or we may be unable to maintain a commercially viable cost structure.*

Our immunotherapy product candidates, GRANITE, SLATE and CORAL, are considered to be biologics, and the manufacturing processes are complex, time-consuming, highly-regulated and subject to multiple risks. Our product candidates for SLATE and CORAL are designed using known genetic sequences available from public databases, while the manufacture of our product candidate GRANITE involves extraction of genetic material from patient tumor samples. GRANITE, SLATE and CORAL require genetic manipulations at the gene sequence level, live cell culture operations, specialized formulations and aseptic fill finish operations. As a result of these complexities, the cost to manufacture biologics in general, and our individualized immunotherapy GRANITE in particular, is generally higher than traditional small molecule chemical compounds, and the manufacturing process is less reliable and more difficult and time-consuming to reproduce. In addition, our manufacturing processes for GRANITE and SLATE are in their early stages of development and will be susceptible to product loss or failure, or product variation that may adversely impact patient outcomes. Our supply chain may not function efficiently due to logistical issues associated with but not limited to the collection of a tumor biopsy from the patient, shipping such material to the manufacturing site, sequencing the biopsy specimen, manufacturing the immunotherapy components, shipping the final immunotherapy back to the patient, and injecting the patient with the immunotherapy. Manufacturing issues or different product characteristics resulting from process development activities or even minor deviations during normal manufacturing processes could result in reduced production yields, product defects and other supply disruptions. If for any reason we lose a patient's biopsy or an in-process product at any point in the process, the manufacturing process for that patient would need to be restarted, and the resulting delay could adversely affect that patient's outcome. Because GRANITE is manufactured specifically for an individual patient, we will be required to maintain a chain of identity and chain of custody with respect to materials as they move from the patient to the manufacturing facility, through the manufacturing process, and back to the patient. Maintaining such a chain of identity and chain of custody is difficult and complex, and the failure to do so could result in adverse patient outcomes, loss of product or regulatory action, including withdrawal of our products from the market, if licensed.

As part of our process development efforts for GRANITE and SLATE, we also may make changes to our manufacturing processes at various points during development, for various reasons, such as controlling costs, achieving scale, decreasing processing time, increasing manufacturing success rate, or other reasons. Such changes carry the risk that they will not achieve their intended objectives, and any of these changes could cause our product candidates to perform differently and affect the results of our ongoing clinical trials or future clinical trials. In some circumstances, changes in the manufacturing process may require us to perform ex vivo comparability studies and to collect additional data from patients prior to undertaking more advanced clinical trials. For instance, changes in our process during the course of clinical development may require us to show the comparability of the product used in earlier clinical phases or at earlier portions of a trial to the product used in later clinical phases or later portions of the trial.

Furthermore, if microbial, viral or other contaminations are discovered in our manufacturing facilities, or those of our CMOs, or in our product candidates manufactured there, such manufacturing facilities may need to be closed for an extended period of time to investigate and remedy the contamination. We cannot assure you that any such contaminations or stability failures or other issues relating to the manufacture of our product candidates will not occur in the future.

*We may be unable to obtain regulatory approval for our product candidates under applicable regulatory requirements. The denial or delay of any such approval would delay or prevent commercialization of our product candidates and adversely impact our potential to generate revenue, our business and our results of operations.*

To gain approval to market our product candidates, we must provide the FDA and foreign regulatory authorities with clinical data that adequately demonstrate the safety, purity, potency and efficacy of the product candidate for the intended indication applied for in the applicable regulatory filing. Product development is a long, expensive and uncertain process, and delay or failure can occur at any stage of any of our clinical development programs. A number of companies in the biotechnology and pharmaceutical industries have suffered significant setbacks in clinical trials, even after promising results in earlier preclinical or clinical trials. These setbacks have been caused by, among other things, preclinical findings made while clinical studies were underway and safety or efficacy observations made in clinical trials, including previously unreported adverse events. Success in preclinical testing and early clinical trials does not ensure that later clinical trials will be successful, and the results of clinical trials by other parties may not be indicative of the results in trials we may conduct.

We have not previously submitted a BLA or any other marketing application to the FDA or similar filings to comparable foreign regulatory authorities. A BLA or other similar regulatory filing requesting approval to market a product candidate must include extensive preclinical and clinical data and supporting information to establish that the product candidate is safe, effective, pure and potent for each desired indication. The BLA or other similar regulatory filing must also include significant information regarding the chemistry, manufacturing and controls for the product. FDA and foreign regulatory authorities may also conduct pre-license inspections of us and/or our CMOs to ensure the manufacture of a product candidate complies with applicable regulatory requirements, including cGMP or similar foreign requirements. Adverse inspection findings could result in the delay or non-approval of a BLA or other similar regulatory filing and require the implementation of costly corrective actions before potential approval can be granted.

The research, testing, manufacturing, labeling, approval, sale, marketing and distribution of biologic products are subject to extensive regulation by the FDA and other regulatory authorities in the United States and other countries, and such regulations differ from country to country. We are not permitted to market our product candidates in the United States or in any foreign countries until they receive the requisite approval from the applicable regulatory authorities of such jurisdictions.

The FDA or any foreign regulatory bodies can delay, limit or deny approval of our product candidates for many reasons, including:

- our inability to demonstrate to the satisfaction of the FDA or the applicable foreign regulatory body that any of our product candidates are safe, pure, potent and effective for the requested indication;

- the FDA's or the applicable foreign regulatory agency's disagreement with our trial protocols or the interpretation or reliability of data from preclinical studies or clinical trials;

- our inability to demonstrate that the clinical and other benefits of any of our product candidates outweigh any safety or other perceived risks;

- the FDA's or the applicable foreign regulatory agency's requirement for additional preclinical studies or clinical trials;

- the FDA's or the applicable foreign regulatory agency's non-approval of the formulation, labeling or specifications of GRANITE, SLATE, or any of our other current or future product candidates;

- the FDA's or the applicable foreign regulatory agency's failure to approve our manufacturing processes and facilities or the facilities of third-party manufacturers upon which we rely; or

- the potential for approval policies or regulations of the FDA or the applicable foreign regulatory agencies to significantly change in a manner rendering our clinical data insufficient for approval. For example, the FDA launched Project Optimus as an initiative to reform the dose optimization and dose selection paradigm in oncology product development as the FDA's view is that the current paradigm for dose selection results in doses and schedules of molecularly targeted therapies that are inadequately characterized before initiating registration/pivotal trials. Through collaboration with industry, academia, and other stakeholders, the FDA's goal for this initiative is to advance an oncology dose-finding and dose optimization paradigm that emphasizes dose selections that maximize efficacy as well as safety and tolerability. In support of this initiative, the FDA may request sponsors of oncology product candidates to conduct dose optimization studies pre- or post-approval. The FDA also continues to develop and finalize guidance documents and implement initiatives regarding the development and clinical research of oncology product candidates.

Additionally, in part due to questions raised by the process underlying the approval of the Alzheimer's disease drug Aduhelm®, government authorities and other stakeholders have been recently scrutinizing the accelerated approval pathway, with some stakeholders advocating for reforms. Even prior to the Aduhelm approval, FDA has held Oncologic Drugs Advisory Committee meetings to discuss accelerated approvals for which confirmatory trials have not verified clinical benefit. Such scrutiny, among other factors, has resulted in voluntary withdrawals of certain products and indications approved on an accelerated basis. FDA also launched an initiative, known as Project Confirm, to promote the transparency of outcomes related to accelerated approvals for oncology indications. Moreover, spurred by the Aduhelm controversy, the U.S. Department of Health and Human Services Office of Inspector General has initiated, and partially completed, an assessment of how the FDA implements the accelerated approval pathway. In addition, Section 3210 of the Consolidated Appropriations Act, 2023, revised the accelerated approval pathway. Although this legislation did not change the standard for accelerated approval, it, among other things, requires FDA to specify the conditions for required post-marketing trials, permits FDA to require such trials to be underway prior to, or within a specific period after, approval, requires sponsors to provide reports on post-marketing trial progress no later than 180 days after approval and every 180 days thereafter until such trials are completed, makes the failure to conduct required post-marketing trials with due diligence and the failure to submit the required reports prohibited acts, and

details procedures FDA must follow to withdraw an accelerated approval on an expedited basis. At this time, it is not clear what, if any, impact these developments may have on the statutory accelerated approval pathway or our business, financial condition, results of operations or prospects.

Of the large number of biopharmaceutical products in development, only a small percentage successfully complete the FDA or other regulatory bodies' approval processes and are commercialized.

Even if we eventually complete clinical testing and receive approval from the FDA or applicable foreign agencies for any of our product candidates, the FDA or the applicable foreign regulatory agency may grant approval contingent on the performance of costly additional clinical trials which may be required after approval. Failure to complete such post-marketing requirements in accordance with the timelines and conditions set forth by the FDA or the applicable foreign regulatory agency could significantly increase costs or delay, limit or ultimately restrict the commercialization of the product candidate. The FDA or the applicable foreign regulatory agency also may approve one or more of our product candidates for a more limited indication or a narrower patient population than we originally requested, and the FDA, or applicable foreign regulatory agency, may not approve our product candidates with the labeling that we believe is necessary or desirable for the successful commercialization of such product candidates.

Any delay in obtaining, or inability to obtain, applicable regulatory approval would delay or prevent commercialization of our product candidates and would materially adversely impact our business and prospects.

*We have chosen to prioritize development of our individualized immunotherapy candidate, GRANITE, and our off-the-shelf immunotherapy candidate, SLATE. We may expend our limited resources on candidates or indications that do not yield a successful product and fail to capitalize on other product candidates or indications for which there may be a greater likelihood of success or that may be more profitable.*

In our cancer programs, we strategically determined initially to focus solely on the development of individualized cancer immunotherapy candidates (including our "off-the-shelf" immunotherapy candidate) rather than pursue other types of immunotherapies based, in part, on the significant resources required to develop and manufacture immunotherapies. As a result, we may initially have foregone, and we may continue to forego, other potentially more profitable therapy indications or those with a greater likelihood of success.

Our decisions concerning the allocation of research, development, collaboration, management and financial resources toward particular product candidates or therapeutic areas may not lead to the development of any viable commercial product and may divert resources away from better opportunities. Similarly, our potential decisions to delay, terminate or collaborate with third parties in respect of certain programs may subsequently also prove to be suboptimal and could cause us to miss valuable opportunities. If we make incorrect determinations regarding the viability or market potential of any of our programs or product candidates or misread trends in the oncology or biopharmaceutical industry, our business, financial condition and results of operations could be materially adversely affected. As a result, we may fail to capitalize on viable commercial products or profitable market opportunities, be required to forego or delay pursuit of opportunities with other product candidates or other diseases and disease pathways that may later prove to have greater commercial potential than those we choose to pursue, or relinquish valuable rights to such product candidates through collaboration, licensing or other royalty arrangements in cases in which it would have been advantageous for us to invest additional resources to retain development and commercialization rights.

*If we are unable to obtain regulatory approval for use of our tumor-specific immunotherapy candidates, GRANITE and SLATE, as a first- and second-line therapy, our commercial opportunity and profitability may be limited.*

Cancer therapies for advanced/metastatic cancers are sometimes characterized as first-line, second-line or third-line, and the FDA often approves new systemic therapies initially only for third-line use. When cancer is detected early enough, surgery plus first-line systemic therapy is sometimes adequate to cure the cancer. Whenever first-line therapy (usually chemotherapy, hormone therapy, radiotherapy, surgery or a combination of these) proves unsuccessful, second-line therapy may be administered. Second-line therapies often consist of more chemotherapy, radiation, antibody drugs, tumor-targeted small molecules or a combination of these. Third-line therapies can include bone marrow transplantation, antibody and small molecule targeted therapies and new technologies such as adoptive cell therapies.

Traditionally, novel oncology therapeutics are developed and approved in late (third) line therapy of cancer patients. Such clinical programs carry risk of failure because patients are often quite frail, with effects of multiple rounds of prior therapy weakening bone marrow, immune systems and general fitness. Immunotherapy, such as checkpoint inhibitors, has generally been shown to be more effective when used in earlier lines of therapy, with the prospect of very durable responses in some patients; and there is a trend towards earlier use of these agents, avoiding in particular cytotoxic chemotherapy agents, which carry substantial toxicity and very little prospect of long-term responses. Our tumor-specific immunotherapy clinical development program also aims to study our products in early stages

48

- the willingness of physicians, operators of hospitals and clinics and patients to utilize or adopt our products as a solution;

- any FDA or foreign regulatory authorities' requirement for a REMS or similar risk management measures;

- the effectiveness of our sales, marketing and distribution efforts;

- adverse publicity about our products or favorable publicity about competitive products; and

- potential product liability claims.

We cannot assure you that our current or future product candidates, if approved, will achieve broad market acceptance among physicians and patients. Any failure by our product candidates that obtain regulatory approval to achieve market acceptance or commercial success would adversely affect our results of operations.

***We currently perform most of the manufacturing of our product candidates internally and rely on qualified third parties to supply some components of our product candidates. Our inability to manufacture sufficient quantities of any of our current or future product candidates, or the loss of our third-party suppliers, or our or their failure to comply with applicable regulatory requirements or to supply sufficient quantities at acceptable quality levels or prices, or at all, would materially adversely affect our business.***

Manufacturing is a vital component of our immunotherapy approach, and we have invested significantly in our manufacturing facility. To ensure timely and consistent product supply assurance to our patients, we previously used a hybrid product supply approach whereby certain elements of our product candidates were manufactured internally at our manufacturing facilities in Pleasanton, California, and other elements were manufactured at qualified third-party contract manufacturing organizations (CMOs). All internal and third-party contract manufacturing is performed under cGMP or similar guidelines. We have since internalized most of the manufacturing steps to optimize cost and production time and establish full control over intellectual property and product quality. We will need to continue to scale up our manufacturing operations, as we continue to build the infrastructure and improve the capability internally to manufacture all supplies needed for our product candidates or the materials necessary to produce them for use in the conduct of our preclinical studies or clinical trials. We currently lack the internal resources and the capability to manufacture certain elements of our product candidates on a late-clinical or commercial scale. Accordingly, we have made, and will be required to continue to make, significant investments in our manufacturing facility and processing in the future, and our efforts to scale our manufacturing operations may not succeed.

Our facilities and the facilities used by our CMOs to manufacture our product candidates are subject to various regulatory requirements and may be subject to inspection by the FDA or other regulatory authorities. We do not control the manufacturing process at our CMOs and are completely dependent on them for compliance with current regulatory requirements. If we or our CMOs cannot successfully manufacture material that conforms to our specifications and the strict regulatory requirements of the FDA or comparable regulatory authorities in foreign jurisdictions, we may not be able to rely on our or their manufacturing facilities for the manufacture of elements of our product candidates. In addition, we have limited control over the ability of our CMOs to maintain adequate quality control, quality assurance and qualified personnel. If the FDA or a comparable foreign regulatory authority finds our facilities or those of our CMOs inadequate for the manufacture of our product candidates, or if such facilities are subject to enforcement action in the future or are otherwise inadequate, we may need to find alternative manufacturing facilities, which would significantly impact our ability to develop, obtain regulatory approval for or market our product candidates.

Additionally, even if one of our product candidates receives regulatory approval, successful commercialization depends on our ability to effectively scale up our in-house manufacturing capabilities and those of our manufacturing partners and contractors. Although we have a dedicated manufacturing facility in Pleasanton, we do not have sufficient manufacturing infrastructure to support a global roll-out of our product candidates on our own. We may not be able to timely and effectively produce our product candidates, if approved, in adequate quantities to address global demand. We have not previously had a commercial launch of any product, and  we cannot guarantee that we will be able to meet any of the related challenges and requirements in a timely manner or at all.

Finally, we and our CMOs may experience manufacturing and raw material sourcing difficulties due to resource constraints, as a result of labor disputes or unstable political environments, or due to the impact of a public health crisis such as the COVID-19 pandemic. If we or our CMOs were to encounter any of these difficulties, our ability to provide our product candidates to patients in clinical trials, or to provide product for the treatment of patients once approved, would be jeopardized.

52

*We depend on third-party suppliers for key materials used in our manufacturing processes, and the loss of these third-party suppliers or their inability to supply us with adequate materials could harm our business.*

We rely on third-party suppliers for certain materials required for the production of our individualized immunotherapy candidate. Our dependence on these third-party suppliers and the challenges we may face in obtaining adequate supplies of materials involve several risks, including limited control over pricing, availability, quality and delivery schedules. As a small company, our negotiation leverage is limited, and we are likely to get lower priority than our larger competitors. We cannot be certain that our suppliers will continue to provide us with the quantities of these raw materials that we require or satisfy our anticipated specifications and quality requirements. Any supply interruption in limited or sole sourced raw materials could materially harm our ability to manufacture our product candidates until a new source of supply, if any, could be identified and qualified. We may be unable to find a sufficient alternative supply channel in a reasonable time or on commercially reasonable terms. Any performance failure on the part of our suppliers could delay the development and potential commercialization of our product candidates, including limiting supplies necessary for clinical trials and regulatory approvals, which would have a material adverse effect on our business.

*We rely, and intend to continue to rely, on third parties in the conduct of all of our preclinical studies and clinical trials. If these third parties do not successfully carry out their contractual duties, fail to comply with applicable regulatory requirements or fail to meet expected deadlines, we may be unable to obtain regulatory approval for our product candidates.*

We currently do not have the ability to independently conduct preclinical studies that comply with good laboratory practice (GLP) regulatory requirements. We also do not currently have the ability to independently conduct any clinical trials. The FDA and regulatory authorities in other jurisdictions require us to comply with regulations and standards, commonly referred to as good clinical practice (GCP) requirements for conducting, monitoring, recording and reporting the results of clinical trials, in order to ensure that the data and results are scientifically credible and accurate and that the trial subjects are adequately informed of the potential risks of participating in clinical trials. We rely on medical institutions, clinical investigators, contract laboratories and other third parties, such as CROs, to conduct GLP-compliant preclinical studies and GCP-compliant clinical trials on our product candidates properly and on time. While we have agreements governing their activities, we control only certain aspects of their activities and have limited influence over their actual performance. The third parties with whom we contract for execution of our GLP-compliant preclinical studies and our GCP-compliant clinical trials play a significant role in the conduct of these studies and trials and the subsequent collection and analysis of data. These third parties are not our employees and, except for restrictions imposed by our contracts with such third parties, we have limited ability to control the amount or timing of resources that they devote to our programs. Although we rely on these third parties to conduct our GLP-compliant preclinical studies and GCP-compliant clinical trials, we remain responsible for ensuring that each of our preclinical studies and clinical trials is conducted in accordance with its investigational plan and protocol and applicable laws and regulations, and our reliance on the CROs does not relieve us of our regulatory responsibilities.

Many of the third parties with whom we contract may also have relationships with other commercial entities, including our competitors, for whom they may also be conducting clinical trials or other drug development activities that could harm our competitive position. Further, under certain circumstances, these third parties may terminate their agreements with us upon as little as 10 days' prior written notice. Some of these agreements may also be terminated with immediate effect by such third parties under certain other circumstances, including our insolvency. If the third parties conducting our preclinical studies or our clinical trials do not adequately perform their contractual duties or obligations, experience significant business challenges, disruptions or failures, do not meet expected deadlines, terminate their agreements with us or need to be replaced, or if the quality or accuracy of the data they obtain is compromised due to their failure to adhere to our protocols or to GLPs/GCPs, or for any other reason, we may need to enter into new arrangements with alternative third parties. This could be difficult, costly or impossible, and our preclinical studies or clinical trials may need to be extended, delayed, terminated or repeated. As a result, we may not be able to obtain regulatory approval in a timely fashion, or at all, for the applicable product candidate, our financial results and the commercial prospects for our product candidates could be harmed, our costs could increase, and our ability to generate revenues could be delayed.

*Disruptions at the FDA and other government agencies caused by funding shortages or global health concerns could hinder their ability to hire, retain or deploy key leadership and other personnel, or otherwise prevent new or modified products from being developed, approved or commercialized in a timely manner or at all, which could negatively impact our business.*

The ability of the FDA or foreign regulatory authorities to review and approve new products can be affected by a variety of factors, including government budget and funding levels, statutory, regulatory and policy changes, the FDA's or foreign regulatory authorities' ability to hire and retain key personnel and accept the payment of user fees, and other events that may otherwise affect the FDA's or foreign regulatory authorities' ability to perform routine functions. Average review times at the FDA and foreign regulatory authorities have fluctuated in recent years as a result. In addition, government funding of other government agencies that fund research and development activities is subject to the political process, which is inherently fluid and unpredictable. Disruptions at the FDA and other agencies may also slow the time necessary for new biologics or modifications to approved biologics to be reviewed and/or approved by necessary government agencies, which would adversely affect our business. For example, over the last several years, the

53

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

*You should read the following discussion and analysis of our financial condition and results of operations together with our audited financial statements and the related notes thereto included elsewhere in this Annual Report on Form 10-K. This discussion and analysis, and other parts of this report, contain forward-looking statements, including, but not limited to, statements related to the potential of our therapeutic programs. Such forward-looking statements involve substantial risks and uncertainties that could cause our research and clinical development programs, future results, performance or achievements to differ significantly from those expressed or implied by the forward-looking statements, including interim results obtained may differ from those at completion of the studies and clinical trials. Such risks and uncertainties include, among others, the uncertainties inherent in the drug development process, including our programs' early stage of development, the process of designing and conducting preclinical and clinical trials, the regulatory approval processes, the timing of regulatory filings, the challenges associated with manufacturing drug products, our ability to successfully establish, protect and defend its intellectual property and other matters that could affect the sufficiency of existing cash to fund operations. Our actual results could differ materially from those discussed in these forward-looking statements. For a further description of the risks and uncertainties that could cause actual results to differ from those expressed in these forward-looking statements, as well as risks relating to our business in general, see the section titled "Risk Factors" included elsewhere in this Annual Report on Form 10-K. These forward-looking statements speak only as of the date hereof. Except as required by law, we assume no obligation to update or revise these forward-looking statements for any reason.*

**Overview**

We are a clinical-stage biotechnology company focused on combining immunological insights with proprietary technologies and capabilities to develop next-generation vaccines. Specifically, we discover, develop, manufacture, and deliver vaccine-based immunotherapy candidates against cancer and infectious disease. Our goal is to unlock more potent and durable immunity by harnessing vaccine innovation. We aim to achieve that goal by leveraging our in-house capabilities and technologies to address the shortcomings of currently available vaccines and immunotherapies.

The immune system sits at the nexus of many diseases, and we believe that immune response modulation is core to several transformational product classes. Recent advances have pointed to T cells as being central to the success of cancer immunotherapy and critical in the elimination of virally infected cells. We believe that our scientific approach of focusing on generating antigen-specific T cells, particularly the challenging but critical cytotoxic CD8+ T cell subclass has the potential to drive transformational therapeutic and prophylactic benefits.

In oncology, we develop personalized vaccines that aim to destroy tumors through CD8+ (killer) T cell recognition of tumor cells by virtue of their surface display of neoantigens, peptides that are presented on cancer cells when certain mutations occur in tumor DNA. In infectious disease, we develop both therapeutic and prophylactic vaccines targeting both T cells and B cells. We believe we are leading the field of development and application of self-amplifying mRNA (samRNA), a rapidly-emerging platform technology. Our unique approach to immunogen design, whereby our vaccines deliver, as appropriate, whole proteins to drive neutralizing antibodies (nAbs) and/or protein fragments to drive T cell responses, has the potential to both neutralize incoming pathogens (through nAbs) and kill infected cells through CD8+ T cell recognition of foreign, pathogen-derived peptides displayed on the surface of infected cells.

Our clinical programs include GRANITE, an individualized neoantigen-based vaccine program; SLATE, an "off-the-shelf" neoantigen-based vaccine program; CORAL, a second-generation SARS-CoV-2 vaccine program; and HIV, HIV vaccine program in collaboration with Gilead Sciences, Inc.

89

The table below summarizes key information about our clinical-stage programs.

| Program | Phase | Status | Indication(s) | Collaborator | Commercial Rights |
|---------|-------|--------|---------------|--------------|-------------------|
| GRANITE | 2/3 | Enrollment Ongoing; Treatment Ongoing | MSS-CRC* first line maintenance | — | Gritstone |
| GRANITE | 1/2 | Enrollment Complete; Treatment Ongoing | Early stage & advanced solid tumors | — | Gritstone |
| SLATE | 2 | Enrollment Ongoing; Treatment Ongoing | KRAS$^{mut}$-driven tumor types | — | Gritstone |
| SLATE | 1/2 | Complete | KRAS Advanced Solid Tumors | — | Gritstone |
| HIV | 1 | 4Q2021 IND Cleared | HIV treatment/cure | Gilead Sciences | Gilead** |
| CORAL | 1 | Enrollment Complete; Treatment Ongoing | SARS-CoV-2 in South Africa | CEPI | Gritstone |
| CORAL | 1 | Enrollment Complete; Treatment Ongoing | SARS-CoV-2 booster | — | Gritstone |
| CORAL | 1 | Enrollment Complete; Treatment Ongoing | SARS-CoV-2 naïve & booster | NIAID, IDCRC | Gritstone |

* MSS-CRC = microsatellite stable colorectal cancer
** Gilead is responsible for conducting a Phase 1 study

Beyond GRANITE, SLATE, CORAL and the HIV collaboration with Gilead, we continue to apply our broad set of capabilities in oncology and infectious diseases through promising preclinical work and partnerships.

**COVID-19 Update**

Since the COVID-19 pandemic began, providers of healthcare services have had to deal with significant strains on their operations. These strains have affected all healthcare institutions, including those where we conduct our clinical trials, with some institutions prohibiting or postponing the initiation of new clinical trials, slowing or halting enrollment in existing trials and restricting the on-site monitoring of clinical trials. Although our operations have not been materially impacted by the COVID-19 pandemic, we have experienced slowing of patient recruitment and sample collection in our ongoing clinical trials. Additionally, as a result of the COVID-19 pandemic, competition for potential patients in our trials may be further exaggerated as a result of multiple clinical site closures. To date, the COVID-19 pandemic has not materially affected our supply chain or production schedule, but further escalation of the health crisis has the potential to cause delays in our supply chain and manufacturing operations, which could materially adversely impact our business.

In response to the COVID-19 pandemic, we have implemented heightened health and safety measures designed to comply with applicable federal, state and local guidelines, and transitioned to a flexible work environment, where employees who can work from home effectively are allowed to do so. We have implemented virtual meeting and messaging technology and encourage employees to follow local health authority guidance. As the pandemic and its impacts continue to evolve, we may need to undertake additional actions that could impact our operations if required by applicable laws or regulations or if we determine such actions to be in the best interests of our employees.

*Funding Sources*

We have funded our operations to date primarily through sales of our convertible preferred stock, sales of our common stock in public offerings and under our "at-the-market" offering program, private placements of our common stock and pre-funded warrants, proceeds from the Loan Agreement (as defined below) and with proceeds received from our collaboration arrangements. We also have received targeted funding from charitable foundations. We do not expect to generate revenue from any product candidates that we develop until we obtain regulatory approval for one or more of such product candidates and commercialize our products or enter into additional collaboration agreements with third parties. Substantially all of our net losses have resulted from costs incurred in connection with our research and development programs and from general and administrative costs associated with our operations. Our programs will require substantial additional development time and resources before we (or our collaboration partners) would be able to apply for or receive regulatory approvals and begin generating revenue from product sales. In addition, we incur substantial costs associated with operating as a public company. We also do not yet have a sales organization or commercial infrastructure and, accordingly, we will incur significant expenses to develop a sales organization or commercial infrastructure in advance of generating any commercial product sales. As a result, we will need substantial additional capital to support our operating activities.

We currently anticipate that we will seek to fund our operations through equity or debt financings or other sources, such as additional collaboration agreements we may enter into with third parties. Adequate funding may not be available to us on acceptable terms, or at all, particularly in light of the current COVID-19 pandemic and associated economic uncertainty and potential local and/or

90

Offering Program. As of December 31, 2022, we have received $20.1 million in gross proceeds from our 2022 ATM Offering Program and have $79.9 million available thereunder.

In April 2022, we received the second tranche payment of $2.7 million under the CEPI Funding Agreement.

In July 2022, we entered into a loan and security agreement (the "Loan Agreement") with Hercules Capital, Inc. ("Hercules") and Silicon Valley Bank ("SVB"), which provides us with a 60-month term loan facility for the Company up to $80.0 million in borrowing capacity across five potential tranches. At the closing of the Loan Agreement, we drew $20.0 million from the first tranche, and we can draw up to an additional $10.0 million through March 2023. The remaining tranches provide up to $50.0 million borrowing capacity and become available if and when we meet certain milestones set forth in the Loan Agreement. As of December 31, 2022, one milestone had been achieved, which provides the Company to draw up to $10 million through December 15, 2023. The term loan is secured by substantially all of our assets, other than intellectual property. There are no warrants associated with the Loan Agreement.

Borrowings under the Loan Agreement bear interest (i) at an annual cash rate equal to the greater of (x) the lesser of (1) the prime rate (as customarily defined) and (2) 5.50%, in either case, plus 3.15%, and (y) 7.15% and (ii) at an annual payment-in-kind rate, which may equal 2.00%. We are required to make monthly interest-only payments prior to the amortization date of January 1, 2025, subject to a potential six-month and one-year extension upon satisfaction of certain conditions. We will also be required to pay a facility charge equal to 0.50% of the principal amount of any borrowings made pursuant to the last four tranches.

All unpaid principal and accrued and unpaid interest with respect to each term loan is due and payable in full on July 19, 2027. At our option, we may prepay all or any portion of the outstanding borrowings, plus accrued and unpaid interest thereon and fees and expenses, subject to a prepayment premium ranging from zero to 2.5%, during the first three years after closing, depending on the year of such prepayment. Upon repayment of the term loan, we will be required to make a final payment fee to the lenders equal to 5.75% of the aggregate original principal amount of the loan

Beginning on April 1, 2023, so long as our market capitalization is equal to or less than $400.0 million, we are subject to a minimum liquidity requirement equal to the then outstanding balance under the Loan Agreement multiplied by 0.55 or 0.45, which multiplier depends on whether we achieve certain performance milestones. Our obligations under the Loan Agreement are subject to acceleration upon the occurrence of customary events of default, including payment default, insolvency and the occurrence of certain events having a material adverse effect, including (but not limited to) material adverse effects upon the business, operations, properties, assets or financial condition of us and our subsidiaries, taken as a whole.

In October 2022, we completed a third private placement of securities (the "Third PIPE Financing"), pursuant to which we sold an aggregate of 6,637,165 shares of common stock at a per share purchase price of $2.26 and pre-funded warrants to purchase 13,274,923 shares of common stock at a price of $2.26 per share (of which $2.2599 per share was prepaid by each purchaser). The aggregate gross cash proceeds to us for the securities sold in the Third PIPE Financing was $45.0 million, and related costs were $2.6 million.

*Future Funding Requirements*

We do not expect positive cash flows from operations in the foreseeable future. Historically, we have incurred operating losses as a result of ongoing efforts to develop our cancer immunotherapy candidates, including conducting ongoing research and development, clinical and preclinical studies and providing general and administrative support for these operations. We do not have any products approved for sale, and we do not expect to generate any meaningful revenue unless and until we obtain regulatory approval of and commercialize any of our current and future product candidates and/or enter into additional significant collaboration or grant agreements with third parties, and we do not know when, or if, either will occur. We expect to continue to incur net operating losses for at least the next several years and we expect the losses to increase as we advance our CORAL, GRANITE, and SLATE programs, as well as any future product candidates, through clinical development, seek regulatory approval, prepare for and, if approved, proceed to commercialization, continue our research and development efforts and invest in our manufacturing facility. We are subject to all the risks typically related to the development of new product candidates, and we may encounter unforeseen expenses, difficulties, complications, delays and other unknown factors that may adversely affect our business. Moreover, we incur substantial costs associated with operating as a public company. We anticipate that we will need substantial additional funding in connection with our continuing operations.

Until we can generate a sufficient amount of revenue from the commercialization sources of liquidity of immunotherapy product candidates or from additional significant collaboration or license agreements with third parties, if ever, we expect to finance our future cash needs through private and public equity offerings, including our "at-the-market" offering programs, debt financings, and potential future collaboration, license and development agreements. Additional capital may not be available on reasonable terms, if at all. If we are unable to raise additional capital in sufficient amounts or on terms acceptable to us, we may have to significantly delay, scale back or discontinue the development or commercialization of one or more of our current or future product candidates. If we raise additional

96

funds by issuing equity or convertible debt securities, it could result in dilution to our existing stockholders and increased fixed payment obligations. In addition, as a condition to providing additional funds to us, future investors may demand, and may be granted, rights superior to those of existing stockholders. If we incur indebtedness, we could become subject to covenants that would restrict our operations and potentially impair our competitiveness, such as limitations on our ability to incur additional debt, limitations on our ability to acquire, sell or license intellectual property rights and other operating restrictions that could adversely impact our ability to conduct our business. Additionally, any future collaborations we enter into with third parties may provide capital in the near term, but we may have to relinquish valuable rights to our product candidates or grant licenses on terms that are not favorable to us. Any of the foregoing could significantly harm our business, financial condition and prospects.

Since our inception, we have incurred significant losses and negative cash flows from operations. We have an accumulated deficit of $521.1 million through December 31, 2022. We expect to incur substantial additional losses in the future as we conduct and expand our research and development activities. We believe that our existing cash, cash equivalents and marketable securities will be sufficient to enable us to fund our projected operations through at least the next twelve (12) months from the date of this Annual Report on Form 10-K. We have based our projections of operating capital requirements on assumptions that may prove to be incorrect and we may use all our available capital resources sooner than we expect. Because of the numerous risks and uncertainties associated with research, development and commercialization of product candidates, we are unable to estimate the exact amount of our operating capital requirements. Our future capital requirements depend on many factors, including:

- the scope, progress, results and costs of developing our product candidates, and of conducting preclinical studies and clinical trials, including our clinical trials for GRANITE, SLATE and CORAL;

- the timing of, and the costs involved in, obtaining regulatory approvals for our oncology and infectious disease immunotherapy product candidates; in particular, any costs incurred in connection with any future regulatory requirements that may be imposed by the FDA or foreign regulatory bodies;

- the number and characteristics of any additional product candidates we develop or acquire;

- the timing and amount of any milestone, royalty or other payments we are required to make pursuant to any current or future collaboration or license agreements;

- potential delays in our ongoing clinical trials as a result of the COVID-19 pandemic;

- the cost of manufacturing our product candidates we successfully commercialize, including the cost of scaling up our internal manufacturing operations;

- the cost of building a sales force in anticipation of product commercialization;

- the cost of commercialization activities, including building a commercial infrastructure, marketing, sales and distribution costs;

- our ability to maintain existing, and establish new, strategic collaborations, licensing or other arrangements and the financial terms of any such agreements, including the timing and amount of any future milestone, royalty or other payments due under any such agreement;

- any product liability or other lawsuits related to our products;

- the costs to attract, hire and retain skilled personnel;

- the costs associated with being a public company;

- the costs involved in preparing, filing, prosecuting, maintaining, defending and enforcing our intellectual property portfolio; and

- the timing, receipt and amount of sales of any future approved products, if any.

A change in the outcome of any of these or other variables with respect to the development of any of our current and future product candidates could significantly change the costs and timing associated with the development of that product candidate. Furthermore, our operating plans may change in the future, and we will need additional funds to meet operational needs and capital requirements associated with such operating plans.

**Gritstone bio, Inc.**
**Notes to Consolidated Financial Statements**

**December 31, 2022**

interest income on the consolidated statements of operations and comprehensive loss. Realized gains and losses and declines in value judged to be other than temporary, if any, on available-for-sale securities are included in interest income, net. The cost of securities sold is determined using specific identification method.

The Company periodically evaluates whether declines in fair values of its marketable securities below their book value are other than temporary. This evaluation consists of several qualitative and quantitative factors regarding the severity and duration of the unrealized loss as well as the Company's ability and intent to hold the marketable security until a forecasted recovery occurs. Additionally, the Company assesses whether it has plans to sell the security or it is more likely than not it will be required to sell any marketable securities before recovery of its amortized cost basis. Factors considered include quoted market prices, recent financial results and operating trends, implied values from any recent transactions or offers of investee securities, credit quality of debt instrument issuers, other publicly available information that may affect the value of the marketable security, duration and severity of the decline in value, and the Company's strategy and intentions for holding the marketable security. To date, the Company has not recorded any impairment charges on its marketable securities related to other-than-temporary declines in market value. No significant facts or circumstances have arisen to indicate that there has been any significant deterioration in the creditworthiness of the issuers of the securities held by us, thus there has been no recognition of any other-than-temporary impairment in the year ended December 31, 2022, 2021 or 2020. Additionally, the Company has determined that it has the ability and intent to hold all marketable securities that have been in a continuous loss position until maturity or recovery, thus there has been no recognition of any other-than-temporary impairment in the year ended December 31, 2022 or 2021.

*Debt Issuance Costs and Debt Discounts*

Debt issuance costs include legal fees, accounting fees, and other direct costs incurred in connection with the execution of the Company's debt financing. Debt discounts represent costs paid to the lenders. Debt issuance costs and debt discounts are deducted from the carrying amount of the debt liability and are amortized to interest expense over the term of the related debt using the effective interest method.

*Concentrations of Credit Risk*

Financial instruments that potentially subject the Company to concentrations of credit risk consist of cash, cash equivalents and marketable securities. Cash, cash equivalents and marketable securities are invested through banks and other financial institutions in the United States. Such deposits may be in excess of federally insured limits. The Company maintains cash equivalents and marketable securities with various high-credit-quality and capitalized financial institutions. The Company has not experienced any credit losses in such accounts and does not believe it is exposed to any significant credit risk on these funds.

The Company's investment policy limits investments to certain types of securities issued by the U.S. government, its agencies, and institutions with investment-grade credit ratings and places restrictions on maturities and concentration by type and issuer. The Company is exposed to credit risk in the event of a default by the financial institutions holding its cash, cash equivalents and marketable securities and issuers of marketable securities to the extent recorded on the consolidated balance sheets. As of December 31, 2022, the Company has no off-balance sheet concentrations of credit risk.

*Other Risks and Uncertainties*

The Company is subject to a number of risks similar to those of other clinical-stage biotechnology companies, including dependence on key individuals; the need to develop commercially viable therapeutics; competition from other companies, many of which are larger and better capitalized; and the need to obtain adequate additional financing to fund the development of its products. The Company currently depends on third-party suppliers for key materials and services used in its research and development manufacturing process and is subject to certain risks related to the loss of these third-party suppliers or their inability to supply the Company with adequate materials and services. Further, the Company is subject to broad market risks and uncertainties resulting from recent events, such as the COVID-19 pandemic, the Russian invasion of Ukraine, inflation, rising interest rates, and recession risks as well as supply chain and labor shortages.

*Property and Equipment, Net*

Property and equipment are stated at cost, less accumulated depreciation and amortization. Maintenance and repairs that do not improve or extend the lives of the respective assets are expensed to operations as incurred.

111

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized**.**

GRITSTONE BIO, INC.

Date: March 9, 2023

By:   /s/ Andrew Allen

Andrew Allen, M.D., Ph.D.
President and Chief Executive Officer
(Principal Executive Officer)

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints each of Andrew Allen and Vassiliki Economides his or her true and lawful attorney-in-fact and agent, with full power of substitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the U.S. Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming that all said attorneys-in-fact and agents, or their, his or her substitutes or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this Report has been signed below by the following persons on behalf of the Registrant in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ Andrew Allen<br>Andrew Allen, M.D., Ph.D. | President, Chief Executive Officer and Director<br>(Principal Executive Officer) | March 9, 2023 |
| /s/ Vassiliki "Celia" Economides<br>Vassiliki "Celia" Economides | Chief Financial Officer<br>(Principal Financial Officer) | March 9, 2023 |
| /s/ James Cho<br>James Cho | Chief Accounting Officer<br>(Principal Accounting Officer) | March 9, 2023 |
| /s/ Elaine Jones<br>Elaine Jones, Ph.D. | Chairperson of our Board of Directors | March 9, 2023 |
| /s/ Clare Fisher<br>Clare Fisher | Director | March 9, 2023 |
| /s/ Steve Krognes<br>Steve Krognes | Director | March 9, 2023 |
| /s/ Naiyer A. Rizvi<br>Naiyer A. Rizvi, M.D. | Director | March 9, 2023 |
| /s/ Lawrence Corey<br>Lawrence Corey, M.D. | Director | March 9, 2023 |
| /s/ Shefali Agarwal<br>Shefali Agarwal, M.D., M.P.H. | Director | March 9, 2023 |

144