POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Lead Plaintiff Richard Rodriguez*
*and Lead Counsel for the Class*

*[Additional Counsel on Signature Page]*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE GRITSTONE BIO, INC. SECURITIES LITIGATION<br><br>THIS DOCUMENT RELATES TO: ALL ACTIONS | Case No. 3:24-cv-3640-CRB<br><br><br><br>CLASS ACTION<br><br>**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>CLASS ACTION<br><br><br>HON. CHARLES R. BREYER |

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

**TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT ...................................................................................... 1

II.    STATEMENT OF FACTS ............................................................................................ 3

    A.     Defendant Misrepresents His Struggling Company's and Its Third-Party Contractors' cGMP Compliance. ................................................................................ 3

    B.     Gritstone's Future Hinges On Submitting an FDA-Approved Investigational New Drug ("IND") Application to Launch the BARDA-CORAL Phase 2 Trial. ................... 4

    C.     Defendant Mislead Investors About the BARDA-CORAL Phase 2 Trial. ..................... 5

    D.     The Truth Beings To Emerge, and Gritstone Goes Bankrupt. ......................................... 6

III.   ARGUMENT................................................................................................................ 6

    A.     Gritstone and Defendant Misled Investors about Its Manufacturing Capabilities. ........... 6

        1.     This Court Already Held that Gritstone and Defendant Mislead Investors About Gritstone's Third-Party cGMP Manufacturing Compliance...................... 7

        2.     Statements About Gritstone's cGMP Compliance Are Also Actionable. ............ 9

    B.     The SAC Adds Allegations That, Given These Known cGMP Failures, Gritstone and Defendant Mislead Investors About The BARDA-Funded CORAL Phase 2 Trial.................................................................................................................. 10

        1.     Those at Gritstone Were Aware That cGMP Materials Were Needed to Launch the CORAL Phase 2 Trial. ................................................................. 10

            a.     The FDA Requires cGMP-Compliant Third-Party Source Materials for Investigational New Drug (IND) Trials in Phase 2........... 10

            b.     New CWs Confirm Gritstone and Defendant Knew cGMP Source Materials Were Required for the BARDA-Funded Phase 2 Trial. ......... 13

        2.     Given this Awareness, Gritstone and Defendant Misled Investors About The BARDA Phase 2 Timeline and Funding. ..................................................... 14

    C.     The SAC Adds New Allegations to Support Defendant's Scienter............................... 18

        1.     Defendant Knew That cGMP Materials Were Required for CORAL Phase 2. ....................................................................................................... 18

        2.     Defendant Received Regular Reports That Conveyed the cGMP Failures....... 20

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

3.  Defendant Was In Constant Contact With His Direct Reports That Knew, And Were Working Actively to Fix, the CORAL Phase 2 cGMP Failures. ..... 21

4.  Defendant Was Legally Required to be Apprised of cGMP Compliance. ....... 22

5.  Defendant Held Himself Out As Knowledgeable About His Company's cGMP Compliance and the CORAL Phase 2 Launch. ................................. 22

6.  Defendant Later Admitted That Resolving His Company's cGMP Issues Would Take Considerable Time. ............................................................. 23

7.  Defendant's Company's Survival Hinged On Meeting The BARDA Deadline. ....................................................................................... 23

D.  The SAC Pleads Loss Causation .......................................................................... 25

IV.  CONCLUSION ................................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Berson v. Applied Signal Tech., Inc.,*
527 F.3d 982 (9th Cir. 2008) ............................................................................... 13, 19

*Cisneros v. Allianz Life Ins.,*
2019 WL 9656383 (N.D. Cal. 2019) ........................................................................... 25

*City of Birmingham Relief and Ret. Sys. v. Acadia Pharms. Inc.,*
2022 WL 4491093 (S.D. Cal. Sept. 27, 2022) ............................................ 8, 16, 22, 23

*City of Livonia Employees' Retirement System v. Wyeth,*
2010 WL 3910265 (S.D.N.Y. 2010) ........................................................................... 23

*Cornwell v. Credit Suisse Grp.,*
689 F. Supp. 2d 629 (S.D.N.Y. 2010) ....................................................................... 18

*E. Ohman J:or Fonder AB v. NVIDIA Corp.,*
81 F.4th 918 (9th Cir. 2023) ...................................................................................... 21

*Fecht v. Price Co.,*
70 F.3d 1078 (9th Cir. 1995) ..................................................................................... 18

*Flynn v. Sientra, Inc.,*
2016 WL 3360676 (C.D. Cal. June 9, 2016) .............................................................. 14

*Galestan v. OneMain Holdings, Inc.,*
348 F. Supp. 3d 282 (S.D.N.Y. 2018) ........................................................................ 18

*Gammel v. Hewlett-Packard Co.,*
2013 WL 1947525 (C.D.Cal.,2013), (C.D. Cal. 2013) .......................................... 18, 25

*Gebhart v. S.E.C.,*
595 F.3d 1034 (9th Cir. 2010) ................................................................................... 23

*Glazer Capital Management, L.P. v. Forescout Technologies, Inc.,*
63 F.4th 747 (9th Cir. 2023) ...................................................................................... 19

*Government of Guam Retirement Fund v. Invacare Corp.,*
2014 WL 4064256 (N.D. Ohio Aug. 18, 2014) ..................................................... 21, 25

*Hatamian v. Advanced Micro Devices,*
87 F.Supp.3d 1149 (N.D. Cal. 2015) ....................................................................... 8, 19

*Henning v. Orient Paper, Inc.,*
2011 WL 2909322 (C.D. Cal. July 20, 2011) ............................................................. 22

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

*In re Alstom SA*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005) .................................................................................. 19

*In re Ariad Pharms., Inc. Sec. Litig.*,
  842 F.3d 744 (1st Cir. 2016) ............................................................................................... 17

*In re Axsome Theraps., Inc. Sec. Litig.*,
  2025 WL 965265 (S.D.N.Y. Mar. 31, 2025) .............................................................. 8, 9, 17

*In re BioMarin Pharm. Inc. Sec. Litig.*,
  2022 WL 164299 (N.D. Cal. Jan. 6, 2022) .......................................................................... 23

*In re Cadence Design Sys., Inc. Sec. Litig.*,
  692 F. Supp. 2d 1181 (N.D. Cal. 2010) ............................................................................... 19

*In re Countrywide Fin. Corp. Derivative Litig.*,
  554 F. Supp. 2d 1044 (C.D. Cal. 2008) ............................................................................... 19

*In re Diamond Foods, Inc., Sec. Litig.*,
  2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) .................................................................... 23

*In re Emergent BioSolutions Inc. Sec. Litig.*,
  2023 WL 5671608 (D. Md. Sept. 1, 2023) ................................................................... *passim*

*In re Extreme Networks, Inc. Sec. Litig.*,
  2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) .................................................................... 19

*In re General Elec. Co. Securities Litigation*,
  857 F.Supp.2d 367 (S.D.N.Y., 2012) .................................................................................. 22

*In re Genius Brand Int'l, Inc. Sec. Litig.*,
  97 F.4th 1171 (9th Cir. 2024) .............................................................................................. 25

*In re Grand Casinos, Sec. Litig.*,
  988 F. Supp. 1273 (D. Minn. 1997) ..................................................................................... 24

*In re LDK Solar Sec. Litig.*,
  584 F. Supp. 2d 1230 (N.D. Cal. 2008) ............................................................................... 19

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
  982 F.Supp.2d 277 (S.D.N.Y. 2013) ................................................................................... 17

*In re Network Assocs., Inc., Sec. Litig.*,
  2000 WL 33376577 (N.D. Cal. Sept. 5, 2000) .................................................................... 19

*In re Nuvelo, Inc., Sec. Litig.*,
  668 F.Supp.2d 1217 (N.D. Cal. 2009) ............................................................................ 21, 24

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) .................................................................................. 14, 20, 21

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

*In re QuantumScape*,
 580 F. Supp. 3d 714 (N.D. Cal. 2022) ........................................................................ 13

*In re Stratosphere Corp. Sec. Litig.*,
 1 F. Supp. 2d 1096 (D. Nev. 1998) ............................................................................ 18

*In re SunPower Corporation Securities Litigation*,
 769 F.Supp.3d 1042 (N.D. Cal. 2025) ....................................................................... 17

*In re Vaxart, Inc. Sec. Litig.*,
 576 F. Supp. 3d 663 (N.D. Cal. 2021) ............................................................... 8, 9, 18

*In re WorldCom, Inc. Sec. Litig.*,
 294 F. Supp. 2d 392 (S.D.N.Y. 2003) ........................................................................ 22

*Irvine v. ImClone Sys., Inc.*,
 2003 WL 21297285 (S.D.N.Y. June 4, 2003) ............................................................ 16

*Kui Zhu v Taronis Techs. Inc.*,
 2020 WL 1703680 (D. Ariz. Apr. 8, 2020) ............................................................... 25

*Loos v. Immersion Corp.*,
 762 F.3d 880 (9th Cir. 2014) ..................................................................................... 25

*McGuire v. Dendreon Corp.*,
 2008 WL 5130042 (W.D. Wash. 2008) ...................................................................... 25

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
 380 F.3d 1226 (9th Cir. 2004) ................................................................................... 21

*Odeh v. Immunomedics, Inc.*,
 *2020 WL 4381924 (D.N.J., 2020)* ............................................................................ 16

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
 780 F. App'x 480 (9th Cir. 2019) .............................................................................. 20

*Oklahoma Police Pension Fund v. Teligent, Inc.*,
 2020 WL 3268531 (S.D.N.Y. June 17, 2020) ............................................................ 21

*Pampena v. Musk*,
 705 F. Supp. 3d 1018 (N.D. Cal. 2023) (Breyer, J.) .................................................. 23

*Robb v. Fitbit Inc.*,
 2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ............................................................... 21

*Roberti v. OSI Sys., Inc.*,
 2015 WL 1985562 (C.D. Cal. 2015) ........................................................................... 23

*Salzman v. ImmunityBio, Inc.*,
 753 F.Supp.3d 1050 (S.D. Cal. 2024) .............................................................. 14, 22, 24

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ....................................................................... 14, 23

*Sinnathurai v. Novavax, Inc.*,
   645 F.Supp.3d 495 (D. Md. 2022) ...................................................................................... 17

*Sommers ex rel. FLIR Systems, Inc. v. Lewis*,
   641 F.Supp.2d 1151 (D. Or. 2009) ...................................................................................... 7

*Special Situations Fund III QP, L.P. v. Brar*,
   2015 WL 1393539 (N.D. Cal. Mar. 26, 2015)...................................................................... 7

*Todd v. STAAR Surgical Company*,
   2016 WL 6699284 (C.D. Cal., 2016)................................................................... 14, 20, 24

*Weston v. DocuSign, Inc.*,
   669 F. Supp. 3d 849 (N.D. Cal. 2023) ................................................................................ 21

*Yanek v. Staar Surgical Co.*,
   388 F.Supp.2d 1110 (C.D. Cal. 2005) (*STAAR I*)........................................................ 17, 21

## Statutes

FD&C Act.................................................................................................................................. 11

PSLRA............................................................................................................................... 17, 24

## Other Authorities

 21 CFR §§ 200.10(b), 211.22(a) ¶54 ...................................................................................... 11

21 CFR § 210.1(b) .................................................................................................................... 11

21 CFR § 210.2(c)..................................................................................................................... 11

 21 CFR § 210.3(b)(3)............................................................................................................... 11

21 CFR §§ 211.84 ..................................................................................................................... 12

2008 Final Rule, *Current Good Manufacturing Practice and Investigational New Drugs Intended for
   Use in Clinical Trials* (July 15, 2008) ............................................................................... 11

## I.    PRELIMINARY STATEMENT

Before its bankruptcy, Gritstone bio, Inc. ("Gritstone" or the "Company") was a clinical-stage biotechnology company founded by Defendant Allen ("Defendant") with no commercial-stage products for sale, and with the vast majority of its clinical trials funded via external collaborators, such as through nonprofits and government grants.  But its touted future rested with its "next generation" vaccine technology and with the Company's (and its third-party contractors') robust "Current Good Manufacturing Practices" ("cGMP")-compliant manufacturing capabilities that Defendant repeatedly represented were capable of bringing these vaccines to market.  One such vaccine program was for COVID-19 (known as "CORAL"), and the Company's March 2023 annual report praised the CORAL Phase 1 results as a path to a more "durable" and "potent" COVID immunity, with the Company preparing to start the Phase 2 trial.

In August 2023, however, a cash crisis threatened the Company's ability to operate as a going concern for another year.  One month later, on September 27, 2023, Defendant touted a critical lifeline: a contract with the Biomedical Advanced Research and Development Authority ("BARDA") (a division of the U.S. Department of Health and Human Services) to provide $423 million to fund the CORAL Phase 2 trial, buoying the Company's cash runway through 2024.  Unlike for Phase 1, the FDA requires the larger and more exacting Phase 2 trials to use cGMP-compliant manufacturing processes, including for the materials used.  The BARDA contract also expressly required cGMP compliance and included a deadline for the Company to get approval from the FDA to launch CORAL Phase 2 by Q1 2024.

There could not be a topic more important to Gritstone investors than the successful BARDA-funded CORAL Phase 2 rollout, including any major cGMP issues that stood in its way.  Accordingly, Defendant repeatedly assured investors that his Company would meet this BARDA-imposed deadline. While Company filings cautioned that it was always theoretically possible that manufacturing issues *could* delay any trials, those filings gave no reason to believe that such issues were plaguing the CORAL Phase 2 trial.  As pled in the amended complaint ("SAC"), investors had no reason to suspect that cGMP issues posed any risk to the BARDA-funded CORAL trial.

In truth, however, Defendant blatantly misrepresented the Company's (and its third-party contractors') cGMP compliance.  Confidential witnesses ("CWs") revealed that, since at least as early as March 2023, neither the Company or its third-party contractors were cGMP-compliant; rather, the Company was struggling (and failing) to obtain the necessary cGMP-compliant materials to launch CORAL Phase 2.  Those issues persisted throughout 2023, and by the end of

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1

the year, the Company was still far from a solution. This truth only started to emerge in in February 2024, when Defendant announced that the CORAL Phase 2 trial would be delayed due to the lack of cGMP-compliant materials.  Soon after, Defendant revealed that the FDA had placed the Phase 2 trial on a clinical hold in January 2024 because of these cGMP failures.  As a result of these setbacks, the Company went belly-up, and it announced it was filing for bankruptcy.

In its Order, this Court held that the prior complaint ("FAC") "adequately alleg[ed] that Gritstone's contractors did not comply with good manufacturing practices, contrary to Gritstone's representations" (Op. 11-12), and the SAC now makes clear Defendant also misrepresented Gritstone's cGMP compliance.  Defendant's half-hearted attempts to challenge their materiality ignores the SAC's allegations and this Court's understanding that cGMP "compliance" is "a term of art that means something specific in the world of drug manufacturing" (Op. 10)—and as the SAC now alleges, Defendant was apprised of these cGMP failures in real time.

As for Defendant's statements about the timing and funding of the BARDA CORAL Phase 2 launch, however, this Court declined to find that Defendant misled the market with scienter, finding the FAC "fail[ed] to adequately allege that Gritstone or Defendant[] knew that [the cGMP failures] would cause problems for the BARDA contract until the FDA issued its clinical hold letter in January 2024" (Op. 12-13), asking for more authority showing "Defendant[]' knew or should have known" that the CORAL Phase 2 trial would require cGMP compliance, including for "the source materials" used (Op. 13 & fn. 4).  The SAC not only adds more FDA authority confirming these requirements, but also new allegations from CWs revealing this knowledge.  As plead now, the FDA's clinical hold would only surprise investors left in the dark about Gritstone's and its contractors' ongoing cGMP failures.

Tellingly, Defendant *does not dispute* that cGMP governs the CORAL Phase 2 trial or its raw materials, but instead offers a carve out for the "grade" of materials that is not only legally baseless, but practically deficient as well.  Using non-cGMP-compliant materials poses serious risks to a vaccine's safety and purity, and the BARDA trial would expose 10,000 human lives to that risk.  Defendant also (wrongly) suggests that he can only act with scienter if he knew that the cGMP issues would be a "dealbreaker" for the FDA and result in a clinical hold.  As other cases have recognized in rejecting the same argument, the SAC does not allege Defendant knew the launch would fail, it alleges Defendant misrepresented the *true risk* of the ongoing cGMP failures and its impact on the CORAL trial that—facts that, if disclosed, would have reduced the price of his Company's stock to account for the acute risk of FDA rejection.  It has long been the law that

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

2

a party acts with scienter when they have knowledge of the facts that make their public statements misleading, and as plead in the SAC, Defendant had such knowledge.

## II.    STATEMENT OF FACTS

**A.    Defendant Misrepresents His Struggling Company's and Its Third-Party Contractors' cGMP Compliance.**

Defendant founded Gritstone in 2015 and, during the Class Period, Gritstone was a clinical-stage biotechnology company that claimed to develop "next generation" vaccines through its "proprietary," novel "self-amplifying mRNA" technology. ¶¶24-25. The Company touted that its "experienced leadership team" has "deep expertise" in "clinical and regulatory development," boasting that half of them have Ph.Ds., and of the seven Board of Directors, five members have Ph.Ds. or M.D.s—and one member (Defendant) has both. ¶26. Prior to founding Gritstone, Defendant founded and was chief medical officer at other immunology companies, and he serves on the Board of Directors at several immunology related entities. ¶¶20-22.

One of the core tenants of Gritstone's "unique approach" was robust cGMP-compliant manufacturing capabilities. ¶70. In the Company's annual report, it boasted that the Company "manufactur[es] our products at our own fully-integrated good manufacturing practice (GMP) biomanufacturing facilities." ¶71. While the Company "perform[s] the majority of the manufacturing," it sometimes "use[s] a hybrid approach to manufacturing … whereby certain elements of our product candidates are manufactured" by third parties, but the Company assured investors that "all [are] designed in compliance with cGMP" and "[a]ll internal and third-party contract manufacturing is performed under cGMP or similar guidelines." ¶¶72-73.

Pursuant to FDA regulation, all Phase 2 clinical trials must comply with cGMP. ¶¶32-50. Unlike the small Phase 1 trials that test only for "basic" safety—and thus are exempt from cGMP—Phase 2 involves a "substantially greater" number of people, and the trial tests the drug for both safety and effectiveness. ¶¶40-50. "Current Good Manufacturing Practices" ("cGMP") are regulations promulgated by the FDA to ensure that drugs tested in clinical trials meet certain quality standards so that they are safe and effective. ¶¶32-35. Under those regulations, the raw materials used in trials are "components," and those components must be sourced from qualified suppliers, received under quarantine, sampled and tested (for identity, purity, and quality), stored and handled to prevent contamination or mix-ups, and documented with full traceability, with written procedures governing every step. ¶¶32-69. If source materials are not handled, tested, and qualified per cGMP, the resulting drug product is deemed "adulterated" by the FDA. ¶32.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

In 2021, Gritstone began its "CORAL program" to test the Company's COVID-19 vaccine. ¶27. By March 2023, the Company had completed CORAL Phase 1, praising the results as demonstrating the vaccine was well-tolerated and "capable of driving strong, potentially durable and broad immunogenicity" response (¶29), and that it was preparing to launch CORAL Phase 2 (¶¶27-31). The cGMP requirements for Phase 2 clinical trials and their source materials are well known in the pharmaceutical industry (¶¶87-88), and those at Gritstone knew that cGMP-compliant materials were required for CORAL Phase 2 (¶¶83-99).

Yet, behind the scenes, former employees confirm that neither Gritstone nor its third-party contractors had the cGMP manufacturing capabilities to launch Phase 2. ¶¶101-20. CW1 (a Director of Quality Assurance) started at the Company in March 2023 to join a "task force" specifically created for the purpose of shoring up the Company's and its contractors' cGMP compliance. ¶¶103-11. There "was a huge project" for "CW1 and the team … to get necessary cGMP raw materials from the Company's existing third-party contractors," but those contractors were not cGMP compliant and "unable to implement the Good Manufacturing Practices needed to meet the cGMP-grade requirements." ¶107. CW6 (a Director of Procurement responsible for "qualifying" third-party contractors for cGMP compliance) revealed that by March 2023, the Company already knew it needed cGMP-compliant materials for the CORAL Phase 2 trial and thus was working actively to obtain them from cGMP-compliant third-party contractors. ¶¶98-100. CW1's task force met throughout 2023 to create reports to update Defendant about the progress (or lack thereof) to get cGMP complaint to launch Phase 2. ¶¶186-88.

**B. Gritstone's Future Hinges On Submitting an FDA-Approved Investigational New Drug ("IND") Application to Launch the BARDA-CORAL Phase 2 Trial.**

While the Company was struggling to achieve cGMP compliance, it was also dealing with another ongoing crisis: imminent insolvency. ¶¶74-76. As a relatively new start-up, Gritstone has no commercial-stage products, so it had "not generated any revenue from product sales, and" did "not expect to generate any revenue from product sales for the foreseeable future." ¶74. Rather, the "vast majority of" its vaccine programs are "being funded via external collaborators," such as through nonprofits and government grants, and all recognized gains would flow from those agreements funding its vaccine programs. ¶74.

On August 9, 2023, the Company acknowledged that—without some external collaboration providing new funding—the Company could no longer continue as a "going concern" for the next year. ¶76. That bleak 2023 Q2 quarterly report noted "[t]he Company's cash, [and] cash equivalents … are not sufficient to fund the Company's planned operations for a

period of 12 months," the Company "ha[d] incurred significant losses and negative cash flows," had "an accumulated deficit of $590.3 million," and "expect[ed] to incur substantial additional losses in the future." ¶76. As such, for "future funding requirements," the Company "anticipat[es] that we will need substantial additional funding" to continue to operate. ¶76.

A month after issuing the "going concern" warning, however, a government-funded contract appeared to solve this acute cash crisis. On September 27, 2023, Defendant touted this lifeline: a $423 million-dollar contract with BARDA to "supply the necessary resources to advance the development of CORAL" Phase 2. ¶78. Defendant lauded that this "validated" the Company's "innovative vaccine platform" showing "broad and durable" protection in CORAL Phase 1 (¶78), "signifies the trust and confidence the U.S. government has placed in our novel vaccine approach," and that the Company "looks forward to initiating the Phase 2b study … in the first quarter of 2024." Upon launching, with this influx of critical BARDA funding, "the Company's cash runway will be extended into the fourth quarter of 2024." ¶78.

The BARDA-funded CORAL Phase 2 trial was a massive scale-up from the prior Phase 1 trial. ¶78. Manufacturing the vaccine involves "a hundred-plus raw materials," including some "unique" to CORAL. ¶111, ¶117. While Phase 1 involved a few hundred subjects, Phase 2 would test the novel vaccine on 10,000. ¶77. In the three CORAL Phase 1 trials, there were a total of 463 patients (or less than 5%) of the number that would be included in the BARDA trial. ¶77.

To get that critical cash, the contract had a "base period" deadline for the Company to submit an FDA-approved Phase 2 "investigational new drug" ("IND") application by Q1 2024. ¶¶79-81. An IND application is a request to the FDA for approval to begin clinical trials with a new drug or biologic product on human subjects. ¶37. Conforming to FDA regulations for trials in Phase 2, the BARDA contract also expressly required the use of cGMP compliant manufacturing for the CORAL Phase 2 trial. ¶81. In addition, the BARDA contract expressly is subject to cancellation if the FDA identifies a "material failure" to comply with cGMP, which the contract defines as a failure affecting the "safety, purity, or potency of the product." ¶81.

## C.  Defendant Mislead Investors About the BARDA-CORAL Phase 2 Trial.

As the base period deadline approached, Defendant repeatedly assured investors that the BARDA-funded CORAL Phase 2 trial would launch as expected in Q1 2024. ¶82.

Unknown to the market, however, neither Gritstone nor its third-party contractors had the necessary cGMP capabilities to meet the BARDA contract's Q1 2024 deadline to launch Phase 2 and get the critical BARDA funding. ¶¶101-20. As CW1 conveyed, all throughout 2023,

Gritstone was struggling (and failing) to secure the "long list" of needed cGMP capabilities, and, by the end of 2023, Gritstone was still missing "critical" cGMP-compliant materials needed for the Phase 2 CORAL study. ¶¶103-11. CW6 corroborated this ongoing failure to find qualified suppliers throughout 2023 (¶¶98-100) and confirmed that—by the end of 2023—Gritstone's Process & Development team was still "seek[ing] suggestions on contractors who might be able to supply" cGMP-compliant materials. ¶112. At the end of 2023, CW3 (a Senior Director of Process Development that worked on the CORAL vaccine) conveyed that the Company was not close to meeting the BARDA deadline: CW3 and CW3's colleagues recognized the timeline for its contractors "to be ready to supply all GMP-grade materials" "plus the time it would take Gritstone to submit an amended IND" as the BARDA contract requires would take at least "*another 9 to 12 months*" past the BARDA-imposed Q1 2024 deadline. ¶¶115, 204-07.

**D.    The Truth Beings To Emerge, and Gritstone Goes Bankrupt.**

On February 12, 2024, Defendant revealed that the Company would not meet the BARDA Q1 2024 deadline, and that the trial would proceed in the "fall of 2024 rather than 1Q24." Two weeks later, on February 29, 2024, Defendant revealed that—due to the lack of the "anticipated" BARDA's "funding"—Gritstone had to fire 40% of its workforce, sending the stock price tumbling. ¶¶171-73. On March 5, 2024, Defendant revealed that the FDA had placed a "clinical hold" on the CORAL program in January 2024, and that Gritstone was "working … to remove the clinical hold," which "includes re-manufacturing our CORAL vaccine candidate to be used in the Phase 2b CORAL Study with GMP-grade materials." ¶¶175-80. On April 1, 2024, Defendant announced that the Company "has commenced an underwritten public offering of shares" to shore up the Company's liquidity crisis caused by this lack of funding, sending the stock falling 48.94%. ¶181. On October 10, 2024, Gritstone declared Chapter 11 bankruptcy. ¶182.

### III.    ARGUMENT

**A.    Defendant Misled Investors About Gritstone's cGMP Capabilities.**

One of the core tenants of Gritstone's "unique approach" was robust cGMP-compliant manufacturing capabilities. ¶¶70-73. In the Company's annual report, it boasted that the Company "manufactur[es] our products at our own fully-integrated good manufacturing practice (GMP) biomanufacturing facilities." ¶72. While the Company "perform[s] the majority of the manufacturing" internally, it sometimes "use[s] a hybrid approach to manufacturing … whereby certain elements of our product candidates are manufactured" by third parties, but the Company

assured investors that "all [are] designed in compliance with cGMP" and "[a]ll internal and third-party contract manufacturing is performed under cGMP or similar guidelines." ¶73.

### 1. This Court Already Held That Defendant Mislead Investors About His Company's Third-Party cGMP Manufacturing Compliance.

This Court concluded that "Gritstone's statement that '[a]ll internal and third-party contract manufacturing is performed under cGMP or similar guidelines'" was "misleading" because Plaintiffs have "adequately allege that Gritstone's contractors did not comply with good manufacturing practices, contrary to Gritstone's representations." Op. 11-12. "According to Plaintiffs' confidential witness [CW1], Gritstone and Defendant already knew that its contractors did not comply with good manufacturing practices when it issued" these statements assuring investors that its third-party contractors were cGMP compliant. Op. 12. Indeed, at the time of the March 2023 annual report, CW1 revealed the Company *already* had been struggling to get its (and its third-party contractors') manufacturing processes cGMP compliant. ¶¶103-11.

Gritstone's and Defendant's[1] assurances about those third parties are no doubt material. *Contra* MTD 10. Gritstone expressly acknowledged that its cGMP-compliant "hybrid" manufacturing approach "***rel[ies]***" on the cGMP compliance of its "qualified" third parties and it is through this "hybrid product supply approach" Gritstone "ensures timely and consistent product supply" all while maintaining cGMP compliance. ¶132. As this Court recognized, claiming "compliance with good manufacturing practices" is a "specific" assurance; it is "a term of art that means something specific in the world of drug manufacturing." Op. 10. As the SAC explains, they are rigorous requirements that ensure the safety, quality, and purity of any commercial drug (¶¶32-69) and are required after Phase 1 trials to lay the groundwork for commercialization and profit (¶¶93 (explaining cGMP-compliant materials in Phase 2 is critical and necessary not only from a regulatory view, but also a practical one). Defendant teased that the CORAL Phase 1 results "demonstrat[ed] the potential ability of our vaccines to elicit potent and durable" COVID immunity (¶¶25-29), so assurances about having the necessary cGMP compliance for CORAL Phase 2 and beyond conveyed that there was nothing material left to do for those trials to move

---

[1] Defendant signed off on the accuracy of the statements in Gritstone's public filings; those statements thus are attributed to him as well as to the Company. *Special Situations Fund III QP, L.P. v. Brar*, 2015 WL 1393539, at *3 (N.D. Cal. Mar. 26, 2015). Gritstone remains a primary violator despite not being named as a defendant due to the Company's bankruptcy. *Sommers ex rel. FLIR Systems, Inc. v. Lewis*, 641 F.Supp.2d 1151, at *11 (D. Or. 2009).

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

7

forward.[2]  As a Company with no approved drug products for sale—and one where the "vast majority of" its vaccine programs are "being funded via external collaborators" (¶¶74)—affirming that it's third-party contractors are cGMP compliant and ready to hit the ground running on any collaboration is a material reassurance of the Company's financial viability.[3]

Thus, having such cGMP compliant manufacturing capabilities "carries a specific meaning."  *Hatamian v. Adv. Micro Devices*, 87 F.Supp.3d 1149, 1161 (N.D. Cal. 2015).  By "highlight[ing] that manufacturing was 'in place,'" and "laud[ing] its vaccine as having the 'potential to offer better'" results, 'the information then available to the market' gave the impression that [Gritstone] could well be on the cusp of achieving something momentous." *In re Vaxart, Inc. Sec. Litig.*, 576 F. Supp. 3d 663, 670–72 (N.D. Cal. 2021); *In re Emergent BioSolutions*, 2023 WL 5671608, at *13-14, *19 (D. Md. Sept. 1, 2023) (pre-commercial statements touting ability to support "large scale manufacturing" misled investors given issues that would impact "how risky it would be" to achieve); *Axsome*, 2025 WL 965265, at *8 ("[d]efendants failed to disclose that Axsome's vendor was experiencing equipment problems that were causing an insufficient supply … when describing the Company's manufacturing capabilities").[4]

---

[2] Defendant claims these assurances have "no impact" on Gritstone because "[a]t the time, the CORAL program was still in Phase 1 trials—which 'did not need to meet the FDA's cGMP requirements' (¶31)—and neither the BARDA contract nor Phase 2 would come into view until several months later."  MTD 10-11.  That is wrong.  Defendant ignores allegations that "[a]t the time that the annual report was filed in March 2023, the CORAL Phase 2 study preparations were underway."  ¶¶31. CORAL Phase 1 was *over*—Defendant in fact touted the results in the same annual report (¶¶29)—and CW1 confirmed that in March 2023, the Company was (and had been) preparing for Phase 2 (¶104).   CW6 likewise confirmed "the effort to obtain all GMP-grade materials started several months if not a year before the Company announced its funding from BARDA."  ¶¶98.  As this Court already concluded, it is a least "a reasonable inference that Gritstone would have been looking ahead to Phase 2 and 3 trials" in March 2023.  Op. 11 n.2.

[3] Defendant's claim that "Plaintiffs conflate 'third-party contract manufacturing organizations (CMOs)' with 'third-party suppliers for key materials used in our manufacturing processes'" (MTD 10 n. 5) is wrong and a distinction without a difference.  As Defendant acknowledges, *both* third-party suppliers and CMOs are third parties that "manufacture material" used in Gritstone's trials (MTD 10), and the SAC alleges ongoing cGMP failures from "existing third-party contractors" that "were not cGMP compliant" and "unable to implement the Good *Manufacturing* Practices" governing the manufacturing of those materials. ¶107; ¶132 (calling CMOs part of Company's hybrid manufacturing "*supply* approach").  Assurances about "third-party contract manufacturing" being cGMP compliant is not limited to "CMOs" in any event.  ¶132.  Indeed, this Court already held that Plaintiffs have "adequately allege that Gritstone's *contractors* did not comply with good manufacturing practices, contrary to Gritstone's representations."  Op. 11-12.

[4] None of the risk warnings (MTD 10) would render this assurance immaterial; none conveyed the truth that its contractors were not cGMP compliant. *Emergent*, 2023 WL 5671608, at *13-14, *19 (ability to support "large scale manufacturing" misled investors given issues that would impact "how risky it would be" for firm to achieve that goal).  This claim is also a premature "truth-on-the-market" defense inappropriate for consideration at the pleading stage. *City of Birmingham v.*

### 2.  Statements About Gritstone's cGMP Compliance Are Also Actionable.

While finding that "[a]ll internal and third-party contract manufacturing is performed under cGMP or similar guidelines" was misleading as to Gritstone's third-party contractors' compliance, the Court held "Plaintiffs offer no allegations that *Gritstone*, as opposed to its contractors, did not comply with" cGMP.  Op. 11.  The SAC adds allegations showing these statements assuring investors about Gritstone's cGMP manufacturing likewise were misleading.

Given the failure of its third-party compliance at the time, Gritstone was not capable of manufacturing cGMP-compliant products "internally" as represented because Gritstone's purported cGMP-compliant hybrid manufacturing approach admittedly "*relies*" on third-party compliance.  ¶¶130, 132.  As the SAC conveys, "CW1 revealed that—when CW1 joined Gritstone in March 2023—the Company already had been aware of, and had been struggling to fix, *Gritstone's* lack of cGMP capabilities to launch the CORAL Phase 2 study."  ¶104; ¶104 (CW1: "By the time I started [in March 2023], it was already being discussed" on how to "look at *our* manufacturing process and evaluate how many raw materials were cGMP vs non-GMP").  Courts accordingly treat representations about third parties as reflecting on the company's own "manufacturing capabilities."  For instance, in *Axsome Therapeutics*, a pharmaceutical company made representations about its "manufacturing capabilities" to support a new drug application, but in reality, key "suppl[ies]" needed to create the drug "w[ere] inadequate due to a vendor's manufacturing issues."  2025 WL 965265, at *5 (S.D.N.Y. Mar. 31, 2025).  The court concluded the statements lauding the manufacturing capabilities "were misleading because they created an impression that the Company was not facing supply issues, when, in reality, the SAC alleges that Axsome was unable to produce sufficient [supply] for at least a year."  *Id.*  The same is true of Defendant's statements (falsely) assuring the market of Gritstone's robust cGMP-compliant manufacturing processes.  *Vaxart*, 576 F. Supp. 3d at 670-71 ("announcement that [issuer] had partnered with Attwill" to manufacture vaccines "was materially misleading" given plead facts showing partnership did not have capabilities to produce them).

The SAC also adds allegations confirming that Gritstone failed its own independent cGMP responsibilities, including those ensuring third-party contractors are cGMP compliant.  As the SAC makes clear, "[t]he company applying for the IND approval is ultimately responsible for ensuring any third-party contractors are cGMP complaint" (¶54), and Gritstone cannot "delegate"

---

*Acadia Pharms. Inc.*, 2022 WL 4491093, at *11 (S.D. Cal. Sept. 27, 2022).  In any event, "materiality is an 'inherently fact-specific finding.'"  *Vaxart*, 576 F. Supp. 3d at *670-72.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

this "statutory or regulatory responsibilities to comply with cGMP" to its contractors (¶58). The FDA's cGMP regulations, for instance, require manufacturers like Gritstone to establish specifications for qualifying third-party contractors, including: evaluating the contractor's quality and compliance history (such as through audits), verifying the safety and identity of the supplies and materials through independent testing, executing quality control agreements, and maintaining ongoing oversight and documentation. ¶¶51-69. As the SAC alleges, Gritstone failed these responsibilities; CWs confirmed that "the Company's *existing* third-party contractors … were not cGMP compliant'" (¶¶106-07), and Gritstone was scrambling to fulfill its vetting obligations (¶¶100, 108-112). As a result, for that reason too, Gritstone was not fulfilling its own cGMP obligations—as thus was not itself cGMP compliant—despite its representations to the contrary.

**B.    Given These Known cGMP Failures, Defendant Mislead Investors About The BARDA-Funded CORAL Phase 2 Trial.**

Only a month after announcing the grim news that Gritstone was on the verge of insolvency, on September 27, 2023, Defendant touted the Company's lucrative solution: a BARDA-funded rollout of CORAL Phase 2 where the Company "will receive funding of up to an estimated $423 million to conduct a 10,000 participant randomized [CORAL] Phase 2b comparative study" in Q1 2024. While Defendant repeatedly assured investors that the Company was preparing the required IND application and would meet the contract's imposed deadline— meaning the FDA would approve the IND to launch the Phase 2 study as expected in Q1 2024— in reality, Defendant hid that his Company lacked the cGMP capabilities to comply with it.

**1.  Those at Gritstone Knew CORAL Phase 2 Required cGMP Materials.**

This Court held that while "Plaintiffs … properly allege that Gritstone knew that some of its source materials were not compliant with good manufacturing practices, they fail to adequately allege that Gritstone or Defendant[] knew that would cause problems for the BARDA contract until the FDA issued its clinical hold letter in January 2024." Op. 12-13. In particular, this Court directed Plaintiffs to provide more authority to "establish that Defendant[] knew or should have known of the cGMP requirements for source materials" for Phase 2. Op. 13 & fn. 4. The SAC adds that authority and new allegations from former employees confirming this awareness.

**a.  The FDA Requires cGMP-Compliant Third-Party Source Materials for Investigational New Drug (IND) Trials in Phase 2.**

As the SAC makes clear, by final rule and regulations, the FDA requires that clinical trials issued under the authority of an "investigational new drug" (IND) application in Phase 2 comply

with the FDA's cGMP regulations.  ¶¶36-50.[5]  The raw or source materials used in those clinical trials are "components" of a drug (21 CFR § 210.3(b)(3)) and thus are subject to the extensive cGMP requirements for such "components."  ¶39.[6]  These cGMP requirements apply to both the drug sponsor (Gritstone) and any third-party contractors. ¶¶51-55.[7]

Critically, Defendant *does not dispute* that cGMP is the standard the FDA requires for IND Phase 2 trials for both Gritstone and its contractors (MTD 13-16) and *acknowledges* that the "raw materials" used are "components" subject to specific cGMP requirements (*id*. 14).

Defendant instead contends that those cGMP regulations do "not require drug components (i.e., raw materials) to satisfy any particular quality or grade," so there is no need to use cGMP-compliant materials.  MTD 14.  That ignores that being "cGMP-compliant" means those materials have been subject to the testing, methods, processing, and procedures outlined in the cGMP regulations for components.  CFR §§ 211.80-211.94.  Those regulations, for instance, include requirements for "testing and approval" of components and "specify procedures for cleaning containers, preventing contamination, using sterile equipment, identifying sample containers" and more.  ¶¶51-69.  Third-party contractors thus understand that the "raw materials used in pharmaceutical production must adhere to [these] cGMP regulations to safeguard purity and quality throughout manufacturing."  ¶68; ¶69 (contractor stating "cGMP raw materials are subject to strict cGMP regulations to select and test …").  Thus, being a "cGMP-grade" component assures that the component was processed and manufactured to comply with those "good manufacturing

---

[5] FDA, Guideline on the Preparation of Investigational New Drug Products (March 1991, reprinted Nov. 1992) (confirming that IND clinical trials in all Phases must conform to cGMP). ¶¶41-43. The FDA reiterated this 1991 cGMP requirement for Phase 2 trials in the Final Rule published by the FDA on July 15, 2008. ¶43; FDA, 2008 Final Rule, *Current Good Manufacturing Practice and Investigational New Drugs Intended for Use in Clinical Trials* (July 15, 2008) (exempting Phase 1 IND trials from cGMP requirements and reiterating cGMP is required for INDs in Phases 2 and 3). ¶¶43-50.  The 2008 Final Rule requirement for cGMP compliance in Phase 2 is codified at 21 CFR § 210.2(c) (stating the cGMP "exemption does not apply … once the investigational drug has been made available for use by or for the sponsor in a phase 2 or phase 3 study" and "[i]f the investigational drug has been made available in a phase 2 or phase 3 study …  the drug … must comply with [21 CFR] part 211 [cGMP]"). ¶49.

[6] CFR §§ 211.80-211.94 (cGMP requirements for components).

[7] As the March 2023 annual report acknowledged, "*we [Gritstone] along with third-party contractors*, will be required to navigate the various preclinical, clinical and commercial approval requirements of the governing regulatory agencies." ¶97; 21 CFR § 210.1(b) (citing FD&C Act § 501(a)(2)(B)) (products manufactured in violation of cGMP are deemed to be "adulterated" within the meaning of the FD&C Act, and any party responsible for the manufacture of adulterated product "shall be subject to regulatory action").  Under the cGMP regulations, "[w]hen an owner uses a contract facility, the *owner's quality unit is legally responsible* for approving or rejecting drug products manufactured by the contract facility."  ¶54 (21 CFR §§ 200.10(b), 211.22(a)).

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

*practices*," *i.e*., the processes assuring that the materials have the requisite "purity, strength, and quality." *E.g*., 21 CFR §§ 211.84. This is consistent with the SAC's allegations that the "Company's existing third-party contractors, … were not cGMP compliant and … 'unable to implement the Good Manufacturing Practices needed to meet the *cGMP-grade requirements*.'" ¶¶107, 111; ¶107 (stating contractors "agreed to change" their practices so materials could meet GMP-grade standards). These shortcomings thus are not limited to the "grade" of materials (a term Defendant does not define) but refers to the practices in place to ensure the materials' grade, *i.e*., purity and safety are in place. *E.g*., ¶100, 108 (vetting contractors processes).[8]

Conforming to these regulations, the BARDA contract expressly called for "Good Manufacturing Practice Regulations (GMP) [to] … be the standard to be applied for clinical manufacturing, processing, packaging, storage, and delivery of this product," confirming that cGMP-compliant materials must be used in the vaccine's manufacturing. ¶81. The Contract is subject to cancellation if the FDA identifies a "material failure" to comply with cGMP, defined as a failure affecting the "*safety, purity, or potency* of the product," requirements that would mean little if cGMP-compliant inputs were not used. ¶81.[9]

Accepting Defendant's argument that such a Phase 2 trial would *not* require cGMP-grade raw materials would pose serious risks to human life. Using non-cGMP materials presents dangers of contamination and metabolic reactions, concerns particularly true of vaccines that are immune-triggering agents injected directly into muscle. ¶124 (vaccines "carry safety risks that may not be present with other products"). An IND trial evaluates "investigational," "new"—and thus untested—exploratory drugs on human subjects. That is why cGMP is the *rule* governing all IND application trials; only Phase 1 trials are exempt. ¶¶41-50. While Phase 1 trials are "limited generally" in number, Phase 2 clinical trials include "a substantially greater number of subjects … exposed to the drug," and that is true here: whereas CORAL Phase 1 had a few hundred subjects, the BARDA Phase 2 trial would involve *10,000*," posing an exponentially greater risk to a substantially larger number of people. And, while Phase 1 trials only test the drug's "basic safety," Phase 2 trials test "safety" "in addition to" drug "efficacy," making a components' purity even more essential to accurately assessing the impact of the drug. Thus, the far more significant stakes, purposes, and scope of Phase 2 trials render cGMP compliance even more essential.

---

[8] This Court already held that the prior FAC alleged violations of cGMP compliance. Op. 10-11.

[9] These realities rebut Defendant's claim that the contract "says nothing" about the required grade of raw materials. MTD 16. CW2 also confirmed that this interpretation is correct. ¶198.

**b. New CWs Confirm Gritstone and Defendant Knew cGMP Source Materials Were Required for the BARDA-Funded Phase 2 Trial.**

Apart from these regulations, the SAC dispels any remaining doubt about Gritstone's awareness of these cGMP requirements. Allegations from new former employees confirm that those at Gritstone knew the CORAL Phase 2 trial would require cGMP-compliant materials—and that this ongoing failure posed huge obstacles for Phase 2's IND approval (and thus the BARDA contract) well before receiving the FDA's formal clinical hold in January 2024. ¶¶85-105. CW4—a Manager Scientist that worked directly on testing and analyzing components for the CORAL Phase 2 trial—confirmed that CW4 and CW4's colleagues knew that because the FDA required cGMP-compliant raw materials for all Phase 2 IND applications (¶¶87-88), from early 2023 onward, the Company was "making efforts to obtain GMP-grade materials for the [CORAL Phase 2 trial] *because* of this awareness" (¶102). CW1 (a member of the task force to shore up the cGMP capabilities for Phase 2) corroborated this account, conveying that the "task force" established to get CORAL Phase 2 cGMP compliant was founded *because* of the knowledge that the FDA required it. ¶105.[10] That is consistent with CW6's account that, even "months to a year" prior to the BARDA contract announcement in September 2023, the quality unit teams were actively working to obtain c-GMP compliant materials from cGMP-compliant third-party contractors *because* his boss "knew we had to find GMP material" to be FDA compliant for CORAL Phase 2. ¶¶98-99. Similarly, based on decades of experience in the pharmaceutical industry, it was CW2's "expectation that GMP-grade raw materials would need to be used to manufacture the [CORAL vaccine] for the Phase 2 trial," particularly given that the Company's prior Phase 2 trials used cGMP materials. ¶94.[11] After Defendant announced the BARDA

---

[10] Defendants try to dismiss the accounts of CW1, CW4, and CW5 as "so temporally vague that they may simply reflect what the CWs believed *after* the Company received the FDA's clinical hold letter in January 2024." MTD 16-17. They instead provide critical insight from the those working directly on CORAL Phase 2, during the relevant timeframe, and thus would be in the best position to opine on the Company's expectations for (and the setbacks plaguing) that trial. *In re QuantumScape*, 580 F. Supp. 3d 714, 732 (N.D. Cal. 2022) (crediting "unidentified employees" because they "plausibly" knew about testing based on "research and development" roles). Indeed, CW allegations should be credited if the witnesses are described with "sufficient particularity to support the probability" that they were "in a position to infer" or "reasonably deduce" the facts attributed to them. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) ("entirely plausible" that CWs who were not in a position to "see the stop-work orders first-hand because they were engineers or technical editors rather than managers" still "would know, or could reasonably deduce" that the company had suffered setbacks). That is the case here.

[11] Defendants claim because CW2 "left the Company by August 2023, i.e., [one month] before the BARDA contract for the Phase 2b Study" was announced, CW2 "lacks credible knowledge regarding the Phase 2b Study." MTD 16. But in August 2023, CORAL Phase 2 was already underway (¶¶31, 104), and CW2 "review[ed]" the CORAL Phase 2 study protocol" (¶91). CW2

contract, former employees also confirmed the clamber to get cGMP-compliant only intensified as the BARDA-imposed deadline for the Phase 2 launch approached with no solution.  ¶¶108-20.

These alleged facts squarely rebut Defendant's contention that "Plaintiffs still rely on an impermissible 'fraud by hindsight' theory—that Gritstone was always required to use fully GMP-grade materials for the Phase 2b Study because the FDA later placed the study on a clinical hold to allow for the use of such materials."  MTD 8.  Rather, these allegations show that Gritstone and Defendant were "well aware of [these] manufacturing deficiencies through other means" throughout 2023, well before that January 2024 formal hold.  *Salzman v. ImmunityBio, Inc.*, 753 F.Supp.3d 1050, 1064 (S.D. Cal. 2024).  "That [Gritstone] had not yet felt the loss resulting from [its contractors'] regulatory shortcomings when it allegedly made these statements does not make the statements any less misleading."  *Flynn v. Sientra, Inc.*, 2016 WL 3360676, *12 (C.D. Cal. June 9, 2016).  The formal clinical hold only further confirmed the deficiencies pervading the manufacturing process.  *Todd v. STAAR Surgical Company*, 2016 WL 6699284 (C.D. Cal. 2016) (formal FDA warning is not "necessary to impute knowledge of [cGMP] violations").

### 2. Defendant Misled Investors About CORAL Phase 2's Timeline and Funding.

Defendant repeatedly assured investors that the approved IND needed to launch the Phase 2 study would meet the BARDA Q1 2024 deadline, supplying the Company with a much-needed cash runway after its recent going concern warning.  When announcing the BARDA collaboration in late September 2023, Defendant lauded that, the BARDA contract "signifies the trust and confidence the U.S. government has placed in our novel vaccine approach," and that the Company "looks forward to initiating the Phase 2b study … in the first quarter of 2024."  ¶78.  As the base period deadline approached, in October 2023, Defendant reiterated, "Preparations for the BARDA-funded, 10,000 subject [CORAL] Phase 2 study … are underway, having entered the base period, and we look forward to initiating the [Phase 2] study in the first quarter of 2024."  ¶82.  Again, in November 2023, Defendant maintained, "Gritstone expects the study to be initiated in the first quarter of 2024," and that "[p]reparations for the study are underway, and we expect to initiate the study in the first quarter of 2024."  ¶82.  Each time, Defendant assured investors that

---

also had overseen "a number of trials" at Gritstone, including some sponsored by government entities, and conveyed the raw materials used for those Phase 2 trials were all cGMP compliant.  ¶¶91-94; *Twitter*, 282 F. Supp. 3d at 1125 n.8 ("[T]he timeframe of [CW's] employment has little bearing on whether he can provide relevant testimony about the [company's business practices] as a general matter.").  Courts regularly credit CWs even where their observations fall outside the class period (which is not the case here) in any event.  *Quality Sys.*, 865 F.3d at 1145.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

14

the BARDA contract would provide a critical influx of cash such that "the Company's cash runway will be extended into the fourth quarter of 2024." ¶¶78-82.

But while lauding this agreement and its implications, Defendant hid from the market that the Company lacked the cGMP capabilities to comply with it. CW1 revealed when Defendant announced the BARDA collaboration on September 27, 2023, the Company was struggling to find the cGMP raw materials needed for the BARDA contract. ¶¶107-08. With only a few short months to submit an FDA-approved IND application—and the amount of the missing cGMP materials needed—CW1 and the rest of the "task force" created to find c-GMP compliant materials already were "discuss[ing] about how we can make it [in time to start] the [Phase 2 trial in] Q1 2024," and those "discussions" became heavier and "heavier" towards the end of 2023 as the team floundered for a solution. ¶108. By the end of 2023, while CW1's team had found some sources of cGMP-compliant materials, Gritstone was still missing "critical" cGMP materials—and did not know where to get them. ¶111. This is corroborated by CW5 (an Associate Scientist that worked on the CORAL Phase 2 vaccine) who conveyed that from conversations with coworkers, "BARDA expected the Company to use only GMP-grade materials to manufacture the vaccine for use in the [CORAL Phase 2] trial" (¶95) and that the Company thus anticipated the FDA's opposition if the materials were not cGMP compliant and prepared an analysis to assess the risks of using non-cGMP materials (¶96).[12] CW6 likewise reported that, at the time Defendant announced the Contract, the Company was searching for cGMP-compliant third-party contractors and, by the end of 2023, had not found them. ¶112. As CW3 (a Director of Process Development working on the CORAL Phase 2 trial) conveyed, at the end of 2023, the Company recognized the timeline for its contractors "to be ready to supply all GMP-grade materials" "plus the time it would take Gritstone to submit an amended IND" would take at least "*another 9 to 12 months*" beyond the BARDA-imposed deadline. ¶¶115, 204-07. The later disclosures revealing the clinical hold likewise noted that the Company was now "preparing to launch the Phase 2b trial … *in the Fall of 2024* rather than first quarter of 2024" and conceded that "[i]t may take *considerable time and expense to*

---

[12] Rather than "undercut Plaintiffs' falsity theory that the Company must comply with some bright-line requirement to use all GMP-grade raw materials for the Phase 2b Study" (MTD 17), it shows the Company's awareness of it. Even if it "shows that the Company was engaged in an ongoing dialogue with the FDA" (MTD 17)—an inference far afield from the SAC—Defendant misses the bigger picture: it would still be misleading to represent to the market that the Company and its contractors were cGMP compliant, assurances that would obviate the need for any such "dialogue." Those repeated assurances of compliance impermissibly misled investors about "how risky it would be" for the Company to achieve its goal to launch Phase 2 by the BARDA deadline. *E.g.*, *Emergent*, 2023 WL 5671608, at *13-14, *19. They are therefore actionable.

*resolve the clinical hold*." ¶206. As the long-projected timeline for resolving these issues reveals, the Company was not even close to meeting the BARDA deadline.

It thus was misleading for Defendant to portray that the CORAL Phase 2 would meet this deadline while omitting this negative information that was likely to delay or to terminate the BARDA-funded trial. *Irvine v. ImClone Sys., Inc.*, 2003 WL 21297285, at \*1 (S.D.N.Y. June 4, 2003) (company "reasonably expected approval by the FDA in early 2002" was actionable where defendants knew "it was not reasonably foreseeable that the FDA would approve Erbitux on that time line"); *Odeh v. Immunomedics, Inc.,* 2020 WL 4381924 at \*6 (D.N.J., 2020) (positive statements about FDA review actionable based on awareness of data breach that "could seriously jeopardize" approval). The court in *Acadia Pharmaceuticals*, for instance, addressed the case where "adequate manufacturing and quality assurance systems w[ere] a significant undertaking and w[ere] a critical component of the [new drug application] NDA approval process," and defendants had proclaimed that a certain drug application was "on track" to meet an upcoming deadline. 2016 WL 5076147, at \*6. Defendants, however, omitted that "Acadia did not perform a mock inspection of these [manufacturing] systems," and "[a]ccordingly, when Defendants represented that the NDA was 'on track' to be submitted by March 31, 2015, without mentioning that no meaningful assessment of the manufacturing and quality assurance systems had been conducted, Defendants created an impression of a state of affairs that differed in a material way from the one that actually existed." *Id*. While "Defendants led the public to believe that all appropriate steps had been taken to make sure that the NDA was ready for review by the deadline and that barring unforeseen circumstances, the NDA would be submitted by that date," "[i]n actuality, Defendants lacked information regarding whether the necessary infrastructure for commercial-scale operations was in place," rendering "Defendants' assurances that the NDA remained 'on track' for submission by March 31, 2015 … materially misleading." *Id*.

The same reasoning applies here. "Defendant[] led the public to believe that all appropriate steps had been taken to make sure that" the CORAL Phase 2 trial would be "ready … by the deadline and that barring unforeseen circumstances, the" trial would begin "by that date," when in reality, the Company was and had been scrambling for a year to procure the necessary cGMP materials to comply with FDA regulations and the BARDA contract. *Acadia*, 2016 WL 5076147, at \*6. Failure to disclose this reality gave a misleading "impression that [the study] was proceeding as expected, with no significant setbacks." *Odonate Theraps.*, 2021 WL 3406271, at \*5 (statement "to complete enrollment of [a Phase 3 study] in the second half of 2019" gave a misleading

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

16

"impression that [the study] was proceeding as expected, with no significant setbacks"); *Sinnathurai v. Novavax, Inc.*, 645 F.Supp.3d 495, 519-20 (D. Md. 2022) (statements of manufacturing status that "left out another important factor in the delay" actionable where company "faced significant manufacturing concerns and … delays"); *Axsome*, 2025 WL 965265, at *5 (statement that "2021 was a year of continued progress which has put the Company in a position to potentially launch" drug was "misleading because they created an impression that the Company was not facing supply issues, when, in reality, the SAC alleges that Axsome was unable to produce sufficient [drug component] for at least a year"). By touting this timeline—while omitting the truth about the poor state of the cGMP compliance—those statements "necessarily implied that there would be no serious impediments to [a] timely" Phase 2 launch; as such, it would be misleading to omit "facts suggesting a possible delay," including the ongoing cGMP obstacles. *Yanek v. STAAR Surgical Co.*, 388 F.Supp.2d 1110, 1130 (C.D. Cal. 2005); *Emergent*, 2023 WL 5671608, at *13-14, *19 (ability to support "large scale manufacturing" misled investors given issues that would impact "how risky it would be" for firm to achieve that goal). "While management may have held out hope of achieving this result, the expression of that hope without disclosure of recent troubling developments created an impermissible risk of misleading investors." *In re Ariad Pharms., Inc. Sec. Litig.*, 842 F.3d 744, 753 (1st Cir. 2016).[13]

Thus, Defendant "exploited a gap in the public's knowledge" and "capitalized on hype [he] had generated around [Gritstone's] vaccine candidate" to "misle[ad] a reasonable investor into thinking that the company would be flush with funds, enabling it to quickly bring a vaccine to market." *Vaxart*, 576 F. Supp. 3d at *663, 671. And Defendant did so at a critical time, when the Company was on the verge of bankruptcy. Indeed, the suspiciously short timing between Defendant's assurances (from late September 2023 to November 2023) and the FDA's reported issues mere week later indicates that Defendant's statements were false when made. *See, e.g., Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525 (C.D.Cal.,2013), *16 (C.D. Cal. 2013)

---

[13]In addition to publicizing the CORAL Phase 2 timeline, Defendant repeatedly characterized the BARDA contract as providing a critical influx of cash such that "the Company's cash runway will be extended into the fourth quarter of 2024." ¶78. For the same reasons, that was misleading given the pervasive and ongoing failure to procure the needed cGMP-compliant manufacturing materials. These statements gave investors a highly misleading impression of the level of risk associated with the CORAL Phase 2 rollout and the likelihood of realizing the $423 million influx of needed BARDA cash; those statements thus are actionable. *In re SunPower Corporation Securities Litigation*, 769 F.Supp.3d 1042 at *8 (N.D. Cal. 2025) (statements about future liquidity are actionable where undisclosed material facts undermine that assurance); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F.Supp.2d 277, 299 (S.D.N.Y. 2013) (same). And for the same reasons, the PSLRA safe harbor (MTD at 12) does not shield these statements. *SunPower*, 769 F.Supp.3d, at *8; *MF*, 982 F. Supp. 2d 277 at 299.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

(temporal proximity between statements and a corrective disclosure, four to eleven weeks, supports falsity); *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1112 (D. Nev. 1998) ("The shortness of time between later revealed truth and prior statements can be circumstantial evidence that the optimistic statements were false or misleading when made"); *Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th Cir. 1995) (the short time (seven weeks) between statements and the revelation is "circumstantial evidence" that the statements "were false when made.").

### C.      The SAC Adds New Allegations to Support Defendant's Scienter.

This Court's prior reasoning held that "even if Defendant['s] statements on" the Company's cGMP "manufacturing practices" or the "BARDA contract value and timeline" "were false when made, the complaint does not support a finding that [Defendant] acted with scienter" because "Plaintiffs have not alleged any facts that would give rise to a strong inference that Defendant … knew or was deliberately reckless as to the FDA's yet-to-be-explained requirement that they use cGMP source products in their CORAL vaccine." Op. 17 & n.6.

The SAC adds this critical context with allegations about the widely known cGMP requirements for CORAL Phase 2 (*supra* 13-14) and Defendant's knowledge of it and the cGMP issues plaguing the CORAL Phase 2 trial. Collectively, the facts establish a strong inference of scienter. *VeriFone*, 704 F.3d at 710 ("Although [defendants] attack individual allegations in isolation, they cannot overcome the overwhelming inference drawn from a holistic view.")

### 1.   Defendant Knew cGMP Materials Were Required for CORAL Phase 2.

As discussed, the SAC adds allegations from former employees showing that those at Gritstone working on the CORAL Phase 2 launch were aware that cGMP-compliant source materials were required. *Supra* 10-14 (describing this widespread knowledge at Company). At minimum, such "widespread internal knowledge" of this requirement and the issues it posed for the BARDA Phase 2 launch raise an inference Defendant likewise was apprised of it. *See*, *e.g.*, *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637–38 (S.D.N.Y. 2010); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 301 (S.D.N.Y. 2018). Given this "widespread internal knowledge" of the material facts, it "would simply be implausible to argue in the face of the evidence presented that [Defendant] did not know of" this requirement. *In re Alstom SA*, 406 F. Supp. 2d 433, 505 (S.D.N.Y. 2005).[14]

---

[14] Defendants try to dismiss CWs3-6 as "lack[ing] personal knowledge that would allow them to speak to [Defendant's] state of mind." MTD 21-22. But because it is "rare that a wrongdoer will admit to the required state of mind," scienter "can be proven and pled through circumstantial evidence." *See In re Network Assocs., Inc., Sec. Litig.*, 2000 WL 33376577, at *8 (N.D. Cal. Sept.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

New CW accounts (informed by decades of experience in the industry) also confirm that the "standard practice" of using GMP-compliant raw materials for Phase 2 trials is "well-known" to "anyone who has worked in pharmaceutical development and with the FDA." ¶87 (CW4: 20 years' experience in pharmaceutical industry); *accord* ¶¶91-92 (from CW2's 25 years of experience working in clinical trials for infectious diseases, CW2 said "GMP-grade raw materials are expected" to be used once the trials get to Phase 2). Defendant—Gritstone's Founder, President, and CEO, with an MD and PhD—is a seasoned biopharmaceutical executive with decades of experience managing drugs through the FDA approval process. ¶195; ¶¶19-22 (listing Defendant's education and experience). As CW2 (SVP of Clinical Development for Infectious Diseases with 25 years of experience) recounted, Defendant was "not a naïve biotech executive," but has "years of experience in the drug development industry," "has sat on the boards of other biotech start-up companies that have gone through clinical process," and thus "should have been aware of the standards and expectations of using cGMP-grade raw materials in Phase 2 of clinical trials." ¶196. Before the BARDA contract, CW2 "oversaw a number of" prior government-sponsored trials in Phase 2 and those likewise required the use of cGMP materials from third party contractors, raising a further inference Defendant was aware of this same requirement for the CORAL Phase 2 trial. ¶94. Indeed, the BARDA contract expressly stated that "[t]he Good Manufacturing Practice Regulations (GMP) will be the standard to be applied for clinical manufacturing, processing, packaging, storage, and delivery of this product" (¶81), language that CW2 said a "seasoned biotech executive … should understand we are talking about cGMP-grade raw materials." ¶198. With his "long history managing FDA regulated companies," Defendant would have known about the need to use cGMP-compliant inputs for the CORAL Phase 2 trial. *STAAR II*, 2016 WL 6699284, at *13 (fact that defendant had a "long history managing FDA regulated companies" weighed in favor of scienter relating to manufacturing issues).

---

5, 2000); *In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1188 (N.D. Cal. 2010) ("'personal knowledge' . . . is not a hard-and-fast requirement"); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1243 (N.D. Cal. 2008) (same). Rather, CWs need not "possess[] inside knowledge about corporate-level trends" or have direct contact with defendants if "their statements combine to tell a plausible story" about the misrepresented company facts. *Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*, 63 F.4th 747 (9th Cir. 2023); *Applied Signal*, 527 F.3d at *982, *985. That is the case here, where each CW "tell[s] what is essentially the same story" but "from markedly different angles" about the known need for cGMP-compliant materials for CORAL Phase 2. *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058-59 (C.D. Cal. 2008). Moreover, that these CWs "corroborate each other … further supports the reliability of their statements." *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *27 (N.D. Cal. Mar. 21, 2018); *Hatamian*, 87 F. Supp.3d at *1149, 1163

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

**2. Defendant Received Regular Reports That Conveyed the cGMP Failures.**

Apart from these strong inferences of Defendant's knowledge of FDA regulations, the SAC adds allegations showing Defendant was apprised of the CORAL Phase 2 cGMP failings in real time. CW1 conveyed that CW1's boss, the Chief Operating Officer (COO) Jones, told CW1 that Jones regularly "informed CEO [Defendant] Allen about the status of the [cGMP] task force's work, including details about the inability to acquire GMP-grade raw materials by early 2024" in time to comply with the BARDA contract's timeline and launch the Phase 2 trial. ¶186.[15]

This Court held that CW1's "account … though detailed … in that witness's knowledge of the cGMP issues, lacks the detail necessary to establish that Defendant knew or should have known about those issues" because CW1 as an "indirect confidential witness must have personal knowledge to verify the reported hearsay statements … for instance, by … participating in developing reports that went to the defendants." Op. 16.

The SAC adds allegations showing that CW1 "develop[ed] reports that went to" Defendant. Op. 16. As CW1 conveyed, CW1 and other senior members of the CORAL Phase 2 cGMP task force met "periodically" with COO Jones throughout 2023 for the ***express purpose*** of providing a report for Defendant about the status of those efforts. ¶188. CW1 also revealed how "during the meetings and conversations with COO Jones," Jones "conveyed that he was reporting all the information to CEO [Defendant]": "He [the COO] was reporting to the CEO," CW1 said, and "[w]e discussed how to convey the information to the CEO …. One hundred percent this [was] be[ing] conveyed to the CEO." ¶187.

Just as in *LifeLock*, this Court must "credit the allegations attributed to CW[1] … because CW[1] was 'in a position to be personally knowledgeable' that [Jones] met with [Defendant] and discussed the reports … that CW[1] had compiled." *Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 485 (9th Cir. 2019) (crediting CW's account that CW's superior conveyed reports to defendants). Courts have repeatedly found reports more tenuously connected to defendants support an inference of scienter. *E.g.*, *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (crediting account of "CW5 … [who] compiled sales reports … and 'arranged for sales reports to be automatically delivered to ... the CFO's office'"); *id.* (crediting

---

[15] Defendant wrongly claims (MTD 20) that "by early 2024" refers to the time when CW1 conveyed this information (*i.e.*, in early 2024), but it in fact refers to the content of those reports—namely, that CW1's task force was not acquiring cGMP compliant materials in time to meet the BARDA deadline set "by early 2024." CW1's other statements corroborate this, conveying that the task force met "periodically" throughout 2023 to create these status reports. ¶188.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

20

"CW1's and CW4's statements establish[ing] the existence of 'funnel reports' and sales forecasts through the Salesforce software that were available to executives"); *Robb v. Fitbit Inc.*, 2017 WL 219673, at \*6 (N.D. Cal. Jan. 19, 2017) (CW gave report to superior who then reported to CEO: "CW1 believes [superior COO] Hartmann provided CW1's findings and recommendations to members of the Company's executive team, including [CEO] Park" and stating "[a]lthough Fitbit defendants are correct that the Amended Complaint does not contain express allegations that COO Hartmann gave this information to defendant[] [CEO] Park … the Court does not find this fatal"); *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 940 (9th Cir. 2023) (crediting "FE2 … [that] reported to VPs who reported directly to" CEO).

Such "contemporaneous reports or data, available to the party, which contradict the statement" are "[t]he most direct way to show … that the party making the statement knew that it was false." *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004); *Quality Sys.*, 865 F.3d at \*1130, \*1145 ("defendants had 'actual access to the disputed information' ... raise a strong inference of scienter"); *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 884 (N.D. Cal. 2023) ("executives' ability to access Salesforce … customer data" supported scienter). As cases hold, such "knowledge of [the] potential problems with its compliance with FDA cGMP" and, by extension, "that these problems could delay or jeopardize" the CORAL trial supports a strong inference of scienter. *STAAR I*, 388 F.Supp.2d at 1130; *Emergent*, 2023 WL 5671608, at \*23. As plead, it was at minimum deliberately reckless to keep these issues from investors given that he knew such information would "materially risk" the CORAL Phase 2 trial. *In re Nuvelo, Inc., Sec. Litig.*, 668 F.Supp.2d 1217, 1230 (N.D. Cal. 2009).

### 3. Defendant Was In Constant Contact With His Direct Reports That Knew, And Were Working Actively to Fix, the CORAL Phase 2 cGMP Failures.

Defendant also had "open lines" of communication with "all top managers" who would have kept him informed of the need for GMP-compliant raw materials. ¶¶189-93. CW2 conveyed that Defendant had "good relationship[s] with all top managers," was "on top of" and "tapped in to" what was happening with operations at the Company, and spoke "frequently with his direct reports." ¶¶189-93. CW2 confirmed Defendant and COO Jones (the manager overseeing the cGMP task force) "were close" and "spoke frequently about what was happening at the Company" "several times a week." ¶191. CW6 likewise revealed that another top manager (CW6's boss, the SVP of Quality) "knew we had to find GMP material" to be FDA compliant for Phase 2 and thus was charging the procurement teams with that task. ¶99. That at least two of Defendant's direct reports knew of these ongoing issues raises an inference Defendant was also aware. *In re*

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

21

*WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 416 (S.D.N.Y. 2003) (scienter where defendant had "a wealth of sources" to learn the facts including "close relationship" with relevant person); *Henning v. Orient Paper, Inc.*, 2011 WL 2909322, at *8 (C.D. Cal. July 20, 2011) ("ongoing nature of [CEO]'s relationship" with "main supplier" contributed to scienter). That inference is particularly strong given these direct reports were spearheading ongoing and extensive efforts to remediate the cGMP issues. ¶¶105-07, ¶¶98-100; *ImmunityBio*, 753 F.Supp.3d at 1067 ("They considered them to be serious, as evidenced by their attempts to resolve the issues"). That "[t]he company actively labored to fix these issues, but continued to convey to the public that it was not experiencing GMP difficulties … supports an inference of intentional deceit." *Id.*

### 4. Defendant Was Legally Required to be Apprised of cGMP Compliance.

As "senior management" "with executive responsibility"—Defendant was legally responsible for knowing about his Company's and its contractors' compliance. ¶66 (calling for "management" to conduct "reviews of process performance and product quality"); ¶66 (sponsor's "[s]enior management has the ultimate responsibility to ensure an effective … quality system is in place to achieve the quality objectives"); ¶67 ("FDA inspectors are required to evaluate … 'whether management with executive responsibility ensures that an adequate and effective quality system has been established and maintained.'"). That legal obligation raises a further inference Defendant was aware of Gritstone's and its contractors' cGMP-compliance status.

### 5. Defendant Held Himself Out As Knowledgeable.

That Defendant repeatedly spoke about the BARDA contract and the expected rollout of the CORAL Phase 2 trial also supports scienter. *E.g.*, ¶¶135, 146, 148, 150, 161, 172, 175; *Acadia Pharms.*, 2016 WL 5076147, at *9 ("[s]tatements made by Defendants … indicate that they had knowledge regarding" manufacturing "issues" where defendants "made statements regarding preparations [company] needed to complete to support the [drug approval process] … and … commented on the [drug approval process] remaining 'on track'"); *In re General Elec. Co. Securities Litigation*, 857 F.Supp.2d 367 (S.D.N.Y., 2012) ("highly improbable" that defendant who publicly described company's finances did not inquire into basis for statements). That is particularly true given Defendant also touted Gritstone's "experienced leadership team with deep expertise in … clinical and regulatory development" (¶26) and represented that management had conferred with the FDA in early 2023 regarding the forthcoming CORAL Phase 2 IND submission (¶¶208-09), raising an inference of his intimate knowledge of those requirements and his Company's ability to meet them. *City of Livonia Employees' Retirement System v. Wyeth*, 2010

WL 3910265 at *2 (S.D.N.Y. 2010) (executive "presented himself as knowledgeable about the status and results of [the company's] clinical trials and the [New Drug Application]" for a product of "critical importance"). Thus, any "assertion that [he was] unaware of an alleged issue [is] directly contradicted by the fact that [he] specifically addressed it in [his] statement." *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1147 (N.D. Cal. 2017); *In re Diamond Foods, Inc., Sec. Litig.*, 2012 WL 6000923, at *11 (N.D. Cal. Nov. 30, 2012) (rejecting CEO's argument that he was "ignorant" of the underlying allegations given his "role in the walnut business at Diamond and his own statements"); *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *12 (C.D. Cal. 2015). "Even if he truly believed that" the FDA would not require cGMP-compliant materials, "it was at least deliberately reckless to not investigate that obligation with the respect to the [CORAL Phase 2 trial] before making his statements." *Pampena v. Musk*, 705 F. Supp. 3d 1018, 1049 (N.D. Cal. 2023) (Breyer, J.); *see Gebhart v. S.E.C.*, 595 F.3d 1034, 1044 (9th Cir. 2010) (defendants "conducted no meaningful independent investigation to confirm the truth").

### 6. Defendant Later Admitted That Resolving His Company's cGMP Issues Would Take Considerable Time.

After the truth about Gritstone's lack of cGMP capabilities to meet the BARDA deadline was partially revealed, Defendant admitted it would take "considerable time" to remove the FDA's January 2024 clinical hold, at the earliest until the "Fall of 2024 rather than first quarter of 2024." This admission "contributes to an inference of scienter." *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *13 (N.D. Cal. Jan. 6, 2022) (later admission that "the FDA had concerns about Phase III data" supported scienter where "[CW] stated that the company was aware that approval was riskier than they let on publicly"). Given the "importance of the implementation of the manufacturing and quality control systems to the [CORAL Phase 2] process, the significant amount of work that actually remained to be done on those fronts, … it was highly likely that Defendant[] w[as] aware that [his] 'on track' assurances [about meeting the BARDA deadline] lacked a factual basis." *Acadia*, 2016 WL 5076147, at *9. In addition, the timing of this news (announced mere weeks after those assurances) suggests Defendant knew they were false. *In re Grand Casinos, Sec. Litig.*, 988 F. Supp. 1273, 1283 (D. Minn. 1997) ("given the short time frame" (three months) "it is reasonable to infer that management was on notice of these problems").

### 7. Defendant's Company's Survival Hinged On Meeting The BARDA Deadline.

This Court's prior reasoning held that "Plaintiffs' theory that [Defendant] knowingly or with deliberate recklessness misled investors" "is not more likely than the alternative explanation

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

that Allen, as Gritstone's CEO, was focused on bigger-picture aspects of the CORAL trials—especially since … there was no reason for Allen or anyone at Gritstone to know that the cGMP status of source products used in the CORAL vaccine would be a dealbreaker." Op. 16-17 & n.6.

The new SAC allegations showing "Allen … [and those] at Gritstone knew" that launching the CORAL Phase 2 trial (and realizing the $423 million in BARDA funds) depended on cGMP-compliant contractors and source materials demonstrates that the ongoing failures *were* "big[]-picture" concerns plaguing the trial. Given Defendant's Company was on the brink of imminent insolvency, there could be nothing more important than a successful, on-time CORAL Phase 2 launch to get the much-needed BARDA funding. It would be "absurd"—indeed, virtually inconceivable—to think that the CEO was unaware of recurring cGMP failures that could (and ultimately did) tank the program on which its finances depended. Opposition 22 n.12 (collecting sources). "[U]nder these circumstances it is reasonable to infer that [Gritstone's] leadership 'would be involved closely in ensuring compliance with FDA regulations, especially where any violations could postpone'" the CORAL Phase 2 rollout and the BARDA lifeline. *ImmunityBio*, 753 F.Supp.3d at 1067; Opposition 22-23 (motive to avoid insolvency).

Importantly, the PSLRA does not require allegations that "the cGMP status of source products used in the CORAL vaccine *would be a dealbreaker*" (Op. 16-17 & n.6), but only that the "ongoing, serious" undisclosed cGMP issues made Defendant's public assessments "riskier than [he] led investors to believe." *Emergent*, 2023 WL 5671608, at *21; *accord STAAR II*, 2016 WL 6699284, at *14 (rejecting same argument: "[T]he PSLRA does not require that Plaintiffs show that Defendants were capable of predicting the future" about regulatory action); *Arena Pharms.*, 840 F.3d at 709 (what matters is "the failure to disclose 'issues' and 'concerns'" undermining defendants' positive statements "not who was ultimately right about the underlying [issue]"). The SAC "does not allege that [Defendant] knew [the CORAL launch] would fail; [it] alleges that [Defendant] concealed known risks of failure that, if disclosed, would have reduced the price of [the] stock to account for the greater risk of failure." *Nuvelo*, 668 F.Supp.2d at 1231. That is true even if Defendant "may well have been working in good faith to manufacture [the CORAL Phase 2] vaccine … rapidly" because "while doing so, [Defendant] omitted the myriad known deficiencies … that undercut the success of the endeavor" which undermines any innocent inference. *Emergent*, 2023 WL 5671608, at *26; *Invacare*, 2014 WL 4064256, at *6-7 (rejecting argument that defendants "honestly believed they were making progress in their discussions with the FDA"). Indeed, even without the added motive of insider trading (MTD 21), "it is far from

implausible that a corporate executive who had spent months building excitement and momentum around important, new technology products might recklessly misrepresent the inability to deliver on those promises." *Gammel*, 2013 WL 1947525, at \*21; *McGuire v. Dendreon Corp.*, 2008 WL 5130042, \*7-8 (W.D. Wash. 2008) (inference defendants had "sincere and reasonable belief that the [manufacturing] problems could easily be remedied in time" not as compelling as inference drawn from awareness of flaws despite lack of stock sales).

### D.    The SAC Pleads Loss Causation.

Plaintiffs need only "plausibly allege" that "the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity." *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014).    Defendant challenges the loss causation dates after the February 12, 2024 disclosure that the CORAL Phase 2 study "would be delayed" due to cGMP failures (MTD 23), but each of those later losses are also causally related to Defendant's omissions about the pervasive cGMP issues:  (1) the February 29, 2024 disclosure revealed a "40% reduction of [the Company's] workforce" "following the recently announced delay of the proposed CORAL Phase 2b study, which resulted in Gritstone not receiving external funding it previously anticipated beginning in 1Q 2024, associated with the initiation of the study" due to cGMP failures; ¶¶171-76; (2) the March 5, 2024 disclosure revealed that the Company "received … [a] formal clinical hold letter from the FDA" due to cGMP deficiencies, ¶179; and (3) the April 1, 2024 disclosure announced that the Company "commenced an underwritten public offering of shares of its common stock" to shore up the Company's liquidity crisis caused by the delay of the CORAL Phase 2 trial and the lack of BARDA funding, ¶181.  A corrective disclosure "can reveal fraud 'in one fell swoop' or through a series of partial disclosures." *In re Genius Brand Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1184 (9th Cir. 2024); *Kui Zhu v Taronis Techs. Inc.*, 2020 WL 1703680, at \*6 (D. Ariz. Apr. 8, 2020).  That is what occurred here.

### IV.    CONCLUSION

Defendant's motion should be denied. Alternatively, Plaintiffs request leave to amend to cure any deficiencies. *Cisneros v. Allianz Life Ins.*, 2019 WL 9656383, at \*4 (N.D. Cal. 2019).

Dated: December 8, 2025                Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

25

1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II (*pro hac vice*)
Samantha Daniels (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com
sdaniels@pomlaw.com

*Counsel for Lead Plaintiff Richard Rodriguez and Lead Counsel for the Class*

THE SCHALL FIRM
Brian Schall
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff Richard Rodriguez*

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

26