CATHERINE D. KEVANE (CSB No. 215501)
ckevane@fenwick.com
MARIE C. BAFUS (CSB No. 258417)
mbafus@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Telephone:    415.875.2300
Facsimile:    415.281.1350

KATHRYN HAUH (CSB No. 347786)
khauh@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone:    650.988.8500
Facsimile.    650.938.5200

Y. MONICA CHAN (admitted *pro hac vice*)
mchan@fenwick.com
FENWICK & WEST LLP
401 Union Street, 5th Floor
Seattle, WA  98101
Telephone:    206.389.4510
Facsimile:    650.938.5200

Attorneys for Defendant ANDREW R. ALLEN

FENWICK & WEST LLP
ATTORNEYS AT LAW

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE GRITSTONE BIO, INC. SECURITIES LITIGATION<br><br>THIS DOCUMENT RELATES TO: ALL ACTIONS | Case No.: 3:24-cv-03640-CRB<br><br>CLASS ACTION<br><br>**DEFENDANT ANDREW R. ALLEN'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>Date:        February 6, 2026<br>Time:       10:00 a.m.<br>Dept:       Courtroom 6—17th Floor<br>Judge:      Hon. Charles R. Breyer |

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ................................................................................................. 1

II.    THE OPPOSITION CONFIRMS THAT THERE IS NO ACTIONABLE CLAIM .......... 1

    A.    The Opposition Confirms that the Pre-BARDA Contract Statements Are Not Actionable. ..................................................................................... 1

        1.    Statements Regarding Third-Party Contract Manufacturing Are Not Actionable. ................................................................................ 2

        2.    Statements Regarding Gritstone's Manufacturing Are Not Actionable. ................................................................................ 4

    B.    The Opposition Confirms That the CORAL Phase 2b Study Statements Are Protected by the PSLRA Safe Harbor and Are Not False or Misleading. ............. 5

        1.    Plaintiffs Fail to Overcome the Protections of the PSLRA Safe Harbor. ................................................................................ 5

        2.    Plaintiffs Have Not Alleged Specific Facts to Establish Falsity. ................. 7

III.    THE SAC FAILS TO RAISE A STRONG INFERENCE OF SCIENTER ...................... 9

    A.    The Opposition Confirms That the CWs Do Nothing to Establish Scienter ........... 9

    B.    Plaintiffs' Remaining Allegations Still Do Not Establish Scienter. ..................... 13

IV.    PLAINTIFFS DO NOT PLEAD LOSS CAUSATION ..................................................... 15

V.    CONCLUSION ................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aramic LLC v. Revance Therapeutics, Inc.*,
 2024 WL 1354503 (N.D. Cal. Apr. 2, 2024) ................................................................8

*Blake v. Canoo Inc.*,
 2025 WL 2992263 (C.D. Cal. Oct. 22, 2025) ..............................................................6

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
 880 F. Supp. 2d 1045 (N.D. Cal. 2012) .......................................................................7

*Espy v. J2 Glob., Inc.*,
 99 F.4th 527 (9th Cir. 2024) .......................................................................................12

*Garcia v. J2 Glob.*,
 2021 WL 1558331 (C.D. Cal. Mar. 5, 2021) ...............................................................8

*Glazer Cap. Mgmt., LP v. Magistri*,
 549 F.3d 736 (9th Cir. 2008) ........................................................................................9

*Henning v. Orient Paper, Inc.*,
 2011 WL 290932 (C.D. Cal. July 20, 2011) ...............................................................12

*In re Axsome Theraps., Inc. Sec. Litig.*,
 2025 WL 965265 (S.D.N.Y. Mar. 31, 2025) ................................................................5

*In re BioMarin Pharm. Inc. Sec. Litig.*,
 2022 WL 164299 (N.D. Cal. Jan. 6, 2022) .................................................................14

*In re Dermtech, Inc. Sec. Litig.*,
 2024 WL 4941026 (S.D. Cal. Dec. 2, 2024) ...............................................................15

*In re Emergent BioSolutions Inc. Sec. Litig.*,
 2023 WL 5671608 (D. Md. Sept. 1, 2023) ...................................................................9

*In re Leapfrog Enter., Inc. Sec. Litig.*,
 200 F. Supp. 3d 987 (N.D. Cal. 2016) .......................................................................12

*In re LeapFrog Enters.*,
 527 F. Supp. 2d 1033 (N.D. Cal. 2007) .......................................................................6

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
 982 F. Supp. 2d 277 (S.D.N.Y. 2013) ..........................................................................6

*In re Palo Alto Networks, Inc. Sec. Litig.*,
 2025 WL 1093247 (N.D. Cal. Apr. 11, 2025) ..............................................................4

*In re Pivotal Sec. Litig.*,
 2020 WL 4193384 (N.D. Cal. July 21, 2020) .............................................................14

FENWICK & WEST LLP
ATTORNEYS AT LAW

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017).............................................................................................12

*In re Rigel Pharms., Inc.*,
  2010 WL 8816155 (N.D. Cal. Aug. 24, 2010), *aff'd*, 697 F.3d 869 (9th Cir. 2012)...............15

*In re SunPower Corp. Sec. Litig.*,
  769 F. Supp. 3d 1042 (N.D. Cal. 2025) ...................................................................................6

*In re Syntex Corp. Sec. Litig.*,
  95 F.3d 922 (9th Cir. 1996).....................................................................................................8

*In re Twitter, Inc. Sec. Litig.*,
  506 F. Supp. 3d 867 (N.D. Cal. 2020), *aff'd sub nom.*, 29 F.4th 611 (9th Cir. 2022).............14

*In re Vaxart, Inc. Sec. Litig.*,
  576 F. Supp. 3d 663 (N.D. Cal. 2021) ......................................................................................5

*In re WorldCom, Inc. Sec. Litig.*,
  294 F. Supp. 2d 392 (S.D.N.Y. 2003).....................................................................................12

*Karam v. Corinthian Colls., Inc.*,
  2012 U.S. Dist. LEXIS 44153 (C.D. Cal. Jan. 30, 2012) ........................................................10

*Lake v. Zogenix, Inc.*,
  2020 WL 3820424 (N.D. Cal. Jan. 24, 2020) ...........................................................................8

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002)................................................................................................15

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016)..........................................................................................10, 15

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014)..................................................................................................15

*Mazzaferro v. Aruba Networks*,
  2015 WL 456534 (N.D. Cal. Feb. 2, 2015), *aff'd sub nom. Par. Inv. Partners. L.P. v.
  Aruba Networks, Inc.*, 681 F. App'x 618 (9th Cir. 2017) .........................................................8

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
  540 F.3d 1049 (9th Cir. 2008).............................................................................................1, 10

*Nguyen v. Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020)..................................................................................................15

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004).................................................................................................12

*Odeh v. Immunomedics, Inc.*,
  2020 WL 4381924 (D.N.J. July 31, 2020)................................................................................9

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
  780 F. App'x 480 (9th Cir. 2019) ...........................................................................................12

FENWICK & WEST LLP
ATTORNEYS AT LAW

*Park v. GoPro, Inc.*,
    2019 WL 1231175 (N.D. Cal. Mar. 15, 2019)............................................................................3

*Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*,
    2024 WL 5399664 (N.D. Cal. Sept. 18, 2024)........................................................................7

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014)..........................................................................................12, 14

*Prodanova v. H.C. Wainwright & Co.*,
    993 F.3d 1097 (9th Cir. 2021)................................................................................................11

*Rihn v. Acadia Pharms. Inc.*,
    2016 WL 5076147 (S.D. Cal. Sept. 19, 2026) ........................................................................9

*Robb v. Fitbit Inc.*,
    2017 WL 219673 (N.D. Cal. Jan. 19, 2017) .........................................................................12

*S. Ferry L.P., No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008).................................................................................................14

*Salzman v. ImmunityBio, Inc.*,
    753 F.Supp.3d 1050 (S.D. Cal. 2024)...................................................................................13

*Sinnathurai v. Novavax, Inc.*,
    645 F. Supp. 3d 495 (D. Md. 2022) ........................................................................................6

*United States v. Goyal*,
    629 F.3d 912 (9th Cir. 2010)..................................................................................................13

*Webb v. SolarCity Corp.*,
    884 F.3d 844 (9th Cir. 2018).............................................................................................12, 14

*Wochos v. Tesla, Inc.*,
    2019 WL 1332395 (N.D. Cal. Aug. 24, 2018), *aff'd*, 985 F.3d 1180 (9th Cir. 2021)................6

*Yanek v. Staar Surgical Co.*,
    388 F.Supp.2d 1110 (C.D. Cal. 2005) ....................................................................................6

**STATUTES**

15 U.S.C. § 78u-5(c)(1) ....................................................................................................................5

**OTHER AUTHORITIES**

21 C.F.R. § 10.115(d)(1)................................................................................................................13

21 C.F.R. § 10.115(d)(2)................................................................................................................13

21 C.F.R. §§ 211.1-208 ...................................................................................................................7

21 C.F.R. § 211.58 ...........................................................................................................................7

21 C.F.R. § 211.84(a)......................................................................................................................7

FENWICK & WEST LLP
ATTORNEYS AT LAW

FDA, *Guidance: Q10 Pharmaceutical Quality System* (Apr. 2009), available at
https://www.fda.gov/regulatory-information/search-fda-guidance-documents/q10-
pharmaceutical-quality-system ................................................................................................13

FDA, *Guide To Inspections Of Quality Systems* (Aug. 1999) available at
https://www.fda.gov/files/Guide-to-Inspections-of-Quality-Systems.pdf ...............................13

FENWICK & WEST LLP
ATTORNEYS AT LAW

## I.    INTRODUCTION[1]

The Opposition confirms that the SAC suffers from the same fatal defects that led the Court to dismiss its predecessor.  First, Plaintiffs do not address most of the statements made on March 9, 2023, May 11, 2023, and August 9, 2023 and therefore, concede that they should once again be dismissed.  Second, as to the forward-looking statements, Plaintiffs fail to overcome the protections of the safe harbor, which they barely acknowledge and relegate to a single footnote.  Accordingly, the forward-looking statements made on September 27, 2023, October 11, 2023, November 8, 2023, and February 12, 2024 should once again be dismissed.  Third, as to the only statement that the Court previously found Plaintiffs had adequately alleged falsity at the pleading stage—that "[a]ll internal and third-party contract manufacturing is performed under cGMP or similar guidelines"—Plaintiffs fail to establish that it was materially misleading.  And, once again, Plaintiffs fail to put forth particularized facts to establish scienter.  Each of Plaintiffs' claims fail as before, and this case should be dismissed with prejudice.

## II.    THE OPPOSITION CONFIRMS THAT THERE IS NO ACTIONABLE CLAIM

As detailed below, Plaintiffs do not meaningfully address their failure to plead any material misstatement with the requisite particularity required under the PSLRA and Rule 9(b).  *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008).

### A.    The Opposition Confirms that the Pre-BARDA Contract Statements Are Not Actionable.

The Opposition does not address the Company's March 9, 2023, May 11, 2023, and August 9, 2023 statements about the Company's use of third-party CMOs, the CORAL Phase 1 studies, and the Company's "future cash requirements" and thus, effectively concedes that they are not actionable.  *See* Mot. at 8-9; Opp. at 7-8.

Plaintiffs focus solely on the March 9, 2023 statement that "[a]ll internal and third-party contract manufacturing is performed under cGMP or similar guidelines" and associated risk

---

[1] Capitalized undefined terms have the same meaning as in Andrew R. Allen's Motion to Dismiss the SAC ("Motion" or "Mot.").  Unless otherwise indicated, references to "¶ _" and "¶¶ _" are to paragraphs in the SAC, and all emphasis herein is added.

disclosures.  But the Opposition confirms that Plaintiffs have not put forth the particularized facts to plead an actionable material misstatement.

### 1.    Statements Regarding Third-Party Contract Manufacturing Are Not Actionable.

The Court previously found that Plaintiffs had adequately alleged at the pleading stage that some of "Gritstone's contractors did not comply with good manufacturing practices," Order at 11, but left open the question of materiality and ultimately dismissed the claim and the complaint because Plaintiffs had not adequately alleged scienter.  While the statement (and the entire case) can again be dismissed on that ground alone, Plaintiffs have failed to establish that any purported misstatement regarding "all" contractors performing "under cGMP or similar guidelines" was *materially misleading.*

Plaintiffs argue that the March 9, 2023 statement regarding third-party contract manufacturing was "no doubt material" because it affirmed that Gritstone's "third-party contractors are cGMP compliant and ready to hit the ground running on any collaboration" and was a "material reassurance of the Company's financial viability."[2]  Opp. at 7-8.  The problem is, the challenged statement says no such thing.

The challenged statement does not affirm that internal and third-party contract manufacturing is ***always*** "cGMP compliant"; instead, it states that such manufacturing is "***performed under cGMP or similar guidelines***."  Ex. 1 at 52.  Stating that manufacturing is performed under specific guidelines is not an assurance that manufacturing is or will always be 100% compliant with those guidelines.  For example, a chicken nugget manufacturing facility may be performing under FDA guidelines and still receive a notification that its facilities did not pass FDA inspection for a minor infraction.  And, Gritstone advised of this precise risk: "If the FDA or a comparable foreign regulatory authority finds our facilities or those of our CMOs inadequate for

---

[2] Quoting from Gritstone's Form 10-K, Plaintiffs suggest that Gritstone' use of a "hybrid manufacturing" approach erases any distinction between third-party *manufacturers* and third-party *suppliers*.  Opp. at 8 n.3.  But read in context, the Form 10-K explains that Gritstone "***previously*** used a hybrid product supply approach whereby certain elements of our product candidates were manufactured internally at our manufacturing facilities in Pleasanton, California, and other elements were manufactured at qualified third-party contract manufacturing organizations (CMOs)."  Ex. 1 at 52.

FENWICK & WEST LLP
ATTORNEYS AT LAW

the manufacture of our product candidates, or if such facilities are subject to enforcement action in the future or are otherwise inadequate, we many need to find alternative manufacturing facilities, which would significantly impact our ability to develop, obtain regulatory approval for or market our product candidates." *Id.*; *see generally Park v. GoPro, Inc.*, 2019 WL 1231175, at *12 (N.D. Cal. Mar. 15, 2019) (statement is inactionable because when read in context, it was not false or misleading as plaintiffs suggested).

Moreover, far from providing any assurance that third parties were "ready to hit the ground running" to meet any cGMP raw material requirements for the yet-to-exist Phase 2b Study, Gritstone expressly cautioned that "additional scale-up activities involving CMOs will be needed as the CORAL program progresses"; that "our efforts to scale our manufacturing operations may not succeed"; and that the "failure to comply with applicable regulatory requirements or to supply sufficient quantities at acceptable quality levels or prices, or at all, would materially adversely affect our business." Ex. 1 at 52 ("If we or our CMOs cannot successfully manufacture material that conforms to our specification and the strict regulatory requirements of the FDA … we may not be able to rely on our or their manufacturing facilities for the manufacture of elements of our product candidates."). Read in context, the challenged statement provided no assurances, let alone a "material reassurance of the Company's financial viability," as Plaintiffs suggest. Opp. at 8.

Plaintiffs' claim—that CW1 revealed that the Company had been struggling in March 2023 to get "its (and its third-party contractors manufacturing processes cGMP compliant"—is unavailing. Opp. at 7. The sum of CW1's allegations is that: (1) the Company knew that some raw materials for the Phase 1 trials were not cGMP-grade (because, as Plaintiffs admit, they were not required to be, ¶ 31); (2) the Company was focused on "finding all GMP-grade raw materials from vendors for manufacturing the COVID-19 vaccine for the CORAL Phase 2b study"; and (3) some current contractors could meet the cGMP-grade requirements for the raw materials, but others could not, and the Company sought new contractors who could provide additional raw materials. ¶¶ 103-111. There is no allegation as to which contractors supposedly were not compliant,[3] when the

---

[3] In fact, there is no allegation that any third party failed to meet the then-current manufacturing guidelines for the CORAL Phase 1 trials or any of Gritstone's other product candidates. The Opposition inexplicably suggests that the Phase 1 trial was over as of March 2023. Opp. 8 n.2. But

FENWICK & WEST LLP
ATTORNEYS AT LAW

noncompliance occurred, how severe it was, whether it could be remedied, what the impact was on the Company's supply chain or operations, or any other allegation to establish that the noncompliance was material. That most of the manufacturing was done in-house further undercuts the notion that some unspecified and unquantified noncompliance by unknown third parties could be material. Ex. 1 at 52, (Gritstone "***currently*** perform[s] most of the manufacturing of our product candidates internally and rely on qualified third parties to supply some components of our product candidates."). As before, even assuming that "Gritstone knew that some of its source materials were not compliant with good manufacturing practices, they fail to adequately allege that Gritstone or Defendants knew that would cause problems for the Barda contract until the FDA issued its clinical hold letter in January 2024." Order at 12-13; *see, e.g.*, *In re Palo Alto Networks, Inc. Sec. Litig.*, 2025 WL 1093247, at *6 (N.D. Cal. Apr. 11, 2025) (dismissing 10(b) claim absent particularized facts to establish a material misstatement).

### 2.    Statements Regarding Gritstone's Manufacturing Are Not Actionable.

The SAC does not allege that Gritstone's internal manufacturing was not performed under "cGMP or similar guidelines," and the Opposition confirms that Plaintiffs cannot identify any facts demonstrating that statements about Gritstone's internal manufacturing were false. Instead, Plaintiffs argue that "given the failure of its third-party compliance at the time, Gritstone was not capable of manufacturing cGMP-compliant products 'internally.'" Opp. at 9. But Plaintiffs identify no allegations to establish why that would be the case. Plaintiffs point to CW1's statement that the Company "had been struggling to fix Gritstone's lack of cGMP capabilities to launch the CORAL Phase 2 study." *Id.* That vague allegation is insufficient to demonstrate that Gritstone's own facilities did not perform under cGMP or similar guidelines. Plaintiffs also ignore that seeking to enhance current capabilities to meet future needs is exactly what the Company cautioned it would need to do, stating: "we have made, and will be require to continue to make, significant investments in our manufacturing facilities and processing in the future, and our efforts to scale our manufacturing operations may not succeed." Ex. 1 at 52.

the Company's March 9, 2023 Form 10-K plainly and repeatedly described the CORAL Phase 1 trials as "ongoing," with "Enrollment Complete; Treatment Ongoing." Ex. 1 at 12, 90.

FENWICK & WEST LLP
ATTORNEYS AT LAW

Nor can a statement that "third-party contract manufacturing is performed under cGMP or similar guidelines" be read as a representation about Gritstone's capabilities. *See* Opp. at 9. As Gritstone cautioned, "we do not control the manufacturing process at our CMOs." Ex. 1 at 52.[4]

**B.     The Opposition Confirms That the CORAL Phase 2b Study Statements Are Protected by the PSLRA Safe Harbor and Are Not False or Misleading.**

As explained in the Motion, the SAC fails to plead particularized facts to establish the falsity of the previously dismissed statements made on September 27, 2023, October 11, 2023, November 8, 2023, and February 12, 2024 describing the terms of the BARDA contract, explaining that preparations for the Phase 2b Study were "underway," and announcing the decision to postpone the Phase 2b Study. *See* Mot. at 11-18. The Opposition confirms this conclusion.

**1.     Plaintiffs Fail to Overcome the Protections of the PSLRA Safe Harbor.**

As explained in the Motion, the September 27, 2023, October 11, 2023, November 8, 2023, and February 12, 2024 statements about the Company's projected cash runway, the anticipated timeline of the Phase 2b Study, and the expected financial impact of the BARDA contract are forward-looking and protected under both prongs of the PSLRA's safe harbor. Mot. at 11-12; *see also, e.g.*, ¶¶ 143, 146. Under the first prong, the statements were identified as forward looking and accompanied by meaningful cautionary language. Under the second prong, Plaintiffs allege no specific facts to show that Dr. Allen had actual, contemporaneous knowledge of falsity. Mot. at 11-13; 15 U.S.C. § 78u-5(c)(1). Either ground mandates dismissal.

[4] Citing two inapposite cases, Plaintiffs argue that "representations about third parties [] reflect[] on the company's own 'manufacturing capabilities.'" Opp. at 9. But *In re Axsome Theraps., Inc. Sec. Litig.*, 2025 WL 965265 (S.D.N.Y. Mar. 31, 2025) is an out-of-Circuit decision where the company made repeated, public assurances that "its suppliers would be capable of providing sufficient materials to meet their clinical trial needs" despite **known** and "persistent manufacturing and supply problems" from its vendor spanning nearly a year. *Id.* at *2, *5. In the case *In re Vaxart, Inc. Sec. Litig.*, the company's statements that its partnership with a manufacturer would "enable[] production of one billion vaccine doses per year" and "solve key manufacturing hiccups," were misleading based on allegations that, in fact, the manufacturer "lacked the regulatory capacity, personnel, and wherewithal to produce **even one dose**, never mind one billion." 576 F. Supp. 3d 663, 670 (N.D. Cal. 2021). Gritstone made no such assurance. Unlike *Axsome* and *Vaxart*, Gritstone repeatedly warned investors that it had "limited control over the ability of [its] CMOs to maintain adequate quality control, quality assurance and qualified personnel" (Ex. 1 at 52) and that "[a]dditional scale-up activities involving CMOs will be needed as the CORAL program progresses." *Id.* at 16; *see also* ¶ 132.

FENWICK & WEST LLP
ATTORNEYS AT LAW

Plaintiffs make minimal effort to address the first prong of the safe harbor, relegating their response to a sentence in a footnote.[5]  Opp. at 17 n. 13.  Instead, Plaintiffs attempt to recast classic forward-looking statements, such as "[w]e . . . look forward to initiating the Phase 2b study" (¶ 146), into present-tense "assur[ances] that the approved IND needed to launch the Phase 2 study would meet the BARDA Q1 2024 deadline."  Opp. at 14.  The law is clear that such statements "fall solidly within the category of forward-looking statements."  *In re LeapFrog Enters.*, 527 F. Supp. 2d 1033, 1046 (N.D. Cal. 2007) (citing 15 U.S.C. § 78u-5(i)(1)); *see also Wochos v. Tesla, Inc.*, 2019 WL 1332395, at *4 (N.D. Cal. Aug. 24, 2018) (Breyer, J.) (rejecting similar argument because, otherwise, "the distinction between present statements and forward-looking statements would collapse"), *aff'd*, 985 F.3d 1180, 1192 (9th Cir. 2021).

Plaintiffs likewise have no answer for the Company's cautionary language, which was specific, meaningful, and addressed the very risk that Plaintiffs allege came to pass.  *See* Ex. 9 at 46-47 ("There can be no assurance that we will be able to achieve these milestones or continue to comply with these procedures and protocols, and there can also be no assurance that BARDA Contract will not be terminated."); *see also* Mot. at 12-13.[6]  Plaintiffs' "failure to address whether these statements fall within the safe harbor is tantamount to a concession on that issue."  *Blake v.*

[5] Citing *In re SunPower Corp. Sec. Litig.*, 769 F. Supp. 3d 1042 (N.D. Cal. 2025) and *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277 (S.D.N.Y. 2013), Plaintiffs conclusorily argue that "for the same reasons, the PSLRA safe harbor . . . does not shield these statements."  Opp. at 17.  But those cases are inapt.  In *SunPower*, the defendants' "disclosures do not constitute sufficiently 'meaningful cautionary language,'" given their alleged "specific knowledge about SunPower's existing inability to meet its financial obligations," including that "SunPower [has] already default[ed] on its payment obligations."  769 F. Supp. 3d at 1055.  In *MF Glob. Holdings*, the company publicly referred to the risks of an investment strategy as "minimal," "limited," and "actually makes [the company] less risky," when at the same time, the company breached trading limits, and internal concerns about the risks were repeatedly and directly expressed to the CEO. 982 F. Supp. 2d at 297-98, 317.

[6] Plaintiffs' cited cases are all distinguishable because they involved preexisting, objective facts (e.g., failed inspections or written FDA warnings) that rendered the challenged statements demonstrably false when made.  For instance, in *Yanek v. Staar Surgical Co.*, at the time of the statements, the company had already received—but omitted to disclose—the FDA's Form 483 detailing "significant objectionable conditions" observed during the FDA's inspection.  388 F.Supp.2d 1110, 1119, 1129 (C.D. Cal. 2005).  And in *Sinnathurai v. Novavax, Inc.*, by the time of the challenged statements, the FDA already inspected two of the company's manufacturing facilities critical to the development of the vaccine and issued a report and a Form 483 "identifying quality control, contamination, and purity issues."  645 F. Supp. 3d 495, 519-20 (D. Md. 2022). There are no such allegations here.

FENWICK & WEST LLP
ATTORNEYS AT LAW

*Canoo Inc.*, 2025 WL 2992263, at \*14 (C.D. Cal. Oct. 22, 2025); *see also Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*, 2024 WL 5399664, at \*11 (N.D. Cal. Sept. 18, 2024) (plaintiffs conceded the arguments not addressed in the opposition). Plaintiffs' claims may be dismissed on this additional basis.

Under the second prong of the safe harbor, Plaintiffs cannot point to any contemporaneous facts showing that Dr. Allen **actually knew** that any statement was false when made. *See infra* § III; Mot. at 13; *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1063 (N.D. Cal. 2012). Thus, both prongs of the safe harbor independently bar Plaintiffs' claim.

### 2.    Plaintiffs Have Not Alleged Specific Facts to Establish Falsity.

Even if Plaintiff could establish that the challenged statements were not forward looking (and they cannot), Plaintiffs identify no facts to establish that any statements about the BARDA Contract or Phase 2b Study were materially false and misleading when made. As the Court previously concluded, Plaintiffs failed to adequately allege that "Gritstone or Defendants knew that [third parties' noncompliance with cGMP] would cause problems for the BARDA contract until the FDA issued its clinical hold letter in January 2024." Order at 12. The Opposition confirms that Plaintiffs have not cured this defect.

*First*, Plaintiffs do not identify a single statute, regulation, or binding authority that requires the use of fully cGMP-grade raw materials for Phase 2 clinical trials. *See* Mot. at 13-16. The regulations Plaintiffs cite address "the minimum current good manufacturing practice for preparation of drug products" (*i.e.*, the vaccines), like practices for testing, storage, and handling. *See generally* 21 C.F.R. §§ 211.1-208. But the SAC contains no particularized facts to suggest that Gritstone (or any third parties)[7] violated any of these practices, or which ones. For example, there are no specific factual allegations that Gritstone failed to maintain the manufacturing facility "in a good state of repair," or that Gritstone failed to sample, test, or examine "[e]ach lot of components, drug product containers, and closures" before they are "released for use by the quality control unit." 21 C.F.R. §§ 211.58, 211.84(a).[8]

---

[7] The SAC does not allege that Gritstone used any CMOs to manufacture the drug products for the Phase 2b Study, much less that those CMOs violated cGMP regulations.

[8] In the Opposition, Plaintiffs abandon their purported expert, Todd Clark, and do not dispute that

FENWICK & WEST LLP
ATTORNEYS AT LAW

Nor can Plaintiffs point to any language in the BARDA Contract that specify what raw materials must be used for the Phase 2b Study, let alone the requisite grade or quality. Ex. 6. Plaintiffs argue that the contract "is subject to cancellation if the FDA identifies a 'material failure' to comply." Opp. at 12. But the SAC nowhere pleads that the FDA identified the use of non-GMP grade raw materials for the study as a "material failure"; that it required all GMP-grade raw materials before January 2024; or that the FDA opted to cancel the contract.

Plaintiffs' own CW3 reinforces that it was an open question as to what position the FDA might take regarding the use of non-GMP-grade raw materials, which was only answered when the FDA issued the clinical hold in January 2024. That the Company allegedly "prepared an analysis to the FDA that looked at the *potential* risks of using non-GMP materials in the trial" shows the reasonable belief that there was room for interpretation, further dialogue, and discretion from the FDA. ¶ 96; *see also* Mot. at 17 n.12 (citing regulations and guidance that the FDA "encourages sponsors to meet with the CMC review team"). As to the other CWs, their subjective expectations and opinions about the use of GMP-grade materials for Phase 2 trials "cannot substitute for specific factual allegations." *Mazzaferro v. Aruba Networks*, 2015 WL 456534, at *2 (N.D. Cal. Feb. 2, 2015), *aff'd sub nom. Par. Inv. Partners. L.P. v. Aruba Networks, Inc.*, 681 F. App'x 618 (9th Cir. 2017); *Garcia v. J2 Glob.*, 2021 WL 1558331, at *15 (C.D. Cal. Mar. 5, 2021) ("mere opinion" of former employee insufficient for falsity); *see also infra* § III.

Try as they might, Plaintiffs cannot convert a complex regulatory question and subsequent FDA decision into a securities fraud claim.[9] *See Lake v. Zogenix, Inc.*, 2020 WL 3820424, at *9 (N.D. Cal. Jan. 24, 2020) (plaintiffs cannot "merely parrot any deficiency identified by the FDA rejection letter" and challenge "the company's decision to omit whatever, *in hindsight*, the FDA said was missing" as securities fraud).[10]

---

the Court should again reject his opinions regarding cGMP. *See* Mot. at 18.

[9] *See, e.g.*, *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 930 (9th Cir. 1996) ("prediction of an FDA approval date" not false even when the company knew "of problems in the testing procedures" because it could have "planned to remedy those deficiencies, and still thought it would achieve FDA approval by the estimated date"); *Aramic LLC v. Revance Therapeutics, Inc.*, 2024 WL 1354503, at *6 (N.D. Cal. Apr. 2, 2024) (no falsity absent allegations that defendants "knew that the projected timeline for BLA approval was not possible").

[10] The cases Plaintiffs cite are readily distinguishable: they involve concealing historical or

FENWICK & WEST LLP
ATTORNEYS AT LAW

*Second*, even if Plaintiffs could establish that there was some bright-line, known requirement to use ***all*** cGMP grade materials in the Phase 2b Study (and they cannot), Plaintiffs fail to put forth facts establishing that Dr. Allen contemporaneously knew of that requirement or that it meant the Company could not comply with the BARDA Contract or launch the study in accordance with the projected timeline. *See infra* § III. Nowhere does the SAC allege (1) how many or which raw materials were not cGMP-grade at the time of the statements, (2) how those materials would impact the anticipated Q1 2024 timeline, or (3) when specifically Dr. Allen knew or should have known. Nor does the allegation that some unnamed and unquantified number of third parties failed to comply with cGMP standards in unspecified ways establish that Gritstone could not comply with the BARDA Contract. *See supra* § II.A.1.

### III.    THE SAC FAILS TO RAISE A STRONG INFERENCE OF SCIENTER

Plaintiffs must identify "in great detail, facts that constitute strong circumstantial evidence of deliberate reckless or conscious misconduct on the part of" Dr. Allen (*Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 747 (9th Cir. 2008)), yet the Opposition confirms that there are no such facts. Instead, Plaintiffs put forth conclusory and speculative theories that are contrary to law and unsupported by their own factual allegations in the SAC. Viewed individually or holistically, Plaintiffs' allegations fall far short of raising a "strong inference" of scienter.

### A.    The Opposition Confirms That the CWs Do Nothing to Establish Scienter.

The Court previously found that Plaintiffs had failed to establish scienter, noting that viewed holistically, the allegations "do not tell a cohesive story of a corporate executive attempting to hide key failings from his investors," and there "was no reason for Allen or anyone at Gritstone to know that the cGMP status of source products used in the CORAL vaccine would be a dealbreaker."

actualized facts that contradict the public statements when made (*e.g.*, contamination, total lack of supply, failure to inspect) not (as here) the holding of a reasonable belief in a future outcome. *See, e.g.*, *In re Emergent BioSolutions Inc. Sec. Litig.*, 2023 WL 5671608 (D. Md. Sept. 1, 2023) (statements regarding the manufacturing capability of defendant's facility were actionable given knowledge of mold, understaffing, and other problems, including as noted in BARDA and FDA inspections); *Rihn v. Acadia Pharms. Inc.*, 2016 WL 5076147 (S.D. Cal. Sept. 19, 2026) (claiming the company was "on track" to submit an NDA but concealing it had not conducted any mock inspections of the manufacturing systems to ensure the NDA was ready for review); *Odeh v. Immunomedics, Inc.*, 2020 WL 4381924, at *3 (D.N.J. July 31, 2020) (concealing the "serious data integrity breach" at the plant, such as the deliberate manipulation of samples and records).

FENWICK & WEST LLP
ATTORNEYS AT LAW

Order at 16-17. That remains true. Moreover, Plaintiffs cannot dispute that none of the CWs (1) had direct contact with Dr. Allen; (2) observed meetings with Dr. Allen; or (3) developed reports that actually went to Dr. Allen. Nor do the CWs identify any of the specifics that could conceivably establish scienter as to any of the challenged statements.

*Allegations of supposed "widespread internal knowledge" and "standard practice" fail to establish Dr. Allen's scienter.* According to Plaintiffs, there was "widespread internal knowledge" at the Company of the supposed requirement to use, and inability to procure, fully GMP-grade materials for the Phase 2b Study. Opp. at 13-15, 18-19. The fundamental problem is that there is no allegation that any such "widespread internal knowledge" was ever communicated to Dr. Allen. *See, e.g.*, *Metzler*, 540 F.3d at 1068 (existence of "massive enrollment fraud" does not establish individual defendants' scienter "absent some additional allegation of specific information conveyed to management and related to the fraud"); *Karam v. Corinthian Colls., Inc.*, 2012 U.S. Dist. LEXIS 44153, at *27 (C.D. Cal. Jan. 30, 2012) (declining to infer that individual defendants knew of "the widespread improper practices," "absent some additional allegation of specific information conveyed to Defendants and related to the specific improper practices"). As such, the allegations do not come close to establishing scienter. *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016).

The CW allegations also do not come close to establishing any "widespread" knowledge. *First*, as before, CW1 merely asserts that there was a task force for the CORAL program and that the Company "had found some sources of cGMP-compliant materials" by "the end of 2023." ¶¶ 111-112. Far from showing scienter, CW1 confirms that "[p]reparations for the study [we]re underway"—just as the Company said in September and October 2023. ¶¶ 145, 148.

*Second*, none of the new allegations about the *CWs'* uncommunicated personal opinions about the use of GMP-grade materials for the Phase 2b Study establishes *Dr. Allen's* scienter. As to CW2—who left the Company before the BARDA Contract was awarded and "was not involved or privy to the manufacturing aspects of the [CORAL Phase 2] trial"—they merely had a personal "expectation that GMP-grade raw materials would need to be used" for the Phase 2b Study. ¶¶ 91, 94. Similarly, CW5 claims to hold the understanding that "BARDA expected the Company to use

only GMP-grade materials to manufacture the vaccine for use in the trial.'" ¶ 95. But CW5 fails to explain how he would know what "BARDA expected" (particularly since there was no such requirement in the BARDA Contract), or when he came to that understanding. There is no allegation that CW 2 and CW5's "expectation" and "understanding" were ever conveyed to Dr. Allen.

*Third*, CW4 contends that it was supposedly "standard practice" to use GMP-grade raw materials for Phase 2 trials, ¶ 92, but "evidence of standard industry practices" is insufficient to establish scienter here. *See Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1110 (9th Cir. 2021). CW4 does not state that any "standard practice" was conveyed to Dr. Allen.

*Fourth*, CW3 and CW6 allude to the "timeline" and effort "to locate raw materials" for the Phase 2b Study at "the end of 2023" or "late 2023," but their accounts are too vague to ascertain (1) whether they were referring to the status before, contemporaneous with, or after the challenged statements were made on September 27, 2023, October 11, 2023, and November 8, 2023; (2) which or how many raw materials the Company was looking for; and (3) which raw materials were available and which were not. ¶¶ 112, 115. Neither CW3 nor CW6 states when any of this information was conveyed to Dr. Allen, if at all. These allegations do not establish scienter.

***Vague insinuations regarding "regular reports" and access to data cannot establish scienter.*** Plaintiff cannot point to any specific allegations to establish that Dr. Allen received *any* report or data that undermined any public statement.

The Opposition leans on CW1—who the Court has already rejected once for failing to supply "the detail necessary to establish [w]hat Allen knew or should have known (Order at 16)— because the SAC now claims that CW1 allegedly "develop[ed] reports that went to" Dr. Allen. Opp. at 20. But all that the SAC alleges regarding CW1's involvement with the "reports" is that "throughout 2023, CW1 and other senior members of the task force met 'periodically' with COO Jones for the express purpose of ***providing a report to COO Jones*** that he said he would then directly convey to CEO Allen." ¶ 188. CW1 does not provide any of the particulars. There is no allegation as to the date or form of the "report," (*e.g.* verbal, written), what it said, or what CW1's role was in preparing it. There is no allegation that any "report" was actually conveyed to Dr.

DEFENDANT ANDREW R. ALLEN'S MOTION TO
DISMISS THE SECOND AMENDED COMPLAINT            11            Case No.: 3:24-cv-03640-CRB

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

Allen. There is no allegation that the "report" established that the FDA would require fully GMP-grade materials or stated that launching the Phase 2b Study in Q1 2024 was unattainable. Nor is there any allegation that the report contradicted any other public statement. Absent such details, the allegations do not come close to establishing scienter. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230-31 (9th Cir. 2004) (vague, unidentified "reports" coupled with speculation that "such reports contained negative information" insufficient to establish scienter); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (confidential witness statements insufficient to establish scienter where they did not "detail the actual contents of the reports the executives purportedly referenced or had access to"); *In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1004 (N.D. Cal. 2016) (dismissing claim where plaintiffs "fail to 'cite any specific report, to mention any dates or contents of reports, or to allege their sources of information about any reports'") (citation omitted).[11]

**Dr. Allen's style as CEO does not establish scienter.** Ignoring controlling authority holding otherwise (*see* Mot. at 22), Plaintiffs argue that Dr. Allen's good relationship with his reports and style as a CEO supports an inference of scienter (Opp. at 21-22). But the Ninth Circuit has repeatedly held that allegations about an executive's management style "do not compel a strong inference that they had knowledge of the alleged omitted information." *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 539 (9th Cir. 2024) (citation omitted); *see also Webb v. SolarCity Corp.*, 884 F.3d 844, 857 (9th Cir. 2018) (allegations that executives had a "hands-on style" not indicative of scienter).[12]

[11] Plaintiffs' cited cases allege sufficient details regarding the content of the reports or data accessed by the defendant and are thus distinguishable. *See*, *e.g.*, *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484–85 (9th Cir. 2019) (defendant "received reports that contained detailed statistics" about the problem); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (CWs described executives' direct access to sales data in specific reports they compiled and that were automatically delivered to the executives' offices on a weekly or monthly basis); *Robb v. Fitbit Inc.*, 2017 WL 219673, at *4-6 (N.D. Cal. Jan. 19, 2017) (CWs "personally generated" negative testing reports that were provided to the CEO, and the challenged product accounted for ~80% of revenue).

[12] Plaintiffs' cited cases do not fit. Opp. at 21-22. In the case *In re WorldCom, Inc. Sec. Litig.*, the plaintiffs pled specific facts about the individual defendant's "direct[] involve[ment] in the decisions central to the accounting fraud," his full familiarity with the company's true financial state, and personal financial motive, such as at least $900 million in loans secured by his holdings in the company. 294 F. Supp. 2d 392, 416-417 (S.D.N.Y. 2003). *Henning v. Orient Paper, Inc.*, is even further afield. There, the undisclosed related party transaction—between the company and the supplier controlled 70% by the CEO—*was* the alleged misstatement. 2011 WL 290932 (C.D. Cal. July 20, 2011). That court did not rely on the close relationship between the CEO and the

### B.    Plaintiffs' Remaining Allegations Still Do Not Establish Scienter.

The Court already once concluded that "Plaintiffs' remaining theories for proving scienter fare no better." Order at 16. Ignoring the Court's ruling, the Opposition relies on substantially the same allegations to establish Dr. Allen's scienter. They fail as before.

***Dr. Allen's position and expertise raise no inference of scienter.***  As the Court previously held, "allegations about Allen's role at the company do not establish scienter, nor do [] allegations about Allen's general experience in the field." Order at 16; *United States v. Goyal*, 629 F.3d 912, 919 (9th Cir. 2010) (If presumed expertise "were enough to establish scienter, then any action by a company [executive] that a juror could conclude in hindsight was false or misleading could subject him to fraud liability without regard to intent to deceive. That cannot be.").

Plaintiffs' rebuttal is to misconstrue two guidance documents from the FDA and contend that Dr. Allen, as "senior management," was "legally responsible for knowing about his Company's and its contractors' compliance." Opp. at 22. But neither of those documents creates any such "legal responsibility." *See* 21 C.F.R. § 10.115(d)(1)-(2) ("[G]uidance documents do not establish legally enforceable rights or responsibilities."). Moreover, the FDA guidance (*see* ¶ 66) describes the ICH Q10 model, which the FDA expressly states is "optional" and "not intended to create any new expectations beyond current regulatory requirements."[13] The other FDA guide (*see* ¶ 67) is a non-binding "reference material" that "provides guidance to ***the FDA field staff*** on a new inspection process."[14] In any event, even if one were "legally responsible," that does not establish scienter.

***After-the-fact risk disclosures do not raise an inference of scienter.***  The Opposition cherry-picks the Company's March 5, 2024 risk factor disclosures—which warned in part that "[i]t

supplier to infer the CEO's scienter as to some other securities fraud. In *Salzman v. ImmunityBio, Inc.*, the defendants were repeatedly informed by FDA inspectors of severe deficiencies in the product's manufacturing process, which they confirmed through their own review and investigation, yet continued to conceal this information from the public. 753 F.Supp.3d 1050, 1067 (S.D. Cal. 2024). No such allegations exist here.

[13] FDA, *Guidance: Q10 Pharmaceutical Quality System* (Apr. 2009), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/q10-pharmaceutical-quality-system.

[14] FDA, *Guide To Inspections Of Quality Systems*, (Aug. 1999) available at https://www.fda.gov/files/Guide-to-Inspections-of-Quality-Systems.pdf.

FENWICK & WEST LLP
ATTORNEYS AT LAW

may take considerable time and expense to resolve the [January 2024] clinical hold that has been placed by the FDA" (Ex. 14 at 48-49)—and tries to spin it as an admission by Dr. Allen that his earlier statements months earlier "lacked a factual basis." *See* Opp. at 23; ¶ 205. This is classic fraud-by-hindsight that raises no inference as to Dr. Allen's scienter at the time of the challenged statements in September, October, and November 2023. *See, e.g.*, *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 890-91 (N.D. Cal. 2020) (rejecting attempt to plead scienter with "temporal-proximity arguments" as "merely speculat[ion] in hindsight"), *aff'd sub nom.*, 29 F.4th 611 (9th Cir. 2022). Plaintiffs' cited authority confirms that post-hoc acknowledgements of delays do not establish prior knowledge of problems absent contemporaneous evidence of scienter. *See*, *e.g.*, *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *11, 13 (N.D. Cal. Jan. 6, 2022) (later admission that "the FDA had concerns about Phase III data" supported scienter only where CW asserted that "the FDA warned [the Company] of that exact danger at the start of the Class Period").

*Plaintiffs still fail to invoke the "core operations" theory.* Plaintiffs already tried and failed once before to invoke the core operations theory. *See* Order at 16. Plaintiffs now argue that "it would be 'absurd' … to think that the CEO was unaware of recurring cGMP failures," but they cannot identify any new allegations to support that claim. *See Intuitive Surgical*, 759 F.3d at 1062 (core operations requires "either specific *admissions* by one or more corporate executives of detailed involvement in the minutia of a company's operations" or "witness accounts demonstrating that executives had *actual involvement in creating false reports*"); *see also In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *18 (N.D. Cal. July 21, 2020). This case is not one of the "exceedingly rare category of cases" to which the core operations theory applies. *S. Ferry L.P., No. 2 v. Killinger,* 542 F.3d 776, 785 n.3 (9th Cir. 2008). The Court should reject this theory again.

*The inference of good faith is far more compelling.* Plaintiffs do not dispute that Dr. Allen is not alleged to have engaged in any insider trading or profited in any way, which undercuts any inference of scienter. *See* Mot. at 21. Unable to refute this fact, Plaintiffs point to Dr. Allen's general "motive" in seeing the Company's continued operation. Opp. at 24-25. But such a "routine corporate objective[]," like maximizing profitability or "generat[ing] badly needed cash," is not sufficiently "specific" or "particularized" to raise a strong inference of scienter. *Webb*, 884 F.3d at

FENWICK & WEST LLP
ATTORNEYS AT LAW

854; *see also In re Dermtech, Inc. Sec. Litig.*, 2024 WL 4941026, at *12 (S.D. Cal. Dec. 2, 2024) (motive to "avoid bankruptcy" was "insufficient"); *In re Rigel Pharms., Inc.*, 2010 WL 8816155, at *13 (N.D. Cal. Aug. 24, 2010) (similar), *aff'd*, 697 F.3d 869 (9th Cir. 2012).

As before, Plaintiffs' scienter allegations are deficient. Order at 17; *see also Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415, 419 (9th Cir. 2020) (rejecting scienter allegations absent allegations that defendants "profit[ed] from this scheme" and where the "the more plausible inference" is that "defendants based their statements about FDA approval on the status and progress" of the trial).

## IV.   PLAINTIFFS DO NOT PLEAD LOSS CAUSATION

Plaintiffs argue that the February 29, 2024, March 5, 2024, and April 1, 2024 statements were "causally related to Defendants' omissions about the pervasive cGMP issues." Opp. at 25. But the allegations show that the "truth" was fully revealed on February 12, 2024, when the Company announced that the FDA would require "fully GMP-grade materials" and that the study was delayed to "the Fall of 2024." Exs. 12-13. None of the later statements corrected a prior misstatement or revealed new information indicative of "fraud." *C.f. Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200 (9th Cir. 2016). Instead, the Company announced a 40% reduction in force on February 29, 2024; reported its FY2023 results on Form 10-K on March 5, 2024; and announced an underwritten public offering of shares on April 1, 2024. Exs. 13-14, 16. That stock prices moved in response to changed circumstances or disappointing news after the February and April 2024 statements does not "reveal" fraud. *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014).

## V.   CONCLUSION

Having had three tries and a roadmap from the Court, Plaintiffs' claims against Dr. Allen remain irredeemably flawed. At this point, the Court should dismiss the SAC with prejudice. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 (9th Cir. 2002).

Dated:   January 9, 2026                    FENWICK & WEST LLP

                                            By: */s/ Catherine D. Kevane*
                                            Catherine D. Kevane (CSB No. 215501)

                                            Attorneys for *Defendant Andrew R. Allen*

FENWICK & WEST LLP
ATTORNEYS AT LAW